**No. 22-55342**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

APEX CAPITAL GROUP, LLC, a Wyoming limited liability
company, *et al.*,

*Defendant-Appellee.*

v.

WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,
proposed Intervenors,

*Movants-Appellants,*

---

THOMAS W. MCNAMARA,

*Receiver -Appellee.*

---

On Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-09573-JFW-JPR
The Honorable John F. Walter

---

## RECEIVER'S SUPPLEMENTAL EXCERPTS OF RECORD
Volume 1 of 1

---

(*Counsel listed on following page*)

October 11, 2022

---

Logan D. Smith
Cornelia J. B. Gordon
McNamara Smith, LLP
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: 619-269-0400
lsmith@mcnamarallp.com
cgordon@mcnamarallp.com

*Attorneys for Thomas W. McNamara, as the Court-Appointed Receiver for Apex Capital Group, LLC -Appellee*

## INDEX

| Docket Number | Document | Page |
|---|---|---|
| 228-1 | Declaration of Kristy Tillman Pursuant to 28 U.S.C. §1746 | R_SER_5 |
| 226-8 | Email from FTC to Wells Fargo's counsel transmitting Minute Order and unsealed Temporary Restraining Order | R_SER_8 |
| 226-7 | Email from Wells Fargo's Counsel re: Wells Fargo's Motion to Intervene in the Apex Case | R_SER_10 |
| 226-6 | Email from Wells Fargo's counsel stating Wells Fargo would not file a motion to intervene in the Apex Case | R_SER_13 |
| 226-5 | Email from Wells Fargo's counsel re: Wells Fargo's intention to file motion to intervene in the Apex Case | R_SER_15 |
| 226-4 | Email from Wells Fargo's Counsel Confirming Its Receipt of April 1, 2020, Correspondence from Jonathan Rotter | R_SER_18 |
| 226-3 | Correspondence from Jonathan Rotter to Wells Fargo Re: Proposal for Pre-Filing Mediation | R_SER_20 |
| 226-2 | Exhibit Index | R_SER_24 |
| 226-1 | Declaration of Logan D. Smith in Support of Receiver's Opposition to Proposed Intervenors Wells Fargo & Company and Wells Fargo Bank N.A.'S Motion to Intervene | R_SER_25 |
| 225-2 | Declaration of Logan D. Smith Pursuant To 28 U.S.C. §1746 | R_SER_30 |
| 225-1 | Declaration of Brian N. Lasky Pursuant to 28 U.S.C. §1746 | R_SER_38 |

| 219-3 | Receiver's Complaint in *McNamara v. Wells Fargo & Co.*, S.D. Cal. Case No. 21-cv-1245 | R_SER_42 |
| 219-2 | Wells Fargo's Request For Judicial Notice In Support Of Motion To Intervene | R_SER_131 |
| 186-1 | Memorandum of Points and Authorities in Support of Receiver's Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report | R_SER_135 |
| 144-1 | Memorandum of Points and Authorities In Support of Receiver's Motion For Authorization To Engage Contingent Fee Counsel | R_SER_143 |

JONATHAN W. WARE (lead counsel), *pro hac vice*
Tel: (202) 326-2726; jware1@ftc.gov
Fax: (202) 326-3197
DC Bar No. 989414; VA Bar No. 77443
Federal Trade Commission
600 Pennsylvania Avenue NW CC-9528
Washington, DC 20580

DELILAH VINZON (local counsel)
Tel: (310) 824-4300; dvinzon@ftc.gov
Fax: (310) 824-4380
Cal. Bar No. 222681
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**APEX CAPITAL GROUP, LLC,** et al.<br><br>Defendants. | Case No. 2:18-cv-9573-JFW(JPR)<br><br>**DECLARATION OF KRISTY TILLMAN PURSUANT TO 28 U.S.C. §1746**<br><br>Date: March 7, 2022<br>Time: 1:30 PM<br>Courtroom: 7A<br>Judge: Hon. John F. Walter |

DECLARATION OF KRISTY TILLMAN
PURSUANT TO 28 U.S.C. § 1746

I, Kristy Tillman, declare as follows:

1. I have personal knowledge of the facts stated herein and, if called to testify, I could and would competently testify to the same. I am a United States citizen over the age of 18. I am employed by the Federal Trade Commission ("FTC" or "the Commission") as an attorney.

2. During August 2021, I was one of the Commission's attorneys in the above-captioned matter (the "*Apex* Matter"). During that month, Wells Fargo & Company and Wells Fargo Bank N.A. ("Wells Fargo") sought to meet and confer with the FTC regarding its intention to file a motion to intervene in the *Apex* Matter on the basis of the Supreme Court's April 2021 decision in *FTC v. AMG Capital Management, LLC*. I attended a telephonic meet-and-confer discussion on August 23, 2021, with Wells Fargo's counsel. Jonathan Cohen, another FTC attorney who also represented the Commission in the *Apex* Matter at that time, also attended.

3. At the August 23, 2021, meet-and-confer conversation, the FTC advised Wells Fargo's counsel that the FTC would oppose its proposed motion to intervene. Among other things, we advised Wells Fargo's counsel that its proposed motion to intervene was already untimely as of that date. In support of this position, we noted to Wells Fargo's counsel that certain defendants in the *Apex* Matter had already filed and fully briefed a motion challenging the final judgments on the basis of *AMG* in the four months that had elapsed since the *AMG* decision.

//

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed on February 7, 2022.

4

5

6    _____

7    Kristy M. Tillman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6

**R_SER_8**

| | |
|---|---|
| **From:** | Ware, Jonathan  <jware1@ftc.gov> |
| **Sent:** | Wednesday, November 10, 2021 12:02 PM |
| **To:** | Lally, Kevin M. |
| **Cc:** | Logan Smith |
| **Subject:** | FTC v. Apex -- unsealing |
| **Attachments:** | 15. Minute Order Granting Pl.'s Ex Parte TRO.pdf; 16. TRO.pdf |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____
Kevin,

Thank you for providing me yesterday with the docket entry numbers to which Wells Fargo seeks to unseal (nos. 15, 146, 168) in *FTC v. Apex Capital, Inc.,* et al., no. 2:18-cv-9573 (C.D. Cal.).  I think you meant #16, which is the sealed TRO, not #15, which is a minute order.  The FTC served the TRO (#16) on Wells Fargo on November 19, 2018 (to Fatima Ledezma, Service Manager, Warner Ranch Branch).  It appears to be an administrative oversight that the TRO remains sealed.  As a courtesy, I am providing you a copy of the TRO previously served on Wells Fargo, as well as the minute order.

In the interest of judicial economy and access to public records, the Receiver's counsel has agreed to prepare a stipulation to which the FTC consents to unseal #16, 146, and 148 in the Apex case.

Kind regards,
Jonathan

**Jonathan W. Ware**
**Federal Trade Commission**
Bureau of Consumer Protection | Enforcement Division
600 Pennsylvania Avenue, NW, CC-9528
Washington, DC 20580
T +1 202 326 2726
F +1 202 326 3197
jware1@ftc.gov
www.ftc.gov

EXHIBIT 6
Page 15

# EXHIBIT 5

**R_SER_10**

| | |
|---|---|
| **From:** | Lally, Kevin M. <KLally@mcguirewoods.com> |
| **Sent:** | Tuesday, October 26, 2021 1:42 PM |
| **To:** | Logan Smith |
| **Subject:** | RE: Wells Fargo Intervention Motion (Apex) |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____

Logan,

Do you have time for a follow-up meet and confer tomorrow.  We intend to proceed with a motion to intervene and would like to address briefing schedules and whether you would consent to the unsealing of any of the following sealed materials:  Court's modified TRO order (Dkt. 15), declarations in support of extending out the Receivership (Dkt.  146, 168).  I am booked at 2-3 pm, but otherwise am available.

Regards,

Kevin

**Kevin M. Lally**
McGuireWoods LLP
T: +1 213 457 9862

---

**From:** Logan Smith <lsmith@mcnamarallp.com>
**Sent:** Monday, August 30, 2021 5:40 PM
**To:** Lally, Kevin M. <KLally@mcguirewoods.com>
**Cc:** Baiardo, Alicia A. <ABaiardo@mcguirewoods.com>; Le, Anthony Q. <ALe@mcguirewoods.com>
**Subject:** Re: Wells Fargo Intervention Motion

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Many thanks for letting me know, Kevin.

Regards,
Logan

> On Aug 30, 2021, at 3:56 PM, Lally, Kevin M. <KLally@mcguirewoods.com> wrote:
>
>  CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____
>
> Logan,

1

EXHIBIT 5
Page 13

**R_SER_11**

Please be advised that we will not be filing today the intervention motion that we discussed last week.  In advance of a future filing, we will get your updated position, provide you with a draft of the joint statement to the Court for your review, and propose potential hearing dates for the motion.

Please do not hesitate to call me should you have any questions.

Regards,

Kevin Lally


**Kevin M. Lally**
Partner
McGuireWoods LLP
Wells Fargo Center
South Tower
355 S. Grand Ave., Suite 4200
Los Angeles, CA 90071-3103
T:   +1 213 457 9862
F:   +1 213 457 9882
klally@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

McGUIREWOODS

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

EXHIBIT 5
Page 14

**R_SER_12**

EXHIBIT 4

R_SER_13

| | |
|---|---|
| **From:** | Lally, Kevin M. <KLally@mcguirewoods.com> |
| **Sent:** | Monday, August 30, 2021 3:57 PM |
| **To:** | Logan Smith |
| **Cc:** | Baiardo, Alicia A.; Le, Anthony Q. |
| **Subject:** | Wells Fargo Intervention Motion |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____
Logan,

Please be advised that we will not be filing today the intervention motion that we discussed last week.  In advance of a future filing, we will get your updated position, provide you with a draft of the joint statement to the Court for your review, and propose potential hearing dates for the motion.

Please do not hesitate to call me should you have any questions.

Regards,

Kevin Lally


**Kevin M. Lally**
Partner
McGuireWoods LLP
Wells Fargo Center
South Tower
355 S. Grand Ave., Suite 4200
Los Angeles, CA 90071-3103
T:  +1 213 457 9862
F:  +1 213 457 9882
klally@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

McGuireWoods

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

EXHIBIT 4
Page 12

**R_SER_14**

EXHIBIT 3

R_SER_15

**From:**     Le, Anthony Q. <ALe@mcguirewoods.com>
**Sent:**     Thursday, August 19, 2021 3:17 PM
**To:**       Logan Smith
**Cc:**       White, Molly M.; Baiardo, Alicia A.
**Subject:**  FTC v. Apex Capital, No. 2:18-cv-9573-JFW (C.D. Cal.) - Wells Fargo Motion to Intervene


CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____
Counsel,

As you are aware, McGuireWoods LLP represents Wells Fargo Bank in connection with a recent lawsuit involving your office by Thomas McNamara, as the court-appointed receiver for Triangle Media Corporation and Apex Capital Group.  This lawsuit is entitled *Thomas McNamara v. Wells Fargo & Company et al.*, No. 3:21-cv-01245-LAB-LL, and is now pending in the Southern District of California.

We are writing to follow-up on our call this afternoon to meet and confer under C.D. Cal. Local Rule 7-3.  As we mentioned, Wells Fargo plans to file a motion to intervene in the FTC action involving your office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief.  *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).

Please call us at your convenience, or let us know when you are available to discuss.  Our contact information is below.  Thanks in advance.

Molly White
mwhite@mcguirewoods.com
(310) 956-3423

Ali Baiardo
abaiardo@mcguirewoods.com
(415) 844-1973

Anthony Le
ale@mcguirewoods.com
(415) 844-1975


**Anthony Q. Le**
Associate
McGuireWoods LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111-3821
T:  +1 415 844 1975
M: +1 949 244 8270
F:  +1 415 844 1918
ale@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

1

EXHIBIT 3
Page 10

# R_SER_16

# McGUIREWOODS

---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

EXHIBIT 3
Page 11

**R_SER_17**

EXHIBIT 2

R_SER_18

From: Baiardo, Alicia A. [mailto:ABaiardo@mcguirewoods.com]
Sent: Monday, April 13, 2020 12:43 PM
To: Jonathan Rotter <JRotter@glancylaw.com>
Cc: Powell, David C. <DPowell@mcguirewoods.com>
Subject: McCraner and McNamara Matters

Good Afternoon Mr. Rotter,

My partner Dave Powell and I tried to reach you earlier today by telephone to introduce ourselves.  We will be representing Wells Fargo with regards to the proposed McCraner and McNamara matters.  Do you have time later this afternoon or tomorrow for a short call? We are in receipt of your invitation to mediate and proposed tolling agreement.

Best regards,
Ali Baiardo

Alicia Anne Baiardo
McGuire Woods LLP
T: 415.844.1973
_____
This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.

EXHIBIT 2
Page 9

**R_SER_19**

# EXHIBIT 1

**R_SER_20**

| | |
|---|---|
| **From:** | Jonathan Rotter <JRotter@glancylaw.com> |
| **Sent:** | Wednesday, April 1, 2020 5:01 PM |
| **To:** | douglas.edwards@wellsfargo.com; david.j.rice@wellsfargo.com |
| **Cc:** | Thomas McNamara; Logan Smith; Edward Chang; Lionel Glancy; Mary Jane Fait |
| **Subject:** | Proposal for Pre-Filing Mediation and Tolling Agreement – McCraner et al. v. Wells Fargo; Receiver v. Wells Fargo (email 1 of 2) |
| **Attachments:** | Letter [FINAL].PDF; Tolling Agreement [FINAL].PDF; 2020.04.01 Draft Complaint – Receiver v. Wells Fargo – For Settlement Purposes Only [FINAL].PDF; 2020.04.01 Draft Complaint – McCraner v. Wells Fargo – For Settlement Purposes Only [FINAL].PDF |

Dear Mr. Edwards and Mr. Rice,

Please see the attached correspondence proposing presuit mediation of the claims addressed in the attached draft complaints. I will send the exhibits via separate email following this one to make sure that this email does not bounce for size reasons.

Sincerely,

Jonathan Rotter

_____

Jonathan Rotter
Partner
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Voice: 310-201-9150
Fax: 310-201-9160
jrotter@glancylaw.com
www.glancylaw.com

_____

This e-mail message is confidential, is intended only for the named recipient(s) above, and may contain information that is privileged, attorney work product, or otherwise be exempt from disclosure under applicable law. If you received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message from your computer. Thank you.

EXHIBIT 1
Page 6

**R_SER_21**



Jonathan Rotter
jrotter@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
T: 310.201.9150

April 1, 2020

*Via Email*:

Douglas R. Edwards, Chief Legal Officer
douglas.edwards@wellsfargo.com

David J. Rice, Assistant General Counsel
david.j.rice@wellsfargo.com

*Via FedEx:*

Law Department
Wells Fargo & Co., Wells Fargo Bank, N.A.
Law Department, 45 Fremont St, 26th Fl
San Francisco, CA 94105

Re:  **Proposal for Presuit Mediation and Tolling Agreements**
*McCraner et al. v. Wells Fargo & Company and Wells Fargo Bank, N.A.*;
*Thomas W. McNamara, as Receiver v. Wells Fargo & Company and Wells Fargo
Bank, N.A.*

Dear Mr. Edwards and Mr. Rice:

Beginning over a decade ago, Wells Fargo conspired with several fraudulent enterprises to defraud consumers.  The Federal Trade Commission recently shut down those enterprises via litigation.  Wells Fargo continued to aid and abet the fraudulent enterprises until the very moment they were shut down.

We represent consumers harmed by those schemes and the Court-appointed receiver for two of the fraudulent enterprises shut down by the Federal Trade Commission.  We are prepared to bring suit against Wells Fargo for aiding and abetting the fraud and related claims.  Draft complaints are enclosed.

Despite the fact that we are prepared to litigate, we write in advance to see whether Wells Fargo is interested in attempting to resolve the disputes without litigation.  We understand that Wells Fargo has regularly utilized the Hon. Daniel Weinstein and the Hon. Layn Phillips as

April 1, 2020
Page 2


mediators in matters of significance.  If Wells Fargo will agree to engage in presuit mediation before Judge Weinstein or Judge Phillips, then please execute the enclosed tolling agreement and return to me via email no later than April 15, 2020, and please let me know with whom we should communicate to schedule the mediation.


Very truly yours,

*/s/ Jonathan M. Rotter*



Attachments:
Tolling Agreement, Draft Complaints

Cc:
Thomas W. McNamara
Logan Smith
Edward Chang
Lionel Glancy
Mary Jane Fait

**EXHIBIT INDEX**

No.                                                                                              Page

1        Correspondence from Jonathan Rotter to Wells Fargo re:
         proposal for pre-filing mediation (April 1, 2020)..................................6

2        Email from Wells Fargo's counsel confirming its receipt of
         April 1, 2020 correspondence from Jonathan Rotter
         (April 13, 2020)...................................................................................9

3        Email from Wells Fargo's counsel re: Wells Fargo's intention to
         file motion to intervene in the Apex Case (Aug. 19, 2021).................10

4        Email from Wells Fargo's counsel stating Wells Fargo would not
         file a motion to intervene in the Apex Case (Aug. 30, 2021)..............12

5        Email from Wells Fargo's counsel re: Wells Fargo's motion to
         intervene in the Apex Case (Oct. 16, 2021).........................................13

6        Email from FTC to Wells Fargo's counsel transmitting Minute
         Order [15] and unsealed Temporary Restraining Order [16]
         (Nov. 10, 2021) ...................................................................................15

7        Email from Wells Fargo's counsel to FTC (Dec. 15, 2021)................16

1  Logan D. Smith (SBN 212041)
   lsmith@mcnamarallp.com
2  McNamara Smith LLP
   655 West Broadway, Suite 900
3  San Diego, California 92101
   Telephone: 619-269-0400
4  Facsimile:  619-269-0401

5  *Attorneys for Receiver,*
   *Thomas W. McNamara*

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,          Case No. 2:18-cv-09573-JFW (JPRx)

12              Plaintiff,             **DECLARATION OF LOGAN D.
                                       SMITH IN SUPPORT OF**
13      v.                             **RECEIVER'S OPPOSITION TO
                                       PROPOSED INTERVENORS**
14  APEX CAPITAL GROUP, LLC, et al.,   **WELLS FARGO & COMPANY
                                       AND WELLS FARGO BANK**
15              Defendants.            **N.A.'S MOTION TO INTERVENE**

16                                     JUDGE:  Hon. John F. Walter
                                       CTRM:   7A
17                                     DATE:   February 21, 2022
                                       TIME:   1:30 p.m.
18

19

20

21      I, Logan D. Smith, hereby declare as follows:

22      1.      I am counsel of record for Thomas W. McNamara in his capacity as

23  Court-appointed Receiver of the Receivership Entities in this action, and I am also

24  counsel of record for Thomas W. McNamara in his capacity as Court-appointed

25  Receiver in *Federal Trade Commission v. Triangle Media Corporation, et al.*

26  ("Triangle Case"), No. 3:18-cv-01388-LAB-LL (S.D. Cal.).  I have personal

27  knowledge of the facts set forth in this Declaration and if called as a witness I

28  could and would competently testify to the facts stated herein.

1       2.     I make this declaration in connection with the concurrently filed

2 Opposition to Proposed Intervenors Wells Fargo & Company and Wells Fargo

3 Bank N.A.'s Motion to Intervene ("Opposition").

4       3.     From April 2020 to June 2021, counsel for the Receiver (including

5 myself) engaged in ongoing negotiations with counsel for Wells Fargo regarding

6 the Receiver's claims against Wells Fargo.  The parties participated in two

7 mediations: the first on November 5, 2020, and the second on April 29, 2021.  The

8 parties entered into a series of agreements during this time which tolled the

9 Receiver's claims from April 15, 2020 through July 7, 2021.  After we reached an

10 impasse, the Receiver filed suit on July 8, 2021, the day after the final tolling

11 agreement expired.

12       4.     After the filing of the Receiver's complaint against Wells Fargo on

13 July 8, 2021, Wells Fargo's counsel had a meet and confer with the Receiver's

14 counsel (including me) on August 23, 2021, which it stated was in advance of

15 filing a motion to intervene.  I understand from speaking with the FTC's counsel

16 that Wells Fargo separately held a meet and confer with the FTC's counsel that

17 same day.

18       5.     At the August 23, 2021 meet and confer, Wells Fargo's counsel stated

19 that it intended to intervene in this action with the express purpose of overturning

20 more than $100,000,000 in final, stipulated judgments against Defendants. Wells

21 Fargo did not express any concern for the harm that the victimized consumers

22 would incur if the judgments were overturned.  I objected to Wells Fargo's

23 proposed motion to intervene on a number of grounds, including the finality of the

24 judgments and the fundamental differences between this case and *AMG Capital*

25 *Management, LLC v. Federal Trade Commission* ("*AMG Capital*"), 141 S. Ct.

26 1341 (2021).

27 ///

28 ///

1      6.     Also at the August 23, 2021 meet and confer, Wells Fargo's counsel

2 mentioned that it was seeking to unseal certain documents. I informed them that I

3 would consider the request.

4      7.     On August 30, 2021, counsel for Wells Fargo emailed me, stating that

5 Wells Fargo would not be filing its motion to intervene and that they would reach

6 back out in advance of any future filing.

7      8.     I did not hear from counsel for Wells Fargo on the issue of

8 intervening between August 30, 2021 and October 26, 2021.

9      9.     On October 26, 2021, counsel for Wells Fargo emailed me, indicating

10 that Wells Fargo intended to move to intervene in the Apex Case and asking to

11 schedule a meet and confer. In the same email, Wells Fargo asked whether the

12 Receiver and the FTC would consent to the unsealing of any of the Court's

13 modified TRO order and two declarations offered in support of extending the

14 Receivership deadline (ECF Nos. 146, 168). In subsequent discussions, Wells

15 Fargo's counsel informed me that Wells Fargo also intended to move to intervene

16 in *Federal Trade Commission v. Triangle Media Corp., et al.*, No. 18-CV-1388

17 (S.D. Cal.). *Triangle* is in the Southern District of California, where there is no

18 obligation to meet and confer before filing.

19      10.    During follow-up discussions, I informed counsel for Wells Fargo that

20 in my view nothing in the declarations was material to Wells Fargo's proposed

21 motion to intervene; however, I ultimately agreed to accommodate this request,

22 and the Receiver and the FTC voluntarily prepared and then jointly filed a joint

23 request to unseal the requested documents. *See* ECF No. 212.

24      11.    Attached hereto as Exhibit 1 is a true and correct copy of an email and

25 attached letter, both dated April 1, 2020, from counsel for the Receiver, Jonathan

26 Rotter, to Wells Fargo regarding a proposal for pre-filing mediation. The April 1,

27 2020 email included, as an attachment, copies of draft complaints and a proposed

28 Tolling Agreement (which are not included in this Exhibit).

12. Attached hereto as Exhibit 2 is a true and correct copy of an email dated April 13, 2020 from Wells Fargo's counsel confirming its receipt of the April 1, 2020 email and correspondence from Mr. Rotter (attached as Exhibit 1).

13. Attached hereto as Exhibit 3 is a true and correct copy of an email dated August 19, 2021 from Wells Fargo's counsel to me, informing me that "Wells Fargo plans to file a motion to intervene in the FTC action involving your office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)."

14. Attached hereto as Exhibit 4 is a true and correct copy of an email dated August 30, 2021 from Wells Fargo's counsel to me regarding Wells Fargo's intervention motion in the Apex Case, informing me that "[Wells Fargo] will not be filing the intervention motion that we discussed last week."

15. Attached hereto as Exhibit 5 is a true and correct copy of an email dated October 26, 2021 from Wells Fargo's counsel to me regarding Wells Fargo's intervention motion in this case.

16. Attached hereto as Exhibit 6 is a true and correct copy of a November 10, 2021 email from Jonathan Ware of the FTC to Kevin Lally, counsel to Wells Fargo, on which I was copied. The email provided Mr. Lally with a copy of the Temporary Restraining Order (ECF No. 16) entered in this case, along with the accompanying minute order entering it (ECF No. 15) (neither of which is included in this Exhibit).

17. Attached hereto as Exhibit 7 is a true and correct copy of an email dated December 15, 2021, from Kevin Lally, counsel for Wells Fargo, to Jonathan Ware, counsel for the FTC, on which I was copied.

///

1        I declare under penalty of perjury under the laws of the United States that

2    the foregoing is true and correct.

3        Executed this 7th day of February, 2022, in San Diego, California.

4                                  /s/ Logan D. Smith

5                                 Logan D. Smith

**Declaration of Logan Smith**
**FTC Exhibit B**

1   JONATHAN W. WARE (lead counsel), *pro hac vice*

2   Tel: (202) 326-2726; jware1@ftc.gov
    Fax: (202) 326-3197

3   DC Bar No. 989414; VA Bar No. 77443

4   Federal Trade Commission
    600 Pennsylvania Avenue NW CC-9528

5   Washington, DC 20580

6
    DELILAH VINZON (local counsel)

7   Tel: (310) 824-4300; dvinzon@ftc.gov

8   Fax: (310) 824-4380
    Cal. Bar No. 222681

9   Federal Trade Commission

10  10990 Wilshire Boulevard, Suite 400
    Los Angeles, CA 90024

11

12  Attorneys for Plaintiff

13  FEDERAL TRADE COMMISSION

14

15              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**

16

17
    **FEDERAL TRADE COMMISSION,**          Case No. 2:18-cv-9573-JFW(JPR)

18

19                          Plaintiff,     **DECLARATION OF LOGAN D.**
                                           **SMITH PURSUANT TO**

20  v.                                     **28 U.S.C. § 1746**

21  **APEX CAPITAL GROUP, LLC,** et al.,
                                           Date:  March 7, 2022

22                          Defendants.    Time:  1:30 PM

23                                         Courtroom:  7A
                                           Judge: Hon. John F. Walter

24

25

26

27

28                                         Case No. 2:18-cv-9573-JFW(JPR)
                                           Smith Decl. ISO FTC's Opposition to Wells
                                           Fargo's Motion to Intervene

# DECLARATION OF LOGAN D. SMITH
## PURSUANT TO 28 U.S.C. § 1746

I have personal knowledge of the facts set forth below and am competent to testify about them.  I am a United States citizen over the age of 18.  If called as a witness, I could and would testify as follows:

(1)    I am licensed to practice law in California.

(2)    I am an attorney with McNamara Smith LLP and represent Thomas W. McNamara, the court-appointed receiver (the "Receiver") in *Federal Trade Commission v. Triangle Media, et al.*, No. 3:18-cv-01388-LAB-LL (S.D. Cal.) (the "Triangle Case") and in *Federal Trade Commission v. Apex Capital Group LLC, et al.*, No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.) (the "Apex Case").  I have been involved with the Receiver's investigation in those cases and in his litigation related to Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo") in *McNamara v. Wells Fargo & Company and Wells Fargo Bank, N.A.*, No. 3:21-cv-01245-LAB-LL (S.D. Cal.) (the "Receiver's Suit").

**The Receiver's Appointments**

(3)    The Court in the Triangle Case appointed the Receiver as temporary receiver on June 29, 2018 (Triangle Case ECF No. 11), and as permanent receiver on August 24, 2018 (Triangle Case ECF No. 75).

(4)    The Court in the Apex Case appointed the Receiver as temporary receiver on November 16, 2018 (Apex Case ECF No. 16), and as receiver on December 18, 2018 (Apex Case ECF Nos. 40, 41).

**The Receiver's Investigations**

(5)    Upon his appointment, the Receiver began to marshal the assets of the estates in each case, as required by each appointing court.  To that end, on September 18, 2018, Wells Fargo issued a cashier's check to the Receiver for $1,181,479.83, which represented the sum across 40 bank accounts identified by Wells Fargo and the Receiver as belonging to the Triangle Case defendants or

1

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene

**R_SER_32**

otherwise subject to the Receiver's control.  Similarly, on January 24, 2019, Wells Fargo transferred to the Receiver $57,464.96, which represented the sum across 17 bank accounts identified by Wells Fargo and the Receiver as belonging to the Apex Case defendants or otherwise subject to the Receiver's control.

(6)     On May 2, 2019, the Receiver served Wells Fargo Bank, N.A. a Rule 45 subpoena seeking information about accounts in the Apex Case.

(7)     The Receiver's investigation in the Triangle Case and the Apex Case identified more than 150 accounts that Wells Fargo opened for the defendants in those cases through approximately 100 shell companies.

**The Receiver's Pursuit of Claims Against Wells Fargo**

(8)     On October 22, 2019, the Receiver publicly sought court approval in the Triangle Case to hire contingency counsel to pursue claims against Wells Fargo (Triangle Case ECF No. 136), which the court granted on November 19, 2019 (Triangle Case ECF No. 142), the same day it closed the case.

(9)     On February 4, 2020, the Receiver publicly sought court approval in the Apex Case to hire contingency counsel to pursue claims against Wells Fargo (Apex Case ECF Nos. 144, 148), and the court granted that request on March 9, 2020 (Apex Case ECF No. 153).  The docket in the Apex Case indicates it was closed on January 15, 2020, the date the Court entered the last of the stipulated permanent injunctions.

**Wells Fargo's Affirmative Actions Concerning the Receiver's Suit**

(10)    On April 1, 2020, the Receiver sent Wells Fargo draft complaints against it relating to Wells Fargo's actions underlying the Triangle Case and the Apex Case, along with a draft tolling agreement and proposed mediation of the claims.

(11)    On April 13, 2020, counsel for Wells Fargo (McGuire Woods LLP) responded to the Receiver's April 1, 2020 communications and spoke to the Receiver's counsel by phone the next day.

2

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene

R_SER_33

FTC Exhibit B - Smith Declaration

(12)   On April 15, 2020, Wells Fargo executed the tolling agreement, sent it to the Receiver, and stated it would be in touch within 30 days about mediation.

(13)   On April 29, 2020, Wells Fargo requested that the Receiver provide the documents the bank had produced to the Receiver via the subpoena described above.  The Receiver provided those to Wells Fargo a week later.

(14)   On May 7, 2020, Wells Fargo requested an extension until June 12, 2020 to consider mediation.

(15)   On May 18, 2020, Wells Fargo requested the Receiver provide certain deposition transcripts and documents.  The Receiver provided certain documents to the bank on May 21, 2020.

(16)   On May 27, 2020, Wells Fargo requested a summary of allegations concerning a third FTC case, *FTC v. Tarr, Inc.,* No. 3:17-cv-02024-KSC (S.D. Cal.), which involved similar conduct and timing as the Triangle Case and Apex Case and in which the Receiver's law firm (Glancy Prongay & Murray LLP) represented a consumer victim.  Counsel provided the requested summary on June 9, 2020.

(17)   On June 12, 2020, Wells Fargo agreed to mediate the Receiver's proposed suits before Judge Weinstein.

(18)   On June 16, 2020, Wells Fargo asked the Receiver about documents related to the Triangle Case, which the Receiver provided on June 19, 2020.

(19)   On June 26, 2020, Wells Fargo sent the Receiver an amended and executed tolling agreement.

(20)   On July 28, 2020, Wells Fargo and the Receiver agreed on October 14, 2020 as the mediation date concerning the Receiver's proposed suits.

(21)   On September 10, 2020, Wells Fargo requested to move the mediation to the first week of November 2020.

FTC Exhibit B - Smith Declaration

(22)    On November 5, 2020, Wells Fargo and the Receiver mediated their claims before Judge Weinstein and Ambassador David Carden, but were unable to reach a resolution.

(23)    Following the mediation, between November 2020 and June 2021, Wells Fargo and the Receiver continued to have discussions and exchange information with each other with the involvement of Judge Weinstein and Ambassador Carden.

(24)    On March 3, 2021, Wells Fargo and the Receiver extended their tolling agreement through May 28, 2021.

(25)    On April 29, 2021, Wells Fargo and the Receiver participated in a second round of mediation before Judge Weinstein and Ambassador Carden.

(26)    On May 25, 2021, Wells Fargo and the Receiver extended their tolling agreement through June 23, 2021, while the parties continued to have follow-up discussions through the mediators.

(27)    On June 23, 2021, Wells Fargo and the Receiver extended their tolling agreement through July 7, 2021.

(28)    On July 8, 2021, the Receiver filed his complaint in the Receiver Suit.

(29)    On July 28, 2021, Wells Fargo and the Receiver jointly moved the court in the Receiver's suit for an extension of time to respond to the Receiver's complaint (Receiver's Suit ECF No. 9), which the court granted on June 30, 2021 (Receiver's Suit ECF No. 12).

(30)    On August 19, 2021, counsel for Wells Fargo called and emailed the Receiver's counsel, stating Wells Fargo wanted to meet and confer with the Receiver regarding Wells Fargo's "plans to file a motion to intervene in the FTC action involving [the Receiver's] office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to

4

obtain equitable monetary relief.  *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)."

(31)    On August 23, 2021, counsel for Wells Fargo and the Receiver held a meet and confer, where Wells Fargo indicated its intent to file a motion to intervene in the Apex Case on August 30, 2021.

(32)    On August 25, 2021, Wells Fargo filed a motion to dismiss the Receiver's suit, along with a memorandum in support and other related documents (ECF No. 14).  The Receiver filed his opposition on October 8, 2021 (ECF Nos. 15, 16), and Wells Fargo filed its reply on October 25, 2021 (ECF Nos. 17, 18).

(33)    On August 30, 2021, counsel for Wells Fargo emailed counsel for the Receiver, stating that Wells Fargo would not be filing its motion to intervene and would reach back out in advance of any future filing.

(34)    On October 26, 2021, counsel for Wells Fargo emailed the Receiver's counsel, indicating Wells Fargo intended to move to intervene in the Apex Case and wanted to schedule a meet and confer.  In subsequent discussions, Wells Fargo's counsel informed the Receiver's counsel that Wells Fargo intended to move to intervene in the Triangle Case in the Southern District of California where there is no obligation to meet and confer before filing.

(35)    Wells Fargo filed its motion to intervene in the Triangle Case on November 10, 2021.  The FTC and Receiver both filed oppositions to that motion on December 20, 2021.  Wells Fargo filed its reply in support of its motion on January 10, 2022.  Wells Fargo's motion to intervene in the Triangle Case is pending.

(36)    Wells Fargo first filed its motion to intervene on January 10, 2022, and then re-filed the pending motion to intervene on January 18, 2022, after its initial motion was stricken for failure to comply with Section 5(b) of the Court's Standing Order.

5

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene

R_SER_36

FTC Exhibit B - Smith Declaration

(37)   Throughout the time that the Receiver has been either in prelitigation discussions with Wells Fargo or active litigation against Wells Fargo, the Receiver has filed multiple motions with this Court seeking to obtain extensions of the completion deadline for the Receivership in the Apex case.  Wells Fargo has not sought to intervene to oppose any of these motions.

(38)   Before initially reaching out to Wells Fargo, on February 4, 2020, the Receiver filed a motion to extend the completion deadline (ECF No. 143) concurrently with his motion for authorization to engage contingent fee counsel (ECF No. 144).  The Court granted both motions on March 9, 2020, extending the deadline until March 11, 2021.  ECF No. 152, 153.  Counsel for the Receiver then contacted Wells Fargo via email on April 1, 2020, as discussed above in Paragraph 10.

(39)   On March 5, 2021, the Receiver filed a motion to extend the deadline (ECF No. 169), which the Court granted on March 26, 2021 (ECF No. 172), extending the completion deadline until September 11, 2021.  Wells Fargo did not seek to intervene to oppose the motion.

(40)   On July 23, 2021 (two weeks after filing its suit against Wells Fargo), the Receiver filed another motion to extend the deadline (ECF No. 186), which the Court granted on August 12, 2021 (ECF No. 198), extending the deadline until September 12, 2022.  Wells Fargo did not seek to intervene to oppose the motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: February 7, 2022                *Logan D. Smith*

Logan D. Smith

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene

**R_SER_37**

**Declaration of Brian Lasky**
**FTC Exhibit A**

FTC Exhibit A - Lasky Declaration

JONATHAN W. WARE (lead counsel) (admitted *pro hac vice*)
DC Bar No. 989414; VA Bar No. 77443
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
Tel: (202) 326-2726; Fax: (202) 326-3197
jware1@ftc.gov

DELILAH VINZON (local counsel)
Cal. Bar No. 222681
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300; Fax: (310) 824-4380
dvinzon@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 2:18-cv-9573-JFW(JPR) |
| Plaintiff, | **DECLARATION OF BRIAN N. LASKY PURSUANT TO 28 U.S.C. § 1746** |
| v. | |
| **APEX CAPITAL GROUP, LLC,** et al. | |
| Defendants. | Date:  March 7, 2022<br>Time:  1:30 P.M.<br>Courtroom:  7A<br>Judge:  Hon. John F. Walter |

## DECLARATION OF BRIAN N. LASKY
## <u>PURSUANT TO 28 U.S.C. § 1746</u>

I, Brian N. Lasky, declare under penalty of perjury that the foregoing is true and correct:

1. I have personal knowledge of the facts stated herein and, if called to testify, I could and would competently testify to the same. I am a United States citizen over the age of 18. I am employed by the Federal Trade Commission ("FTC") as an attorney.

2. I am counsel for the FTC in the above-captioned matter, admitted *pro hac vice* to this Court, and licensed to practice in the State of New York.

3. I participated during the investigation phase of this matter and in litigating it.

4. On November 19, 2018, a Wells Fargo service manager at the Warner Ranch Branch in Woodland Hills, California, Fatima Ledezma, was personally served a copy of the Court's November 16, 2018 Ex Parte Temporary Restraining Order With Asset Freeze, Appointment Of A Temporary Receiver, And Other Equitable Relief, And Order To Show Cause Why A Preliminary Injunction Should Not Issue (Docket No. 16) by an FTC Staff member under my direction.

5. In a subsequent letter dated November 19, 2018, Wells Fargo's Legal Order Processing Operations Manager, Joe Medina, confirmed in writing to the FTC that, "As you requested in the Temporary Restraining Order served on Wells Fargo on November 19, 2018, we have restricted customer withdrawals from the accounts below," followed by a list of 23 accounts related to this case.

6. On November 10, 2021, the FTC provided counsel for Wells Fargo, Kevin Lally, with a courtesy copy of the Temporary Restraining Order (Docket No. 16) that had been served on Wells Fargo on November 19, 2018.

7. On February 2, 2022, the FTC provided counsel for Wells Fargo, Kevin
Lally, with a courtesy copy of Wells Fargo's November 19, 2018 letter
(described above).

Executed on February 2, 2022 in New York, NY.

_____
Brian N. Lasky

# EXHIBIT A

LOGAN D. SMITH (#212041)
CORNELIA J.B. GORDON (#320207)
**MCNAMARA SMITH LLP**
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  619-269-0400
Facsimile:   619-269-0401
Email: lsmith@mcnamarallp.com

LIONEL Z. GLANCY (#134180)
JONATHAN M. ROTTER (#234137)
GARTH A. SPENCER (#335424)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  310-201-9150
Facsimile:   310-201-9160
Email: info@glancylaw.com

*Attorneys for Receiver, Thomas W. McNamara*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC; and their successors, assigns, affiliates, and subsidiaries,<br><br>        Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association,<br><br>        Defendants. | Case No. **'21 CV1245 AJB JLB**<br><br>**RECEIVER'S COMPLAINT FOR:**<br><br>**(1) Aiding and Abetting Fraud;**<br>**(2) Conspiracy to Commit Fraud;**<br>**(3) Breach of Fiduciary Duty;**<br>**(4) Aiding and Abetting Breach of Fiduciary Duty;**<br>**(5) Aiding and Abetting Conversion;**<br>**(6) Violation of California Penal Code § 496;**<br>**(7) Violation of California Business & Professions Code § 17200;**<br>**(8) Aiding and Abetting Fraudulent Transfers and/or Voidable Transfers;**<br>**(9) Unjust Enrichment/Constructive Trust;**<br>**(10) Negligent Supervision (in the Alternative);**<br>**(11) Negligence (in the Alternative); and**<br>**(12) Request for an Accounting**<br><br>**JURY TRIAL DEMAND** |

R_SER_43

1  Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity
2  as the court-appointed receiver for the Triangle and Apex Enterprises, as defined
3  below, hereby brings the following Complaint against Wells Fargo & Company
4  and Wells Fargo Bank, N.A. (collectively, "Wells Fargo," the "Bank," or
5  "Defendants") and alleges the following.

## I.  INTRODUCTION: A NEW REVELATION OF WELLS FARGO'S FACILITATION OF CONSUMER FRAUD

8  1.  The Receiver brings this action against Wells Fargo to recover
9  damages suffered as a result of Wells Fargo's knowing provision of substantial
10  assistance to two multi-million-dollar fraudulent schemes perpetrated by the
11  former operators of Triangle Media Corporation ("Triangle") and Apex Capital
12  Group ("Apex").[1]

13  2.  The Receiver was appointed after the Federal Trade Commission
14  ("FTC") brought lawsuits against the Triangle and Apex Enterprises in 2018.   The
15  Enterprises ran similar, though separate, Internet risk-free trial schemes marketing
16  dozens of products, most of which were personal care products and dietary
17  supplements that purported to promote enhanced weight loss, hair growth, clear
18  skin, muscle development, sexual performance, and cognitive abilities.  Consumers
19  were offered "free" trials of the products for "just the cost of shipping and
20  handling," usually $4.95.  Two weeks after consumers signed up for the "trial,"
21  they were charged the full price of the product (roughly $90) and enrolled in
22  continuity programs, which continued to ship products on a monthly basis—
23  charging the consumer the full $90 each time, of course.  Cancellation was difficult
24  and obtaining a refund was nearly impossible.  The schemes, a category of frauds

---

[1] Triangle and Apex, along with their related entities and the individuals controlling those entities, are referred to herein as the "Triangle Enterprise" and the "Apex Enterprise," respectively, and collectively as the "Enterprises."

known as "negative option schemes,"[2] were incredibly successful, raking in more than $200 million from consumers.

    3.    To execute the schemes, the Enterprises recruited unrelated individuals (sometimes referred to as "fronts", "signors", "nominees" or "straw owners") and paid them a modest monthly fee for the use of their names and identities to establish approximately 100 shell companies.  The Enterprises then immediately turned to Wells Fargo, which opened scores of Wells Fargo bank accounts – more than 150 in total[3] – in the names of the shell companies.  Having the Wells Fargo bank accounts was a prerequisite for the Enterprises to secure accounts with merchant processors, which the Enterprises needed to accept consumers' credit and debit card payments.

    4.    Crucially, the Enterprises were able to obtain continued access to accounts with merchant processors, while concealing the identities of the Enterprises' owners from the merchant processors.  The practice of processing credit card transactions through other companies' merchant accounts is known as "credit card laundering," and it is an unlawful practice used by fraudulent merchants, like the Enterprises, to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement.

    5.    Through his independent investigation, which gave him access to the Enterprises' email communications with Wells Fargo and Wells Fargo bank account statements, the Receiver discovered that Wells Fargo was providing substantial, knowing assistance to both the Triangle and Apex Enterprises' sales

---

[2] "Risk-free" trial scams are sometimes referred to as negative option scams, because they require consumers to affirmatively opt out (*i.e.*, exercise a negative option) of a program to avoid being charged.

[3] References to the numbers of Apex and Triangle-related bank accounts identified herein are estimates based on calculations made by the Receiver using only on information presently available to him.  The number is likely to grow when information on Wells Fargo is received in discovery.

1 | scams.

2 | 6. Wells Fargo bankers were aware of the Enterprises' risk-free trial
3 | schemes, understood the people listed as "owners" of the Wells Fargo accounts did
4 | not actually own or control them, and knew the Enterprises were engaged in credit
5 | card laundering. Despite this knowledge, Well Fargo gladly opened *more than*
6 | *150 bank accounts for the shell companies and straw owners*, *sometimes opening*
7 | *as many as 6 bank accounts in one day*. Wells Fargo then allowed millions of
8 | dollars to be deposited in the accounts, knowing that these funds were unlawfully
9 | obtained in the risk-free trial schemes, and afterwards allowing the Enterprises'
10 | operators to transfer their ill-gotten gains from the shell accounts to third-party
11 | bank accounts, including accounts located outside of the United States.

12 | 7. The principals of the Apex and Triangle Enterprises came to rely
13 | heavily upon Wells Fargo to aid their frauds by providing them with law oversight
14 | and atypical banking services, widely deviating from accepted banking standards
15 | and violating applicable banking laws and regulations. As one telling example of
16 | this from very early in the Triangle scheme, owner Brian Phillips recruited a son
17 | and his mother to serve as straw owners of two of the shell companies Phillips
18 | actually owned. Wells Fargo promptly opened the bank accounts for the shell
19 | companies, listing the straw owners as "owners" of the accounts, and gave Phillips
20 | complete control over the shell accounts to Phillips. When the son expressed
21 | concerns that Wells Fargo might call his unaware mother to conduct due diligence
22 | into the relationship, Phillips plainly explained that it was Wells Fargo, and that
23 | would not be happening, emailing him:

| | |
|---|---|
| **From:** | Brian Phillips <brian@trianglemediacorp.com> |
| **Sent:** | Friday, November 11, 2011 8:18 PM |
| **To:** | Marty |
| **Subject:** | Re: Please see attached document |

Dude, you still don't understand how wells is totally different. The bank won't be calling her

On Nov 11, 2011 11:01 PM, "Marty" <mglinsky1@comcast.net> wrote:
Brian- Mom faxed signed doc to Wells Fargo today. Should we have a prepatory conv - you/me/mom so she
doesnt get blindsided again?

Thanks Marty G.

1   Phillips was right. Wells Fargo didn't call her.

2       8.      And during the period in which the Apex and Triangle Enterprises'
3   risk-free trial scams were operating, Wells Fargo was indeed "totally different"
4   from its banking peers.  As Wells Fargo has since *admitted*, Wells Fargo's
5   established corporate policies and sales incentives were fueling a high-pressure
6   sales culture that required its bankers to open as many accounts as possible.  As a
7   direct result of that pernicious sales culture, and with the ongoing knowledge and
8   authorization of Wells Fargo, an array of Wells Fargo bankers in multiple branch
9   offices in California (and in a few cases, Texas) deliberately assisted the operators
10  of the Apex and Triangle risk-free trial scams for an astonishingly long period of
11  time: from at least 2009 to 2018 for the Triangle fraud and from at least 2014 to
12  2018 for the Apex fraud ("the Relevant Period"), until the filing of the FTC actions
13  finally shut them down.

14      9.      The Bank's high-pressure sales culture and near unattainable sales
15  goals drove Wells Fargo bankers to open accounts regardless of the risk to the
16  Bank or others; if the employees failed to deliver, the consequences were severe:
17  "[i]t was common knowledge within the Bank that employees who could not meet
18  sales goals could and would be terminated," and "[e]mployees' incentive
19  compensation and promotional opportunities depended on their ability to meet the
20  unreasonable sales goals."[4]  As discussed in greater detail below, this drive for new
21  accounts aligned perfectly with the Enterprises' constant need for shell accounts.

22      10.     In the aftermath of Wells Fargo's much-publicized unauthorized
23  accounts scandal caused by this sales culture, Wells Fargo's newly-installed CEO
24  described the bank's corporate policies as excessively "focus[ed] on growing the

_____

[4] January 23, 2020 Office of the Comptroller of the Currency Notice Of Charges
For Orders Of Prohibition And Orders To Cease And Desist And Notice Of
Assessments Of A Civil Money Penalty, AA-EC-2019-82 et al. (Jan. 23, 2020)
("OCC Notice of Charges") ¶¶ 72, 77.

---

4                                  Case No. _____
                                   RECEIVER'S COMPLAINT

**R_SER_47**

number of accounts," admitting that Wells Fargo's actions were "just stupid." Unfortunately for Wells Fargo and the victims here, this "stupid" conduct had devastating consequences, as these policies encouraged and rewarded Wells Fargo bankers for aiding and abetting fraud in order to satisfy the pressurized sales culture and hit sales quotas. The Receiver's investigation revealed that Wells Fargo knowingly facilitated the opening of accounts by the Enterprises' principals for use in their fraud, all while making a conscious decision to let the fraud go unreported.

11. Wells Fargo's misconduct centered around the Community Bank, which was the largest of Wells Fargo's three business units and contributed more than half (and in some years more than three-quarters) of the Bank's revenue. The Community Bank was responsible for the everyday banking products sold to businesses such as the Enterprises in this case.

12. Commenting on the widespread nature of Wells Fargo's misconduct in the Community Bank, the Office of the Comptroller of the Currency (the "OCC"), the federal bank regulator which ensures safe and sound banking, found that: "To the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank." OCC Notice of Charges ¶ 6. Consistent with this finding, the Receiver's investigation has led him to conclude that Wells Fargo intentionally designed and maintained controls which served to conceal—rather than unmask—its customers' illegal activities, which Wells Fargo was actively facilitating.

13. Wells Fargo knowingly assisted the operators of the Apex and Triangle Enterprises, including by, among other things: (i) authorizing or allowing the use of atypical banking procedures to assist the Enterprises in their frauds, (ii) counseling the Enterprises on how to set up deceptive bank accounts with straw owners, which enabled them to hide the fraud, (iii) accepting deposits obtained

Case No. _____
RECEIVER'S COMPLAINT

**R_SER_48**

through the fraud, and (iv) authorizing suspicious inter-company transfers that enabled the wrongdoers to secrete the proceeds of their fraud, including in accounts located outside of the United States.

14. Wells Fargo has admitted wrongdoing and paid substantial fines and restitution for one consequence of its illegal sales culture, namely, the creation of fraudulent accounts in customers' names, opened without their consent. But the Receiver's investigation revealed that there were other, previously unidentified consequences of Wells Fargo's sales culture and its actions here: in this case, the consequences were hundreds of millions of dollars in harm, done to the thousands of consumers who signed up for Apex's and Triangle's risk-free trials, and the resulting liability of the Receivership Entities to make the defrauded consumers whole. To date, Wells Fargo has never compensated this newly-identified category of victims, including the Receivership Entities, that were harmed by Wells Fargo's sales culture and the resulting conduct that aided these fraudulent businesses.

15. The Receiver is therefore seeking to recover damages for the harm proximately caused to the Apex and Triangle Receivership Entities by Wells Fargo, including, but not limited to: (i) the Receivership Entities' legal obligations to satisfy the FTC judgments, which were premised on misconduct that could not have occurred but for Wells Fargo's assistance, (ii) the fees charged by Wells Fargo in connection with their account services, (iii) the account funds which were improperly transferred out of the Receivership Entities' accounts by Wells Fargo at the direction of the Enterprises' principals, and (iv) the costs of defending the actions by the FTC (including the resulting Receiverships).

## II. PRIOR FEDERAL TRADE COMMISSION PROCEEDINGS AND THE APPOINTMENTS OF THE RECEIVER

16. In June 2018 and November 2018, the FTC brought separate lawsuits in the Southern and Central Districts of California against Triangle Media Corporation and Apex Capital Group, LLC and their related entities (the

1  "*Triangle*" and "*Apex*" actions), respectively, each of which was operating

2  deceptive online risk-free trial offer schemes in violation of consumer protection

3  statutes.    The FTC sued to obtain temporary, preliminary, and permanent

4  injunctive relief, rescission or reformation of contracts, restitution, the refund of

5  monies paid, disgorgement of ill-gotten gains, and other equitable relief. The FTC

6  filed amended complaints in December 2018 and May 2019 in the Triangle and

7  Apex actions, respectively.

8          A.     The *Apex* Action

9          17.    Plaintiff is the Court-appointed Receiver in the *Apex* action: *Federal*

10  *Trade Commission v. Apex Capital Group, LLC, et al.,* Case No. 2:18-cv-09573-

11  JFW *(JPRx)* (C.D. Cal.).    The Apex Preliminary Injunctions (the "Apex PIs," *id.*,

12  ECF Nos. 40 (Peikos) and 41 (Barnett)) direct the Receiver to preserve the value of

13  the assets of the Receivership Estate and authorize the Receiver to institute actions

14  to preserve or recover those assets.  *See id.*, ECF Nos. 40, 41 at 19-23.

15          18.    Receivership Entities subject to th*e Apex* action are expressly defined

16  to include the following: the Corporate Defendants,[5] the Wyoming Related

17  Companies,[6] and the U.K. Related Companies.[7]   Apex PIs at 7, Definition K.  In

18  addition, the term "Receivership Entities" is defined to include "any other entity

19  that has conducted any business related to Defendants' marketing or sale of

20

_____

21  [5] The Corporate Defendants include: Apex Capital Group, LLC; Capstone Capital
22  Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital
     Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global
23  Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited;
     and Tactic Solutions Limited; and each of their subsidiaries, affiliates, successors,
24  and assigns.  Apex PIs at 6, Definition C.

25  [6] The Wyoming Related Companies include entities formed in Wyoming by
     Defendants, in the names of nominees, for the sole purpose of fronting merchant
26  accounts.  They are identified in Exhibit A to the *Apex* action Complaint.

27  [7] The U.K. Related Companies include entities formed in the U.K. by Defendants,
     in the names of nominees, to front merchant accounts.  They are identified in
28  Exhibit B to the *Apex* action Complaint.

products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *Id*. To date, the Receiver has determined that multiple additional entities qualify as Receivership Entities under this definition.[8] These entities are collectively referred to herein as the "Apex Enterprise."

19. As alleged in the *Apex* Complaint, Philip Peikos ("Peikos") and his one-time partner, David Barnett ("Barnett), and their agents ran an online "free trial" subscription scam through the Apex Enterprise. Peikos was the Chief Executive Officer and co-owner of Apex. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

20. Barnett was the Chief Operating Officer of the Apex Enterprise. He was a co-owner of the Apex Enterprise until at least late 2017, when he transferred his shares to Peikos. At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

21. On September 11, 2019, the FTC and the *Apex* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**B.    The *Triangle* Action**

22. Plaintiff is also the Court-appointed Receiver in the *Triangle* action:

---

[8] These include five nominee entities formed by Defendants for the purpose of opening new merchant accounts to conduct business inextricably related to the *FTC v. Apex* defendants' sale of products with a Negative Option Feature: Albright Solutions LLC ("Albright"); Asus Capital Solutions LLC ("Asus Capital"); Element Media Group LLC ("Element"); NextLevel Solutions LLC ("NextLevel"); and Vortex Media Group LLC ("Vortex").

**R_SER_51**

*FTC v. Triangle Media Corporation, et al,* 3:18-cv-01388 (LAB-LL) (S.D. Cal.).[9] The Temporary Restraining Order (the "Triangle Order," *id.*, ECF No. 11) which first appointed the Receiver directs the Receiver to preserve the value of the assets of the Receivership Estate and authorizes the Receiver to institute actions to preserve or recover those assets. *See id.* at 18-19.

23. Receivership Entities subject to the Triangle Receivership are expressly defined to include Corporate Defendants Triangle Media Corporation ("Triangle"), Hardwire Interactive Inc. ("Hardwire"), and Jasper Rain Marketing LLC ("Jasper Rain"), and their respective dbas.[10] Triangle Order at 8, Definition N. Receivership Entities also include "any other entity that has conducted any business related to Defendants' marketing of negative option offers, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."[11] These Entities are collectively referred to herein as the "Triangle Enterprise."

24. Brian Phillips ("Phillips") and his agents operated the Triangle online "free trial" subscription scam. During the relevant period, Phillips was an owner and officer of the Triangle Enterprise. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the

---

[9] In the *Triangle* Complaint, the Corporate Defendants are defined as: Triangle Media Corporation also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; Jasper Rain Marketing LLC also doing business as, and each of their subsidiaries, affiliates, successors, and assigns. The Individual Defendant is Brian Phillips.

[10] These dbas include Cranium Power, Phenom Health, Beauty and Truth, and E-Cigs.

[11] The Receiver has determined that additional entities fall within this definition of Triangle-related Receivership Entities: (1) Global Northern Trading Ltd. ("Global Northern"), a Canadian corporation as to which Triangle transferred more than $44 million during the period 2013-2018; and (2) the nominee entities formed and controlled by Phillips but deliberately placed in the names of nominees.

Case No. _____
RECEIVER'S COMPLAINT

**R_SER_52**

1   authority to control, or participated in the acts and practices of the Triangle
2   Enterprise.

3       25.    During the relevant period, Devin Keer ("Keer") was also an owner
4   and officer of the Triangle Enterprise.  At all times material to this Complaint,
5   acting alone or in concert with others, he formulated, directed, controlled, had the
6   authority to control or participated in the acts and practices of the Triangle
7   Enterprise.

8       26.    On May 30, 2019, the FTC and the *Triangle* defendants stipulated to
9   the entry of Orders for Permanent Injunctions (barring them from their illegal
10  conduct) and Monetary Judgments resolving all matters in dispute between them.

11  **C.    The Receiver's Investigation of Wells Fargo and Discovery of**
12  **Wells Fargo's Wrongful Conduct.**

13      27.    After conducting his initial investigations, the Receiver filed
14  preliminary reports as to his conclusions in each of the Triangle and Apex FTC
15  actions.  In both cases, the Receiver determined that the businesses could not
16  continue to be operated lawfully and profitably.

17      28.    Based on initial and subsequent reviews of internal Apex and Triangle
18  emails and bank records, the Receiver's investigation revealed that Wells Fargo
19  was aiding and abetting both Enterprises by providing similar atypical banking
20  services, as detailed herein, in furtherance of the frauds.

21      29.    During the investigation, the Receiver issued subpoenas to Wells
22  Fargo regarding their relationships with the Apex and Triangle Enterprises.    In
23  response, Wells Fargo made incomplete productions.  On information and belief,
24  numerous internal bank records, including electronic documents and internal
25  communications, still exist regarding the Apex and Triangle Enterprises, as Wells
26  Fargo was obligated under applicable banking regulations and laws to maintain
27  such records.

28      30.    In late October 2019 and January 2020, the Receiver filed motions in

---

10                          Case No. _____
                            RECEIVER'S COMPLAINT

the *Triangle* and *Apex* actions, respectively, advising the Courts that he wished to retain counsel to pursue claims against Wells Fargo on behalf of the Receivership Entities. In the *Triangle* action, on November 19, 2019, Judge Burns ruled that "the Court finds good cause exists to grant the Receiver's motion to (1) extend the receivership for the sole purpose of pursuing litigation against Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3) administratively close the case while that litigation is pursued." In the *Apex* action, on March 9, 2020, Judge Walter similarly permitted the Receiver to retain contingency counsel to pursue claims against Wells Fargo.

## III. PARTIES

31. Plaintiff Thomas W. McNamara is the Court-appointed Receiver of the Triangle and Apex Entities. Triangle's principal place of business was 1350 Columbia Street, San Diego, California 92101 until May 17, 2018, when it filed paperwork with the California Secretary of State changing its principal place of business to Tampa, Florida, though the center of operations remained in San Diego. Apex was a Wyoming limited liability company which had business addresses in Westlake Village, California; Jackson, Wyoming; Beverly Hills, CA; and Woodland Hills, CA, though it was always, to the Receiver's knowledge, operated out of California during the Relevant Period.

32. Defendant Wells Fargo & Company is a nationwide, diversified, financial services company. Upon information and belief, its corporate headquarters are located in San Francisco, California. Defendant Wells Fargo & Company is the parent company of Wells Fargo Bank, N.A.

33. Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in South Dakota. It maintains multiple offices in the State of California and the Southern District of California for the purposes of maintaining checking, savings, business, and merchant accounts, and engaging in

1   other business activities.

2        34.    The Defendants are collectively referred to herein as "Wells Fargo,"

3   the "Bank," or "Defendants."

4   **IV.    JURISDICTION AND VENUE**

5        35.    This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28

6   U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and

7   ancillary jurisdiction. *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir.

8   2004) ("[T]he receiver's complaint was brought to accomplish the objectives of the

9   Receivership Order and was thus ancillary to the court's exclusive jurisdiction over

10  the receivership estate").

11       36.    Venue in the Southern District of California is proper pursuant to 28

12  U.S.C. § 1391, because the *Triangle* Court retained jurisdiction of this matter for

13  all purposes and appointed the Permanent Receiver in the Southern District of

14  California on August 24, 2018,  and because this proceeding is supplemental to

15  *FTC v. Triangle. See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th

16  Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration

17  of venue is ancillary as well."), and because the *Triangle* action was initiated prior

18  to the filing of the *Apex* action in the Central District of California.

19       37.    The Court may exercise personal jurisdiction over the Defendants

20  pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets

21  of the Receivership Entities under the Court's Orders issued in the *Triangle* and

22  *Apex* actions.

23       38.    This Court also has personal jurisdiction over Defendants named in

24  this Complaint because Wells Fargo conducted business in California and it

25  participated in California-based fraudulent schemes that injured Californians.

26  Venue is also proper in this District because the conduct at issue took place and

27  had an effect in this District and Wells Fargo regularly conducted and still

28  regularly conducts substantial banking business in this District.  Defendants have

**R_SER_55**

1  sufficient minimum contacts with the Southern District of California arising from

2  the specific conduct committed in or directed to the Southern District of California.

3  **V.    WELLS FARGO'S UNATTAINABLE SALES GOALS AND HIGH-**

4        **PRESSURE SALES CULTURE DROVE ITS BANKERS TO**

5        **PARTICIPATE IN THE ENTERPRISES' FRAUDS**

6        39.    During the Relevant Period, Wells Fargo engaged in rampant sales

7  misconduct from the top down.  That misconduct has been repeatedly confirmed

8  by multiple regulators, hearings, and lawsuits.   In September 2016, the

9  CFPB imposed a fine of $100 million against Wells Fargo for opening more than

10 two million new accounts not requested by customers in order to generate illicit

11 fees.  The company also paid $35 million to the Office of the Comptroller of the

12 Currency and $50 million to the City and County of Los Angeles.

13       40.    Despite signing consent orders with the CFPB and OCC, in 2018,

14 those same two agencies fined Wells Fargo again (this time for *one billion* dollars)

15 for selling unnecessary products to customers and for engaging in other improper

16 practices.  Later, in February 2020, Wells Fargo agreed to pay *three billion* dollars

17 to resolve federal civil and criminal investigations into the consumer account

18 scandal; the settlement of those matters included a deferred prosecution agreement.

19       41.    Wells Fargo's sales misconduct began at least as early as 2002.  At

20 that time, the Bank's internal investigations unit noticed an increase in "sales

21 integrity" cases.   According to Wells Fargo's employees, sales goals were

22 impossible to meet, and incentives for compensation and ongoing employment

23 necessitated "gaming" the system.  Gradually, "gaming," which was defined in the

24 Wells Fargo Code of Ethics as "the manipulation and/or misrepresentation of sales

25 or referrals . . . in an attempt to receive compensation or to meet sales goals,"

26 became commonplace.

27       42.    To meet company sales quotas, employees opened accounts and credit

28 lines, ordered credit cards without their customers' permission, and forged client

---

13                          Case No. _____
                            RECEIVER'S COMPLAINT

**R_SER_56**

signatures on paperwork. Some employees urged family members to open ghost accounts.

43. Between 2011 and 2015, Wells Fargo employees opened more than 1.5 million deposit accounts and more than 565,000 credit card accounts that may not have been authorized. On a per-employee basis, the reports of sales-related misconduct tripled from the second quarter of 2007 through the fourth quarter of 2013.

44. Despite Wells Fargo's payment of a combined $185 million penalty to the OCC, CFPB, and the City and County of Los Angeles in 2016 to settle charges related to consumer account fraud, the next year in an August 4, 2017 quarterly 10-Q filing, Wells Fargo said it had expanded the period targeted for review (previously 2011 through 2015) to 2009 through 2016 and disclosed that the expansion of the review period could reveal a "significant increase" in unauthorized accounts.

45. On January 23, 2020, the OCC brought additional charges against several Wells Fargo executives for allowing long-term sales misconduct. As the OCC put it:

> **The Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model**, and declined to implement effective controls to catch systemic misconduct. Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper conduct across the entire Community Bank.…**To the extent the Bank did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank**. In short, Bank senior executives favored profits and other market rewards over taking action to stop the systemic issuance of unauthorized products and services to customers.

(Emphasis added).

46. In 2020, Wells Fargo also entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina that included a

---

14                          Case No. _____
                            RECEIVER'S COMPLAINT

1   "Statement of Facts" in which Wells Fargo "admitted, accepted, acknowledged as
2   true" (among other things) that "[d]espite [having] knowledge of the widespread
3   sales practices problems" as early as 2002 and through 2016, "Community Bank
4   senior leadership failed to take sufficient action to prevent and reduce the
5   incidence of unlawful and unethical sales practices." According to the DPA, Wells
6   Fargo was alerted to the fraud by "Wells Fargo's internal investigations unit, the
7   Community Bank's own internal sales quality oversight unit, and managers leading
8   the Community Bank's geographic regions, as well as regular complaints by
9   lower-level employees and Wells Fargo customers reporting serious sales practices
10  violations."

11          47.    In the wake of Wells Fargo's consumer account scandal, the federal
12  bank regulators, the OCC and the Federal Reserve, initiated a multi-phase "Sales
13  Practices and Incentive Compensation Horizontal Review,"[12] with the goals
14  including to determine whether *other* banks doing the very same things that Wells
15  Fargo did.  After conducting its investigation, the regulators OCC concluded in
16  2017 that Wells Fargo was unique in terms of its sales culture, which prompted
17  employees to open unauthorized, and even fraudulent, accounts in order to meet
18  daily new account goals and keep their jobs.  The banking regulators' review
19  confirmed that Wells Fargo's banking peers, unlike Wells Fargo, had taken
20  seriously the significant compliance risks caused by an overly aggressive sales
21  culture and lax oversight of branches.

22          48.    In other words, Wells Fargo's misconduct was not the norm within the
23  industry and was tethered to Wells Fargo's uniquely toxic sales culture.  That same
24  culture is at issue here but in an entirely different context, and one that was only
25  discovered after the Receiver was appointed.  Here, Wells Fargo's corporate focus

26  _____

27  [12] That review initially covered all large national banks, like Wells Fargo, and later
28  significant regional banks.

---

**R_SER_58**

1   on the opening of new accounts at any cost resulted in the Bank opening *roughly*
2   *one hundred and fifty bank accounts for shell companies across the Apex and*
3   *Triangle frauds*—accounts which Apex and Triangle's principals required to
4   secure merchant payment processing services (leaning on Wells Fargo's
5   imprimatur and reference letters to convince the processors of the accounts'
6   legitimacy) and then used to launder the proceeds from their consumer frauds.

7   **VI.    WELLS FARGO'S CREATION AND MAINTENANCE OF BANK**
8   **         ACCOUNTS FOR DECEPTIVE SHELL COMPANIES WERE**
9   **         ESSENTIAL TO THE FRAUDS**

10      49.    The Apex and Triangle frauds were simple in concept:  bait
11  consumers with deceptive internet ads offering "risk-free" trials for only the cost of
12  shipping, and then use the consumers' billing information to charge for the product
13  and impose a monthly continuity charge.  Make it impossible to cancel.  These
14  schemes defrauded consumers of hundreds of millions of dollars.

15      50.    Simple as it was, the con was effective.  Consumers would be offered
16  a full month's supply of a featured product and, at the time of the initial order,
17  would only pay the nominal cost for the shipping and handling of the product.  But
18  if the consumer did not cancel the order and return the unused portion of the
19  product within a short period of time (often, fourteen calendar days), the Triangle
20  and Apex Enterprises would automatically charge the consumer's card for the full
21  price of the product (usually around $87 or $89).  The consumer would also be
22  enrolled in an auto-ship program when signing up for the "risk-free" trial offer—
23  meaning that unless the subscription was affirmatively canceled, the consumer was
24  automatically charged monthly for additional product.

25      51.    Both the Apex and Triangle schemes required access to a steady
26  stream of new bank accounts to function.  As such, Wells Fargo and the
27  Enterprises' objectives were aligned: the Enterprises needed new bank accounts on
28  a regular basis, and Wells Fargo was constantly pressuring its sales employees to

**R_SER_59**

1 open more bank accounts. As a result, the Enterprises, the individuals behind
2 them, and the bank developed a symbiotic relationship. Without Wells Fargo's
3 assistance, the Enterprises' frauds could not have survived (let alone thrived) for as
4 long as they did.

5     **A.     The Payment Processing System and Credit Card Laundering**

6     52.     In order to charge consumers' credit or debit cards, the Triangle and
7 Apex Enterprises (the "merchants") needed to establish an account with a merchant
8 processor. Merchant processors have access to credit card associations ("card
9 networks") like MasterCard and VISA and thereby enable merchants to charge
10 consumers' credit cards.

11     53.     Card networks require all participants within their networks to comply
12 with detailed rules, including screening processes and underwriting standards for
13 merchants. These rules are put in place (1) to ensure that the merchants whose
14 purchases are being processed are legitimate, bona fide businesses, and (2) to
15 screen out merchants engaged in potentially fraudulent or illegal practices. The
16 rules also prohibit "credit card laundering," which encompasses the practice of
17 processing card charges through the merchant accounts of shell companies like
18 those used by the Enterprises.

19     54.     Merchants who pose a heightened risk of fraud to the card networks
20 are subject to closer scrutiny by their merchant processors and may have their
21 access to the card networks capped or terminated altogether.

22     55.     One sign of potential illicit activity by a merchant is the generation of
23 an excessive number of transactions which have to be refunded to consumers
24 ("chargebacks").

25     56.     Consumers initiate "chargebacks" when they dispute card charges
26 (most often because of fraud or unauthorized use) by contacting their "issuing
27 bank," which is the bank that issued the credit card to the consumer. When a
28 consumer successfully disputes the charge, the consumer's issuing bank credits the

consumer's card for the disputed amount, and then recovers the chargeback amount from the merchant processor.  The merchant processor, in turn, collects the chargeback amount from the bank account of its merchant client.  In this case, merchant processors would seek to collect chargebacks from the Enterprises' Wells Fargo accounts.

57.    In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs.  These chargeback monitoring programs are designed to flag merchant accounts with excessive chargeback ratios or an excessive number of chargebacks.  For example, if a merchant account has chargeback levels that exceed the thresholds set by VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties, and termination.

58.    Credit card laundering is commonly used by merchants who cannot meet a merchant processor's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of a prior history of excessive chargebacks, complaints, use of sales or industry practices prohibited by merchant processors, or other signs of illegal activity).  To conceal their identities, merchants which are engaged in fraud will often create shell companies to act as fronts, and apply for merchant accounts under the names of these shell companies.  Once the shell merchant accounts are approved, the fraudulent merchants then launder their own transactions through the shell companies' merchant accounts.  This allows the merchants to circumvent card associations' onboarding and monitoring programs and avoid detection by consumers and law enforcement.

59.    When a merchant is terminated, or if it has a high-risk account or excessive chargebacks, its name (and that of the merchant's owner) is put on a blacklist, which is often referred to as the "MATCH" list ("Merchant Alert To Control High-Risk"), as a terminated merchant file ("TMF").  Other reasons for

---

18                          Case No. _____
                            RECEIVER'S COMPLAINT

being listed as a terminated merchant file include merchant collusion, fraud, and money laundering. Merchant processors use the MATCH list to screen potential merchant clients, and merchants on the list are often unable to open an account with a new merchant processor.

60. For credit card laundering to be effective long-term and on a large scale, then, a merchant needs access to a ready supply of merchant processing accounts, so that the merchants can move sales from one shell company to a newly-created shell company once the profits have been reaped and the chargeback rates or other "red flags" have attracted attention. An absolute prerequisite to a merchant processing account is a bank account in a shell company's name. Luckily for Apex and Triangle (and unluckily for consumers), Wells Fargo was more than happy to provide the latter.

**B.      Apex and Triangle's (Mis)Use of the Credit Card Processing System**

61. Entities associated with the Triangle and Apex Enterprises showed up again and again on the MATCH list during the Relevant Period, because they were flagged as high risk and/or routinely had high card chargebacks.

62. The average chargeback rate in the United States is 0.2% of the transaction rate and a chargeback rate greater than 1% is considered excessive. The Triangle and Apex Entities' chargeback rates were astronomical, with both and averaging over 20% on a monthly basis, with some months having chargeback rates of 70% or higher. The merchant processors would typically cancel accounts when chargebacks exceeded 3% of sales—a regular occurrence for the Apex and Triangle Entities.

63. Merchant processors would not deal with repeat offenders like the Apex and Triangle principals. To get around the merchant processors' restrictions, Apex and Triangle's owners hid their connection to the fraudulent businesses (and the high chargeback rates that they generated) by creating phony shell companies.

**R_SER_62**

64.     The Apex and Triangle Enterprises used a host of straw owners (which they sometimes referred to as "fronts" or "nominees" or "signors") to act as the "owners" of the shell companies.  These straw owners were individuals who would act as the "front" for a shell company, often in exchange for a payment of about $500 per month, typically.  The Enterprises would orchestrate the formation of the shell companies, the opening of the necessary Wells Fargo bank accounts, and the completion of applications for merchant processing in the shell companies' names.  When the merchant processor inevitably terminated processing for a shell company (typically due to excessive chargebacks), the Apex and Triangle Enterprises would use a new nominee to form another shell company and restart the whole process.  Rinse and repeat.

65.     For the scheme to work, the shell companies needed to be able to establish depository accounts with an actual bank.  Without bank accounts, merchant processing could not be acquired, and without bank accounts, the shell companies would have nowhere to transfer the funds they took from consumers.

66.     Enter Wells Fargo.  Wells Fargo's employees gladly helped the Enterprises set up bank accounts for the shell companies and readily provided them with bank reference letters, which the shell companies often needed to secure merchant processing services.  Merchant processors would never have provided merchant processing for the shell companies had they known the identity of the entities' true owners (Apex and Triangle's principals).

67.     When merchant processors charged consumers' cards for Apex or Triangle products, the transactions were processed through accounts secured in the names of the shell companies.  The consumer payments would then be sent to accounts at Wells Fargo, which nominally belonged to the shell companies but which were actually controlled by the owners of the Apex and Triangle Enterprises.  As discussed below, Wells Fargo was well aware of the shell companies' true ownership yet continued to assist the Enterprises in their creation

R_SER_63

1    of shell bank accounts needed to perpetrate and conceal their fraud.

2        68.    From at least 2014 through 2018 for the Apex Enterprise, and 2009

3    through 2018 for the Triangle Enterprise, Wells Fargo provided vital access to the

4    enable the Enterprises to open approximately 150 Apex and Triangle shell bank

5    accounts to accept fraudulently-obtained payments from consumers.  As detailed

6    herein, Wells Fargo knew of this scheme, counseled the Enterprises' principals,

7    and helped them hide the true ownership of the accounts.

8    **VII.   WELLS FARGO'S KNOWING INVOLVEMENT IN THE FRAUDS**

9        **A.    Wells Fargo's Support of the Apex Enterprise**

10       69.    Wells Fargo bankers in California regularly and repeatedly helped

11   Apex executives advance their credit card laundering scheme in a number of ways.

12   Wells Fargo bankers like Dominic Testa (Westlake Village Branch) developed

13   long-term business relationships with Apex's principals: Peikos (Co-Owner),

14   Barnett (Co-Owner), and Raul Camacho ("Camacho," Apex Chief Financial

15   Officer).  Testa and other Wells Fargo bankers were able to keep—and grow—the

16   Bank's business with Apex because Wells Fargo was willing to wade into the

17   muck in ways that other banks would not.

18       70.    As early as 2014, Wells Fargo was helping Apex executives to open,

19   and also close, accounts for dozens and dozens of shell companies owned and

20   controlled by Apex owners Peikos and Barnett.  Wells Fargo, and in particular

21   banker Testa, knew that Peikos and Barnett were using these shell companies to

22   run high-risk internet sales operations that bilked consumers out of millions of

23   dollars.  At the same time, Wells Fargo had visibility into the high number of

24   chargeback refunds that were being withdrawn from the shell companies' Wells

25   Fargo accounts to repay the alarmingly high proportion of consumers who disputed

26   the charges.

27       71.    By early 2015, Apex employee Camacho was Testa's primary Apex

28   contact point.  Camacho was also often listed as the "owner" of the Wells Fargo

1 accounts Testa opened for the shell companies, although Testa was acutely aware
2 that Peikos and Barnett were the true owners of Apex and the shell company bank
3 accounts – and Camacho took directions from them. Testa, and other Wells Fargo
4 bankers, also readily provided prized anonymous bank reference letters for the
5 shell company accounts, which Apex then used to support merchant processing
6 applications by the shell companies. Without Wells Fargo's imprimatur, these
7 shell companies would not have been able to secure the essential merchant
8 processing accounts. Further, without Wells Fargo's continually providing
9 atypical bank services for Apex-related shell companies in a host of ways, the
10 Apex fraudulent enterprise would not have been able to exist.

11      72.    The Apex Enterprise generated millions of dollars in revenues—
12 money that left the shell companies' accounts almost as soon as it hit them. Those
13 funds went straight into the laundering chute, where Peikos and Barnett used the
14 Wells Fargo accounts to clean the money, transferring the funds into external
15 personal and third-party accounts to which they had access.

16      73.    The success of Apex's fraudulent scheme was by no means inevitable.
17 Wells Fargo in particular was in a rare position to stop the fraud very early on.
18 Moreover, it had an obligation to do so pursuant to a host of banking regulations
19 and laws. But it never did.

20      74.    Instead, Wells Fargo actively assisted the Apex Enterprise by
21 establishing dozens (upon dozens) of bank accounts for the Enterprises' shell
22 companies, providing the corresponding bank reference letters for those shell
23 companies, allowing Apex's principals to "wash" the dirty proceeds of their fraud
24 by transferring funds through their Wells Fargo accounts, and otherwise
25 performing atypical banking services for these fraudulent Enterprises. Through
26 this and other conduct, coupled with their intentionally lax oversight, Wells Fargo
27 flouted standard banking practices and in the process violated the Bank Secrecy
28 Act, anti-money laundering ("AML") laws, and the Bank's own internal policies

and procedures as they were written; as a result, Wells Fargo's conduct caused hundreds of millions of dollars in harm to consumers and to the Receivership Entities.

75.     During the Relevant Period, the Apex principals dealt primarily with Wells Fargo bankers at a San Diego branch and at the Westlake Village Branch in the Los Angeles area, though other branches and bankers assisted the fraud.  For instance, Wells Fargo's Woodland Hills office opened at least seven accounts for anonymous Wyoming LLCs that were part of the Apex Enterprise, and closed four of those accounts once the associated shell companies lost their access to merchant processing services (*i.e.*, the ability to charge consumers' credit cards).

76.     On information and belief, the Wells Fargo bankers at the San Diego Branch, the Westlake Village Branch, and the Woodland Hills Branch, just like numerous other Wells Fargo Community Bank branches during the Relevant Period, were operating under intentionally deficient bank practices and policies effected by the most senior executives at Wells Fargo.  Those practices and policies featured a reckless quota system that improperly pressured and incentivized Wells Fargo employees to provide atypical banking services, bend the rules, and even commit fraud when performing what should have been routine business tasks.

(i)     The San Diego Branch

77.     In the Wells Fargo branch located at First and Market Street in downtown San Diego (the "San Diego Branch"), several bankers, often collaborating with one another as well as with Apex principals, knowingly facilitated Apex's fraud for their own—and Wells Fargo's—financial gain.

78.     Apex's relationship with the San Diego Branch began in January 2014, when on two separate days Barnett walked into the branch with formation documents for eight Wyoming LLCs and asked to open bank accounts in each LLC's name. Barnett had no history with the bank; he was a walk-in off the street.

1   The LLC documents that Barnett presented to the branch were also suspect with
2   numerous indicia of fraud: they were nearly identical, with each of the LLCs based
3   in Wyoming (which allows for the creation of LLCs without identification of the
4   principals, effectively anonymizing the entities), each having the same Wyoming
5   mail drop as its business address, and each having been formed on the same day
6   four months earlier.

7          79.    Basic (AML) training that Wells Fargo bankers should have received
8   during the Relevant Period taught how and why anonymous LLC accounts with
9   shared addresses (especially a shared Wyoming mail drop) are used to camouflage
10  ownership and further frauds.  Such basic AML training alerted bankers to look for
11  transactions with other internal accounts in order to identify undisclosed
12  relationships.  The circumstances required that all of the Apex accounts be
13  evaluated together with bankers looking for similarities and patterns of activity that
14  indicate fraud.

15         80.    Under many banks' policies, a customer who provided the same
16  Wyoming mail drop address for multiple applications would have had those
17  applications further reviewed and then rejected for failing to satisfy bank customer
18  identification requirements.  At a minimum and per industry practice, additional
19  follow-up by Wells Fargo was required.  A bank following the requisite due
20  diligence consistent with industry practice would not have permitted these
21  accounts to be opened.

22         81.    But the Wells Fargo banker didn't ask questions.  Instead, the banker
23  promptly completed eight identical—generic—applications for Wells Fargo
24  accounts for the shell companies.  Each of the accounts were funded with minimal
25  opening deposits (generally $100, which was the minimum amount necessary for
26  the banker to get sales quota credit for opening the account), and each of the
27  account applications projected annual gross sales of $100.

28         82.    Under Wells Fargo's toxic sales culture and compensation system,

---

24                           Case No. _____
                            RECEIVER'S COMPLAINT

Barnett's appearance at the Wells Fargo branch was manna from heaven for the banker and Wells Fargo. While most banks would have refused to open the accounts or at least conducted more diligence, Wells Fargo just opened the accounts. And not just eight accounts. The banker opened sixteen accounts, when, unprompted, she opened a savings account for each of the eight checking accounts Barnett had requested.

83. The savings accounts were superfluous from the customer's perspective, but they were nevertheless valuable to Wells Fargo's bankers because they counted towards the extreme sales quotas that Wells Fargo put in place. Much later, upon a request to close some accounts by Peikos, Testa confirmed that the "[savings] accounts really have no purpose and can be shut down…".

84. After his initial success in establishing the shell company accounts at Wells Fargo, Barnett returned to the same branch three more times over the next seven months (March, August and September), opening 22 more business bank accounts for 11 more anonymous Wyoming LLCs. Each of these shell company bank account applications had the same indicia of fraud as the first batch, including anonymous principals, similar deposit and anticipated revenues information, and the same Wyoming mail drop address. Each time, Wells Fargo conducted no investigation, instead rubber-stamping the new accounts. When necessary, Wells Fargo also closed accounts that Apex had burned due to egregiously high chargeback rates.

85. For these later applications, Wells Fargo had the benefit of being able to review the activity in the prior Apex shell companies' bank accounts. Across the accounts, the same pattern of activity reappeared: after millions of dollars in consumer charges were deposited into the accounts (which had projected sales of $100 on their applications), extraordinarily high chargebacks would follow. In some monthly Wells Fargo account statements, the chargeback rates for these companies exceeded 70% and 80%.

---

25                                    Case No. _____
                              RECEIVER'S COMPLAINT

86. Wells Fargo was fully aware that Apex was burning through shell companies, due to these high chargeback rates, which caused merchant processors to cease doing business with the shells, because Peikos and Barnett were also regularly asking Wells Fargo to close old accounts for shell companies that could no longer access merchant processing services due to their high chargeback rates.

87. Notwithstanding numerous indicia of fraud, the rigorous Know-Your-Customer ("KYC") and AML requirements that were in place for the branch, and Wells Fargo's own internal policies and procedures that required (in theory) enhanced scrutiny of high-risk companies such as those associated with the Apex Enterprise, the San Diego Branch quickly approved every application and opened the accounts.

88. Wells Fargo bankers at the San Diego Branch also provided reference letters which validated the shell companies' Wells Fargo accounts. Initially, these letters were addressed to Barnett, but in May 2014, Apex's atypical banking requests to Wells Fargo grew bolder—and Wells Fargo's complicity in the fraud expanded. Barnett asked the San Diego Branch to re-execute and re-sign *ten* reference letters for the initial Wyoming LLCs for which the branch had opened accounts; the new letters would have Barnett's name removed, making them anonymous, "Dear Company" letters.

89. Without blinking, the San Diego Branch banker quickly re-executed the ten Wells Fargo reference letters, amending the address associated with the accounts to include just the company name, without any address and without Barnett's name. Wells Fargo accommodated this remarkable request for anonymity without comment or question.

| BEFORE: | AFTER: |
|---|---|



90.     Under these particular circumstances, and given the Bank's KYC and Enhanced Due Diligence obligations for these high-risk customers, acceding to specific requests to omit this same owner's name from all ten of the reference letters previously issued for supposedly separate anonymous LLCs deviated from accepted banking practice.    While providing bank reference letters can be appropriate in other instances, the circumstances here made it clear to Wells Fargo that there were heightened risks that the bank reference letters would be misused. This should have set off alarm bells.  It did not.

91.     That is especially the case, because of Apex's choice of the so-called "anonymous LLCs" from Wyoming as its preferred corporate form.    As Wells Fargo knew, using anonymous LLCs created a high risk for financial crime that, from the outset, should have resulted in a higher level of scrutiny by Wells employees of both the accounts and their related individuals.  Wells Fargo should not only have categorized these accounts as high risk, requiring enhanced due diligence prior to opening the account, but going forward, Wells Fargo should also have treated these supposedly separate shell accounts with enhanced monitoring as

a family of accounts from a risk compliance perspective.

92.    Globally-recognized account opening and oversight standards in place for decades have classified anonymous LLCs entities as "high risk" entities and warned that these entities are one of the most widely used vehicles in laundering of the proceeds of crime, corruption, and other malfeasance.  Therefore, Wells Fargo was required to conduct due diligence sufficient to establish the true beneficial owners of LLCs before allowing them access to bank accounts—and were further required to document the results of that diligence correctly in the bank's files in order to assist the bank in its future monitoring endeavors.

93.    In light of the increased risks created from the outset, Barnett's specific request to reissue generic no-name letters to 10 related anonymous LLCs was highly suggestive of credit card laundering by Apex.  As the Bank knew, Apex could easily conceal the identities of its blacklisted owners from merchant processors by submitting applications in straw owners' name that were supported by the essential no-name reference letters from Wells Fargo.  And that's exactly what Apex did.

94.    The most basic compliance training would have taught these bankers that such tactics were highly suggestive of card laundering or some other nefarious activity.  This means one of two things is true: either Wells Fargo's high-pressure sales culture made it clear that identifying and stopping fraud was secondary to the Bank's profit motive, or Wells Fargo's training and oversight were intentionally designed to be so deficient that its employees were clueless as to the most obvious signs of fraud.

95.    In August 2014, Barnett was back and opened ten more Wyoming LLC shell company accounts at the San Diego Branch (this time with a different banker), and he requested and received ten more no-name reference letters.  Like the banker before her, the banker wrote and executed anonymous reference letters for the shell companies: they did not identify the accounts owners or include any

**R_SER_71**

1   other identifying information, e.g., company addresses.  Rather than take any of the
2   steps required by a bank when undertaking typical due diligence for new
3   customers, multiple bankers at Wells Fargo's San Diego Branch instead continued
4   to process identical business account applications.  These bankers did so, because
5   at Wells Fargo, opening these bank accounts was not only profitable for the Bank,
6   but was also personally beneficial to Wells Fargo's employees, who were acting
7   under corporate edicts to meet daily account opening goals.

8        96.    Despite the fact the initial shell companies accounts were established
9   in January 2014 with a $100 deposit and minimal ($100) projected annual sales,
10  deposit activity in the accounts was immediate, dramatic and inconsistent with the
11  account applications.  Millions of dollars began to flow through the accounts
12  almost at once.

13       97.    In the month of February, these Wells Fargo Apex accounts took in
14  $810,000 in consumer credit card payments from Apex's high-risk merchant
15  processors.  From February to December 2014, the Apex Wells Fargo accounts
16  took in a whopping $12,300,000 in consumer credit card payments forwarded by
17  merchant processors.[13]  The vast difference between the expected and actual
18  account activity was obvious to Wells Fargo and a huge red flag, which a bank
19  following standard industry practice was required to investigate.

20       98.    Within a short time, the shell company bank accounts also began to
21  suffer staggering merchant chargebacks and refunds.  As a group, the Apex shell
22  company bank accounts at Wells Fargo suffered more than 22% in
23  chargebacks/refunds in 2014 through mid-2015.  To put these numbers into
24  perspective, a 1% chargeback rate is considered excessive and grounds to
25  terminate a merchant's account with a merchant processor.

26  _____

27  [13] This number is based only on information presently available to the Receiver,
     and is expected to grow when complete monthly account statements are received in
28  discovery.

99.     In some months, the chargeback rate was much higher.  As just one example, the August 2014 statement for an Apex shell company named "Bold Media" reflects a chargeback rate of 78% for the month.

100.   And the immense chargeback activity was obvious to Wells Fargo, on a monthly basis, given that the monthly account statements for all of the shell companies similarly reflected pages of chargebacks.  As the below example makes clear, the shell accounts' Wells Fargo monthly statements specifically identify the chargebacks in the "Withdrawals/Debits" column – often in the very same amounts again and again, for example, $87.67 and 97.88 (or multiplies thereof), as consumer after consumer requested chargebacks on their credit cards.

Account number: ████2051  ■ November 1, 2014 - November 30, 2014  ■ Page 9 of 11

**WELLS FARGO**

## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.68 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.68 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.68 | |
| 11/25 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | | 145.69 | |
| 11/25 | | Bkcd Processing Bkcd Depst 20 411 272400398421 Lion Capital LLC | | 592.23 | 721.29 |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | 172.73 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | 395.29 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | 552.80 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398405 Lion Capital LLC | 1,559.51 | | |
| 11/26 | | Humboldt MS Deposit 141125 8 7201693883 Healthy Choice Savings | | 39.95 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 82.72 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.68 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.68 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.68 | |
| 11/26 | | Humboldt MS Deposit 141125 8 72016896 81 8446072489 Dermanique | | 195.76 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201690889 8446317914 Dermanique | | 195.76 | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398421 Lion Capital LLC | | 257.05 | 1,566.02 |
| 11/28 | | Bkcd Processing Bkcd Depst 20 411 272400398405 Lion Capital LLC | 39.19 | | |
| 11/28 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/28 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |

Case No. _____
RECEIVER'S COMPLAINT

**R_SER_74**

101.  Of course, Wells Fargo also knew about these excessive chargebacks, because Wells Fargo's very own customers, using credit cards issued by Wells Fargo, were among the many Apex customers requesting such chargebacks on their credit cards.  Wells Fargo's own customers even made consumer complaints about the "risk-free" trial schemes to the Better Business Bureau.

102.  Wells Fargo deliberately overlooked this early and obvious aberrational activity in the Apex shell company accounts.  Had even minimal investigation under standard banking procedures been conducted, with such obvious red flags – as Wells Fargo was required to do – the consumer losses could have been staunched almost immediately. Wells Fargo took a different path instead.

103.  As described further below, Barnett's role as Apex's primary bank contact and shell company account opener transitioned to Apex co-owner Peikos in 2015 and Apex employee Camacho at the direction of Peikos.

(ii)    The Westlake Village Branch

104.  In April of 2015, the initial Apex shell company accounts that Barnett had established in 2014 had been open for fifteen months; most were inactive after having received (and then having transferred out) millions of dollars of consumer funds, even accounting for staggering consumer chargebacks.  These chargebacks, which ran through the Wells Fargo accounts, had resulted in nearly all of the shell companies being terminated by their merchant processors.  In spite of all this, Wells Fargo was still anxious to expand its business with Apex.

105.  Beginning in early 2015, Apex began to use Los Angeles County Wells Fargo branches, and its principals developed relationships with the Wells Fargo bankers at a Los Angeles County office located in Westlake Village (the "Westlake Village Branch").  Like the bankers at the San Diego Branch, the Wells Fargo bankers at the Westlake Village Branch were happy to facilitate Apex's ongoing consumer fraud and card-laundering activities in exchange for a revenue

**R_SER_75**

1  boost and assistance hitting sales quotas—even if that meant assisting a fraud and
2  deliberately turning a blind eye to conduct that any banker would have recognized
3  as bearing numerous indicia of fraud.

4        106.   David Hannig ("Hannig") was an Assistant Vice President and Sr.
5  Business Sales Consultant for Wells Fargo Merchant Services.   On information
6  and belief, Hannig was based out of the Los Angeles area but worked regularly
7  with a number of branches, including the Westlake Village Branch, where he held
8  meetings with Apex personnel and Wells Fargo customers.

9        107.   Dominic Testa ("Testa") was a Business Banking Specialist for Wells
10  Fargo at the Westlake Village Branch.   On information and belief, Hannig and
11  Testa had a close working relationship with each other and communicated
12  frequently about how they could expand Wells Fargo's business with and sell new
13  bank products to the Apex Enterprise.

14        108.   The Westlake Village Branch was located nearby Apex's office in
15  Woodland Hills, California.   Wells Fargo banker Testa, who was part of Wells
16  Fargo's Community Bank division, was able to develop and sustain a long-term
17  and ongoing business relationship with the Apex Enterprise.   He was particularly
18  friendly with Apex's employee and CFO, Camacho, who often referred to Testa
19  with nicknames like "bud."   As Testa knew, Camacho was simply an employee of
20  Apex and was not the true "owner" of any account in his name.   Testa knew that
21  Camacho was taking his instructions directly from Peikos, who was the true owner
22  and controller of Apex.   Testa also knew that Camacho was only an "owner" on
23  paper of the accounts and shell companies held in his name.

24        109.   Testa's interactions with Peikos and Camacho made it clear from
25  early on that Peikos was the boss.   As just one example, on April 17, 2015, Testa
26  emailed Peikos about opening "new accounts for you".   Testa noted "I'm assuming
27  you'll be using Wyoming like your other LLCs" and requested the documentation
28  and identification of the "owner."   Peikos responded that Camacho, and not Peikos,

---

33                                      Case No. _____
                                        RECEIVER'S COMPLAINT

**R_SER_76**

1   would be the "owner" of the LLCs and the bank accounts that Peikos was

2   instructing Testa to set up: "So we are clear, [Camacho] will be the 100% owner

3   on these accounts, and I will have access like the current ones were set up." The

4   "current ones" Peikos was referring to were the roughly 40 shell company accounts

5   that Barnett had opened in San Diego which were lying mostly unused at that point

6   because they had lost access to merchant processing services as a result of their

7   extraordinarily high consumer chargeback rates.  Testa told Peikos that he would

8   put a fee waiver on the accounts for the next three months and recommended that

9   Peikos "[k]eep in contact with me on when they should be closed and I can do it

10   over the phone."

11      110.  During this same time, Hannig, in coordination with Testa,

12   encouraged the Apex Enterprise to apply for merchant processing with Wells

13   Fargo. Apex employee Chris Carr met with Hannig and identified shell companies

14   and products for which Apex wanted to obtain merchant processing services.

15      111.  Wells Fargo requires merchant account applicants to undergo an

16   underwriting process intended to ensure the applicant is a legitimate and

17   creditworthy business and to weed out merchants engaged in illegal conduct and

18   required the legitimacy of the business be verified/validated. Any material

19   discrepancies must be documented, investigated, and resolved and the source of the

20   verification should be in the merchant file.  The Bank forbid the solicitation of

21   merchants engaged in certain unacceptable business practices because they were

22   presumptively illegal, violated card association rules, or created excessive risk

23   exposure for the Bank.

24      112.  Several days after their in-person meeting, on April 21, 2015, Carr

25   followed up with an email to Hannig containing information for two shell

26   companies.  This opened a string of emails between the two in rapid succession,

27   with emails being exchanged often literal minutes apart.  Carr wrote, "Here is some

28   information on the corps and URLs that we wanted to lead off with  . . . Please let

34

Case No. _____
RECEIVER'S COMPLAINT

us know if you require additional information to Pre-fill these apps for us. We are
eager to get started so as soon as you can send us the paperwork, we will turn it
around with any additional documentation you require. Thanks!" Carr identified
Arturo Oliveros and Julia Buenrostro as the "owners" of shell companies Alpha
Group, LLC and Crest Capital LLC, respectively, both of which had the same
Wyoming mail drop listed as their business address. Carr listed the shell
companies' businesses as "supplement[s]" and "health plus", respectively, and
included links to the companies' websites, www.virilitymuscle.com and
www.evermaxbody.com.

113. Hannig reviewed the material and linked websites and quickly
responded, identifying crucial and fundamental discrepancies in the information
Apex provided:

> Chris,
>
> The bottom of the websites show different LLC's then what is listed below. That will need to be changed to the below listed LLC's on the websites before I can even start the process. ***The people you listed below are not owners on the Wells Fargo bank account that you gave us. They must be owners of the business in order to use their name on the merchant accounts. The address also does not match up to what is on the website.*** Everything needs to be matched up on the accounts or the applications won't not pass the submission process.
>
> Thank you,
>
> David Hannig
>
> (Emphasis Added).

114. Carr quickly replied claiming to have corrected the issues:

> David,
>
> Thanks for your reply. The company names and addresses have been updated on the websites.
>
> The Websites just had the product name in the footer as a placeholder until we got all of the docs in order.
>
> ***Arturo Oliveros and Julia Buenrostro are owners of the entities listed***.

1      Thanks! - Chris

2      (Emphasis added).

3      ****

4      115.   Almost immediately, Hannig again responded:

5      I see the names changed so that will work. ***The bank accounts still do not***
6      ***show them as owners. Coordinate with Dominic [Testa] on how to get***
7      ***this updated. Here is what we have listed on the bank accounts:***

8      

17     David Hannig
18     Assistant Vice President
19     Business Sales Consultant
       Wells Fargo Merchant Services

20     (Emphasis Added).

21     116.   The irregularities Hannig identified were troubling, particularly since,

22     as Hannig knew, Apex had already opened (and in almost every case, burned

23     through) roughly 40 shell bank accounts with Wells Fargo in which millions of

24     dollars had flowed through.   Apex's excuses and scramble to alter website and

25     product information on the fly only reinforced what Hannig already knew to be

26     true: that the "owners" of the shell companies were owners in name only.

27     117.   But most troubling were the discrepancies in information regarding

28     the key issue of the beneficial ownership of these anonymous Wyoming LLCs.

Case No. _____
       RECEIVER'S COMPLAINT

**R_SER_79**

The two shell companies, Alpha Group and Crest Capital, had Wells Fargo accounts opened by Apex principal Barnett a year earlier in San Diego. When he opened the accounts, Barnett claimed to be the sole owner of the companies and presented anonymous Wyoming LLC documents and the same maildrop address for these shell companies.

118. By April of 2015, when Hannig flagged the issues, the accounts had been open for 11 months and had taken in more than a quarter of a million dollars in consumer payments from merchant processor deposits. But Hannig was now being told that the account holder, Barnett, did not in fact own the shell companies – and two people (Oliveros and Buenrostro), who were not listed on those Wells Fargo bank accounts or identified in any Wells Fargo bank records, did.

119. Such information was an obvious indication that Apex was engaged in credit card laundering by listing owners on merchant account applications for an anonymous LLC, thus obscuring the identity of the true owners.

120. Apex's next response, sent just 23 minutes later, should have been even more alarming to Hannig and Testa. Rather than "updating" the information, Apex instead changed course and told Wells Fargo they had decided to use instead new anonymous Wyoming LLCs, supposedly now "owned" by Camacho, to apply for the merchant accounts. The new shell companies shared (as did every one of the Apex shell companies) the same Wyoming mail drop address.

> From: Chris Carr [mailto:chris@apexcapitalgrp.com]
> Sent: Tuesday, April 21, 2015 4:03 PM
> To: Hannig, David
> Cc: Raul A; Phillip Peikos; Testa, Dominic J
> Subject: Re: Information for New MIDs
>
> I see you are correct. Those accounts are, indeed, in David Barnett's name. **On review, we decided that we would like to run those two websites through these new corps that we just set up. They are owned by our CFO Raul Camacho**[. . . ]
>
> Raul will come in tomorrow and open bank accounts at your branch. EIN numbers are forthcoming. Websites have been updated. Sorry for all the changes. Will you be in tomorrow to help us set up the

1    accounts?

2    Thanks! - Chris

3    (Emphasis Added.)

4    121.    The response of Hannig, who was specifically seeking to provide
5    *merchant banking* for Apex, was problematic.   He simply suggested Apex
6    coordinate with the bank to get the ownership "updated".   Notably, Hannig did not
7    copy the actual account holder, Barnett, on any of this correspondence.

8    122.    Hannig's cursory review had immediately identified fundamentally
9    inconsistent information about the LLCs' ownership, the ownership of the bank
10   accounts, and discrepancies between the websites and the products which Apex
11   was hoping to sell on them.   He had pointed out that the irregularities and
12   discrepancies would cause the merchant applications he wanted to present on
13   Apex's behalf to be rejected.   As a merchant banker, Hannig knew that the
14   discrepancies in the owners, coupled with the use of anonymous Wyoming LLCs
15   and the pattern of burning through the LLCs' bank accounts, were indicative of
16   fraud.

17   123.    Instead of doing what he should have done under standard banking
18   procedures – *e.g.*, refuse to submit the shell account's merchant processing
19   applications; ask questions and demand answers about the troubling and
20   inconsistent information being revealed; and communicate his concerns and report
21   suspicious activity through Wells Fargo's established channels — Hannig simply
22   directed Apex on how to change its paperwork, so the applications would not be
23   flagged, allowing him to potentially pad his sales numbers and the bank itself to
24   expand its banking relationship with the fraudulent Apex Enterprise.

25   124.    During the years when the Apex fraud was in full bloom, on
26   information and belief, such aggressive sales tactics were rewarded within Wells
27   Fargo's misaligned compensation system.   Hannig himself was recognized as a
28   Wells Fargo "Sales Star" (winning that award in 2013, 2014, 2015, 2016, and

38                    Case No. _____
                      RECEIVER'S COMPLAINT

**R_SER_81**

1   2017), and he was also named the #1 Wells Fargo Sales Representative out of 500

2   employees in 2013 and 2016.

3       125.   Hannig was not the only Wells Fargo banker to advance Apex's

4   ongoing fraud, however.  In light of Wells Fargo's pernicious sales culture and

5   misaligned compensation system, this type of employee misconduct repeated itself

6   again and again, across Wells Fargo bankers and branches. Indeed, as recently as

7   January 23, 2020, the OCC recognized: "[t]he Bank tolerated pervasive sales

8   practices misconduct as an acceptable side effect of the Community Bank's

9   profitable sales model, and declined to implement effective controls to catch

10   systemic misconduct.  Instead, to avoid upsetting a financially profitable business

11   model, senior executives…turned a blind eye to illegal and improper ***conduct***

12   ***across the entire Community Bank***."  (Emphasis added.)

13       126.   Apex's last-minute pivot to the two new corporations they had "just

14   set up" for merchant processing and which were now supposedly "owned" by

15   Apex employee Camacho, necessitated getting new Wells Fargo bank accounts

16   opened before the merchant account application could be completed.  Testa was

17   more than happy to oblige.  When Camacho sent Testa documents for one of the

18   new LLCs (with a Wyoming operating agreement signed that same day, April 21,

19   2015), Testa replied that the documents were "perfect" and the accounts were

20   promptly opened.

21       127.   Once the new bank accounts were opened, Apex submitted the

22   merchant processing application to Hannig listing Camacho as the "owner" and

23   listing the Wyoming mail drop as the address.  But on April 30, 2015, Hannig

24   informed Apex that higher-ups at Wells Fargo had rejected the application, as he

25   had received a "decline email due to an unqualified business model for Wells

26   Fargo. We tried, thank you for considering us."

27       128.   In response to questions from Apex, Hannig said the application was

28   rejected because the companies were selling supplements.  In other words, despite

1  Hannig's questionable efforts to obtain Wells Fargo's merchant processing
2  services for Apex, Wells Fargo's merchant banking division had (correctly)
3  categorized the shell companies as high-risk businesses with which they did not
4  want a relationship. The Bank's merchant division was unwilling to take on the
5  risk of processing for these companies, recognizing that they were in an industry
6  rife with consumer deception, and there was the potential for high chargebacks and
7  losses *for Wells Fargo* caused by fraudulent activity.

8      129.  Of course, Wells Fargo was still perfectly willing to continue
9  servicing the fraudulent LLCs at the branch level and opening bank accounts for
10 additional shell companies, while letting *other* merchant processors (who had less
11 insight into Apex's illegitimacy, and no insight into its obfuscated performance
12 history and ownership legerdemain, and who would be reassured by the fact that
13 Wells Fargo had approved them for bank accounts) take on that risk – and while
14 allowing Apex to deceive more unsuspecting consumers (including even Wells
15 Fargo's own credit card holders) with the lure of "free trial" products.

16     130.  Knowing what it did, Wells Fargo was legally required to take a
17 number of steps, including conducting a further investigation into the Apex
18 Enterprise, evaluating patterns of misconduct and suspicious activity across the
19 entire Apex relationship, terminating the Bank's relationship with Apex, its
20 principals, and its associated shell companies, and/or following the Wells Fargo
21 established procedures for reporting the suspicious activity both internally and
22 externally.

23     131.  Wells Fargo did none of these things. Instead, it kept doing business
24 and looking for growth opportunities with Apex. Through Testa, Wells Fargo
25 continued to open numerous shell company accounts for Apex. Similarly, Hannig
26 periodically attempted to get merchant processing for Apex shell companies but
27 was ultimately always unsuccessful.

28     132.  In December of 2015, Camacho accidentally sent a spreadsheet of

---

40                          Case No. _____
                           RECEIVER'S COMPLAINT

active and pending "MID's" (merchant processing accounts) to Hannig. The
spreadsheet listed more than 25 LLCs with bank accounts at Wells Fargo, along
with their corresponding accounts at various merchant processors. As was the case
when Hannig had identified and flagged the central issue months earlier, *the
purported owners of the LLCs were not the Wells Fargo account holders.* The
spreadsheet made it absolutely clear that, at a minimum, Apex was engaged in
large-scale credit card laundering and was using shell companies and straw owners
to secure merchant processing services—something any banker in Hannig's
position would have immediately recognized, particularly because of the incident
some months earlier.

133. Within minutes, Camacho recognized that he did not want that
spreadsheet in the Bank's files. He wrote to Hannig, asking him to "[p]lease delete
ASAP" and adding that he "would greatly appreciate if you can keep the
information confidential." Camacho concluded the email by asking Hannig to
confirm with him once the email had been deleted.

134. Hannig promptly replied "Deleted." On information and belief,
Hannig's prompt deletion of this e-mail and attachment from Wells Fargo records
violated both Bank policy and the law. As an executive at Wells Fargo, Hannig
had a duty under a number of federal laws to investigate and report Apex's
suspicious activities. Those obligations did not disappear just because a customer
asked that Hannig delete an email.

135. The spreadsheet was not sent to Hannig in a vacuum. Both he and
Testa knew exactly who this very high-risk customer was. They were all too aware
of Apex's history of hiding the true owners of the anonymous shell companies they
created – and they had even helped Apex to mask these beneficial ownership issues
and sanitize its merchant processing application at Wells Fargo. Hannig and Testa
also knew that Wells Fargo had analyzed Apex's high-risk business earlier that
year and had declined to provide merchant processing services to it. In light of the

1    above, on information and belief, the deletion of Camacho's email and failure to
2    take steps to report the suspicious actions were deliberate efforts to aid and abet
3    Apex's fraud.

4        136.   Notwithstanding its knowledge of obvious fraud, Wells Fargo and the
5    Westlake Village Branch continued to open bank accounts for Apex shell
6    companies throughout 2015, 2016, 2017, and 2018; the new accounts only stopped
7    when the FTC filed its lawsuit against Apex.  In 2015, Camacho opened 14 more
8    Wells Fargo accounts for 13 anonymous shell companies.  In 2016, Camacho
9    opened six accounts for six shell companies; in 2017, 19 accounts for 19 shell
10   companies; and in 2018 12 accounts for 12 shell companies.  In total, Wells Fargo
11   opened *at least* 92 bank accounts for more than 70 shell companies over the course
12   of just four years.

13       137.   When opening and servicing the accounts, Wells Fargo bankers
14   continued to provide atypical banking services, asking no questions and
15   deliberately ignoring Apex's obvious efforts to launder money it obtained
16   operating its high-risk, fraudulent business through anonymous shell companies
17   fronted by straw owners.

18       138.   The pattern was clear – and only became clearer with time: Apex,
19   primarily through Camacho, would periodically request that Wells Fargo close
20   existing shell companies' bank accounts after those shell companies had been
21   blacklisted and lost their merchant processing because of the massive levels of
22   chargebacks.   At the same time, Camacho would request Wells Fargo open new
23   shell company bank accounts—often six new bank accounts at a time—of which
24   Camacho would be the "owner".  In this way, Wells Fargo's conduct enabled Apex
25   to cycle through the burned shell companies and their associated bank accounts
26   before creating new, "unrelated" and anonymous LLCs to use to defraud
27   consumers.

28       139.   As was the case with the San Diego Branch, the Westlake Village

---

42                                    Case No. _____
                                     RECEIVER'S COMPLAINT

Branch, via Testa, was more than willing to supply no-name reference letters for the shell companies. Testa provided large tranches of reference letters, routinely issuing 6 letters, and on one occasion 12 letters, at a time. He was also willing to vary the format and information contained in the reference letters based on requests made Camacho.

140. Across multiple branches and multiple bankers, between 2014 and 2018, Wells Fargo assisted the Apex Enterprise by opening account, after account, after account, for a host of shell companies. These shell companies were "anonymous" LLCs based out of Wyoming, though true their owners were not anonymous to Wells Fargo—Wells Fargo was well aware that all of these companies and accounts were part of the Apex Enterprise, owned and controlled by Barnett and Peikos. That was clear not only based on the fact that core Apex personnel were always the ones opening the accounts, and also from the email that Camacho mistakenly sent to Hannig, which spelled out exactly what Apex was doing. Yet Wells Fargo was more than happy to keep, and even pursue, Apex's business by facilitating Apex's ongoing fraud.

**B.    Wells Fargo's Support of the Triangle Enterprise**

(i) <u>Overview</u>

141. At the same time that Wells Fargo was providing banking services to the Apex Enterprise, it was also providing those same services to the Triangle Enterprise, which was also running "free trial" scams out of Southern California and which was operating using a business model strikingly similar to Apex's.

142. In the case of Triangle, as with Apex, multiple Wells Fargo bankers across multiple branches developed long-term and ongoing business relationships with Triangle's owner and controller, Brian Phillips; as with Apex, these Wells Fargo bankers eagerly opened bank accounts for a host of companies that they knew were shells being used by Phillips. And as with Apex, Wells Fargo's clear-eyed support of the Triangle Enterprise resulted in millions of dollars in consumer

harm—damages which spilled over to the Receivership Entities.

143.   Wells Fargo began providing services to Phillips and Triangle in at least 2009.   In addition to opening and closing accounts and executing reference letters for Phillips and his shell companies, Wells Fargo also provided a host of other services, including payroll services and tax return preparation.   In each instance, Wells Fargo took instructions from Phillips and provided information directly to him, understanding that he was the owner and controller of all Triangle-related accounts even though numerous others were listed as the "owners" of the accounts.   Wells Fargo provided these services to Phillips and Triangle even though it knew that those services were a prerequisite for money laundering and fraudulent business activity.

144.   Like Apex, the Triangle fraud relied on the use of shell companies with straw owners, which Triangle generally referred to as "nominees", to keep their fraudulent businesses running.   Phillips recruited nominees to be the "owners" of the shell companies by offering them a monthly fee, such as $500 per month, for allowing Phillips to use their names and identities to establish shell companies and accompanying bank accounts at Wells Fargo.   Phillips' only requirement to qualify was that the nominees not be blacklisted on the MATCH list as a previously terminated merchant.

145.   Phillips then served as the conduit between Wells Fargo and each nominee in order to secure the Wells Fargo bank accounts needed to carry out the Triangle fraud.   Each time, Wells Fargo rubber-stamped the applications.   From there, Phillips used the corporate documents and Wells Fargo account information (along with the essential Wells Fargo reference letters) to obtain merchant processing services in the nominee's name, which allowed the Triangle Enterprise to perpetrate its "free trial" scam at consumers' expense.

146.   None of this would have been possible without Wells Fargo.   Each time Phillips opened a new shell account, he instructed Wells Fargo that the

nominee was the "100 % owner" on paper, but Phillips was always to be given
immediate access and full control as a "co-signer" of the Wells Fargo bank account
belonging to the supposed "100% owner." Each shell company's account opening
paperwork falsely represented Phillips as a rank-and-file employee of the shell
company—its supposed "Data Specialist" —a transparent effort understood by
Wells Fargo to mask Phillips' true ownership of all of the shell companies. Wells
Fargo always accommodated "employee" Phillips' requests, which was not in line
with banking practices. As a result, Wells Fargo knew that Phillips retained the
unfettered ability to transfer money from a nominee's shell account directly into
the primary Triangle Enterprise account at Wells Fargo, which Wells Fargo knew
was owned by Phillips.

147. The troubling pattern repeated itself, again and again, with Phillips
driving all communications with Wells Fargo for the nominees. Notwithstanding
known abuse of beneficial ownership for these types of high-risk businesses, and
mounting evidence that Phillips was actively engaged in such abuse, Wells Fargo
bankers happily opened this stream of new accounts in the names of nominees (in
keeping with its sales culture prizing growth above all else). All the while Wells
Fargo bankers conducted the most minimal level of due diligence, if any, on the
nominee "owners", largely relying on Phillips' vouching for the new nominee
"owner." Phillips himself routinely filled out the forms and gathered and
submitted the signatures of the "owners" to Wells Fargo. If a Wells Fargo banker
requested a cursory phone call with the "owner" before opening an account,
Phillips arranged it. In the latter years of the fraud, Phillips even walked nominees
into the local branches, and Wells Fargo promptly accepted the paperwork from
the new "owners" before turning around to give "employee" Phillips full control as
the co-signer. This arrangement benefitted Wells Fargo as well as Triangle and
Phillips, because it gave Wells Fargo an easy way to open new accounts in
perpetuity.

Case No. _____
RECEIVER'S COMPLAINT

R_SER_88

148.   After dealing with the "owners" on only the most perfunctory level at account opening, if at all, Wells Fargo then dealt thereafter with Phillips, understanding him as their customer and the actual owner of all of the accounts. At Phillips' direction, Wells Fargo regularly swept funds in the shell company accounts into Triangle's primary bank account at Wells Fargo. Once transferred to Triangle's main account, the funds would almost immediately be sent to a Canadian company owned by Triangle, Global Northern, at a Canadian bank. In turn, Global Northern would forward the funds to Hardwire accounts in Hong Kong or Thailand. Hardwire would then wire money back to Triangle in the U.S. to cover expenses to complete the laundering of the funds.

149.   From the very start, Phillips and Triangle's offshore-based principal, Devin Keer relied upon Wells Fargo as the best (and perhaps only) banking option for opening scores of essential bank accounts for the shell companies. In 2009, near the start of Triangle's implementation of its "free trial" scam, Keer, then in Canada, emailed a merchant processor to ask:

> Do you guys work with/know any corp services type guys who incorporate US corps quickly?  Brian [Phillips] has a corp in NV that he just set up but there's no bank accounts and stuff set up yet. Would like your advice on the whole US corp issue before we drive down to Seattle to open bank accounts - if we can set up another corp for the purpose of this…deal that might be a better play for us.

The processor promised to look into it, but before he could, Keer wrote back: "***I think we can get Wells to take care of it***." (Emphasis added.)  As it turned out, Keer was right.

150.   Phillips, Keer, and Triangle relied on Wells Fargo to deliberately overlook obvious beneficial ownership issues, which Wells Fargo was happy to do. Phillips was so confident in Wells Fargo's pliancy that when one nominee raised a concern about what would happen if Wells Fargo contacted his mother (whom he had enlisted to serve as another nominee for Phillips in 2011), Phillips responded by dismissing his concerns wholesale, responding, "***Dude, you still don't***

---

Case No. _____
RECEIVER'S COMPLAINT

1   *understand how wells is totally different.  The bank won't be calling her*."

2 (Emphasis added).  Wells didn't call.

3      151.  Instead of conducting an investigation, increasing its monitoring of

4 the Triangle accounts, reporting suspicious or unusual activity internally or

5 externally, or simply refusing to provide banking services to the Triangle fraud,

6 time and again Wells Fargo acceded to Phillips's requests for the Bank to open

7 new shell company accounts with nominee owners, effectively legitimizing the

8 shells in the eyes of the merchant processors.

9              (ii) <u>The Keller, Texas Branch</u>

10      152.  The relationship between Wells Fargo, Phillips, and Triangle began in

11 Texas on September 2, 2009, when Wells Fargo's Keller, Texas branch, principally

12 through banker Lea Walker ("Walker"), but with assistance of others in the branch,

13 including the branch manager, began opening shell company accounts for Phillips

14 and providing him with reference letters.

15      153.  In roughly one year, Walker opened at least eight shell company

16 accounts for Phillips and provided him with four reference letters for these

17 accounts.

18      154.  In 2011, Walker opened four more accounts for shell companies at

19 Phillips' request, providing him with three reference letters.  That year, another

20 banker at the Keller, Texas branch, opened two more shell company accounts for

21 Phillips and signed another reference letter.  Walker continued to open additional

22 shell accounts for Phillips into 2012.  In total, this Wells Fargo branch opened

23 more than 20 banks account at Phillips' request, with roughly half of those being

24 for shell accounts nominally owned by others.

25      155.  Wells Fargo's understanding of Phillips' ownership interest in the

26 accounts is abundantly clear in May 2012 emails that Phillips and Walker

27 exchanged, in which Phillips asked Walker to remove certain approval

28 requirements so that he could generate and send wires for accounts that he did not

1   own on paper.  Walker immediately fulfilled Phillips' request, which would have

2   been unthinkable if she were not aware that he was the true owner of the accounts

3   and that the purported "owner" was just a nominee.

4               (iii)   <u>The Southern California Branches</u>

5       156.   In or about 2013, Phillips began moving his banking relationship with

6   Wells Fargo to Southern California.  Across multiple Wells Fargo Community

7   Bank branches in Southern California (and in partnership with multiple Wells

8   Fargo bankers), Phillips came to open dozens more Wells Fargo accounts as the

9   Triangle scheme expanded.  In total, over the course of the Triangle scheme, Wells

10   Fargo opened more than 85 Triangle-related accounts in California and Texas at

11   Phillips' request.  While Wells Fargo knew that all of the accounts were under

12   Phillips' exclusive control, over 60% (approximately 55) of those accounts were

13   bank accounts for the shell companies that were "owned" in the names of the

14   nominees.  Wells Fargo also opened more than 30 corporate bank accounts that

15   Phillips directly owned.  These included, most notably, numerous Wells Fargo

16   bank accounts for the Triangle Media Corporation, into which Phillips regularly

17   requested that Wells Fargo transfer funds from the shell company accounts

18   "owned" by others, which Wells Fargo always did.

19       157.   Between 2013 and Triangle's demise in 2018, Phillips' business with

20   Wells Fargo in California expanded rapidly.  Over a nine-month period in 2015

21   alone, Wells Fargo opened a total of 12 shell company accounts "owned" by

22   nominees for Phillips.   Phillips established a close and continued relationship with

23   Wells Fargo across multiple branches in Southern California.  In total, over a

24   dozen Wells Fargo Community Bank branches in Southern California provided an

25   array of banking services for Phillips, Triangle, and his many related shell

26   companies.  Between fall 2013 and the end of Triangle in 2018, Wells Fargo

27   opened more than 60 accounts at Phillips' request.  More than 40 of those bank

28   accounts, however, were for shell companies supposedly not "owned" by Phillips.

Phillips was a repeat player at many branches, including San Diego (1st and Market – 5 accounts and 3 reference letters), El Cajon (6 shell accounts and 9 reference letter), Palomar Vista (8 accounts and 2 reference letters), and San Marcos (6 accounts and 1 reference letter). Additionally, Phillips often made requests to open accounts to his Relationship Managers (Albana and Cording) working out of the Escondido branch, who expedited that process. Albana and Cording played the essential role of providing Phillips with ready access to reference letters (they wrote more than 30 such letters between 2015 and 2018).

158. The scope of the branches involved emphasizes that this was not one bad banker or one bad branch—rather, the bad conduct was reliably endemic at Wells Fargo. While the Escondido Branch was probably the worst offender (as discussed below), the misconduct at issue occurred across the Southern California branches noted above, all of which were operating under Wells Fargo's toxic sales culture. For example, in 2015 a banker from the San Diego Branch came to Phillips's aid when he asked her to set up a bank account for a shell company "with me and another signer on it." The banker responded that she needed the nominee owner's information to open the account, but that she would "switch the relationship once I have it." Phillips sent the banker the information she requested (the nominee's driver license, phone number, and social security number, among other things), and the banker proceeded to open the account, apparently untroubled by the fact that Phillips—not the nominee—was the one providing the information to open an account for a company that purported to be owned by the nominee.

159. The Wells Fargo bankers knew that all of these accounts were related, but on information and belief, that relationship was never risk-rated, monitored, or otherwise managed as would be befitting a relationship encompassing the volumes, number of accounts and global scope of what was an enterprise—not a series of individually-owned accounts.

---

(iv)   The Escondido Branch

160.   Wells Fargo bankers at the Escondido Branch were especially accommodating to Phillips, particularly Haiman Albana ("Albana"), who was a Vice President and Business Relationship Manager at the branch, and Brian Cording ("Cording"), who was a Vice President and Senior Business Relationship Manager.  Compliance "rules" were easily bent or discarded for Phillips, in line with the OCC's conclusion that "[t]o the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank."  Albana, for example, initially told Phillips on October 30, 2013, that a shell company account (which Phillips had requested on October 24) hadn't yet been set up because Albana was "waiting to hear back from my compliance department" about it—but when Phillips complained that "when [he] was working with the branch on this stuff they could turn it around in 1 day" and asked whether he should "reach out to my branch contact," Albana sent him the forms for the next step *less than one hour later*.

161.   On August 25, 2014, Phillips sent an email to Albana about one shell company's accounts, asking Albana "to make sure that my name is not showing up on the [Vital Global Marketing] account (7355) at all.  These are [the nominee]'s accounts of which I have access too.  ***Can you please work to have my name replaced with her name?***  Let me know how quickly we can get this taken care of?" (Emphasis added.)  About a week later, Phillips forwarded forms purportedly completed by the nominee to add her and remove him from the shell account, at which point a Wells Fargo effected the change.

162.   Cording was fully aware that Phillips was the one in control of the shell accounts that Triangle had at Wells Fargo.  On August 19, 2015, for example, Phillips complained to Cording that he couldn't see accounts for shell companies H1 Marketing, Brand Junction, and Total Market Products "at the moment in a

single portal view on my wells fargo login." Phillips explained that he "need[ed] to have key executive access" to the shell company accounts because "they need[ed] to have my status changed in the company." Cording immediately made changes to the profiles in Wells Fargo's system in order to allow Phillips "to see the accounts with the ability to transfer into the 3 of them."

163. Meanwhile, Phillips was making changes to the ownership of the Vital Global Marketing account—the account which, roughly a year earlier, he'd had Wells Fargo scrub his name from. Phillips sent over the paperwork to have the old nominee "owner" removed from the account on August 28, 2015. Less than a week later, he asked to have a different nominee added to another Vital Global Marketing account (x1053); a Wells Fargo banker business associate gave the new nominee control over the account, but when Phillips asked for documentation of a change in ownership, the Wells Fargo employee explained she would need an amended operating agreement. A few days after that, Cording chimed in to explain that the change in ownership would require a new account. The Wells Fargo employee sent over the required paperwork, explaining that Phillips "would want to list [the new nominee] as 100% owner to match your documents." Recognizing Phillips's true role in the operation, the banker added, "You will also need to list anyone (like yourself) who might have control of the company," and warned Phillips that as the technical owner of the shell company, the new nominee would have control over the other Vital Global Marketing account (x7355)—a warning she would not have needed to give if she'd believed the nominee was, in fact, the owner.

164. Cording also continued to accommodate Phillips' requests for visibility into accounts purportedly owned by others. On May 5, 2016, Phillips asked Cording to add another shell account, Sunset Order Marketing, to his "consolidated Business banking view in the portal." Cording asked another banker to make the change without hesitation. That banker, however, pointed out that the

Case No. _____
RECEIVER'S COMPLAINT

1  nominee for the account was the "100% owner, so in order to grant [Phillips]

2  combine[d] view through online banking" she would need approval from the

3  nominee.  Phillips then asked, "why do these accounts keep getting setup this way

4  where I have no right to visibility. Can we please get this and all accounts going

5  forward switched to be in my consolidated view."

6      165.  The Wells Fargo banker was quick to offer a couple work arounds:

7        If you aren't owner they can't automatically grant you combined view
because you can transfer between other entities and personal accounts

8        that way. **The work around is to have the owner grant you this
authority but our online department requires it in writing incase**

9        **there is some sort of internal fraud or something with the
business, WF won't be liable**.

10

11        Unfortunately we cannot automatically do this every time. We have
the work around but it requires an extra step. **In order to avoid this**

12        **entirely we do offer the CEO portal for our large business clients**.
(Emphasis added.)

13

14      166.  Phillips made it absolutely clear that he wanted full access to multiple

15  accounts for companies in which he had, on paper, no ownership interest.  Though

16  this is an obvious indication of potential fraud, no one at Wells Fargo appeared

17  troubled by the request.  In fact, when Phillips expressed exasperation with the

18  process, one Wells Fargo banker even sympathized, apologizing for the Bank's

19  (flimsy) procedural hurdle: "I'm sure somewhere along the lines an employee

20  transferred out money from a business to his/her personal accounts and WF took a

21  significant loss.  So they now require an acknowledgement from the owner stating

22  they are ok with the combine view."

23      167.  Wells Fargo clearly understood that Phillips was in charge and that

24  the nominee owner of the company was more or less irrelevant, but the Bank

25  continued to do business with Phillips and Triangle.  Wells Fargo did so in

26  violation of KYC rules and regulations, which required the Bank to have a

27  relationship with each of its customers.  That posed a problem since Wells Fargo's

28  only relationship with the shell companies was through Phillips.

168.   The rules changed in May 2016, but by December 2017—nearly a year and a half later—Wells Fargo had not yet implemented them.  On information and belief, the new rule, in fact, simply reflected what had been accepted as standard practices at many other banks for a number of years (but of course not Wells Fargo), going back as far as the establishment of new rules after the September 11, 2001 terrorist attacks.  That month, Cording emailed Phillips to explain the Bank's obligations under the "new" rule:

> In May 2016, the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) issued a rule strengthening the due diligence that certain financial institutions must perform with respect to their customers.  The new rule requires that financial institutions thoroughly understand the nature of the business of each of their clients. Wells Fargo and other banks are required to comply with these new and existing regulations related to the prevention of financial crimes.  As a result, we are enhancing our internal compliance and risk related policies.  Because of the size and scope of our organization, we are starting to collect customer information now to ensure that we are able to comply with the federal deadline.

169.   Cording sent Phillips pre-filled paperwork for 10 companies, seven of which were shell companies *but all of which listed Phillips as the owner*.  This was inconsistent with the owners listed on the Wells Fargo bank records, but Cording clearly considered Phillips to be the actual owner of all 10 companies in spite of this.  Predictably, Phillips responded and asked to have the "docs changed around" so he could "coordinate for each of the people to sign."  Cording replied: "Happy to do it, *I think the challenge is we may not be sure of the owners of each entity*."  Not only did Wells Fargo have zero idea who its account owners were (showing how little the Bank was concerned about Triangle's proliferation of shell accounts), but Cording, apparently unperturbed, continued doing business with Phillips even after he was once more faced with proof that Phillips was the *de facto* owner for a host of shell companies.

(v)   Triangle's Attempts at Securing ACH Processing

170.   Phillips periodically looked into securing ACH processing services from Wells Fargo, which would give Triangle another avenue to accept customer

**R_SER_96**

1    payments..  Wells Fargo's incentive was obvious: they would be able to collect
2    processing fees for any transactions that Triangle ran.

3        171.  As early as 2014, Albana was working with Phillips to try and secure
4    web-based ACH processing for Triangle.  Apologizing for the delay in getting
5    approval for Phillips' application, Albana explained that "[a]s you know your
6    industry is high risk and the bank is scrutinizing each detail prior to getting
7    approval, I am working diligently with credit supervision to get the approval."  In
8    response to requests from Albana, Phillips provided him with a client list, sample
9    agreement, key officer bios, and additional information.

10        172.  The 2014 push to get ACH processing for Triangle through Wells
11    Fargo was dead by August, however.  As Keer wrote to another Triangle
12    employee, "the entire ACH deal with Wells was scuttled because of some random
13    text on [the Triangle website]."

14        173.  Emails the following month between Triangle personnel make it clear
15    exactly what, in one employee's words, "wells' compliance team saw" that caused
16    the Bank to back off: an old website for Triangle Media Corporation, which touted
17    the company's ability to "provide expertise for your high-risk business" because its
18    "seamless solutions offer your business the ability to market concepts normally
19    rejected by traditional processors and banks."

20        174.  While Triangle had already removed the problematic language from
21    its website, it was still popping up as the top google search for "Triangle Media,"
22    so   Phillips and his employees made efforts to bury it by "get[ting] new content to
23    pile over the [problematic language]."

24        175.  Wells Fargo's compliance team's decision to reject Triangle's
25    processing application demonstrates, as with the Bank's rejection of the Apex
26    merchant processing applications, that Wells Fargo was unwilling to take on the
27    risk of processing for these companies.  The Bank was careful when its own
28    potential exposure was on the line.  Of course, the Bank remained perfectly willing

Case No. _____
RECEIVER'S COMPLAINT

to continue servicing the fraudulent shell companies at the branch level, open bank accounts for additional shell companies, and take other atypical steps to assist the schemes' success.

176.   Despite the compliance team's decision to nix ACH processing, the sales imperative at the Bank was overwhelming.  One year later  in 2015, Cording, was doing his best to get ACH approval for Phillips and Triangle once again.  Cording emailed Phillips that after "thinking through my strategy to get ACH approved on Triangle Media," he thought it would be useful to have some balance sheets and income statements, because they would allow him to "utilize the financial strength of the business [to] mitigate any risks."

177.   Cording still had not managed to obtain approval for Triangle to use Wells Fargo's ACH processing in early 2017, but that didn't mean that he had stopped trying.  On February 16, he wrote Phillips that "[w]e did do some further due diligence internally and there is potential for us to fulfill the ACH request as well as we may have a solution for the account needs."  Although it does not appear that Cording was ultimately able to secure ACH processing for Triangle, the fact that he was still willing to try (and that Wells Fargo was still apparently considering it) in light of everything that Cording and Wells Fargo knew about Phillips and Triangle speaks for itself.  The evidence firmly establishes that Wells Fargo knew exactly what Triangle was doing, and that by assisting Triangle, it was violating banking regulations and the Bank's own (on paper) policies and procedures.

(vi)   Wells Fargo Authorized Suspicious and Unusual Transactions that Made No Economic Sense.

178.   As all of the above examples indicate, Wells Fargo knew from very early on in its relationship with Triangle that Triangle was using nominees as fronts for shell companies, with Phillips regularly insisting that the nominees (as opposed to Phillips, who Wells Fargo knew was the true owner) be listed as the

"100% owners" of the accounts. Wells Fargo bankers had obligations under standard banking practices and banking laws and regulations to investigate and report Phillips' manipulation of the shell companies' beneficial ownership. Had Wells Fargo conducted a real investigation, its findings would have compelled it to refuse to do any more business with Phillips, shut down Phillips' accounts, and/or follow Wells Fargo's established processes regarding the making of internal and external reports of suspicious activity. In reality, of course, given all that it knew by this point, Wells Fargo already understood what the results of any such investigation would be.

179. Wells Fargo knew that Triangle's shell companies continually suffered massive chargebacks. Like with Apex, this was abundantly clear from the shell companies' monthly account statements.

180. Wells Fargo had an obligation under banking laws and regulations to look at the family of Triangle accounts as a whole, rather than looking at individual account activity in isolation. If one Triangle-related account needed to be closed, then all other Triangle accounts likely would have to be closed too. This obligation required the Bank to reassess its dealings with the Triangle Enterprise on a regular basis, including whenever it opened a new account at Phillips' request.

181. Wells Fargo was therefore obligated when conducting its account opening and at least annual diligence for Triangle-related entities under standard AML procedures to assess both new – and existing accounts in the context of the overall relationship with Triangle's beneficial owners and key parties, namely Phillips who had more than 30 personal and corporate accounts with Wells Fargo (in addition to the more than 50 shell accounts).

182. In particular, Wells Fargo should have conducted a critical examination of transfers between Phillips-owned and Phillips-associated companies, which there is no indication it did—even though there were multiple indicia of fraud present. Wells Fargo knew that Phillips was regularly requesting

Case No. _____
RECEIVER'S COMPLAINT

that the Bank move money into his main Wells Fargo Triangle account, which Phillips himself exclusively owned. At Phillips' direction, Wells Fargo regularly processed suspicious large-figure, round-number transfers out of shell accounts (which were nominally owned by others) and into his own Triangle account. Wells Fargo bankers should have pressed Phillips on why significant amounts of money were being sent from accounts owned by others to Phillips' Triangle account, all while the listed owners (nominees) were receiving only nominal payments from the accounts that they supposedly owned. Wells Fargo was also knew that funds which hit Wells Fargo's Triangle account were regularly being transferred overseas. If Wells Fargo had any concern for protecting the interests of these "owners," or complying with anti-fraud or AML regulations, it would not have permitted Phillips and Triangle to do what they were doing.

183. Wells Fargo had no such concerns. Instead, after Wells Fargo had enabled Phillips himself, and not the supposed "owners," to direct these transfers from the LLC accounts to his Triangle accounts, thereafter Wells Fargo even transferred the recently-deposited funds from the Triangle account entirely out of the United States.

184. While Wells Fargo was disregarding problematic and unusual account activity, Wells Fargo was not at all ignoring Phillips or Triangle's accounts. However, instead of vigilantly monitoring these accounts for suspicious behavior in the context of a high-risk customer in a high-risk industry, making all manner of suspicious transactions out of accounts he did not "own," Wells Fargo was nurturing its relationship with Phillips to try to grow Wells Fargo's business. In other words, Wells Fargo was doing what it did best: opening accounts wherever it could, whether by providing new banks accounts for the shell companies or trying to provide add-on banking services, such as ACH processing, merchant processing, or even access to foreign accounts. Cross-selling clients, not compliance or client oversight, was the priority for Wells Fargo. *See, e.g.,* American Banker, *Bankshot:*

Case No. _____
RECEIVER'S COMPLAINT

**R_SER_100**

*Wells Fargo Should Have Seen Add-on-product Trouble Coming,* Kevin Wack, July 19, 2018.

185.   It is particularly troubling that over many years, Wells Fargo used so-called "Relationship Managers" (in this case Albana and Cording operating out of the Escondido branch) to serve as lead salespersons seeking to grow the Triangle relationship as much as possible.  Wells Fargo flouted the common industry role that positions such as Relationship Managers have as experienced bankers, providing an extra "first line of defense" layer of protection for a bank against fraud and money laundering.

186.   Wells Fargo designed a corporate structure prioritizing sales that instead used its designated Relationship Managers in a way that perpetuated fraud and weakened risk compliance, unlike other banks of its size.  Typically, a banker in such a position will conduct periodic due diligence reviews across families of accounts, especially for accounts like Triangle, operating in high-risk industries rife with fraud.  At other institutions following standard banking practices, a designated account representative such as this would have adhered to procedures such as requiring visits to an owner's place of business.  Such designated account representatives would also have been responsible for being familiar with the specific activity in the account and its purpose, and for providing updated predictions of expected activity in order to facilitate centrally managed, automated monitoring for potentially suspicious activity.  But, as Brian Phillips had learned early on, Wells Fargo was "totally different."

## C.   Wells Fargo Aided and Abetted Fraudulent Transfers

187.   There is additional evidence of Wells Fargo's knowledge of the scammers' modus operandi.  Millions of dollars consumers paid into the various shell company accounts were diverted to the individual fraudsters to maintain their lavish personal lifestyle, or to funnel monies out of the Enterprises into real estate and investments that they would purchase via trusts and corporations.  For

Case No. _____
RECEIVER'S COMPLAINT

1  example, in July 2014 emails between Triangle's Phillips and Tim Morgan, a

2  Wells Fargo Private Mortgage Banker, Phillips notified Morgan that Phillips would

3  receive a $2 million wire from Hardwire (a defendant in the FTC case), and then

4  asked, "will this money need to be 'seasoned' before being used for a house

5  purchase?"

6  188.  As set forth herein, Peikos and/or Barnett, and Phillips controlled the

7  Apex and Triangle Enterprises (which are now Receivership Entities), and directed

8  them to make numerous transfers out of proceeds of the fraud to themselves, and

9  third parties (including Wells Fargo).  At the time of each fraudulent transfer, they

10  intended to delay, defraud, or hinder their creditors (most notably the Receivership

11  Entities under their control).

12  189.  Through the numerous acts identified herein, Wells Fargo

13  substantially assisted Phillips, Peikos and Barnett in making these fraudulent

14  transfers, despite knowing that the transfers were unlawful, they controlled the

15  Receivership Entities and had no lawful claim to fraudulently-obtained consumer

16  funds. Wells Fargo knowingly transferred shell company account funds to other

17  Receivership Entity shell company accounts and then directly to Phillips, Peikos,

18  and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or

19  Barnett) without the shell companies receiving a reasonably equivalent value in

20  exchange for the transfers and which depleted the shell companies of all or

21  substantially all of their assets.

22  190.  The transfers from the Wells Fargo accounts of the Receivership

23  Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers

24  under the California UVTA and UFTA for the following reasons, among others:

25  191.  Phillips, Peikos and Barnett made the transfers to themselves or third

26  parties with the actual intent to hinder, delay, or defraud consumers;

27  192.  Phillips, Peikos and Barnett engaged in the free-trial schemes

28  knowing that their assets and the assets of the Receivership Entities they controlled

1 were unreasonably small considering that all of the assets were obtained by frauds

2 on consumers and did not belong to them;

3 Phillips, Peikos and Barnett knew that through their fraudulent schemes, they

4 incurred debts to the Receivership Entities and consumers beyond their ability to

5 pay;They retained possession or control of the assets after the transfers.

6     193. The Receivership Entities did not receive a reasonably equivalent

7 value in exchange for the transfers from the Wells Fargo accounts because Phillips,

8 Peikos, and Barnett drained the accounts for their own personal use and benefit,

9 and the shell companies acted as mere pass-throughs to allow the fraudsters to

10 avoid detection by creditors of their ownership and control of the funds;

11     194. The Receivership Entities had no assets other than the fraudulently-

12 obtained funds before or after the transfers;

13     195. The transfers to Phillips, Peikos, and Barnett were as corporate

14 insiders of the Receivership Entities;

15     196. The transfers among and from the Wells Fargo accounts were

16 intended to conceal the true ownership and recipients of the funds;

17     197. When the transfers were made, Phillips, Peikos and Barnett knew they

18 were likely to be sued for their wrongdoing;

19     198. Phillips, Peikos, and Barnett removed and concealed receipt of the

20 consumer funds from the Wells Fargo accounts by transferring them to unrelated,

21 unidentified and undisclosed personal and offshore accounts;

22     199. The transfers were of substantially all the Receivership Entities'

23 assets;

24     200. The Receivership Entities were insolvent or became insolvent shortly

25 after the transfers were made or the obligations were incurred; and

26     201. The transfers occurred shortly before or shortly after the substantial

27 debts to consumers were incurred.

28     202. Despite knowing that Phillips, Peikos and Barnett had no lawful claim

to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

203.   Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities.   Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

204.   Wells Fargo knowingly aided and abetted the fraudulent transfers from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

205.   In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

206.   Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities and thus constitute fraudulent transfers which must be returned to the Receivership Entities.

R_SER_104

## VIII. KNOWING VIOLATIONS OF BANKING LAWS AND PROCEDURES

207. Wells Fargo repeatedly and knowingly violated banking rules and regulations in its assistance and facilitation of the Apex and Triangle Enterprises, which is further evidence that Wells Fargo knew exactly what it was doing to assist a fraud. The lengths to which Wells Fargo went to substantially aid and abet these fraudulent enterprises is evidenced by not only their willful disregard of standard banking procedures, but also Wells Fargo's continued violations of a dizzying array of banking laws designed to protect against fraud and money laundering.[14]

208. The Bank Secrecy Act ("BSA") makes it a criminal act for banks and other financial institutions to aid and abet criminals in the laundering of money. FinCEN is the federal regulatory agency responsible for issuing regulations to combat money laundering. FinCEN defines money laundering as the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (*i.e.*, "clean"). Typically, it involves three steps: placement, layering, and integration. First, the illegitimate funds are introduced into a legitimate financial system (placement). Then, the money is moved around to create confusion, sometimes by wiring or transferring the funds through numerous accounts (layering). Finally, it is integrated into the financial system through additional transactions until the "dirty money" appears "clean" (integration).[15]

209. Under the BSA, banks must comply with certain Customer Identification Program (CIP) requirements when opening new accounts, including

---

[14] Plaintiff is not bringing any claims for violating the Bank Secrecy Act or related regulations, nor is he alleging that an express or implied duty arose to Plaintiff based on Wells Fargo's BSA violations. Wells Fargo's duties directly arose to the Receivership Entities as Wells Fargo's customers.

[15] *See* "History of Anti-Money Laundering Laws," FinCEN, *available at* https://www.fincen.gov/history-anti-money-laundering-laws.

1  maintaining account-opening procedures detailing the identifying information that

2  must be obtained from each customer.  As an established nationwide banking

3  system, Wells Fargo and its bankers knew what these requirements were.

4       210.  Section 326 of the USA PATRIOT Act was enacted following the

5  9/11 terrorist attacks and jointly implemented by the federal banking regulators,

6  requires that banks to meet minimum standards with regard to collection of the

7  name, address, date of birth and tax identification number or other means of

8  positive identification for all customers for which it opens an account.

9       211.  A circular issued jointly by the then four federal bank regulatory

10  agencies, joining with FinCEN and the Department of Treasury stated that:

11        "a bank's CIP **must** include risk-based procedures for verifying the identity
12        of each customer to the extent reasonable and practicable. ***It is critical that***
13        ***each bank develop procedures to account for all relevant risks including***
14        ***those presented by the types of accounts maintained by the bank***, the
        various methods of opening accounts provided, the type of identifying
15        information available, and the bank's size, location, and type of business or
16        customer base. ***Thus, specific minimum requirements in the rule, such as***
        ***the four basic types of information to be obtained from each customer,***
17        ***should be supplemented by risk-based verification procedures, where***
        ***appropriate, to ensure that the bank has a reasonable belief that it knows***
18        ***each customer's identity.*** (Emphasis added.)

19

20       212.  Additionally, Wells Fargo was required as a part of federally-

21  mandated account opening process to understand the business/account use ("Know

22  Your Customer"), and to add extra steps in due diligence, especially where, as was

23  the case with both Triangle and Apex, high risk existed: Customer Due Diligence

24  ("CDD") and Enhanced Due Diligence ("EDD").

25       213.  During the Relevant Period, it was standard industry practice (and

26  expected by banks of Wells Fargo's size) to provide its branch employees with

27  tailored training on how to comply with these laws and regulations, including how

28  recognize and escalate suspicious activity in their roles.

214.    Wells Fargo was required to train its employees on how to comply with the BSA and USA PATRIOT Act, including but not limited to:

- The importance of getting accurate identity information and beneficial owner identification;

- The ability to identify and act upon red flags for suspicious activity, including but not limited to

     o Suspicious designation of beneficiaries, assignees or joint owners
     o Suspicious use of multiple accounts
     o Transactions out-of-pattern for the customer or business situation
     o Transactions that don't make economic sense

- Understanding of various types of activity that require reporting in a number of categories including:

     o 31-Fraud, including
          ▪ e-credit/debit card
          ▪ h-mass marketing
          ▪ i-pyramid scheme

     o 33-Money Laundering
          ▪ d-suspicious designation of beneficiaries, assignees or joint owners
          ▪ h-suspicious use of multiple accounts
          ▪ l-transactions out-of-pattern for customers

     o 34-Identification/Documentation.

215.    The regulatory requirements under the BSA placed central importance on vigilantly monitoring to identify and verify customers and beneficial owners, to understand the nature and purpose of customer relationships to develop an accurate customer risk profile, and to undertake ongoing monitoring for reporting suspicious transactions and to maintain and update customer information.

216.    In a branch system, like Wells Fargo maintained, the branch employees were required to have a central role in complying with the law and related regulations.  Among other things, branch employees were typically the

Case No. _____
RECEIVER'S COMPLAINT

1   primary source of reporting suspicious activity up the chain within Wells Fargo to
2 enable the bank to determine whether it needed to take steps to fulfill its
3 obligations to report such activity externally (to FinCEN). Wells Fargo routinely
4 failed to follow the requirements of BSA/AML/CIP for Apex and Triangle. Wells
5 Fargo's Community Bank gave its branches wide discretion and deficient oversight
6 in performing these tasks, while at the same time incentivizing branch employees
7 to open accounts and cross-sell under a high-pressure quota system.

8     217. As examples, Wells Fargo knowingly allowed accounts to have
9 incorrect addresses and use identical Wyoming mail drops (in the case of Apex).
10 Instead of identifying and verifying actual beneficial owners of the shell
11 companies, Wells Fargo knew that actual owners were different from the listed
12 owners, and undertook any number of steps to mask or paper over such
13 inconsistencies.

14     218. Wells Fargo deliberately failed to compile an adequate customer risk
15 profile for all of the shell companies. If the Bank had used commercially
16 reasonable risk assessment techniques, it would never have opened these accounts
17 or would have immediately closed the accounts after it processed transactions that
18 were clearly suspicious.

19     219. Further, Wells Fargo knew that Apex and Triangle shell companies
20 were routinely executing suspicious transactions using their Wells Fargo accounts,
21 such as transferring funds between accounts and to external accounts in "round"
22 dollar amounts—that is, round numbers with zeros on the end (*e.g.*, $100,000). An
23 abundance of "round" dollar transactions (which the Apex and Triangle shell
24 companies certainly had) is indicative of money laundering and has been referred
25 to as "a fingerprint of fraud." *See* Nigrini, Mark J., "Round numbers: A fingerprint
26 of fraud," Journal of Accountancy (May 1, 2018), *available at*
27 https://www.journalofaccountancy.com/issues/2018/may/fraud-round-
28 numbers.html.

220.  As even the most cursory reviews of monthly account statements made abundantly clear, Wells Fargo was well aware of the Apex and Triangle shell companies' high chargeback rates, which were well in excess of the permitted chargeback rates under Visa/Mastercard rules for high-risk merchants.

221.  Regardless of the vantage point from which the Apex and Triangle Enterprises are viewed, Wells Fargo knew that they were high-risk relationships and accounts for multiple reasons.  As such, Wells Fargo knew that they were required to classify the family of Apex and Triangle accounts as high risk for misuse and as such, subject them to heightened oversight and enhanced due diligence.

222.  Further, Wells Fargo was well aware that Apex and Triangle were classified as high risk by merchant processors, including Wells Fargo's own merchant processing group.  This provided yet another reason for active monitoring of these accounts by Community Bank employees and branches.

223.  Indeed, the Bank's very own Merchant Processing Agreement and Credit Risk Guidelines confirm the many risks created by businesses like Apex and Triangle. The Processing Agreement specifically prohibits the solicitation of merchants engaged in certain unacceptable business practices, because they were presumptively illegal, violated card association rules, or created excessive risk exposure. The prohibited categories included, for example, debt consolidation services, Get Rich Quick Opportunities, and any merchant engaged in any form of deceptive marketing practices.

224. Wells Fargo also prohibited the solicitation of merchants selling nutraceuticals through free trial offers, unless specifically pre-approved by Wells Fargo.  And when Wells Fargo periodically evaluated, and on several occasions reviewed, completed applications, for the Apex and Triangle Enterprises Wells Fargo declined to provide merchant processing.  (The exception was the small amount Triangle legacy merchant processing through a third party, which

Case No. _____
RECEIVER'S COMPLAINT

apparently stayed below Wells Fargo's radar for years – either by mistake or policy design.)

225.   Wells Fargo's Credit Risk Guidelines (the "Guidelines") require that merchants be scrutinized for evidence of deceptive marketing practices and, if found, immediately compel the merchant to eliminate these practices or terminate the merchant.  The Guidelines provide numerous examples of common warning signs of potential deceptive marketing practices, almost all of which the Enterprises employed. These include negative options and industries where deceptive marketing practices were prevalent, such as nutraceuticals.  Further, the Guidelines specifically warn about merchants opening multiple accounts, particularly via multiple shell companies with the same or similar principals (in some cases, hired "mules" with little or no business involvement which may be submitted to obscure the true ownership).

## IX.   WELLS FARGO EXECUTIVES AUTHORIZED AND RATIFIED BANKER PARTICIPATION IN THE FRAUDS

226.   Evidence of Wells Fargo's executives' pressure on managers and employees to participate in the fraudulent misconduct alleged herein also is set forth in numerous governmental and private lawsuits. In the SEC's complaint against Carrie L. Tolstedt, Senior Executive Vice President of Community Banking for Wells Fargo filed on November 13, 2020, the SEC alleged that for several years, until mid-2016, Wells Fargo opened millions of accounts or sold products that were unauthorized or fraudulent, and others that were unneeded and unwanted by retail banking customers.

227.   The Community Bank, which Tolstedt led from 2007 through mid-2016, was responsible for managing the large network of bank branches, referred to within Wells Fargo as "stores," as well as other sales channels through which Wells Fargo offered its products.  The branches employed, among others, bankers who were generally responsible for offering accounts and financial products or

**R_SER_110**

1  services to customers. The bankers reported up through managers of the branches

2  to Regional Bank Executives, who reported to Tolstedt. In addition, the persons

3  who managed the various groups organized around products that the Community

4  Bank offered also reported up to Tolstedt.

5      228.   The Community Bank also had financial and risk officers who

6  reported to Tolstedt and assessed the Community Bank's business progress and its

7  risks. Those persons provided information to the financial and risk officers for the

8  Company overall, often after first discussing the information with Tolstedt. In

9  addition, at least quarterly, Tolstedt met with the CEO (and frequently others) to

10  discuss the business of the Community Bank and to make strategic plans.

11      229.   During the Relevant Period, Wells Fargo's CEO and other high-level

12  executives and directors of the Bank encouraged employees to deliberately ignore

13  indicia of fraud if it helped the Bank's bottom line—instructions which led to

14  Wells Fargo and its employees aiding and abetting the Enterprise schemes.

15      230.   Other higher-level employees and agents of Wells Fargo in the

16  Community Bank branches encouraged and instructed their bankers and employees

17  to do the same.  These higher-level employees and agents included:

18/19   • David Hannig, who was an Assistant Vice President and Business
        Sales Consultant for Wells Fargo Merchant Services, and who worked
        directly with Apex's Barnett, Peikos, Camacho, and Carr;

20/21/22  • Lea Walker, who was a Business Specialist and subsequently an
        Assistant Vice President at Wells Fargo in the Keller, TX branch (910
        Keller Parkway, Keller, TX 76248), and who worked directly with
        Triangle's Phillips;

23/24   • Haiman Albana, who was a Business Relationship Manager at Wells
        Fargo associated in the Escondido, CA branch (500 La Terraza
        Boulevard, Suite 200, Escondido, CA 92025), and who worked
        directly with Triangle's Phillips; and

25/26/27  • Brian Cording, who was a Senior Business Relationship Manager at
        Wells Fargo associated with the Escondido, CA branch (500 La
        Terraza Boulevard, Suite 200, Escondido, CA 92025), and who
        worked directly with Triangle's Phillips.

28      231.   These are just some of the Wells Fargo employees who knowingly

---

68                          Case No. _____
                            RECEIVER'S COMPLAINT

1   acted in collaboration and collusion with Apex and Triangle in furtherance of the

2   unlawful schemes. Wells Fargo authorized or ratified the acts of these employees

3   as alleged herein.

4   **X.    INFORMATION ALLEGATIONS**

5   232. Allegations made in this Complaint are based on information and

6   belief, except those allegations that pertain directly to the Receiver, which are

7   based on his personal knowledge. The Receiver's information and belief is based

8   on, *inter alia,* the investigation and review of publicly filed documents and from

9   the Receiver appointed in the FTC actions described above and his attorneys. Each

10  and every allegation and factual contention contained in this Complaint has

11  evidentiary support or, alternatively, is likely to have evidentiary support after

12  reasonable opportunity for further investigation or discovery by the Receiver or his

13  counsel.

14  **XI.   DELAYED DISCOVERY BY THE RECEIVER AND ESTOPPEL**

15  233. First and foremost, the Receiver's discovery of the Receivership

16  Entities' claims against Wells Fargo was impossible until his appointment; prior to

17  that, the Receivership Entities were controlled by Phillips, Barnett, and Peikos,

18  which made discovery of their wrongdoing impossible. The statutes of limitations

19  were tolled until the time of the Receiver's appointment.

20  234. The statutes of limitations were tolled past that point, however,

21  because the Receiver did not (and could not have) discovered the fraud

22  immediately upon his appointment. The Receiver only discovered Wells Fargo's

23  misconduct related to the Apex and Triangle Enterprises in 2019. There were two

24  primary reasons for this: (1) Wells Fargo took steps to conceal its role in the Apex

25  and Triangle frauds; and (2) the Receiver did not receive responses to subpoenas it

26  issued to Wells Fargo until June and July of 2019, before which there was

27  insufficient documentary evidence for the Receiver to discover the claims. Once

28  the Receiver and his counsel had the documents in hand, they were finally able to

1  piece together Wells Fargo's role in facilitating the Apex and Triangle frauds, and

2  to confirm that the Bank knew of the fraudulent nature of the Apex and Triangle

3  Enterprises.[16]

4      235.  Because of Phillips's, Peikos's and Barnett's efforts to conceal the

5  Apex and Triangle frauds from consumers, along with the role Wells Fargo played

6  in those frauds, Wells Fargo is estopped from contending that any of the

7  Receiver's claims are barred by applicable statutes of limitations.

8  **XII.  CAUSES OF ACTION**

9  <u>**First Cause of Action**</u>

10  **(Aiding and Abetting Fraud)**

11      236.  The Receiver repeats and realleges the allegations of each and every

12  one of the prior paragraphs, inclusive, as if fully set forth herein.

13      237.  Phillips, Peikos, and Barnett, via the Apex and Triangle Enterprises,

14  operated online "free trial" scams, which falsely advertised that consumers would

15  only be charged the cost of shipping in exchange for a trial of a product.  In reality,

16  the consumers were being signed up for a subscription service and charged for the

17  full price of the product on the next billing cycle unless they affirmatively canceled

18  the subscription.

19      238.  Wells Fargo knew that the Apex and Triangle Enterprises were

20  engaged in a high-risk, fraudulent business, and Wells Fargo knew that they were

21  required to terminate or further investigate that business pursuant to the BSA,

22  FinCEN regulations, and their own internal policies. Multiple Wells Fargo

23  employees across multiple branches deliberately turned a blind eye to the Apex

24  and Triangle frauds, because the large number of accounts needed by the Apex and

25  Triangle Enterprises helped them to meet otherwise-unattainable sales quotas set

26  _____

27  [16] The Receiver did not file until now pursuant to a Tolling Agreement with

28  Defendants.

1   by Wells Fargo's corporate headquarters.   Wells Fargo's corporate policies
2   encouraged sales misconduct by setting unrealistic sales goals and requiring
3   bankers to open as many accounts, and to sell as many services and bank products,
4   as possible.

5          239.   Wells Fargo provided substantial assistance to the intentional torts
6   committed by the primary wrongdoers by, among other things, creating accounts
7   for shell companies used by the Apex and Triangle Enterprises to secure critical
8   merchant processing services; assisting the Apex and Triangle principals in hiding
9   their ownership of those accounts from the merchant processors, so that the
10  principals could continue to secure merchant processing services for the underlying
11  fraud; and allowing Apex and Triangle to launder money obtained from defrauded
12  consumers through their Wells Fargo accounts.

13         240.   The substantial assistance that Wells Fargo provided to the Apex and
14  Triangle frauds proximately caused substantial damages to the Receivership
15  Entities in an amount to be proven at trial.   These damages include, but are not
16  limited to: the fees charged by Wells Fargo for their banking services, which
17  directly furthered the fraudulent schemes and depleted the funds of the
18  Receivership Entities; the Receivership Entities' legal obligations to satisfy the
19  FTC Judgments, which require the Receivership Entities to make whole the
20  consumers who were defrauded as a result of the Apex and Triangle frauds that
21  Wells Fargo facilitated; all fees and costs necessitated by the need to establish a
22  Receivership; and the costs of defending the action by the FTC (including the
23  resulting Receiverships).

24         241.   Wells Fargo's conduct was intentional, fraudulent, willful, malicious,
25  and intended to injure the Receivership Entities, by virtue of which the Receiver
26  prays for an award of exemplary and punitive damages.

27                          **Second Cause of Action**

28                      **(Conspiracy to Commit Fraud)**

---

71                            Case No. _____
                              RECEIVER'S COMPLAINT

242.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

243.   Philips, Peikos, and Barnett engaged in the primary wrongs described herein.

244.   Wells Fargo entered into a conspiracy with Phillips, Barnett, and Peikos to perpetuate their frauds.  Wells Fargo agreed to assist the frauds by, among other things, and as described herein, (i) opening accounts for dozens of shell companies, which Wells Fargo knew were owned and controlled by Apex and Triangle's principals, (ii) executing reference letters that gave legitimacy to the shell companies and allowed them to secure merchant processing services, (iii) accepting as deposits funds which Wells Fargo knew were fraudulently obtained from consumers, (iv) transferring those funds to other accounts (including foreign accounts), which allowed the Apex and Triangle principals to launder the money they derived from the frauds, and (v) continually providing atypical banking services.

245.   The Receivership Entities suffered damages that were proximately caused by Wells Fargo's participation in the conspiracy (without which the Apex and Triangle Enterprises could not have functioned) and which are described herein.

### Third Cause of Action

### (Breach of Fiduciary Duty)

246.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

247.   Wells Fargo owed fiduciary duties to the Receivership Entities pursuant to their bank/client relationships.  Wells Fargo had a duty to their customers, the Receivership Entities, to discharge its duties in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

248.   Wells Fargo knew that Phillips, Peikos, and Barnett were engaging in fraud as described herein.

249.   Wells Fargo breached the fiduciary duties it owed to the Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities. Specifically, Wells Fargo (i) diverted funds that belonged to the Receivership Entities into Phillips, Peikos, and Barnett's pockets, and (ii) failed to, or refused to, fulfill its "know your customer" obligations, conduct due diligence, and abide by other banking regulations and standard practices.

250.  Wells Fargo's breaches of the fiduciary duties it owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities as described herein.

<u>**Fourth Cause of Action**</u>

**(Aiding and Abetting Breach of Fiduciary Duty)**

251.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

252.   At all material times, Phillips, Peikos, and Barnett owned or controlled their respective Receivership Entities.  As the owners of the Triangle or Apex Enterprises, they had a fiduciary relationship with the Receivership Entities because the entities were under their complete control.  Phillips, Peikos, and Barnett owed the Receivership Entities a fiduciary duty to act in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

253.   Phillips, Peikos, and Barnett breached their fiduciary duties owed to their respective Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities by engaging in the primary wrongs described herein and by diverting the Receivership Entities' assets into their own pockets with no

Case No. _____
RECEIVER'S COMPLAINT

**R_SER_116**

1  legitimate or justifiable business purpose.

2      254. Phillips, Peikos, and Barnett's breaches of the fiduciary duties they
3  owed to the Receivership Entities actually and proximately caused financial injury
4  to the Receivership Entities, as described herein, in an amount to be proven at trial.

5      255. Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's
6  breaches of their fiduciary duty and rendered substantial assistance in regard to
7  such breaches by affording them or their agents special privileges, by enabling and
8  allowing continuous, suspicious, and obviously fraudulent banking activity, and by
9  failing to adhere to federal, local and internal regulatory banking procedures and
10  policies.

11      256. Wells Fargo is liable for all damages actually and proximately caused
12  to the Receivership Entities through its acts and omissions, including those
13  damages described above, in an amount to be proven at trial.

14                        **Fifth Cause of Action**
15                   **(Aiding and Abetting Conversion)**

16      257. The Receiver repeats and realleges the allegations of each and every
17  one of the prior paragraphs, inclusive, as if fully set forth herein.

18      258. Phillips, Peikos, and Barnett wrongfully asserted dominion and
19  control over the funds in the Apex and Triangle Enterprise accounts, which
20  rightfully belonged to their respective Receivership Entities, by misappropriating
21  consumer funds from those accounts and using the funds for their personal use and
22  benefit. Phillips, Peikos, and Barnett's actions resulted in the conversion of funds
23  belonging to the Receivership Entities.

24      259. Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's
25  misappropriation of the Receivership Entities' funds, because those funds were
26  wrongfully transferred into, between, and out of accounts held by Wells Fargo.

27      260. Wells Fargo rendered substantial assistance to Phillips, Peikos, and
28  Barnett in their conversion of the Receivership Entities' funds by executing their

---

1  transactions, even though doing so violated banking regulations and other prudent

2  and sound banking practices and procedures.

3  261. Wells Fargo is therefore liable for all damages actually and

4  proximately caused to the Receivership Entities based on the conversion of funds

5  undertaken by Phillips, Peikos, and Barnett, in an amount to be proven at trial.

## Sixth Cause of Action

### (Violation of California Penal Code § 496)

8  262. The Receiver repeats and realleges the allegations of each and every

9  one of the prior paragraphs, inclusive, as if fully set forth herein.

10  263. Penal Code § 496(c) permits "any" person who has been injured by a

11  violation of § 496(a) to recover three times the amount of actual damages, costs of

12  suit and attorney's fees in a civil suit. Penal Code § 496(a) creates an action

13  against "any" person who (1) receives "any" property that has been obtained in any

14  manner constituting theft, knowing the property to be so obtained, or (2) conceals,

15  withholds, or aids in concealing or withholding "any" property from the owner,

16  knowing the property to be so obtained.

17  264. Under Penal Code § 7, "person" includes a corporation as well as a

18  natural person. Wells Fargo Bank, N.A., as a national banking association, and

19  Wells Fargo & Co., as a corporation, are "persons" capable of violating § 496(a).

20  265. Phillips, Peikos, and Barnett obtained consumer funds by theft under

21  Penal Code § 484, because those funds were obtained "knowingly and designedly,

22  by any false or fraudulent representation or pretense," from consumers. These

23  funds were so obtained because, among other things, consumers were falsely

24  informed they were signing up for free trials but ended up paying for products or

25  subscriptions without their consent.

26  266. Wells Fargo, knowing of their frauds, deliberately concealed and

27  aided in concealing those frauds by, *inter alia*, hiding the identity of the individuals

28  who were committing the fraud, and by setting up and maintaining the fraudulent

---

Case No. _____
RECEIVER'S COMPLAINT

accounts as described herein.

267.  Additionally, Wells Fargo knowingly transferred property that was wrongfully obtained from consumers to Phillips, Peikos, Barnett, or third parties at their behest, as described herein.

268.  As a direct and proximate result of Wells Fargo's violations of Penal Code § 496(a), the Receivership Entities were deprived of assets.  Pursuant to Penal Code § 496(c), the Receiver seeks statutory treble damages, costs of suit, and reasonable attorney's fees.

<u>**Seventh Cause of Action**</u>

**(Violation of California Business and Professions Code § 17200)**

269.  The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

270.  Business & Professions Code §§ 17200, et seq., prohibit acts of "unfair competition," a term which is defined by Business & Professions Code § 17200 as including "any unlawful, unfair or fraudulent business act or practice…."

271.  Defendants have violated Business & Professions Code section 17200's prohibition against engaging in unlawful, unfair, and/or fraudulent business practices by, *inter alia*, aiding and abetting fraud, conspiring to commit fraud, and violating California Penal Code § 496.

272.  The Receivership Entities suffered injury in fact and lost money as a result of Wells Fargo's substantial assistance in these unlawful business acts and practices.

273.  As a result of Defendants' violations of Business & Professions Code § 17200, et seq., the Receiver is entitled to equitable relief in the form of full restitution of all monies wrongfully paid pursuant to the fraudulent schemes aided and abetted by Defendants.

Case No. _____
RECEIVER'S COMPLAINT

R_SER_119

## Eighth Cause of Action

### (Aiding and Abetting Fraudulent Transfer/Voidable Transaction)

274.  The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

275.  Prior to the establishment of the Receiverships, the physical operations of the Receivership Entities with which Defendants did business were primarily in the State of California. The *FTC v. Triangle* and *FTC v. Apex* actions in which the Receiver was appointed were then filed in the United States District Court for the Southern and Central Districts of California, respectively.

276.  Effective January 1, 2016, California (similar to the majority of other States) adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at California Civil Code §§ 3439, et seq.  The UVTA defines a voidable transfer to include the following types of transfer or obligations incurred by a debtor:

A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

---

Case No. _____
RECEIVER'S COMPLAINT

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

277. California Civil Code §3439.05(a) provides that transfers are voidable as to present creditors as follows:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

278. The UVTA provides the following definitions, in relevant part:

(b) "Claim," except as used in "claim for relief," means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(c) "Creditor" means a person that has a claim, and includes an assignee of a general assignment for the benefit of creditors, as defined in Section 493.010 of the Code of Civil Procedure, of a debtor.

(d) "Debt" means liability on a claim.

(e) "Debtor" means a person that is liable on a claim.

---

Case No. _____
RECEIVER'S COMPLAINT

**R_SER_121**

279.  Phillips, Peikos and Barnett are "debtors" under the UVTA because they are liable to the Receivership Entities and consumers who have a right to reimbursement for their claims of consumer fraud under the FTC judgments. Said Receivership Entities and consumers are "creditors" with "claims" under the meaning of the UVTA.

280.  Prior to enactment of the UVTA, and relevant to transfers by Defendants prior to 2016, the California Uniform Fraudulent Transfer Act ("UFTA"), formerly codified at California Civil Code §§ 3439, et seq. ("UFTA"), provided in §3439.04:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

281.  A "transfer" was defined in the UFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Civ. Code, former § 3439.01, subd. (i)).  A similar definition is found as subdivision (m) of the UVTA with one minor revision: "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license and creation of a lien or other encumbrance."

282.  As set forth herein, Phillips, Peikos, and/or Barnett controlled the

**R_SER_122**

1  Receivership Entities and directed them to make numerous transfers out of
2  proceeds of the fraud to themselves, and third parties (including Wells Fargo).  At
3  the time of each fraudulent transfer, they intended to delay, defraud, or hinder their
4  creditors (most notably the Receivership Entities under their control).

5       283.  Through the numerous acts identified herein, Wells Fargo
6  substantially assisted Phillips, Peikos and Barnett in making these fraudulent
7  transfers, despite knowing that the transfers were unlawful, and that they controlled
8  the Receivership Entities and had no lawful claim to fraudulently-obtained
9  consumer funds. Wells Fargo knowingly transferred shell company account funds
10 to other Receivership Entity shell company accounts and then directly to Phillips,
11 Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos,
12 and/or Barnett) without the shell companies receiving a reasonably equivalent
13 value in exchange for the transfers and which depleted the shell companies of all or
14 substantially all of their assets.

15      284.  The transfers from the Wells Fargo accounts of the Receivership
16 Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers
17 under the California UVTA and UFTA for the following reasons, among others:

18         (a)   Phillips, Peikos and Barnett made the transfers to themselves or
19               third parties with the actual intent to hinder, delay, or defraud
               creditors (including the Receivership Entities and consumers);

20         (b)   Phillips, Peikos and Barnett engaged in free trial schemes
21               knowing that their assets and the assets of the Receivership
               Entities they controlled were unreasonably small considering
22               that all of the assets were obtained by frauds on consumers and
               did not belong to them;

23         (c)   Phillips, Peikos and Barnett knew that through their fraudulent
24               schemes, they incurred debts to the Receivership Entities and
               consumers beyond their ability to pay;

25         (d)   Phillips, Peikos and Barnett retained possession or control of
26               the assets after the transfers;

27         (e)   The Receivership Entities did not receive a reasonably
               equivalent value in exchange for the transfers from the Wells
28               Fargo accounts because Phillips, Peikos, and Barnett drained
               the accounts for their own personal use and benefit, and the

---

80                              Case No. _____
                               RECEIVER'S COMPLAINT

**R_SER_123**

shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

(f) The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

(g) The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

(h) The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

(i) When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

(j) Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

(k) The transfers were of substantially all the Receivership Entities' assets;

(l) The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

(m) The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

285. Despite knowing that Phillips, Peikos and Barnett had no lawful claim to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

286. Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

287. Wells Fargo knowingly aided and abetted the fraudulent transfers

from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

288.    In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

289.    Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities, and thus these payments constitute fraudulent transfers which must be returned to the Receivership Entities.

290.    Accordingly, the Receiver seeks to recover as fraudulent transfers any (a) Receivership Entity funds taken from the Wells Fargo accounts and transferred to Phillips, Peikos, and Barnett as a result of the fraudulent schemes and b) payments to Wells Fargo from Receivership Entities in connection with setting up and maintaining the fraudulent accounts.

291.    The Receiver therefore asks that the Court order Wells Fargo to pay to the Receiver all fraudulent transfers they received or transferred, as alleged herein and as further shown by proof at trial. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

### Ninth Cause of Action

### (Unjust Enrichment/ Constructive Trust)

292.    The Receiver repeats and realleges the allegations of each and every

1    one of the prior paragraphs, inclusive, as if fully set forth herein.

2       293.  Wells Fargo received payments (whether denominated as "fees,"

3    "charges," "fines," "reserves," or otherwise) from the Receivership Entities'

4    accounts used in connection with the processing and maintenance of accounts, and

5    also transferred fraudulently-obtained funds to Peikos, Barnett, and Phillips.

6       294.  The payments received by Wells Fargo were made in furtherance of

7    the fraudulent schemes and Wells Fargo has been unjustly enriched by the amount

8    of these payments.

9       295.  In addition, through Wells Fargo's knowing and substantial assistance

10   in the wrongful transfer of account funds from the Receivership Entities, entities

11   and individuals who owned or controlled the Receivership Entities were unjustly

12   enriched in the amount of these transfers.

13      296.  Because of Wells Fargo's own unjust enrichment and its knowing

14   assistance in unjustly enriching the perpetrators of the frauds, the Receiver seeks

15   an equitable remedy ordering that Wells Fargo is holding, and shall continue to

16   hold, in constructive trust for the Receiver, the amount of the payments and

17   transfers to itself, as well as funds in Wells Fargo accounts which were wrongfully

18   transferred to third parties, including those who owned or controlled the

19   Receivership Entities.

20      297.  The Receiver further asks that he be awarded pre- and post- judgment

21   interest from Defendants from the date of the receipt of each fraudulent transfer.

22                    **Tenth Cause of Action (In the Alternative)**

23                            **(Negligent Supervision)**

24      298.  The Receiver repeats and realleges the allegations of each and every

25   one of the prior paragraphs, inclusive, as if fully set forth herein.

26      299.  In the alternative to Causes of Action One through Nine, Wells Fargo

27   negligently supervised the Wells Fargo employees named and/or described herein.

28      300.  Wells Fargo knew or should have known that the policies and

---

                              83              Case No. _____
                                              RECEIVER'S COMPLAINT

procedures permeating its Community Bank regarding sales incentives and quotas
were deficient and created a sales culture pressuring its employees into opening
accounts without concern for the repercussions, and which directly contributed to
and incentivized branch-level employees under the fear of being terminated, aiding
and abetting the Apex and Triangle frauds, cutting corners, and disregarding both
applicable Bank procedures (on paper) and legal obligations when opening and
monitoring accounts, and under the BSA and related rules. Wells Fargo's
knowledge of its own toxic sales culture is described herein.

301. Wells Fargo also knew or should have known that a corporate policy
pushing employees to open as many accounts as possible would facilitate money
laundering activities, as it would make it substantially easier for the Bank's
customers to open dozens of shell companies. The relevance of shell companies to
money laundering and fraud is discussed herein.

302. Wells Fargo knew or should have known that its lax oversight and its
implementation, design, and maintenance of proper controls to ensure branch-level
compliance in the Community Bank with all legal obligations, including under the
BSA, and to protect against fraudulent conduct, were deficient and would directly
contribute to branch-level bankers' misconduct, by providing atypical services,
assisting the frauds, and taking steps to conceal—rather than unmask or report—
the Apex and Triangle Entities' fraud.

303. Wells Fargo knew or should have known that its deficient policies for
the Community Bank, as detailed herein, leading to Wells Fargo's facilitation of
the Apex and Triangle Enterprises' consumer fraud and money laundering
activities would result in increased liabilities for, and substantial damage to, the
Receivership Entities as described herein.

304. Had Wells Fargo properly supervised its employees, properly put in
place appropriate policies and procedures in the Community Bank regarding sales
practices and incentives, properly implemented, designed, and maintained proper

controls to ensure branch-level compliance in the Community Bank with industry
standards and norms, and/or monitored and terminated employees who engaged in
misconduct (none of which occurred), the Receivership Entities would not have
suffered the damages that they did.

### Eleventh Cause of Action (In the Alternative)

### (Negligence)

305.   The Receiver repeats and realleges the allegations of each and every
one of the prior paragraphs, inclusive, as if fully set forth herein.

306.   In the alternative to Causes of Action One through Nine, the acts and
omissions of Wells Fargo as described herein were negligent.

307.   Wells Fargo provided banking services to the Apex and Triangle
Receivership Entities; as such, these entities were Wells Fargo's clients.

308.   Because the Receivership Entities were customers of Wells Fargo, the
Bank owed them a duty to act with reasonable care in its dealings with, and in
performing its services for, the Receivership Entities and their accounts.  That duty
included, without limitation, the duty to use the requisite care, skill and diligence
to detect, investigate and/or prevent the use of Wells Fargo accounts to perpetrate
fraud.

309.   Wells Fargo breached this duty because, without limitation, it
established corporate policies that prioritized the opening of accounts above
anything else—a policy which uniquely incentivized its employees to facilitate the
banking activities of shell companies, which any banker would know were key
indicia of fraud and money laundering.  Despite fully understanding that the
accounts opened by Apex and Triangle personnel were for shell companies used to
hide the true ownership of the accounts, Wells Fargo failed to timely stop or take
any action to prevent the fraud, including the transfer of Receivership Entities'
assets to Phillips, Peikos, Barnett, and/or third parties.

310.   Wells Fargo's breaches of its duties proximately caused damages to

1 the Receivership Entities in an amount to be determined at trial, because those
2 breaches allowed Phillips, Peikos, Barnett, and/or third parties to commit massive
3 fraud and to siphon off funds that rightfully belonged to the Receivership Entities
4 for their own, personal use.

**Twelfth Cause of Action**

**(Request for an Accounting)**

7     311. The Receiver repeats and realleges the allegations of each and every
8 one of the prior paragraphs, inclusive, as if fully set forth herein.

9     312. To ascertain the exact amounts received by Wells Fargo in connection
10 with the Apex and Triangle Enterprises the Receiver seeks entry of an order
11 compelling Wells Fargo to file with the Court and serve upon the Receiver an
12 accounting, under oath, detailing: (i) the amounts received from all accounts
13 owned or controlled by the Receivership Entities or related individuals and entities,
14 including Peikos, Barnett, and Phillips; (ii) the current locations of the amounts,
15 including the specific bank accounts to which any funds were transferred; and (iii)
16 the fees which Wells Fargo obtained as a result of doing business with the Apex
17 and Triangle Enterprises.

**XIII. PRAYER FOR RELIEF**

19     WHEREFORE, the Receiver respectfully prays for judgment against
20 Defendants as follows:

21     1.    For all applicable damages to the Receivership Entities proximately
22           caused by Wells Fargo's tortious conduct, including punitive damages
23           pursuant to California Civil Code § 3294, and treble damages
24           pursuant to California Penal Code § 496(c); in an amount to be
25           determined at trial;

26     2.    For the return of funds acquired by Wells Fargo through fraudulent
27           transfers and/or unjust enrichment at the expense of the Receivership
28           Entities, including, but not limited to, funds acquired as fraudulent

1    obligations supposedly owed to the Wells Fargo by the Receivership
2    Entities;

3    3.    For imposition of a constructive trust in favor of the Receiver as to all
4          funds received by Wells Fargo from the Receivership Entities;

5    4.    For a judgment ordering Wells Fargo to file an accounting, under
6          oath, as requested herein;

7    5.    For pre- and post- judgment interest;

8    6.    For attorneys' fees and costs: and

9    7.    For such other and further relief as the Court may deem proper.

10   **XIV. JURY DEMAND**

11   The Receiver demands a jury trial.

12                                     Respectfully Submitted,

13

14   DATED: July 8, 2021            By:*/s/ Lionel Z. Glancy*

15                                  **GLANCY PRONGAY & MURRAY LLP**
16                                  Lionel Z. Glancy
                                    Jonathan M. Rotter
17                                  Garth A. Spencer
                                    1925 Century Park East, Suite 2100
18                                  Los Angeles, California 90067
                                    Telephone:  310-201-9150
19                                  Facsimile:   310-201-9160
                                    Email: info@glancylaw.com
20
                                    **MCNAMARA SMITH LLP**
21
                                    Logan D. Smith
22                                  Cornelia J.B. Gordon
                                    655 West Broadway, Suite 900
23                                  San Diego, California 92101
                                    Telephone:  619-269-0400
24                                  Facsimile:   619-269-0401
                                    Email: lsmith@mcnamarallp.com
25
                                    *Attorneys for Court-Appointed Receiver*
26                                  *Thomas W. McNamara*

27

28

---

87                          Case No. _____
                            RECEIVER'S COMPLAINT

1 | **MCGUIREWOODS LLP**
DAVID C. POWELL (SBN 129781)
2 | dpowell@mcguirewoods.com
ALICIA A. BAIARDO (SBN 254228)
3 | abaiardo@mcguirewoods.com
Two Embarcadero Center, Suite 1300
4 | San Francisco, CA 94111-3821
Telephone: 415.844.9944
5 | Facsimile: 415.844.9922

6 | **MCGUIREWOODS LLP**
KEVIN M. LALLY (SBN 226402)
7 | klally@mcguirewoods.com
355 S. Grand Avenue, Suite 4200
8 | Los Angeles, CA 90071
Telephone: 213.627.2268
9 | Facsimile: 213.627.2579

10 |

11 | Attorneys for Proposed Intervenors
Wells Fargo & Company and
12 | Wells Fargo Bank N.A.

13 | **UNITED STATES DISTRICT COURT**

14 | **CENTRAL DISTRICT OF CALIFORNIA**

15 | FEDERAL TRADE | CASE NO. 18-cv-9573-JFW (JPRx)
16 | COMMISSION,
| The Hon. John F. Walter
17 |        Plaintiff,
18 |    vs. | **WELLS FARGO'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE**
19 | APEX CAPITAL GROUP, LLC, et al.,
20 | | Date:  February 21, 2022
21 |      Defendants. | Time: 1:30 p.m.
22 |
23 | | Complaint Filed: November 14, 2018
24 |
25 |
26 |
27 |
28 |

WELLS FARGO'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION TO INTERVENE

**R_SER_131**

1 **TO THE HONORABLE COURT AND ALL PARTIES OF RECORD:**

2      Pursuant to Rule 201 of the Federal Rules of Evidence, Proposed Intervenors

3 Wells Fargo & Company and Wells Fargo Bank N.A. (collectively "Wells Fargo")

4 respectfully request the Court take judicial notice of the following documents in

5 support of their Motion to Intervene:

6      1.    Plaintiff-Receiver Thomas M. McNamara's Complaint, filed as ECF

7 No. 1 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,*

8 Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit A.**

9      2.    September 3, 2021 Order on FTC's Motion for Summary Judgment

10 entered as ECF No. 1338 in *Federal Trade Commission v. AMG Services, Inc., et*

11 *al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), attached hereto as **Exhibit B**.

12      3.    Monitor Thomas M. McNamara's Statement Re: July 13, 2021 Status

13 Conference entered as ECF No. 1333 on September 3, 2021, in *Federal Trade*

14 *Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D.

15 Nev.), attached hereto as **Exhibit C**.

16      4.    Order on Remedies and Summary Judgment entered as ECF No. 627

17 on June 29, 2021 in *Federal Trade Commission v. Cardiff, et al.,* Case No. 5:18-cv-

18 02104-DMG-PLA, attached hereto as **Exhibit D**.

19      5.    Plaintiff-Receiver Thomas M. McNamara's Notice of Related Cases,

20 filed as ECF No. 2 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo &*

21 *Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as

22 **Exhibit E.**

23      Rule 201 makes facts that "can be accurately and readily determined from

24 sources whose accuracy cannot be reasonably questioned" the proper subject of

25 judicial notice. Fed. R. Evid. 201. Rule 201(c)(2) provides that the Court "must take

26 judicial notice [of such a matter] if a party requests it and the court is supplied with

27 the necessary information." *Id*.

28      Here, the existence and content of filings from the litigation brought by the

2

WELLS FARGO'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION TO INTERVENE

**R_SER_132**

1   Receiver in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No.

2   3:21-cv-01245-AJB-JLB (S.D. Cal.) and the Federal Trade Commission ("FTC") in

3   *Federal Trade Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-

4   GMN-VCF (D. Nev.) and *Federal Trade Commission v. Cardiff, et al.,* Case No.

5   5:18-cv-02104-DMG-PLA, are proper subjects of judicial notice.  *See, e.g., Harris*

6   *v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial

7   notice of undisputed matters of public record…including documents on file in

8   federal or state courts"); *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d

9   1149, 1158 (C.D. Cal. 2011) (taking judicial notice "of complaints filed by the

10  Plaintiffs in related proceedings, as well as complaints and orders from other

11  cases"); *Chrisanthis v. U.E.*, No. C 08-02472 WHA, 2008 WL 4848764, at *2 (N.D.

12  Cal. Nov. 7, 2008) ("When adjudicating a motion to dismiss, a court may take

13  judicial notice of public filings."); *Ramirez v. Quemetco, Inc.*, No. 17-cv-03384,

14  2017 WL 2957935, at *3 (C.D. Cal. July 11, 2017) (taking judicial notice of

15  declaration filed in another case).

16      Attached hereto as **Exhibits A-E** are copies of public filings in litigation

17  brought by the FTC and the Receiver in different actions.  Wells Fargo respectfully

18  requests the Court take judicial notice of these documents, and the facts they

19  evidence.

20

21  DATED: January 18, 2022              Respectfully submitted,

22                                       MCGUIREWOODS LLP

23                                       */s/ Alicia A. Baiardo*

24                                       Kevin M. Lally, Esq.
                                         David C. Powell, Esq.
25                                       Alicia A. Baiardo, Esq.

26

27                                       Attorneys for Proposed Intervenors Wells
                                         Fargo & Company and Wells Fargo Bank
28                                       N.A.

1

## <u>CERTIFICATE OF SERVICE</u>

2     I hereby certify that on January 18, 2022, I electronically filed the foregoing

3   document entitled with the Clerk of the Court for the United States District Court,

4   Southern District of California using the CM/ECF system and served a copy of same

5   upon all counsel of record via the Court's electronic filing system. Any counsel of

6   record who has not consented to or registered for electronic service through the

7   Court's CM/ECF system will be served by electronic mail, first class mail, facsimile,

8   and/or overnight delivery.

9                              */s/ Alicia A. Baiardo*
10                             Alicia A. Baiardo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Logan D. Smith (SBN 212041)
   lsmith@mcnamarallp.com
2  McNamara Smith LLP
   655 West Broadway, Suite 900
3  San Diego, California 92101
   Telephone:  619-269-0400
4  Facsimile:  619-269-0401

5  *Attorneys for Receiver,*
   *Thomas W. McNamara*

6

7

8                       UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,              Case No. 2:18-cv-09573-JFW (JPRx)

12              Plaintiff,                  **MEMORANDUM OF POINTS AND**
                                            **AUTHORITIES IN SUPPORT OF**
13         v.                              **RECEIVER'S UNOPPOSED**
                                            **MOTION TO EXTEND**
14  APEX CAPITAL GROUP, LLC, et al.,        **COMPLETION DEADLINE FOR**
                                            **RECEIVERSHIP AND INTERIM**
15              Defendants.                 **STATUS REPORT**

16                                          JUDGE:   Hon. John F. Walter
                                            CTRM:    7A
17                                          DATE:    August 23, 2021
                                            TIME:    1:30 p.m.
18

19

20

21

22

23

24

25

26

27

28

1        The Court-appointed receiver, Thomas W. McNamara (the "Receiver"),

2  respectfully moves to extend the completion deadline for the receivership for an

3  additional year, until September 12, 2022, and hereby provides this interim status

4  report regarding the receivership tasks that remain to be completed.  The Receiver

5  submits that good cause exists to extend the receivership for the reasons set forth

6  below.

7                                    **I.**

8          **INTRODUCTION AND BACKGROUND**

9        The Receiver was first appointed over the Receivership Entities in a

10  temporary capacity by a Temporary Restraining Order ("TRO") entered on

11  November 16, 2018 (ECF No. 16), which appointment was confirmed, and the

12  temporary designation removed, by the Preliminary Injunctions entered on

13  December 18, 2018 (ECF Nos. 40 and 41).  On September 11, 2019, the Court

14  entered two Stipulated Orders for Permanent Injunction and Monetary Judgment,

15  resolving all matters in dispute between the FTC and Defendants David Barnett,

16  Phillip Peikos, and the Receivership Entities.  *See* ECF No. 120 (the "Barnett

17  Order") and ECF No. 121 (the "Peikos Order").[1]

18        The Barnett and Peikos Orders direct the Receiver to recover and liquidate

19  Receivership Estate assets.  The Barnett Order included a receivership termination

20  provision, requiring the Receiver to complete his duties and file his final report and

21  final fee application within six months after entry of the order, by March 11, 2020,

22  "**unless this time was extended for good cause**."  Barnett Order at 27-28

23  (Section XIII, Termination of Receivership) (emphasis added); *see also* Peikos

24  Order at 29.  On March 9, 2020, the Court subsequently extended the completion

25  ///

26

---

[1] A third Stipulated Order of Permanent Injunction and Monetary Judgment was
27  later entered as to Defendants Mark Moskvins and SIA Transact Pro (ECF
No. 142), but these defendants are not subject to the receivership and therefore not
28  affected by this request to extend the receivership.

1   deadline to March 11, 2021.  *See* ECF No. 152.  On March 9, 2021, this Court

2   extended the receivership through September 11, 2021.  *See* ECF No. 172.

3        For the reasons explained below, the Receiver believes that good cause

4   exists to extend the receivership's completion deadline to September 12, 2022 in

5   order to enable the Receiver to complete his remaining responsibilities and

6   maximize the recovery of receivership assets for the benefit of the Receivership

7   Estate.

8                                    **II.**

9                               **DISCUSSION**

10       The Receiver has completed the vast majority of his duties under the Barnett

11   and Peikos Orders, and there are minimal ongoing receivership expenses.  There

12   are, however, a limited number of important tasks that have yet to be completed,

13   and chief among them is the resolution of the Receiver's recently-filed complaint

14   against Wells Fargo.

15   **A.    The Lawsuit Against Wells Fargo**

16       On July 8, 2021, the Receiver filed a lawsuit against Wells Fargo &

17   Company and Wells Fargo Bank, N.A. (collectively referred to herein as "Wells

18   Fargo" or the "Bank").[2]  A copy of the complaint is attached as Exhibit 1.  On that

19   same day, a second, related lawsuit was filed against Wells Fargo by consumer

20   victims seeking certification of a class.[3]

21   ///

22

23   [2] The Receiver sued Wells Fargo for aiding and abetting fraud, conspiracy to
     commit fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary
24   duty, violation of California Penal Code § 496, violation of California Business &
     Professions Code § 17200, aiding and abetting fraudulent transfers and/or voidable
25   transfers, unjust enrichment, negligence, and for an accounting.

26   [3] The class action lawsuit seeks to hold Wells Fargo accountable for aiding and
     abetting fraud, conspiracy to commit fraud, violation of California Penal Code
27   § 496, and violation of California Business & Professions Code § 17200.  The
     class is represented by counsel Glancy Prongay & Murray LLP, which is one of the
28   law firms representing the Receiver in his lawsuit against Wells Fargo.

Since discovering Wells Fargo's involvement in the Apex consumer scheme, the Receiver has aggressively investigated the underlying facts. Based on that investigation, the Receiver concluded that Wells Fargo knowingly provided critical assistance to Apex's principals, along with the principals of another, similar "risk-free" trial scheme run by Triangle Media Corporation ("Triangle").[4]

As previously reported to the Court, in late October 2019 and January 2020, the Receiver filed motions in the *Triangle* and *Apex* actions, respectively, advising both Courts that he wished to retain contingency counsel to pursue claims against Wells Fargo on behalf of the Receivership Entities for the extensive harm that Wells Fargo caused them. In the *Triangle* action, on November 19, 2019, Judge Burns ruled that "the Court finds good cause exists to grant the Receiver's motion to (1) extend the receivership for the sole purpose of pursuing litigation against Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3) administratively close the case while that litigation is pursued." On March 9, 2020, this Court likewise permitted the Receiver to retain contingency counsel to pursue claims against Wells Fargo.

After obtaining court approval and hiring counsel, the Receiver and counsel engaged in pre-filing settlement discussions and voluntary exchanges of information with Wells Fargo from Spring 2020 through Summer 2021. During the period when settlement discussions continued with the assistance of the mediators,[5] the parties were operating under Tolling Agreements which extended

---

[4] Apex and Triangle were sued in separate actions by the FTC, and the Receiver was appointed in each of the cases to determine whether the businesses could continue to be operated lawfully and profitably, and to protect assets and maximize the value of Receivership Estate. The Receiver determined the Apex and Triangle businesses were fraudulent "continuity" schemes that could not continue to operate. Apex and Triangle were both offering internet-based, deceptive "free trial" products to consumers, who were then charged the full price for the trial product and also enrolled in expensive, ongoing continuity plans without their knowledge or consent.

[5] The Receiver and Wells Fargo participated in confidential mediation in November 2020 and again in April 2021.

---

1   through July 7, 2021.  Immediately after the Tolling Agreements lapsed, the

2   Receiver and the consumer victims filed their lawsuits against Wells Fargo in the

3   Southern District of California.  The lawsuits were filed in the Southern District of

4   California because it was the venue in which the FTC first brought its litigation

5   against Triangle and because the FTC had also filed suit in that District against a

6   third Southern California continuity scheme called Tarr Inc., which was similar to

7   those run by Apex and Triangle.  Just as was the case with Apex and Triangle,

8   Wells Fargo provided atypical banking services to Tarr Inc. and a host of related

9   shell companies.  The Receiver's case and the consumers' case were reassigned

10  post-filing to Judge Larry Burns, who is the judge in the FTC's lawsuits against

11  Triangle and Tarr.

12      The Receiver is now actively pursuing his litigation against Wells Fargo and

13  believes it is a worthy case that could result in a substantial recovery for the

14  Receivership Estate.  Any recovered funds will ultimately be returned to the FTC,

15  which will then make distributions to the consumer victims of these frauds.

16  Significantly, the Receiver will be able to litigate this case *without* the

17  Receivership Entities incurring any costs and fees of litigation.  This was a key

18  factor in the Receiver's decision to pursue the litigation.  Because the Receiver was

19  able to hire contingency counsel, who expressly agreed to a contingent fee model

20  and to advance all costs, the Receivership will not be required to expend resources

21  in pursuing the case and will thus bear none of the financial risk.  If that were not

22  the case, the costs and legal fees required to take on such a deep-pocketed financial

23  institution would have been prohibitive.

24      As set forth in greater detail in the Complaint, the Receiver's case against

25  Wells Fargo is centered around the bank's continued willingness over a span of

26  years to deviate from accepted banking standards and practices and provide

27  atypical banking services in aid of the Apex and Triangle continuity schemes.

28  Both "risk-free" trial enterprises required a continuous stream of Wells Fargo bank

1  accounts for their dozens of shell companies to continue to operate, since those

2  shell companies were constantly being shut down by credit card processors

3  concerned about fraudulent activity and excessive consumer chargebacks.  The

4  Receiver has gathered evidence that Wells Fargo acted in a manner unlike any of

5  its banking peers during the relevant time period by opening more than 150 bank

6  accounts for the Apex and Triangle enterprises.

7       The root cause of Wells Fargo's conduct was the high-pressure sales culture

8  in place at the time, which caused Wells Fargo Community Bank employees and

9  branches to work under constant pressure to cross-sell and to open as many

10  accounts as possible, including under threat of termination.  Wells Fargo has

11  previously been subject to regulatory, civil, and criminal sanctions arising out of

12  this sales culture.  Those sanctions, which included substantial fines and

13  remediation efforts, were focused on compensating Wells Fargo's own customers

14  after Wells Fargo's Community Bank employees had opened fraudulent bank

15  accounts in the customers' names without their consent.  While the conduct here

16  has the same root cause (Wells Fargo's sales culture), the Receiver's case is

17  focused on conduct that Wells Fargo has not yet been held accountable for, where

18  its Community Bank employees and branches aided fraudulent enterprises by

19  opening scores of bank accounts for them – accounts which should never have

20  been opened.  Wells Fargo has never compensated the victims of this newly-

21  identified consequence of its toxic sales culture.  Those victims include consumers

22  as well as the Receivership Entities, both of which were harmed by Wells Fargo's

23  misconduct.

24  **B.    Claims Against European Beach Club and Corporation**

25       As previously noted in status reports provided to the Court, in addition to the

26  Wells Fargo lawsuit, the Receiver has also engaged counsel to investigate and

27  pursue claims against a beach club located in Greece and a related corporation

28  based in Cyprus.  *See* ECF Nos. 157 (Fourth Interim Status Report), 158 (Fifth

1   Interim Status Report).  The claims pursued relate to funds that the Receivership
2   Entities provided as "loans" to the beach club and shares in that beach club that
3   were sold to the Receivership Entities by the Cypriot corporation.

4         The COVID-19 pandemic disrupted the Greece and Cyprus court systems.
5   The lawsuit filed in Cyprus was stalled for a substantial period, but court activity
6   has now restarted.  The Receiver has been, and will continue to be, very careful in
7   evaluating the merits at each stage before moving forward.  For the time being, the
8   Receiver has instructed counsel to prioritize settlement discussions, which have
9   been initiated.  It is too early to tell whether these efforts will be successful.  At the
10  conclusion of the settlement discussion, the Receiver will base subsequent
11  decisions about how to proceed on counsel's further analysis and advice.

12  **C.    Payments on Convertible Notes**

13        The Receiver also continues to receive quarterly interest payments on ten
14  convertible promissory notes issued by a video e-commerce startup, Cinsay.  These
15  notes are set to mature between August 2022 and July 2023.  Should the Receiver
16  complete his other duties prior to the termination of the interest payments, the
17  Receiver will suggest that payments be made directly to the FTC.

18  **D.    Artwork**

19        Lastly, the Receiver will continue his efforts to sell artwork, which was
20  initially purchased by Defendant Barnett for approximately $70,000.  Despite
21  various and continued efforts to do so, the Receiver has not been able to liquidate
22  the ten pieces of art.  The Receiver will continue to market them until they are
23  sold.

24  ///
25  ///
26  ///
27  ///
28  ///

**III.**

**CONCLUSION**

Based on the foregoing, the Receiver respectfully requests that the Court modify Section XIII (Termination of Receivership) of the Stipulated Permanent Injunction (ECF No. 120 at 27-28) and extend the receivership completion deadline to September 12, 2022, unless the Court subsequently extends that date for good cause.

Dated:  July 23, 2021                          MCNAMARA SMITH LLP

                                               By:    /s/ Logan D. Smith
                                               Logan D. Smith
                                               *Attorney for Receiver,*
                                               *Thomas W. McNamara*

MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

**R_SER_142**

1  Edward Chang (SBN 268204)
   echang@mcnamarallp.com
2  McNamara Smith LLP
   655 West Broadway, Suite 1600
3  San Diego, California 92101
   Telephone:  619-269-0400
4  Facsimile:  619-269-0401

5  *Attorneys for Receiver,*
   *Thomas W. McNamara*
6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,          Case No. 2:18-cv-09573-JFW (JPRx)

12                   Plaintiff,        **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT OF**
13        v.                           **RECEIVER'S MOTION FOR**
                                       **AUTHORIZATION TO ENGAGE**
14  APEX CAPITAL GROUP, LLC, et al.,   **CONTINGENT FEE COUNSEL**

15                   Defendants.       JUDGE:   Hon. John F. Walter
                                       CTRM:    7A
16                                     DATE:    March 9, 2020
                                       TIME:    1:30 p.m.
17

18

19

20

21

22

23

24

25

26

27

28

1       Thomas W. McNamara, in his capacity as Court-appointed receiver

2  ("Receiver"), respectfully requests for the reasons identified in this motion that the

3  Court authorize his retention of contingent-fee counsel to pursue a lawsuit against

4  Wells Fargo and Company ("Wells Fargo").

5  **I.**     **The Receiver Requests Authorization to Hire Contingent-fee Counsel**

6      **A.**     **The Reasons for Hiring Contingent-fee Counsel**

7       For some time, the Receiver and counsel have investigated potential

8  Receivership claims against Wells Fargo for its conduct in connection with the

9  "risk-free" trial scheme.  The investigation involved a review of documents in the

10  Receiver's possession, as well as documents subpoenaed from Wells Fargo.[1]  The

11  conduct that was discovered was troubling to say the least.  The Receiver believes

12  that the anticipated litigation against Wells Fargo is meritorious, and the potential

13  recovery for the Receivership Estate is significant.  But all litigation is uncertain.

14  It will be expensive, as the conduct occurred over several years and involved many

15  individuals and entities, and the case will likely be vigorously defended at all

16  stages.

17       The Receiver has made his assessment that viable claims exist which should

18  be vigorously pursued fully recognizing the potential costs to the Receivership

19  Estate that such litigation would require.  Because the litigation will likely be hard-

20  fought, expensive, and long, the Receiver has determined that the cost and risk of

21  pursuing litigation on an hourly fee basis would be prohibitive.  This caused the

22  Receiver to evaluate alternative fee arrangements, which would shift the risk away

23  from the Receivership Estate.  While a hybrid (reduced hourly rate and reduced

24  contingency rate) arrangement was considered, the Receiver ultimately concluded

25  that a pure contingency fee arrangement makes the most sense; a contingency fee

26  eliminates direct costs to the Receivership Estate because the significant

27  _____

28  [1] A declaration of receiver Thomas W. McNamara supporting this Motion is filed
under seal.

---

                                          1  Case No. 2:18-cv-09573-JFW (JPRx)
MPAs ISO RECEIVER'S MOT. FOR AUTH. TO ENGAGE CONTINGENT FEE COUNSEL

1    professional fees necessary to prosecute the cases would not be paid by the

2    Receivership Estate.  Attorney's fees would only be paid out of litigation

3    recoveries should the case be successfully settled or litigated.

4         The Receiver generally has the discretion to hire counsel as he deems

5    necessary.  *See* Preliminary Injunctions, XV. Duties and Authority of Receiver,

6    ECF No. 40 at 20; ECF No. 41 at 18 ("IT IS FURTHER ORDERED that the

7    Receiver is directed and authorized to accomplish the following: . . . F. "Choose,

8    engage, and employ attorneys, accountants, appraisers, and other independent

9    contractors and technical specialists, as the Receiver deems advisable or necessary

10   in the performance of duties and responsibilities under the authority granted by this

11   Order.").

12        However, it is common when a receiver intends to retain contingency

13   counsel to seek permission for the retention from the appointing court.  *See, e.g.*,

14   *FTC v. Triangle Media Corp., et al.*, Case No. 3:18-cv-01388-LAB, ECF No. 142

15   (S.D. Cal. Nov. 19, 2019); *SEC v. Capital Cove Bancorp, LLC, et al.*, Case No.

16   8:15-cv-00980-JLS, ECF No. 302 (C.D. Cal. Mar. 23, 2016); *SEC v. Diversified

17   Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R, ECF No. 264 (C.D. Cal.

18   Jan. 7, 2011); *SEC v. Ruderman, et al.*, Case No. 2:09-cv-02974-ODW, ECF No.

19   122 (C.D. Cal. Dec. 22, 2010).

20        Of particular relevance here, the Receiver notes that a few months before his

21   appointment in this case he was separately appointed as receiver in a case in the

22   Southern District of California which involved a "risk free" trial scheme very

23   similar to that used by the Apex Defendants.  *See FTC v. Triangle Media Corp., et

24   al.*, Case No. 3:18-cv-01388-LAB (S.D. Cal.) ("Triangle").  In both Apex and

25   Triangle, the defendants used Wells Fargo to open up dozens and dozens of

26   accounts through which consumer funds were passed.  In Triangle, the Receiver

27   recently sought and obtained the Court's permission to hire contingent-fee counsel

28   ///

1  to pursue a lawsuit against Wells Fargo.  *See* Triangle, ECF No. 142 (attached as
2  Exhibit 1).

3      The Receiver and his counsel conducted parallel investigations of Wells
4  Fargo's conduct in connection with the Apex and Triangle schemes.  After
5  consulting with counsel, the Receiver believes that the claims against Wells Fargo
6  in both the Apex and Triangle Receiverships should be pursued in the same
7  litigation and brought by the same counsel, given the identity of interests and
8  claims.

9      The Receiver has also concluded that the only way to pursue such litigation
10  against Wells Fargo without harming the Receivership Estate would be on a
11  contingent-fee basis.  The Receiver reached out to experienced contingency
12  counsel to discuss possible claims that might be brought and the potential contours
13  of litigation.  As a result of these discussions, the Receiver identified and has
14  spoken on numerous occasions with partners at Glancy Prongay & Murray LLP, a
15  national law firm based in Los Angeles with offices in New York and Berkeley
16  that prosecutes class action cases and complex litigation in federal and state courts
17  throughout the country.  As lead counsel or as a member of the Plaintiff's Counsel
18  Executive Committees, the firm has recovered billions for its clients.

19      Glancy Prongay & Murray has spent months reviewing substantial materials
20  regarding the potential case provided by the Receiver, and its lawyers have
21  conducted their own independent investigation into the merits of a prospective
22  litigation.  The firm has concluded that it is willing to pursue the litigation on
23  behalf of the Receiver.  Given the firm's credentials (discussed above), the
24  Receiver believes the firm is eminently qualified to represent the Receivership
25  Estate's interest in the prospective litigation against Wells Fargo.

26      McNamara Smith professionals have dedicated substantial efforts over the
27  last year working closely with the Receiver to understand the facts, identify various
28  parties, and review voluminous transactions related to the potential litigation.

1   They are thus uniquely suited to assist in the prosecution of the litigation because

2   of their in-depth understanding of the factual background and deep knowledge of

3   the legal issues peculiar to receiverships.  McNamara Smith attorneys regularly

4   represent fiduciaries, including receivers and monitors, in matters across the

5   country, and they have worked with the Receiver here.  The firm is willing to

6   continue on in collaboration with Glancy Prongay & Murray pursuant to a

7   contingency fee arrangement.

8       **B.      The Proposed Terms of the Contingent Fee Agreement Are**

9               **Reasonable**

10          The Receiver believes that the proposed arrangement is reasonable,

11  especially in light of the agreement by counsel to advance litigation costs and thus

12  remove any financial risk to the Receivership Estate.  The Receiver negotiated with

13  Glancy Prongay & Murray for the costs of the litigation to be fronted by counsel,

14  under the express condition that the Receivership Estate will only be responsible

15  for the costs in the event that there is a recovery through settlement or judgment.

16  The Receiver believes that this is the most cost-effective approach and will also

17  result in the greatest possible recovery for the Receivership Estate.

18          The Court's power to supervise an equity receivership and to determine the

19  appropriate action to be taken in the receivership, including the retention and

20  compensation of counsel, is extremely broad.  *See SEC v. Capital Consultants,*

21  *LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (district court has broad discretion to

22  approve appropriate action to be taken in the administration of a receivership); *see*

23  *also CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This

24  court affords 'broad deference' to the [district] court's supervisory role and 'we

25  generally uphold reasonable procedures instituted by the district court that serve

26  th[e] purpose' of orderly and efficient administration of the receivership for the

27  benefit of creditors.").

28  ///

---

Courts in this Circuit have considered and approved contingent fee arrangements in order to compensate a receiver's counsel to recover assets for the receivership.  There is no particular formula employed by the courts.  *See e.g.*, *SEC v. Diversified Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R (C.D. Cal.) (district court approved contingent fee arrangement, including 25 percent of pre-suit recovery, 35 percent if settled up until 120 days before trial and 45 percent thereafter); *SEC v. Ruderman, et al.*, Case No. 2:09-cv-02974-ODW (C.D. Cal.) (approving contingency fee arrangement, 33 percent of recovery up to 60 days before trial, 40 percent after that date); *SEC v. Capital Cove Bancorp, LLC, et al.*, Case No. 8:15-cv-00980-JLS (C.D. Cal.) (approving contingency fee of between 25 and 40 percent, rate changing depending on timing and size of gross recoveries).

In *SEC v. JCS Enterprises, Inc., et al.*, Case No. 9:14-cv-80468-DMM, ECF Nos. 237 and 238 (S.D. Fla. Oct. 16, 2015), the district court approved a standard contingent fee arrangement for one counsel (25 percent of gross recoveries before summary judgment, and 30 percent after that date) and a hybrid contingent agreement for a second counsel ($200 per hour and 20 percent of gross recoveries). *See also SEC v. We the People, Inc. of the United States*, Case No. 2:13-cv-14050-JEM, ECF No. 100 (S.D. Fla. Mar. 14, 2014) (approving a 33.3 percent contingent fee).

Here, the proposed contingent fees fall well within the range of fees approved in other receivership cases.  Notably, the proposed contingent fee arrangement is the same fee structure presented to Judge Burns when he recently authorized the engagement of contingent-fee counsel in the Triangle case in November of 2019.  *See Triangle*, ECF No. 142 (authorizing receiver to engage contingency counsel on the terms proposed).  The Glancy Prongay & Murray and McNamara Smith firms have agreed to act as counsel to the Receiver and to share a contingent fee equal to 28.5% of the gross recovery up until a ruling on summary

1  judgment, and 33.3% contingent fee on gross recovery received after a ruling on
2  summary judgment.  Under this arrangement, the Receivership Estate will not be
3  obligated to advance litigation costs, *e.g.*, court fees, discovery and expert costs.
4       The proposed contingent fees fall well within the range of fees approved in
5  other receivership cases, and the Receiver believes that the proposed arrangement
6  is reasonable, especially in light of the agreement by counsel to advance litigation
7  costs and thus remove any financial risk to the Receivership Estate.

8  **II.   CONCLUSION**

9       Based on the foregoing, I respectfully request that the Court grant the
10 Receiver permission to engage contingency counsel to represent the Receiver, as
11 identified above.

12 Dated:  February 4, 2020        MCNAMARA SMITH LLP

14                By:___/s/ Edward Chang_____
                    Edward Chang
15                     *Attorneys for Receiver,*
                    *Thomas W. McNamara*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Ninth Circuit using the

appellate CM/ECF system, which will also serve counsel of record.

Dated: October 11, 2022            */s/ Logan D. Smith*
                                   Logan D. Smith