No. 22-55342

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellee*,

v.

APEX CAPITAL GROUP, LLC, *et al*.,
*Defendants-Appellees*,

v.

WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,
*Proposed Intervenors-Movants-Appellants*.

Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-09573-JFW-JPR
Hon. John F. Walter

## SUPPLEMENTAL EXCERPTS OF RECORD
## OF THE FEDERAL TRADE COMMISSION

ANISHA S. DASGUPTA
*General Counsel*

JOEL MARCUS
*Deputy General Counsel*

Of Counsel:
JONATHAN W. WARE
SARAH WALDROP
*Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

MICHAEL BERGMAN
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3184
mbergman@ftc.gov

## SUPPLEMENTAL EXCERPTS OF RECORD INDEX

| Document Name | District Ct. ECF No.* | Date | Excerpted Pages | SER Page # |
|---|---|---|---|---|
| Order Granting Receiver's Motion to Extend Receivership | 257 | 9/7/2022 | All | 3 |
| Receiver's Opp. Motion to Intervene, Ex. 3 (email from Wells Fargo's Counsel Regarding Intention to Intervene) | 226-5 | 2/7/2022 | All | 4 |
| FTC Opp. Motion to Intervene Exh. B - Declaration of Logan Smith | 225-2 | 2/7/2022 | All | 7 |
| FTC Opp. Motion to Intervene Exh. A - Declaration of Brian Lasky | 225-1 | 2/7/2022 | All | 15 |
| Receiver's complaint in *McNamara v. Wells Fargo & Co*., No. 3:21-cv-1245-LAB-DDL (S.D. Cal.) | 219-3 | 1/18/2022 | All | 19 |
| Wells Fargo's Anticipated Motion to Modify Existing Orders | 219-1 | 1/18/2022 | 3-4, 20-26 | 108 |
| Order Denying Defendants' Motion to Modify Permanent Injunction | 207 | 9/30/2021 | All | 118 |
| Memorandum of Points and Authorities – Receiver Motion to Sue Wells Fargo | 144-1 | 2/4/2020 | All | 126 |
| *Ex Parte* Application for Temporary Restraining Order Ex. 5 - Part 5 | 2-5 | 11/14/18 | 21, 35-36 | 133 |

*Docket numbers refer to the district court docket.

1

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 18-9573-JFW(JPRx)**                           Date:  September 7, 2022

Title:    Federal Trade Commission -*v*- Apex Capital Group, et al.

**PRESENT:**
    **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

    **Shannon Reilly**                              **None Present**
    **Courtroom Deputy**                          **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
            None                                                None

**PROCEEDINGS (In Chambers): ORDER GRANTING RECEIVER'S MOTION TO EXTEND**
                            **COMPLETION DEADLINE FOR RECEIVERSHIP AND**
                            **INTERIM STATUS REPORT [filed 8/15/22; Docket No. 252]**

On August 15, 2022, Receiver Thomas W. McNamara ("Receiver") filed a Motion to Extend Completion Deadline for Receivership and Interim Status Report ("Motion").[1]  On August 22, 2022, Non-Parties Wells Fargo & Company and Wells Fargo Bank N.A. (collectively, "Wells Fargo") filed their Opposition.  On August 29, 2022, the Receiver filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument.  The hearing calendared for September 12, 2022 is hereby vacated and the matter taken off calendar. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

In his Motion, the Receiver seeks to extend the completion deadline for the receivership for an additional year from September 12, 2022, to September 12, 2023.  In its Opposition, Wells Fargo opposes "[f]or the reasons stated in [Wells Fargo's] Motion to Intervene [Dkt. 219] and Ninth Circuit Appeal Opening Brief" the Receiver's Motion to the extent it is based on extending the completion deadline for the receivership to allow the Receiver to pursue litigation against Wells Fargo.  However, as the Receiver points out in his Reply, the arguments raised by Wells Fargo in its Motion to Intervene have already been considered and rejected by the Court when it denied the Motion to Intervene.  *See* Docket No. 238.

Accordingly, for the reasons stated in the Receiver's Motion and Reply, the Receiver's Motion is **GRANTED**.  Section XIII of the Stipulated Order for Permanent Injunction and Monetary Judgment (Docket No. 120) is hereby modified to provide that the deadline for the Receiver to complete his duties shall be September 12, 2023, unless the Court subsequently extends that date for good cause.

IT IS SO ORDERED.

---

[1]  In his Motion, the Receiver states that counsel for the Federal Trade Commission does not oppose to this Motion.

Initials of Deputy Clerk  _sr_

EXHIBIT 3

| From: | Le, Anthony Q. <ALe@mcguirewoods.com> |
|---|---|
| Sent: | Thursday, August 19, 2021 3:17 PM |
| To: | Logan Smith |
| Cc: | White, Molly M.; Baiardo, Alicia A. |
| Subject: | FTC v. Apex Capital, No. 2:18-cv-9573-JFW (C.D. Cal.) - Wells Fargo Motion to Intervene |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____

Counsel,

As you are aware, McGuireWoods LLP represents Wells Fargo Bank in connection with a recent lawsuit involving your office by Thomas McNamara, as the court-appointed receiver for Triangle Media Corporation and Apex Capital Group. This lawsuit is entitled *Thomas McNamara v. Wells Fargo & Company et al.*, No. 3:21-cv-01245-LAB-LL, and is now pending in the Southern District of California.

We are writing to follow-up on our call this afternoon to meet and confer under C.D. Cal. Local Rule 7-3. As we mentioned, Wells Fargo plans to file a motion to intervene in the FTC action involving your office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).

Please call us at your convenience, or let us know when you are available to discuss. Our contact information is below. Thanks in advance.

Molly White
mwhite@mcguirewoods.com
(310) 956-3423

Ali Baiardo
abaiardo@mcguirewoods.com
(415) 844-1973

Anthony Le
ale@mcguirewoods.com
(415) 844-1975

**Anthony Q. Le**
Associate
McGuireWoods LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111-3821
T:  +1 415 844 1975
M: +1 949 244 8270
F:  +1 415 844 1918
ale@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

EXHIBIT 3
Page 10

**FTCSER-5**

# McGUIREWOODS

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

2

EXHIBIT 3
Page 11

**FTCSER-6**

# Declaration of Logan Smith
# FTC Exhibit B

1   JONATHAN W. WARE (lead counsel), *pro hac vice*
2   Tel: (202) 326-2726; jware1@ftc.gov
    Fax: (202) 326-3197
3   DC Bar No. 989414; VA Bar No. 77443
4   Federal Trade Commission
    600 Pennsylvania Avenue NW CC-9528
5   Washington, DC 20580

6   DELILAH VINZON (local counsel)
7   Tel: (310) 824-4300; dvinzon@ftc.gov
    Fax: (310) 824-4380
8   Cal. Bar No. 222681
9   Federal Trade Commission
    10990 Wilshire Boulevard, Suite 400
10  Los Angeles, CA 90024
11
12  Attorneys for Plaintiff
    FEDERAL TRADE COMMISSION
13
14
15              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
16

17  | | |
    |---|---|
    | **FEDERAL TRADE COMMISSION**, | Case No. 2:18-cv-9573-JFW(JPR) |
    | Plaintiff, | **DECLARATION OF LOGAN D. SMITH PURSUANT TO 28 U.S.C. § 1746** |
    | v. | |
    | **APEX CAPITAL GROUP, LLC,** et al., | Date:  March 7, 2022 |
    | Defendants. | Time:  1:30 PM |
    | | Courtroom:  7A |
    | | Judge: Hon. John F. Walter |

18
19
20
21
22
23
24
25
26
27
28
                              Case No. 2:18-cv-9573-JFW(JPR)
                    Smith Decl. ISO FTC's Opposition to Wells
                              Fargo's Motion to Intervene

                              **FTCSER-8**

FTC Exhibit B - Smith Declaration

# DECLARATION OF LOGAN D. SMITH
## PURSUANT TO 28 U.S.C. § 1746

I have personal knowledge of the facts set forth below and am competent to testify about them. I am a United States citizen over the age of 18. If called as a witness, I could and would testify as follows:

(1)     I am licensed to practice law in California.

(2)     I am an attorney with McNamara Smith LLP and represent Thomas W. McNamara, the court-appointed receiver (the "Receiver") in *Federal Trade Commission v. Triangle Media, et al.*, No. 3:18-cv-01388-LAB-LL (S.D. Cal.) (the "Triangle Case") and in *Federal Trade Commission v. Apex Capital Group LLC, et al.*, No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.) (the "Apex Case"). I have been involved with the Receiver's investigation in those cases and in his litigation related to Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo") in *McNamara v. Wells Fargo & Company and Wells Fargo Bank, N.A.*, No. 3:21-cv-01245-LAB-LL (S.D. Cal.) (the "Receiver's Suit").

**The Receiver's Appointments**

(3)     The Court in the Triangle Case appointed the Receiver as temporary receiver on June 29, 2018 (Triangle Case ECF No. 11), and as permanent receiver on August 24, 2018 (Triangle Case ECF No. 75).

(4)     The Court in the Apex Case appointed the Receiver as temporary receiver on November 16, 2018 (Apex Case ECF No. 16), and as receiver on December 18, 2018 (Apex Case ECF Nos. 40, 41).

**The Receiver's Investigations**

(5)     Upon his appointment, the Receiver began to marshal the assets of the estates in each case, as required by each appointing court. To that end, on September 18, 2018, Wells Fargo issued a cashier's check to the Receiver for $1,181,479.83, which represented the sum across 40 bank accounts identified by Wells Fargo and the Receiver as belonging to the Triangle Case defendants or

FTC Exhibit B - Smith Declaration

otherwise subject to the Receiver's control. Similarly, on January 24, 2019, Wells Fargo transferred to the Receiver $57,464.96, which represented the sum across 17 bank accounts identified by Wells Fargo and the Receiver as belonging to the Apex Case defendants or otherwise subject to the Receiver's control.

(6)     On May 2, 2019, the Receiver served Wells Fargo Bank, N.A. a Rule 45 subpoena seeking information about accounts in the Apex Case.

(7)     The Receiver's investigation in the Triangle Case and the Apex Case identified more than 150 accounts that Wells Fargo opened for the defendants in those cases through approximately 100 shell companies.

**The Receiver's Pursuit of Claims Against Wells Fargo**

(8)     On October 22, 2019, the Receiver publicly sought court approval in the Triangle Case to hire contingency counsel to pursue claims against Wells Fargo (Triangle Case ECF No. 136), which the court granted on November 19, 2019 (Triangle Case ECF No. 142), the same day it closed the case.

(9)     On February 4, 2020, the Receiver publicly sought court approval in the Apex Case to hire contingency counsel to pursue claims against Wells Fargo (Apex Case ECF Nos. 144, 148), and the court granted that request on March 9, 2020 (Apex Case ECF No. 153). The docket in the Apex Case indicates it was closed on January 15, 2020, the date the Court entered the last of the stipulated permanent injunctions.

**Wells Fargo's Affirmative Actions Concerning the Receiver's Suit**

(10)    On April 1, 2020, the Receiver sent Wells Fargo draft complaints against it relating to Wells Fargo's actions underlying the Triangle Case and the Apex Case, along with a draft tolling agreement and proposed mediation of the claims.

(11)    On April 13, 2020, counsel for Wells Fargo (McGuire Woods LLP) responded to the Receiver's April 1, 2020 communications and spoke to the Receiver's counsel by phone the next day.

(12)   On April 15, 2020, Wells Fargo executed the tolling agreement, sent it to the Receiver, and stated it would be in touch within 30 days about mediation.

(13)   On April 29, 2020, Wells Fargo requested that the Receiver provide the documents the bank had produced to the Receiver via the subpoena described above.  The Receiver provided those to Wells Fargo a week later.

(14)   On May 7, 2020, Wells Fargo requested an extension until June 12, 2020 to consider mediation.

(15)   On May 18, 2020, Wells Fargo requested the Receiver provide certain deposition transcripts and documents.  The Receiver provided certain documents to the bank on May 21, 2020.

(16)   On May 27, 2020, Wells Fargo requested a summary of allegations concerning a third FTC case, *FTC v. Tarr, Inc.,* No. 3:17-cv-02024-KSC (S.D. Cal.), which involved similar conduct and timing as the Triangle Case and Apex Case and in which the Receiver's law firm (Glancy Prongay & Murray LLP) represented a consumer victim.  Counsel provided the requested summary on June 9, 2020.

(17)   On June 12, 2020, Wells Fargo agreed to mediate the Receiver's proposed suits before Judge Weinstein.

(18)   On June 16, 2020, Wells Fargo asked the Receiver about documents related to the Triangle Case, which the Receiver provided on June 19, 2020.

(19)   On June 26, 2020, Wells Fargo sent the Receiver an amended and executed tolling agreement.

(20)   On July 28, 2020, Wells Fargo and the Receiver agreed on October 14, 2020 as the mediation date concerning the Receiver's proposed suits.

(21)   On September 10, 2020, Wells Fargo requested to move the mediation to the first week of November 2020.

3

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene
**FTCSER-11**

(22)    On November 5, 2020, Wells Fargo and the Receiver mediated their claims before Judge Weinstein and Ambassador David Carden, but were unable to reach a resolution.

(23)    Following the mediation, between November 2020 and June 2021, Wells Fargo and the Receiver continued to have discussions and exchange information with each other with the involvement of Judge Weinstein and Ambassador Carden.

(24)    On March 3, 2021, Wells Fargo and the Receiver extended their tolling agreement through May 28, 2021.

(25)    On April 29, 2021, Wells Fargo and the Receiver participated in a second round of mediation before Judge Weinstein and Ambassador Carden.

(26)    On May 25, 2021, Wells Fargo and the Receiver extended their tolling agreement through June 23, 2021, while the parties continued to have follow-up discussions through the mediators.

(27)    On June 23, 2021, Wells Fargo and the Receiver extended their tolling agreement through July 7, 2021.

(28)    On July 8, 2021, the Receiver filed his complaint in the Receiver Suit.

(29)    On July 28, 2021, Wells Fargo and the Receiver jointly moved the court in the Receiver's suit for an extension of time to respond to the Receiver's complaint (Receiver's Suit ECF No. 9), which the court granted on June 30, 2021 (Receiver's Suit ECF No. 12).

(30)    On August 19, 2021, counsel for Wells Fargo called and emailed the Receiver's counsel, stating Wells Fargo wanted to meet and confer with the Receiver regarding Wells Fargo's "plans to file a motion to intervene in the FTC action involving [the Receiver's] office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to

4

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene
**FTCSER-12**

obtain equitable monetary relief. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)."

(31)    On August 23, 2021, counsel for Wells Fargo and the Receiver held a meet and confer, where Wells Fargo indicated its intent to file a motion to intervene in the Apex Case on August 30, 2021.

(32)    On August 25, 2021, Wells Fargo filed a motion to dismiss the Receiver's suit, along with a memorandum in support and other related documents (ECF No. 14).  The Receiver filed his opposition on October 8, 2021 (ECF Nos. 15, 16), and Wells Fargo filed its reply on October 25, 2021 (ECF Nos. 17, 18).

(33)    On August 30, 2021, counsel for Wells Fargo emailed counsel for the Receiver, stating that Wells Fargo would not be filing its motion to intervene and would reach back out in advance of any future filing.

(34)    On October 26, 2021, counsel for Wells Fargo emailed the Receiver's counsel, indicating Wells Fargo intended to move to intervene in the Apex Case and wanted to schedule a meet and confer.  In subsequent discussions, Wells Fargo's counsel informed the Receiver's counsel that Wells Fargo intended to move to intervene in the Triangle Case in the Southern District of California where there is no obligation to meet and confer before filing.

(35)    Wells Fargo filed its motion to intervene in the Triangle Case on November 10, 2021.  The FTC and Receiver both filed oppositions to that motion on December 20, 2021.  Wells Fargo filed its reply in support of its motion on January 10, 2022.  Wells Fargo's motion to intervene in the Triangle Case is pending.

(36)    Wells Fargo first filed its motion to intervene on January 10, 2022, and then re-filed the pending motion to intervene on January 18, 2022, after its initial motion was stricken for failure to comply with Section 5(b) of the Court's Standing Order.

5

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene
FTCSER-13

(37)   Throughout the time that the Receiver has been either in prelitigation discussions with Wells Fargo or active litigation against Wells Fargo, the Receiver has filed multiple motions with this Court seeking to obtain extensions of the completion deadline for the Receivership in the Apex case.  Wells Fargo has not sought to intervene to oppose any of these motions.

(38)   Before initially reaching out to Wells Fargo, on February 4, 2020, the Receiver filed a motion to extend the completion deadline (ECF No. 143) concurrently with his motion for authorization to engage contingent fee counsel (ECF No. 144).  The Court granted both motions on March 9, 2020, extending the deadline until March 11, 2021.  ECF No. 152, 153.  Counsel for the Receiver then contacted Wells Fargo via email on April 1, 2020, as discussed above in Paragraph 10.

(39)   On March 5, 2021, the Receiver filed a motion to extend the deadline (ECF No. 169), which the Court granted on March 26, 2021 (ECF No. 172), extending the completion deadline until September 11, 2021.  Wells Fargo did not seek to intervene to oppose the motion.

(40)   On July 23, 2021 (two weeks after filing its suit against Wells Fargo), the Receiver filed another motion to extend the deadline (ECF No. 186), which the Court granted on August 12, 2021 (ECF No. 198), extending the deadline until September 12, 2022.  Wells Fargo did not seek to intervene to oppose the motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: February 7, 2022        *Logan D. Smith*

Logan D. Smith

Case No. 2:18-cv-9573-JFW(JPR)
Smith Decl. ISO FTC's Opposition to Wells Fargo's Motion to Intervene
**FTCSER-14**

# Declaration of Brian Lasky
# FTC Exhibit A

JONATHAN W. WARE (lead counsel) (admitted *pro hac vice*)
DC Bar No. 989414; VA Bar No. 77443
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
Tel: (202) 326-2726; Fax: (202) 326-3197
jware1@ftc.gov

DELILAH VINZON (local counsel)
Cal. Bar No. 222681
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300; Fax: (310) 824-4380
dvinzon@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **APEX CAPITAL GROUP, LLC,** et al. <br><br> Defendants. | Case No. 2:18-cv-9573-JFW(JPR) <br><br> **DECLARATION OF BRIAN N. LASKY PURSUANT TO 28 U.S.C. § 1746** <br><br> Date: March 7, 2022 <br> Time: 1:30 P.M. <br> Courtroom: 7A <br> Judge: Hon. John F. Walter |

# DECLARATION OF BRIAN N. LASKY
## PURSUANT TO 28 U.S.C. § 1746

I, Brian N. Lasky, declare under penalty of perjury that the foregoing is true and
correct:

1. I have personal knowledge of the facts stated herein and, if called to testify, I
   could and would competently testify to the same. I am a United States
   citizen over the age of 18. I am employed by the Federal Trade Commission
   ("FTC") as an attorney.

2. I am counsel for the FTC in the above-captioned matter, admitted *pro hac
   vice* to this Court, and licensed to practice in the State of New York.

3. I participated during the investigation phase of this matter and in litigating it.

4. On November 19, 2018, a Wells Fargo service manager at the Warner Ranch
   Branch in Woodland Hills, California, Fatima Ledezma, was personally
   served a copy of the Court's November 16, 2018 Ex Parte Temporary
   Restraining Order With Asset Freeze, Appointment Of A Temporary
   Receiver, And Other Equitable Relief, And Order To Show Cause Why A
   Preliminary Injunction Should Not Issue (Docket No. 16) by an FTC Staff
   member under my direction.

5. In a subsequent letter dated November 19, 2018, Wells Fargo's Legal Order
   Processing Operations Manager, Joe Medina, confirmed in writing to the
   FTC that, "As you requested in the Temporary Restraining Order served on
   Wells Fargo on November 19, 2018, we have restricted customer
   withdrawals from the accounts below," followed by a list of 23 accounts
   related to this case.

6. On November 10, 2021, the FTC provided counsel for Wells Fargo, Kevin
   Lally, with a courtesy copy of the Temporary Restraining Order (Docket No.
   16) that had been served on Wells Fargo on November 19, 2018.

7. On February 2, 2022, the FTC provided counsel for Wells Fargo, Kevin Lally, with a courtesy copy of Wells Fargo's November 19, 2018 letter (described above).

Executed on February 2, 2022 in New York, NY.

Brian N. Lasky

# EXHIBIT A

1  LOGAN D. SMITH (#212041)
   CORNELIA J.B. GORDON (#320207)
2  **MCNAMARA SMITH LLP**
   655 West Broadway, Suite 900
3  San Diego, California 92101
   Telephone:   619-269-0400
4  Facsimile:   619-269-0401
   Email: lsmith@mcnamarallp.com
5
   LIONEL Z. GLANCY (#134180)
6  JONATHAN M. ROTTER (#234137)
   GARTH A. SPENCER (#335424)
7  **GLANCY PRONGAY & MURRAY LLP**
   1925 Century Park East, Suite 2100
8  Los Angeles, California 90067
   Telephone:   310-201-9150
9  Facsimile:   310-201-9160
   Email: info@glancylaw.com
10
   *Attorneys for Receiver, Thomas W. McNamara*
11
12              **UNITED STATES DISTRICT COURT**
                **SOUTHERN DISTRICT OF CALIFORNIA**
13
14 THOMAS W. MCNAMARA, as the          Case No.   **'21 CV 1245 AJB JLB**
   Court-Appointed Receiver for Triangle
15 Media Corporation, Apex Capital      **RECEIVER'S COMPLAINT FOR:**
   Group, LLC; and their successors,
16 assigns, affiliates, and subsidiaries,  **(1) Aiding and Abetting Fraud;**
                                          **(2) Conspiracy to Commit Fraud;**
17                Plaintiff,              **(3) Breach of Fiduciary Duty;**
                                          **(4) Aiding and Abetting Breach of**
18         v.                            **Fiduciary Duty;**
                                          **(5) Aiding and Abetting Conversion;**
19 WELLS FARGO & COMPANY, a             **(6) Violation of California Penal Code**
   corporation, WELLS FARGO BANK,       **§ 496;**
20 N.A., a national banking association,  **(7) Violation of California Business &**
                                          **Professions Code § 17200;**
21                Defendants.            **(8) Aiding and Abetting Fraudulent**
                                          **Transfers and/or Voidable Transfers;**
22                                       **(9) Unjust Enrichment/Constructive**
                                          **Trust;**
23                                       **(10) Negligent Supervision (in the**
                                          **Alternative);**
24                                       **(11) Negligence (in the Alternative);**
                                          **and**
25                                       **(12) Request for an Accounting**
26                                       **JURY TRIAL DEMAND**
27
28
                                                    Case No. _____
                                                  RECEIVER'S COMPLAINT

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the court-appointed receiver for the Triangle and Apex Enterprises, as defined below, hereby brings the following Complaint against Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo," the "Bank," or "Defendants") and alleges the following.

I.     INTRODUCTION: A NEW REVELATION OF WELLS FARGO'S FACILITATION OF CONSUMER FRAUD

1.     The Receiver brings this action against Wells Fargo to recover damages suffered as a result of Wells Fargo's knowing provision of substantial assistance to two multi-million-dollar fraudulent schemes perpetrated by the former operators of Triangle Media Corporation ("Triangle") and Apex Capital Group ("Apex").[1]

2.     The Receiver was appointed after the Federal Trade Commission ("FTC") brought lawsuits against the Triangle and Apex Enterprises in 2018.   The Enterprises ran similar, though separate, Internet risk-free trial schemes marketing dozens of products, most of which were personal care products and dietary supplements that purported to promote enhanced weight loss, hair growth, clear skin, muscle development, sexual performance, and cognitive abilities.  Consumers were offered "free" trials of the products for "just the cost of shipping and handling," usually $4.95.  Two weeks after consumers signed up for the "trial," they were charged the full price of the product (roughly $90) and enrolled in continuity programs, which continued to ship products on a monthly basis—charging the consumer the full $90 each time, of course.  Cancellation was difficult and obtaining a refund was nearly impossible.  The schemes, a category of frauds

---

[1] Triangle and Apex, along with their related entities and the individuals controlling those entities, are referred to herein as the "Triangle Enterprise" and the "Apex Enterprise," respectively, and collectively as the "Enterprises."

known as "negative option schemes,"[2] were incredibly successful, raking in more than $200 million from consumers.

3.     To execute the schemes, the Enterprises recruited unrelated individuals (sometimes referred to as "fronts", "signors", "nominees" or "straw owners") and paid them a modest monthly fee for the use of their names and identities to establish approximately 100 shell companies.  The Enterprises then immediately turned to Wells Fargo, which opened scores of Wells Fargo bank accounts – more than 150 in total[3] – in the names of the shell companies.  Having the Wells Fargo bank accounts was a prerequisite for the Enterprises to secure accounts with merchant processors, which the Enterprises needed to accept consumers' credit and debit card payments.

4.     Crucially, the Enterprises were able to obtain continued access to accounts with merchant processors, while concealing the identities of the Enterprises' owners from the merchant processors.  The practice of processing credit card transactions through other companies' merchant accounts is known as "credit card laundering," and it is an unlawful practice used by fraudulent merchants, like the Enterprises, to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement.

5.     Through his independent investigation, which gave him access to the Enterprises' email communications with Wells Fargo and Wells Fargo bank account statements, the Receiver discovered that Wells Fargo was providing substantial, knowing assistance to both the Triangle and Apex Enterprises' sales

---

[2] "Risk-free" trial scams are sometimes referred to as negative option scams, because they require consumers to affirmatively opt out (*i.e.*, exercise a negative option) of a program to avoid being charged.

[3] References to the numbers of Apex and Triangle-related bank accounts identified herein are estimates based on calculations made by the Receiver using only on information presently available to him.  The number is likely to grow when information on Wells Fargo is received in discovery.

Case No. _____
RECEIVER'S COMPLAINT

1   scams.

2       6.      Wells Fargo bankers were aware of the Enterprises' risk-free trial

3   schemes, understood the people listed as "owners" of the Wells Fargo accounts did

4   not actually own or control them, and knew the Enterprises were engaged in credit

5   card laundering.  Despite this knowledge, Well Fargo gladly opened ***more than***

6   ***150 bank accounts for the shell companies and straw owners***, ***sometimes opening***

7   ***as many as 6 bank accounts in one day***.  Wells Fargo then allowed millions of

8   dollars to be deposited in the accounts, knowing that these funds were unlawfully

9   obtained in the risk-free trial schemes, and afterwards allowing the Enterprises'

10  operators to transfer their ill-gotten gains from the shell accounts to third-party

11  bank accounts, including accounts located outside of the United States.

12      7.      The principals of the Apex and Triangle Enterprises came to rely

13  heavily upon Wells Fargo to aid their frauds by providing them with law oversight

14  and atypical banking services, widely deviating from accepted banking standards

15  and violating applicable banking laws and regulations.  As one telling example of

16  this from very early in the Triangle scheme, owner Brian Phillips recruited a son

17  and his mother to serve as straw owners of two of the shell companies Phillips

18  actually owned. Wells Fargo promptly opened the bank accounts for the shell

19  companies, listing the straw owners as "owners" of the accounts, and gave Phillips

20  complete control over the shell accounts to Phillips. When the son expressed

21  concerns that Wells Fargo might call his unaware mother to conduct due diligence

22  into the relationship, Phillips plainly explained that it was Wells Fargo, and that

23  would not be happening, emailing him:

24

25  From:       Brian Phillips <brian@trianglemediacorp.com>
    Sent:       Friday, November 11, 2011 8:18 PM
26  To:         Marty
    Subject:    Re: Please see attached document

27

28  Dude, you still don't understand how wells is totally different. The bank won't be calling her

    On Nov 11, 2011 11:01 PM, "Marty" <mglinsky1@comcast.net> wrote:
    Brian- Mom faxed signed doc to Wells Fargo today. Should we have a prepatory conv - you/me/mom so she
    doesnt get blindsided again?

    Thanks Marty G.

Phillips was right. Wells Fargo didn't call her.

8. And during the period in which the Apex and Triangle Enterprises' risk-free trial scams were operating, Wells Fargo was indeed "totally different" from its banking peers. As Wells Fargo has since *admitted*, Wells Fargo's established corporate policies and sales incentives were fueling a high-pressure sales culture that required its bankers to open as many accounts as possible. As a direct result of that pernicious sales culture, and with the ongoing knowledge and authorization of Wells Fargo, an array of Wells Fargo bankers in multiple branch offices in California (and in a few cases, Texas) deliberately assisted the operators of the Apex and Triangle risk-free trial scams for an astonishingly long period of time: from at least 2009 to 2018 for the Triangle fraud and from at least 2014 to 2018 for the Apex fraud ("the Relevant Period"), until the filing of the FTC actions finally shut them down.

9. The Bank's high-pressure sales culture and near unattainable sales goals drove Wells Fargo bankers to open accounts regardless of the risk to the Bank or others; if the employees failed to deliver, the consequences were severe: "[i]t was common knowledge within the Bank that employees who could not meet sales goals could and would be terminated," and "[e]mployees' incentive compensation and promotional opportunities depended on their ability to meet the unreasonable sales goals."[4] As discussed in greater detail below, this drive for new accounts aligned perfectly with the Enterprises' constant need for shell accounts.

10. In the aftermath of Wells Fargo's much-publicized unauthorized accounts scandal caused by this sales culture, Wells Fargo's newly-installed CEO described the bank's corporate policies as excessively "focus[ed] on growing the

---

[4] January 23, 2020 Office of the Comptroller of the Currency Notice Of Charges For Orders Of Prohibition And Orders To Cease And Desist And Notice Of Assessments Of A Civil Money Penalty, AA-EC-2019-82 et al. (Jan. 23, 2020) ("OCC Notice of Charges") ¶¶ 72, 77.

number of accounts," admitting that Wells Fargo's actions were "just stupid." Unfortunately for Wells Fargo and the victims here, this "stupid" conduct had devastating consequences, as these policies encouraged and rewarded Wells Fargo bankers for aiding and abetting fraud in order to satisfy the pressurized sales culture and hit sales quotas. The Receiver's investigation revealed that Wells Fargo knowingly facilitated the opening of accounts by the Enterprises' principals for use in their fraud, all while making a conscious decision to let the fraud go unreported.

11. Wells Fargo's misconduct centered around the Community Bank, which was the largest of Wells Fargo's three business units and contributed more than half (and in some years more than three-quarters) of the Bank's revenue. The Community Bank was responsible for the everyday banking products sold to businesses such as the Enterprises in this case.

12. Commenting on the widespread nature of Wells Fargo's misconduct in the Community Bank, the Office of the Comptroller of the Currency (the "OCC"), the federal bank regulator which ensures safe and sound banking, found that: "To the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank." OCC Notice of Charges ¶ 6. Consistent with this finding, the Receiver's investigation has led him to conclude that Wells Fargo intentionally designed and maintained controls which served to conceal—rather than unmask—its customers' illegal activities, which Wells Fargo was actively facilitating.

13. Wells Fargo knowingly assisted the operators of the Apex and Triangle Enterprises, including by, among other things: (i) authorizing or allowing the use of atypical banking procedures to assist the Enterprises in their frauds, (ii) counseling the Enterprises on how to set up deceptive bank accounts with straw owners, which enabled them to hide the fraud, (iii) accepting deposits obtained

Case No. _____
RECEIVER'S COMPLAINT

through the fraud, and (iv) authorizing suspicious inter-company transfers that enabled the wrongdoers to secrete the proceeds of their fraud, including in accounts located outside of the United States.

14. Wells Fargo has admitted wrongdoing and paid substantial fines and restitution for one consequence of its illegal sales culture, namely, the creation of fraudulent accounts in customers' names, opened without their consent. But the Receiver's investigation revealed that there were other, previously unidentified consequences of Wells Fargo's sales culture and its actions here: in this case, the consequences were hundreds of millions of dollars in harm, done to the thousands of consumers who signed up for Apex's and Triangle's risk-free trials, and the resulting liability of the Receivership Entities to make the defrauded consumers whole. To date, Wells Fargo has never compensated this newly-identified category of victims, including the Receivership Entities, that were harmed by Wells Fargo's sales culture and the resulting conduct that aided these fraudulent businesses.

15. The Receiver is therefore seeking to recover damages for the harm proximately caused to the Apex and Triangle Receivership Entities by Wells Fargo, including, but not limited to: (i) the Receivership Entities' legal obligations to satisfy the FTC judgments, which were premised on misconduct that could not have occurred but for Wells Fargo's assistance, (ii) the fees charged by Wells Fargo in connection with their account services, (iii) the account funds which were improperly transferred out of the Receivership Entities' accounts by Wells Fargo at the direction of the Enterprises' principals, and (iv) the costs of defending the actions by the FTC (including the resulting Receiverships).

## II. PRIOR FEDERAL TRADE COMMISSION PROCEEDINGS AND THE APPOINTMENTS OF THE RECEIVER

16. In June 2018 and November 2018, the FTC brought separate lawsuits in the Southern and Central Districts of California against Triangle Media Corporation and Apex Capital Group, LLC and their related entities (the

Case No. _____
RECEIVER'S COMPLAINT

"*Triangle*" and "*Apex*" actions), respectively, each of which was operating deceptive online risk-free trial offer schemes in violation of consumer protection statutes. The FTC sued to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten gains, and other equitable relief. The FTC filed amended complaints in December 2018 and May 2019 in the Triangle and Apex actions, respectively.

### A. The *Apex* Action

17. Plaintiff is the Court-appointed Receiver in the *Apex* action: *Federal Trade Commission v. Apex Capital Group, LLC, et al.,* Case No. 2:18-cv-09573-JFW *(JPRx)* (C.D. Cal.). The Apex Preliminary Injunctions (the "Apex PIs," *id.*, ECF Nos. 40 (Peikos) and 41 (Barnett)) direct the Receiver to preserve the value of the assets of the Receivership Estate and authorize the Receiver to institute actions to preserve or recover those assets. *See id.*, ECF Nos. 40, 41 at 19-23.

18. Receivership Entities subject to the *Apex* action are expressly defined to include the following: the Corporate Defendants,[5] the Wyoming Related Companies,[6] and the U.K. Related Companies.[7] Apex PIs at 7, Definition K. In addition, the term "Receivership Entities" is defined to include "any other entity that has conducted any business related to Defendants' marketing or sale of

---

[5] The Corporate Defendants include: Apex Capital Group, LLC; Capstone Capital Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited; and Tactic Solutions Limited; and each of their subsidiaries, affiliates, successors, and assigns. Apex PIs at 6, Definition C.

[6] The Wyoming Related Companies include entities formed in Wyoming by Defendants, in the names of nominees, for the sole purpose of fronting merchant accounts. They are identified in Exhibit A to the *Apex* action Complaint.

[7] The U.K. Related Companies include entities formed in the U.K. by Defendants, in the names of nominees, to front merchant accounts. They are identified in Exhibit B to the *Apex* action Complaint.

---

Case No. _____
RECEIVER'S COMPLAINT

products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *Id*. To date, the Receiver has determined that multiple additional entities qualify as Receivership Entities under this definition.[8] These entities are collectively referred to herein as the "Apex Enterprise."

19.     As alleged in the *Apex* Complaint, Philip Peikos ("Peikos") and his one-time partner, David Barnett ("Barnett), and their agents ran an online "free trial" subscription scam through the Apex Enterprise. Peikos was the Chief Executive Officer and co-owner of Apex. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

20.     Barnett was the Chief Operating Officer of the Apex Enterprise. He was a co-owner of the Apex Enterprise until at least late 2017, when he transferred his shares to Peikos. At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

21.     On September 11, 2019, the FTC and the *Apex* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**B.     The *Triangle* Action**

22.     Plaintiff is also the Court-appointed Receiver in the *Triangle* action:

---

[8] These include five nominee entities formed by Defendants for the purpose of opening new merchant accounts to conduct business inextricably related to the *FTC v. Apex* defendants' sale of products with a Negative Option Feature: Albright Solutions LLC ("Albright"); Asus Capital Solutions LLC ("Asus Capital"); Element Media Group LLC ("Element"); NextLevel Solutions LLC ("NextLevel"); and Vortex Media Group LLC ("Vortex").

Case No. _____
RECEIVER'S COMPLAINT

*FTC v. Triangle Media Corporation, et al,* 3:18-cv-01388 (LAB-LL) (S.D. Cal.).[9] The Temporary Restraining Order (the "Triangle Order," *id.*, ECF No. 11) which first appointed the Receiver directs the Receiver to preserve the value of the assets of the Receivership Estate and authorizes the Receiver to institute actions to preserve or recover those assets. *See id.* at 18-19.

23.     Receivership Entities subject to the Triangle Receivership are expressly defined to include Corporate Defendants Triangle Media Corporation ("Triangle"), Hardwire Interactive Inc. ("Hardwire"), and Jasper Rain Marketing LLC ("Jasper Rain"), and their respective dbas.[10]  Triangle Order at 8, Definition N.  Receivership Entities also include "any other entity that has conducted any business related to Defendants' marketing of negative option offers, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."[11] These Entities are collectively referred to herein as the "Triangle Enterprise."

24.     Brian Phillips ("Phillips") and his agents operated the Triangle online "free trial" subscription scam.  During the relevant period, Phillips was an owner and officer of the Triangle Enterprise.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the

---

[9] In the *Triangle* Complaint, the Corporate Defendants are defined as:  Triangle Media Corporation also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; Jasper Rain Marketing LLC also doing business as, and each of their subsidiaries, affiliates, successors, and assigns. The Individual Defendant is Brian Phillips.

[10] These dbas include Cranium Power, Phenom Health, Beauty and Truth, and E-Cigs.

[11] The Receiver has determined that additional entities fall within this definition of Triangle-related Receivership Entities: (1) Global Northern Trading Ltd. ("Global Northern"), a Canadian corporation as to which Triangle transferred more than $44 million during the period 2013-2018; and (2) the nominee entities formed and controlled by Phillips but deliberately placed in the names of nominees.

---

Case No. _____
RECEIVER'S COMPLAINT

authority to control, or participated in the acts and practices of the Triangle Enterprise.

25. During the relevant period, Devin Keer ("Keer") was also an owner and officer of the Triangle Enterprise. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control or participated in the acts and practices of the Triangle Enterprise.

26. On May 30, 2019, the FTC and the *Triangle* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

## C. The Receiver's Investigation of Wells Fargo and Discovery of Wells Fargo's Wrongful Conduct.

27. After conducting his initial investigations, the Receiver filed preliminary reports as to his conclusions in each of the Triangle and Apex FTC actions. In both cases, the Receiver determined that the businesses could not continue to be operated lawfully and profitably.

28. Based on initial and subsequent reviews of internal Apex and Triangle emails and bank records, the Receiver's investigation revealed that Wells Fargo was aiding and abetting both Enterprises by providing similar atypical banking services, as detailed herein, in furtherance of the frauds.

29. During the investigation, the Receiver issued subpoenas to Wells Fargo regarding their relationships with the Apex and Triangle Enterprises. In response, Wells Fargo made incomplete productions. On information and belief, numerous internal bank records, including electronic documents and internal communications, still exist regarding the Apex and Triangle Enterprises, as Wells Fargo was obligated under applicable banking regulations and laws to maintain such records.

30. In late October 2019 and January 2020, the Receiver filed motions in

---

Case No. _____
RECEIVER'S COMPLAINT

the *Triangle* and *Apex* actions, respectively, advising the Courts that he wished to retain counsel to pursue claims against Wells Fargo on behalf of the Receivership Entities. In the *Triangle* action, on November 19, 2019, Judge Burns ruled that "the Court finds good cause exists to grant the Receiver's motion to (1) extend the receivership for the sole purpose of pursuing litigation against Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3) administratively close the case while that litigation is pursued." In the *Apex* action, on March 9, 2020, Judge Walter similarly permitted the Receiver to retain contingency counsel to pursue claims against Wells Fargo.

## III. PARTIES

31. Plaintiff Thomas W. McNamara is the Court-appointed Receiver of the Triangle and Apex Entities. Triangle's principal place of business was 1350 Columbia Street, San Diego, California 92101 until May 17, 2018, when it filed paperwork with the California Secretary of State changing its principal place of business to Tampa, Florida, though the center of operations remained in San Diego. Apex was a Wyoming limited liability company which had business addresses in Westlake Village, California; Jackson, Wyoming; Beverly Hills, CA; and Woodland Hills, CA, though it was always, to the Receiver's knowledge, operated out of California during the Relevant Period.

32. Defendant Wells Fargo & Company is a nationwide, diversified, financial services company. Upon information and belief, its corporate headquarters are located in San Francisco, California. Defendant Wells Fargo & Company is the parent company of Wells Fargo Bank, N.A.

33. Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in South Dakota. It maintains multiple offices in the State of California and the Southern District of California for the purposes of maintaining checking, savings, business, and merchant accounts, and engaging in

other business activities.

34. The Defendants are collectively referred to herein as "Wells Fargo," the "Bank," or "Defendants."

## IV. JURISDICTION AND VENUE

35. This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28 U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction. *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("[T]he receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

36. Venue in the Southern District of California is proper pursuant to 28 U.S.C. § 1391, because the *Triangle* Court retained jurisdiction of this matter for all purposes and appointed the Permanent Receiver in the Southern District of California on August 24, 2018, and because this proceeding is supplemental to *FTC v. Triangle. See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well."), and because the *Triangle* action was initiated prior to the filing of the *Apex* action in the Central District of California.

37. The Court may exercise personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Receivership Entities under the Court's Orders issued in the *Triangle* and *Apex* actions.

38. This Court also has personal jurisdiction over Defendants named in this Complaint because Wells Fargo conducted business in California and it participated in California-based fraudulent schemes that injured Californians. Venue is also proper in this District because the conduct at issue took place and had an effect in this District and Wells Fargo regularly conducted and still regularly conducts substantial banking business in this District. Defendants have

---

12

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-32**

sufficient minimum contacts with the Southern District of California arising from the specific conduct committed in or directed to the Southern District of California.

## V.    WELLS FARGO'S UNATTAINABLE SALES GOALS AND HIGH-PRESSURE SALES CULTURE DROVE ITS BANKERS TO PARTICIPATE IN THE ENTERPRISES' FRAUDS

39.    During the Relevant Period, Wells Fargo engaged in rampant sales misconduct from the top down.  That misconduct has been repeatedly confirmed by multiple regulators, hearings, and lawsuits.  In September 2016, the CFPB imposed a fine of $100 million against Wells Fargo for opening more than two million new accounts not requested by customers in order to generate illicit fees.  The company also paid $35 million to the Office of the Comptroller of the Currency and $50 million to the City and County of Los Angeles.

40.    Despite signing consent orders with the CFPB and OCC, in 2018, those same two agencies fined Wells Fargo again (this time for *one billion* dollars) for selling unnecessary products to customers and for engaging in other improper practices.  Later, in February 2020, Wells Fargo agreed to pay *three billion* dollars to resolve federal civil and criminal investigations into the consumer account scandal; the settlement of those matters included a deferred prosecution agreement.

41.    Wells Fargo's sales misconduct began at least as early as 2002.  At that time, the Bank's internal investigations unit noticed an increase in "sales integrity" cases.  According to Wells Fargo's employees, sales goals were impossible to meet, and incentives for compensation and ongoing employment necessitated "gaming" the system.  Gradually, "gaming," which was defined in the Wells Fargo Code of Ethics as "the manipulation and/or misrepresentation of sales or referrals . . . in an attempt to receive compensation or to meet sales goals," became commonplace.

42.    To meet company sales quotas, employees opened accounts and credit lines, ordered credit cards without their customers' permission, and forged client

Case No. _____
RECEIVER'S COMPLAINT

signatures on paperwork.  Some employees urged family members to open ghost accounts.

43.     Between 2011 and 2015, Wells Fargo employees opened more than 1.5 million deposit accounts and more than 565,000 credit card accounts that may not have been authorized.  On a per-employee basis, the reports of sales-related misconduct tripled from the second quarter of 2007 through the fourth quarter of 2013.

44.     Despite Wells Fargo's payment of a combined $185 million penalty to the OCC, CFPB, and the City and County of Los Angeles in 2016 to settle charges related to consumer account fraud, the next year in an August 4, 2017 quarterly 10-Q filing, Wells Fargo said it had expanded the period targeted for review (previously 2011 through 2015) to 2009 through 2016 and disclosed that the expansion of the review period could reveal a "significant increase" in unauthorized accounts.

45.     On January 23, 2020, the OCC brought additional charges against several Wells Fargo executives for allowing long-term sales misconduct.  As the OCC put it:

> **The Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model**, and declined to implement effective controls to catch systemic misconduct.  Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper conduct across the entire Community Bank….**To the extent the Bank did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank**.  In short, Bank senior executives favored profits and other market rewards over taking action to stop the systemic issuance of unauthorized products and services to customers.

(Emphasis added).

46.     In 2020, Wells Fargo also entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina that included a

"Statement of Facts" in which Wells Fargo "admitted, accepted, acknowledged as true" (among other things) that "[d]espite [having] knowledge of the widespread sales practices problems" as early as 2002 and through 2016, "Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices." According to the DPA, Wells Fargo was alerted to the fraud by "Wells Fargo's internal investigations unit, the Community Bank's own internal sales quality oversight unit, and managers leading the Community Bank's geographic regions, as well as regular complaints by lower-level employees and Wells Fargo customers reporting serious sales practices violations."

47.     In the wake of Wells Fargo's consumer account scandal, the federal bank regulators, the OCC and the Federal Reserve, initiated a multi-phase "Sales Practices and Incentive Compensation Horizontal Review,"[12] with the goals including to determine whether *other* banks doing the very same things that Wells Fargo did. After conducting its investigation, the regulators OCC concluded in 2017 that Wells Fargo was unique in terms of its sales culture, which prompted employees to open unauthorized, and even fraudulent, accounts in order to meet daily new account goals and keep their jobs. The banking regulators' review confirmed that Wells Fargo's banking peers, unlike Wells Fargo, had taken seriously the significant compliance risks caused by an overly aggressive sales culture and lax oversight of branches.

48.     In other words, Wells Fargo's misconduct was not the norm within the industry and was tethered to Wells Fargo's uniquely toxic sales culture. That same culture is at issue here but in an entirely different context, and one that was only discovered after the Receiver was appointed. Here, Wells Fargo's corporate focus

---

[12] That review initially covered all large national banks, like Wells Fargo, and later significant regional banks.

on the opening of new accounts at any cost resulted in the Bank opening *roughly one hundred and fifty bank accounts for shell companies across the Apex and Triangle frauds*—accounts which Apex and Triangle's principals required to secure merchant payment processing services (leaning on Wells Fargo's imprimatur and reference letters to convince the processors of the accounts' legitimacy) and then used to launder the proceeds from their consumer frauds.

## VI. WELLS FARGO'S CREATION AND MAINTENANCE OF BANK ACCOUNTS FOR DECEPTIVE SHELL COMPANIES WERE ESSENTIAL TO THE FRAUDS

49. The Apex and Triangle frauds were simple in concept: bait consumers with deceptive internet ads offering "risk-free" trials for only the cost of shipping, and then use the consumers' billing information to charge for the product and impose a monthly continuity charge. Make it impossible to cancel. These schemes defrauded consumers of hundreds of millions of dollars.

50. Simple as it was, the con was effective. Consumers would be offered a full month's supply of a featured product and, at the time of the initial order, would only pay the nominal cost for the shipping and handling of the product. But if the consumer did not cancel the order and return the unused portion of the product within a short period of time (often, fourteen calendar days), the Triangle and Apex Enterprises would automatically charge the consumer's card for the full price of the product (usually around $87 or $89). The consumer would also be enrolled in an auto-ship program when signing up for the "risk-free" trial offer— meaning that unless the subscription was affirmatively canceled, the consumer was automatically charged monthly for additional product.

51. Both the Apex and Triangle schemes required access to a steady stream of new bank accounts to function. As such, Wells Fargo and the Enterprises' objectives were aligned: the Enterprises needed new bank accounts on a regular basis, and Wells Fargo was constantly pressuring its sales employees to

Case No. _____
RECEIVER'S COMPLAINT

open more bank accounts. As a result, the Enterprises, the individuals behind them, and the bank developed a symbiotic relationship. Without Wells Fargo's assistance, the Enterprises' frauds could not have survived (let alone thrived) for as long as they did.

## A. The Payment Processing System and Credit Card Laundering

52. In order to charge consumers' credit or debit cards, the Triangle and Apex Enterprises (the "merchants") needed to establish an account with a merchant processor. Merchant processors have access to credit card associations ("card networks") like MasterCard and VISA and thereby enable merchants to charge consumers' credit cards.

53. Card networks require all participants within their networks to comply with detailed rules, including screening processes and underwriting standards for merchants. These rules are put in place (1) to ensure that the merchants whose purchases are being processed are legitimate, bona fide businesses, and (2) to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit "credit card laundering," which encompasses the practice of processing card charges through the merchant accounts of shell companies like those used by the Enterprises.

54. Merchants who pose a heightened risk of fraud to the card networks are subject to closer scrutiny by their merchant processors and may have their access to the card networks capped or terminated altogether.

55. One sign of potential illicit activity by a merchant is the generation of an excessive number of transactions which have to be refunded to consumers ("chargebacks").

56. Consumers initiate "chargebacks" when they dispute card charges (most often because of fraud or unauthorized use) by contacting their "issuing bank," which is the bank that issued the credit card to the consumer. When a consumer successfully disputes the charge, the consumer's issuing bank credits the

Case No. _____
RECEIVER'S COMPLAINT

consumer's card for the disputed amount, and then recovers the chargeback amount from the merchant processor.  The merchant processor, in turn, collects the chargeback amount from the bank account of its merchant client.  In this case, merchant processors would seek to collect chargebacks from the Enterprises' Wells Fargo accounts.

57.     In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs.  These chargeback monitoring programs are designed to flag merchant accounts with excessive chargeback ratios or an excessive number of chargebacks.  For example, if a merchant account has chargeback levels that exceed the thresholds set by VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties, and termination.

58.     Credit card laundering is commonly used by merchants who cannot meet a merchant processor's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of a prior history of excessive chargebacks, complaints, use of sales or industry practices prohibited by merchant processors, or other signs of illegal activity).  To conceal their identities, merchants which are engaged in fraud will often create shell companies to act as fronts, and apply for merchant accounts under the names of these shell companies.  Once the shell merchant accounts are approved, the fraudulent merchants then launder their own transactions through the shell companies' merchant accounts.  This allows the merchants to circumvent card associations' onboarding and monitoring programs and avoid detection by consumers and law enforcement.

59.     When a merchant is terminated, or if it has a high-risk account or excessive chargebacks, its name (and that of the merchant's owner) is put on a blacklist, which is often referred to as the "MATCH" list ("Merchant Alert To Control High-Risk"), as a terminated merchant file ("TMF").  Other reasons for

being listed as a terminated merchant file include merchant collusion, fraud, and money laundering.  Merchant processors use the MATCH list to screen potential merchant clients, and merchants on the list are often unable to open an account with a new merchant processor.

60.     For credit card laundering to be effective long-term and on a large scale, then, a merchant needs access to a ready supply of merchant processing accounts, so that the merchants can move sales from one shell company to a newly-created shell company once the profits have been reaped and the chargeback rates or other "red flags" have attracted attention.  An absolute prerequisite to a merchant processing account is a bank account in a shell company's name. Luckily for Apex and Triangle (and unluckily for consumers), Wells Fargo was more than happy to provide the latter.

### B.     Apex and Triangle's (Mis)Use of the Credit Card Processing System

61.     Entities associated with the Triangle and Apex Enterprises showed up again and again on the MATCH list during the Relevant Period, because they were flagged as high risk and/or routinely had high card chargebacks.

62.     The average chargeback rate in the United States is 0.2% of the transaction rate and a chargeback rate greater than 1% is considered excessive. The Triangle and Apex Entities' chargeback rates were astronomical, with both and averaging over 20% on a monthly basis, with some months having chargeback rates of 70% or higher.  The merchant processors would typically cancel accounts when chargebacks exceeded 3% of sales—a regular occurrence for the Apex and Triangle Entities.

63.     Merchant processors would not deal with repeat offenders like the Apex and Triangle principals.  To get around the merchant processors' restrictions, Apex and Triangle's owners hid their connection to the fraudulent businesses (and the high chargeback rates that they generated) by creating phony shell companies.

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-39**

64. The Apex and Triangle Enterprises used a host of straw owners (which they sometimes referred to as "fronts" or "nominees" or "signors") to act as the "owners" of the shell companies. These straw owners were individuals who would act as the "front" for a shell company, often in exchange for a payment of about $500 per month, typically. The Enterprises would orchestrate the formation of the shell companies, the opening of the necessary Wells Fargo bank accounts, and the completion of applications for merchant processing in the shell companies' names. When the merchant processor inevitably terminated processing for a shell company (typically due to excessive chargebacks), the Apex and Triangle Enterprises would use a new nominee to form another shell company and restart the whole process. Rinse and repeat.

65. For the scheme to work, the shell companies needed to be able to establish depository accounts with an actual bank. Without bank accounts, merchant processing could not be acquired, and without bank accounts, the shell companies would have nowhere to transfer the funds they took from consumers.

66. Enter Wells Fargo. Wells Fargo's employees gladly helped the Enterprises set up bank accounts for the shell companies and readily provided them with bank reference letters, which the shell companies often needed to secure merchant processing services. Merchant processors would never have provided merchant processing for the shell companies had they known the identity of the entities' true owners (Apex and Triangle's principals).

67. When merchant processors charged consumers' cards for Apex or Triangle products, the transactions were processed through accounts secured in the names of the shell companies. The consumer payments would then be sent to accounts at Wells Fargo, which nominally belonged to the shell companies but which were actually controlled by the owners of the Apex and Triangle Enterprises. As discussed below, Wells Fargo was well aware of the shell companies' true ownership yet continued to assist the Enterprises in their creation

Case No. _____
RECEIVER'S COMPLAINT

of shell bank accounts needed to perpetrate and conceal their fraud.

68.     From at least 2014 through 2018 for the Apex Enterprise, and 2009 through 2018 for the Triangle Enterprise, Wells Fargo provided vital access to the enable the Enterprises to open approximately 150 Apex and Triangle shell bank accounts to accept fraudulently-obtained payments from consumers.  As detailed herein, Wells Fargo knew of this scheme, counseled the Enterprises' principals, and helped them hide the true ownership of the accounts.

## VII.   WELLS FARGO'S KNOWING INVOLVEMENT IN THE FRAUDS

### A.     Wells Fargo's Support of the Apex Enterprise

69.     Wells Fargo bankers in California regularly and repeatedly helped Apex executives advance their credit card laundering scheme in a number of ways. Wells Fargo bankers like Dominic Testa (Westlake Village Branch) developed long-term business relationships with Apex's principals: Peikos (Co-Owner), Barnett (Co-Owner), and Raul Camacho ("Camacho," Apex Chief Financial Officer).  Testa and other Wells Fargo bankers were able to keep—and grow—the Bank's business with Apex because Wells Fargo was willing to wade into the muck in ways that other banks would not.

70.     As early as 2014, Wells Fargo was helping Apex executives to open, and also close, accounts for dozens and dozens of shell companies owned and controlled by Apex owners Peikos and Barnett.  Wells Fargo, and in particular banker Testa, knew that Peikos and Barnett were using these shell companies to run high-risk internet sales operations that bilked consumers out of millions of dollars.  At the same time, Wells Fargo had visibility into the high number of chargeback refunds that were being withdrawn from the shell companies' Wells Fargo accounts to repay the alarmingly high proportion of consumers who disputed the charges.

71.     By early 2015, Apex employee Camacho was Testa's primary Apex contact point.  Camacho was also often listed as the "owner" of the Wells Fargo

---

Case No. _____
RECEIVER'S COMPLAINT

accounts Testa opened for the shell companies, although Testa was acutely aware that Peikos and Barnett were the true owners of Apex and the shell company bank accounts – and Camacho took directions from them. Testa, and other Wells Fargo bankers, also readily provided prized anonymous bank reference letters for the shell company accounts, which Apex then used to support merchant processing applications by the shell companies. Without Wells Fargo's imprimatur, these shell companies would not have been able to secure the essential merchant processing accounts. Further, without Wells Fargo's continually providing atypical bank services for Apex-related shell companies in a host of ways, the Apex fraudulent enterprise would not have been able to exist.

72. The Apex Enterprise generated millions of dollars in revenues—money that left the shell companies' accounts almost as soon as it hit them. Those funds went straight into the laundering chute, where Peikos and Barnett used the Wells Fargo accounts to clean the money, transferring the funds into external personal and third-party accounts to which they had access.

73. The success of Apex's fraudulent scheme was by no means inevitable. Wells Fargo in particular was in a rare position to stop the fraud very early on. Moreover, it had an obligation to do so pursuant to a host of banking regulations and laws. But it never did.

74. Instead, Wells Fargo actively assisted the Apex Enterprise by establishing dozens (upon dozens) of bank accounts for the Enterprises' shell companies, providing the corresponding bank reference letters for those shell companies, allowing Apex's principals to "wash" the dirty proceeds of their fraud by transferring funds through their Wells Fargo accounts, and otherwise performing atypical banking services for these fraudulent Enterprises. Through this and other conduct, coupled with their intentionally lax oversight, Wells Fargo flouted standard banking practices and in the process violated the Bank Secrecy Act, anti-money laundering ("AML") laws, and the Bank's own internal policies

Case No. _____
RECEIVER'S COMPLAINT

and procedures as they were written; as a result, Wells Fargo's conduct caused hundreds of millions of dollars in harm to consumers and to the Receivership Entities.

75.     During the Relevant Period, the Apex principals dealt primarily with Wells Fargo bankers at a San Diego branch and at the Westlake Village Branch in the Los Angeles area, though other branches and bankers assisted the fraud.  For instance, Wells Fargo's Woodland Hills office opened at least seven accounts for anonymous Wyoming LLCs that were part of the Apex Enterprise, and closed four of those accounts once the associated shell companies lost their access to merchant processing services (*i.e.*, the ability to charge consumers' credit cards).

76.     On information and belief, the Wells Fargo bankers at the San Diego Branch, the Westlake Village Branch, and the Woodland Hills Branch, just like numerous other Wells Fargo Community Bank branches during the Relevant Period, were operating under intentionally deficient bank practices and policies effected by the most senior executives at Wells Fargo.  Those practices and policies featured a reckless quota system that improperly pressured and incentivized Wells Fargo employees to provide atypical banking services, bend the rules, and even commit fraud when performing what should have been routine business tasks.

(i)     The San Diego Branch

77.     In the Wells Fargo branch located at First and Market Street in downtown San Diego (the "San Diego Branch"), several bankers, often collaborating with one another as well as with Apex principals, knowingly facilitated Apex's fraud for their own—and Wells Fargo's—financial gain.

78.     Apex's relationship with the San Diego Branch began in January 2014, when on two separate days Barnett walked into the branch with formation documents for eight Wyoming LLCs and asked to open bank accounts in each LLC's name. Barnett had no history with the bank; he was a walk-in off the street.

The LLC documents that Barnett presented to the branch were also suspect with numerous indicia of fraud: they were nearly identical, with each of the LLCs based in Wyoming (which allows for the creation of LLCs without identification of the principals, effectively anonymizing the entities), each having the same Wyoming mail drop as its business address, and each having been formed on the same day four months earlier.

79.     Basic (AML) training that Wells Fargo bankers should have received during the Relevant Period taught how and why anonymous LLC accounts with shared addresses (especially a shared Wyoming mail drop) are used to camouflage ownership and further frauds.  Such basic AML training alerted bankers to look for transactions with other internal accounts in order to identify undisclosed relationships.  The circumstances required that all of the Apex accounts be evaluated together with bankers looking for similarities and patterns of activity that indicate fraud.

80.     Under many banks' policies, a customer who provided the same Wyoming mail drop address for multiple applications would have had those applications further reviewed and then rejected for failing to satisfy bank customer identification requirements.  At a minimum and per industry practice, additional follow-up by Wells Fargo was required.  A bank following the requisite due diligence consistent with industry practice would not have permitted these accounts to be opened.

81.     But the Wells Fargo banker didn't ask questions.  Instead, the banker promptly completed eight identical—generic—applications for Wells Fargo accounts for the shell companies.  Each of the accounts were funded with minimal opening deposits (generally $100, which was the minimum amount necessary for the banker to get sales quota credit for opening the account), and each of the account applications projected annual gross sales of $100.

82.     Under Wells Fargo's toxic sales culture and compensation system,

Case No. _____
RECEIVER'S COMPLAINT

Barnett's appearance at the Wells Fargo branch was manna from heaven for the banker and Wells Fargo. While most banks would have refused to open the accounts or at least conducted more diligence, Wells Fargo just opened the accounts. And not just eight accounts. The banker opened sixteen accounts, when, unprompted, she opened a savings account for each of the eight checking accounts Barnett had requested.

83. The savings accounts were superfluous from the customer's perspective, but they were nevertheless valuable to Wells Fargo's bankers because they counted towards the extreme sales quotas that Wells Fargo put in place. Much later, upon a request to close some accounts by Peikos, Testa confirmed that the "[savings] accounts really have no purpose and can be shut down…".

84. After his initial success in establishing the shell company accounts at Wells Fargo, Barnett returned to the same branch three more times over the next seven months (March, August and September), opening 22 more business bank accounts for 11 more anonymous Wyoming LLCs. Each of these shell company bank account applications had the same indicia of fraud as the first batch, including anonymous principals, similar deposit and anticipated revenues information, and the same Wyoming mail drop address. Each time, Wells Fargo conducted no investigation, instead rubber-stamping the new accounts. When necessary, Wells Fargo also closed accounts that Apex had burned due to egregiously high chargeback rates.

85. For these later applications, Wells Fargo had the benefit of being able to review the activity in the prior Apex shell companies' bank accounts. Across the accounts, the same pattern of activity reappeared: after millions of dollars in consumer charges were deposited into the accounts (which had projected sales of $100 on their applications), extraordinarily high chargebacks would follow. In some monthly Wells Fargo account statements, the chargeback rates for these companies exceeded 70% and 80%.

Case No. _____
RECEIVER'S COMPLAINT

86.     Wells Fargo was fully aware that Apex was burning through shell companies, due to these high chargeback rates, which caused merchant processors to cease doing business with the shells, because Peikos and Barnett were also regularly asking Wells Fargo to close old accounts for shell companies that could no longer access merchant processing services due to their high chargeback rates.

87.     Notwithstanding numerous indicia of fraud, the rigorous Know-Your-Customer ("KYC") and AML requirements that were in place for the branch, and Wells Fargo's own internal policies and procedures that required (in theory) enhanced scrutiny of high-risk companies such as those associated with the Apex Enterprise, the San Diego Branch quickly approved every application and opened the accounts.

88.     Wells Fargo bankers at the San Diego Branch also provided reference letters which validated the shell companies' Wells Fargo accounts.  Initially, these letters were addressed to Barnett, but in May 2014, Apex's atypical banking requests to Wells Fargo grew bolder—and Wells Fargo's complicity in the fraud expanded.  Barnett asked the San Diego Branch to re-execute and re-sign *ten* reference letters for the initial Wyoming LLCs for which the branch had opened accounts; the new letters would have Barnett's name removed, making them anonymous, "Dear Company" letters.

89.     Without blinking, the San Diego Branch banker quickly re-executed the ten Wells Fargo reference letters, amending the address associated with the accounts to include just the company name, without any address and without Barnett's name.    Wells Fargo accommodated this remarkable request for anonymity without comment or question.

Case No. _____
RECEIVER'S COMPLAINT

**BEFORE:**                                              **AFTER:**



90.     Under these particular circumstances, and given the Bank's KYC and Enhanced Due Diligence obligations for these high-risk customers, acceding to specific requests to omit this same owner's name from all ten of the reference letters previously issued for supposedly separate anonymous LLCs deviated from accepted banking practice.    While providing bank reference letters can be appropriate in other instances, the circumstances here made it clear to Wells Fargo that there were heightened risks that the bank reference letters would be misused. This should have set off alarm bells.  It did not.

91.     That is especially the case, because of Apex's choice of the so-called "anonymous LLCs" from Wyoming as its preferred corporate form.   As Wells Fargo knew, using anonymous LLCs created a high risk for financial crime that, from the outset, should have resulted in a higher level of scrutiny by Wells employees of both the accounts and their related individuals.  Wells Fargo should not only have categorized these accounts as high risk, requiring enhanced due diligence prior to opening the account, but going forward, Wells Fargo should also have treated these supposedly separate shell accounts with enhanced monitoring as

a family of accounts from a risk compliance perspective.

92.     Globally-recognized account opening and oversight standards in place for decades have classified anonymous LLCs entities as "high risk" entities and warned that these entities are one of the most widely used vehicles in laundering of the proceeds of crime, corruption, and other malfeasance.  Therefore, Wells Fargo was required to conduct due diligence sufficient to establish the true beneficial owners of LLCs before allowing them access to bank accounts—and were further required to document the results of that diligence correctly in the bank's files in order to assist the bank in its future monitoring endeavors.

93.     In light of the increased risks created from the outset, Barnett's specific request to reissue generic no-name letters to 10 related anonymous LLCs was highly suggestive of credit card laundering by Apex.  As the Bank knew, Apex could easily conceal the identities of its blacklisted owners from merchant processors by submitting applications in straw owners' name that were supported by the essential no-name reference letters from Wells Fargo.  And that's exactly what Apex did.

94.     The most basic compliance training would have taught these bankers that such tactics were highly suggestive of card laundering or some other nefarious activity.  This means one of two things is true: either Wells Fargo's high-pressure sales culture made it clear that identifying and stopping fraud was secondary to the Bank's profit motive, or Wells Fargo's training and oversight were intentionally designed to be so deficient that its employees were clueless as to the most obvious signs of fraud.

95.     In August 2014, Barnett was back and opened ten more Wyoming LLC shell company accounts at the San Diego Branch (this time with a different banker), and he requested and received ten more no-name reference letters.  Like the banker before her, the banker wrote and executed anonymous reference letters for the shell companies: they did not identify the accounts owners or include any

Case No. _____
RECEIVER'S COMPLAINT

other identifying information, e.g., company addresses. Rather than take any of the steps required by a bank when undertaking typical due diligence for new customers, multiple bankers at Wells Fargo's San Diego Branch instead continued to process identical business account applications. These bankers did so, because at Wells Fargo, opening these bank accounts was not only profitable for the Bank, but was also personally beneficial to Wells Fargo's employees, who were acting under corporate edicts to meet daily account opening goals.

96. Despite the fact the initial shell companies accounts were established in January 2014 with a $100 deposit and minimal ($100) projected annual sales, deposit activity in the accounts was immediate, dramatic and inconsistent with the account applications. Millions of dollars began to flow through the accounts almost at once.

97. In the month of February, these Wells Fargo Apex accounts took in $810,000 in consumer credit card payments from Apex's high-risk merchant processors. From February to December 2014, the Apex Wells Fargo accounts took in a whopping $12,300,000 in consumer credit card payments forwarded by merchant processors.[13] The vast difference between the expected and actual account activity was obvious to Wells Fargo and a huge red flag, which a bank following standard industry practice was required to investigate.

98. Within a short time, the shell company bank accounts also began to suffer staggering merchant chargebacks and refunds. As a group, the Apex shell company bank accounts at Wells Fargo suffered more than 22% in chargebacks/refunds in 2014 through mid-2015. To put these numbers into perspective, a 1% chargeback rate is considered excessive and grounds to terminate a merchant's account with a merchant processor.

---

[13] This number is based only on information presently available to the Receiver, and is expected to grow when complete monthly account statements are received in discovery.

Case No. _____
RECEIVER'S COMPLAINT

99.    In some months, the chargeback rate was much higher.  As just one example, the August 2014 statement for an Apex shell company named "Bold Media" reflects a chargeback rate of 78% for the month.

100.    And the immense chargeback activity was obvious to Wells Fargo, on a monthly basis, given that the monthly account statements for all of the shell companies similarly reflected pages of chargebacks.  As the below example makes clear, the shell accounts' Wells Fargo monthly statements specifically identify the chargebacks in the "Withdrawals/Debits" column – often in the very same amounts again and again, for example, $87.67 and 97.88 (or multiplies thereof), as consumer after consumer requested chargebacks on their credit cards.

Case No. _____

RECEIVER'S COMPLAINT



Account number: ███████2051 ▪ November 1, 2014 - November 30, 2014 ▪ Page 9 of 11

**Transaction history  (continued)**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | | 145.69 | |
| 11/25 | | Bkcd Processing Bkcd Depst 20 411 272400398421 Lion Capital LLC | | 592.23 | 721.29 |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | 172.73 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | 395.29 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398512 Lion Capital LLC | 552.80 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398405 Lion Capital LLC | 1,559.51 | | |
| 11/26 | | Humboldt MS Deposit 141125 8 201693883 Healthy Choice Savings | | 39.95 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 82.72 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201689881 8446072489 Dermanique | | 195.76 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201690889 8446317914 Dermanique | | 195.76 | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 411 272400398421 Lion Capital LLC | | 257.05 | 1,568.02 |
| 11/28 | | Bkcd Processing Bkcd Depst 20 411 272400398405 Lion Capital LLC | 39.19 | | |
| 11/28 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/28 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |

101.   Of course, Wells Fargo also knew about these excessive chargebacks, because Wells Fargo's very own customers, using credit cards issued by Wells Fargo, were among the many Apex customers requesting such chargebacks on their credit cards.  Wells Fargo's own customers even made consumer complaints about the "risk-free" trial schemes to the Better Business Bureau.

102.   Wells Fargo deliberately overlooked this early and obvious aberrational activity in the Apex shell company accounts.  Had even minimal investigation under standard banking procedures been conducted, with such obvious red flags – as Wells Fargo was required to do – the consumer losses could have been staunched almost immediately. Wells Fargo took a different path instead.

103.   As described further below, Barnett's role as Apex's primary bank contact and shell company account opener transitioned to Apex co-owner Peikos in 2015 and Apex employee Camacho at the direction of Peikos.

(ii)   The Westlake Village Branch

104.   In April of 2015, the initial Apex shell company accounts that Barnett had established in 2014 had been open for fifteen months; most were inactive after having received (and then having transferred out) millions of dollars of consumer funds, even accounting for staggering consumer chargebacks.  These chargebacks, which ran through the Wells Fargo accounts, had resulted in nearly all of the shell companies being terminated by their merchant processors.  In spite of all this, Wells Fargo was still anxious to expand its business with Apex.

105.   Beginning in early 2015, Apex began to use Los Angeles County Wells Fargo branches, and its principals developed relationships with the Wells Fargo bankers at a Los Angeles County office located in Westlake Village (the "Westlake Village Branch").  Like the bankers at the San Diego Branch, the Wells Fargo bankers at the Westlake Village Branch were happy to facilitate Apex's ongoing consumer fraud and card-laundering activities in exchange for a revenue

Case No. _____
RECEIVER'S COMPLAINT

boost and assistance hitting sales quotas—even if that meant assisting a fraud and deliberately turning a blind eye to conduct that any banker would have recognized as bearing numerous indicia of fraud.

106. David Hannig ("Hannig") was an Assistant Vice President and Sr. Business Sales Consultant for Wells Fargo Merchant Services. On information and belief, Hannig was based out of the Los Angeles area but worked regularly with a number of branches, including the Westlake Village Branch, where he held meetings with Apex personnel and Wells Fargo customers.

107. Dominic Testa ("Testa") was a Business Banking Specialist for Wells Fargo at the Westlake Village Branch. On information and belief, Hannig and Testa had a close working relationship with each other and communicated frequently about how they could expand Wells Fargo's business with and sell new bank products to the Apex Enterprise.

108. The Westlake Village Branch was located nearby Apex's office in Woodland Hills, California. Wells Fargo banker Testa, who was part of Wells Fargo's Community Bank division, was able to develop and sustain a long-term and ongoing business relationship with the Apex Enterprise. He was particularly friendly with Apex's employee and CFO, Camacho, who often referred to Testa with nicknames like "bud." As Testa knew, Camacho was simply an employee of Apex and was not the true "owner" of any account in his name. Testa knew that Camacho was taking his instructions directly from Peikos, who was the true owner and controller of Apex. Testa also knew that Camacho was only an "owner" on paper of the accounts and shell companies held in his name.

109. Testa's interactions with Peikos and Camacho made it clear from early on that Peikos was the boss. As just one example, on April 17, 2015, Testa emailed Peikos about opening "new accounts for you". Testa noted "I'm assuming you'll be using Wyoming like your other LLCs" and requested the documentation and identification of the "owner." Peikos responded that Camacho, and not Peikos,

Case No. _____
RECEIVER'S COMPLAINT

would be the "owner" of the LLCs and the bank accounts that Peikos was instructing Testa to set up: "So we are clear, [Camacho] will be the 100% owner on these accounts, and I will have access like the current ones were set up." The "current ones" Peikos was referring to were the roughly 40 shell company accounts that Barnett had opened in San Diego which were lying mostly unused at that point because they had lost access to merchant processing services as a result of their extraordinarily high consumer chargeback rates. Testa told Peikos that he would put a fee waiver on the accounts for the next three months and recommended that Peikos "[k]eep in contact with me on when they should be closed and I can do it over the phone."

110. During this same time, Hannig, in coordination with Testa, encouraged the Apex Enterprise to apply for merchant processing with Wells Fargo. Apex employee Chris Carr met with Hannig and identified shell companies and products for which Apex wanted to obtain merchant processing services.

111. Wells Fargo requires merchant account applicants to undergo an underwriting process intended to ensure the applicant is a legitimate and creditworthy business and to weed out merchants engaged in illegal conduct and required the legitimacy of the business be verified/validated. Any material discrepancies must be documented, investigated, and resolved and the source of the verification should be in the merchant file. The Bank forbid the solicitation of merchants engaged in certain unacceptable business practices because they were presumptively illegal, violated card association rules, or created excessive risk exposure for the Bank.

112. Several days after their in-person meeting, on April 21, 2015, Carr followed up with an email to Hannig containing information for two shell companies. This opened a string of emails between the two in rapid succession, with emails being exchanged often literal minutes apart. Carr wrote, "Here is some information on the corps and URLs that we wanted to lead off with . . . Please let

Case No. _____
RECEIVER'S COMPLAINT

us know if you require additional information to Pre-fill these apps for us. We are eager to get started so as soon as you can send us the paperwork, we will turn it around with any additional documentation you require. Thanks!" Carr identified Arturo Oliveros and Julia Buenrostro as the "owners" of shell companies Alpha Group, LLC and Crest Capital LLC, respectively, both of which had the same Wyoming mail drop listed as their business address. Carr listed the shell companies' businesses as "supplement[s]" and "health plus", respectively, and included links to the companies' websites, www.virilitymuscle.com and www.evermaxbody.com.

113. Hannig reviewed the material and linked websites and quickly responded, identifying crucial and fundamental discrepancies in the information Apex provided:

> Chris,
>
> The bottom of the websites show different LLC's then what is listed below. That will need to be changed to the below listed LLC's on the websites before I can even start the process. **The people you listed below are not owners on the Wells Fargo bank account that you gave us. They must be owners of the business in order to use their name on the merchant accounts. The address also does not match up to what is on the website.** Everything needs to be matched up on the accounts or the applications won't not pass the submission process.
>
> Thank you,
>
> David Hannig
>
> (Emphasis Added).

114. Carr quickly replied claiming to have corrected the issues:

> David,
>
> Thanks for your reply. The company names and addresses have been updated on the websites.
>
> The Websites just had the product name in the footer as a placeholder until we got all of the docs in order.
>
> ***Arturo Oliveros and Julia Buenrostro are owners of the entities listed***.

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-55**

Thanks! - Chris

(Emphasis added).

****

115.   Almost immediately, Hannig again responded:

I see the names changed so that will work. ***The bank accounts still do not show them as owners. Coordinate with Dominic [Testa] on how to get this updated. Here is what we have listed on the bank accounts:***



David Hannig
Assistant Vice President
Business Sales Consultant
Wells Fargo Merchant Services

(Emphasis Added).

116.   The irregularities Hannig identified were troubling, particularly since, as Hannig knew, Apex had already opened (and in almost every case, burned through) roughly 40 shell bank accounts with Wells Fargo in which millions of dollars had flowed through.  Apex's excuses and scramble to alter website and product information on the fly only reinforced what Hannig already knew to be true: that the "owners" of the shell companies were owners in name only.

117.   But most troubling were the discrepancies in information regarding the key issue of the beneficial ownership of these anonymous Wyoming LLCs.

Case No. _____
RECEIVER'S COMPLAINT

The two shell companies, Alpha Group and Crest Capital, had Wells Fargo accounts opened by Apex principal Barnett a year earlier in San Diego. When he opened the accounts, Barnett claimed to be the sole owner of the companies and presented anonymous Wyoming LLC documents and the same maildrop address for these shell companies.

118.  By April of 2015, when Hannig flagged the issues, the accounts had been open for 11 months and had taken in more than a quarter of a million dollars in consumer payments from merchant processor deposits. But Hannig was now being told that the account holder, Barnett, did not in fact own the shell companies – and two people (Oliveros and Buenrostro), who were not listed on those Wells Fargo bank accounts or identified in any Wells Fargo bank records, did.

119.  Such information was an obvious indication that Apex was engaged in credit card laundering by listing owners on merchant account applications for an anonymous LLC, thus obscuring the identity of the true owners.

120.  Apex's next response, sent just 23 minutes later, should have been even more alarming to Hannig and Testa. Rather than "updating" the information, Apex instead changed course and told Wells Fargo they had decided to use instead new anonymous Wyoming LLCs, supposedly now "owned" by Camacho, to apply for the merchant accounts. The new shell companies shared (as did every one of the Apex shell companies) the same Wyoming mail drop address.

From: Chris Carr [mailto:chris@apexcapitalgrp.com]
Sent: Tuesday, April 21, 2015 4:03 PM
To: Hannig, David
Cc: Raul A; Phillip Peikos; Testa, Dominic J
Subject: Re: Information for New MIDs

I see you are correct. Those accounts are, indeed, in David Barnett's name. **On review, we decided that we would like to run those two websites through these new corps that we just set up. They are owned by our CFO Raul Camacho**[. . . ]

Raul will come in tomorrow and open bank accounts at your branch. EIN numbers are forthcoming. Websites have been updated. Sorry for all the changes. Will you be in tomorrow to help us set up the

Case No. _____
RECEIVER'S COMPLAINT

accounts?

Thanks! - Chris

(Emphasis Added.)

121. The response of Hannig, who was specifically seeking to provide *merchant banking* for Apex, was problematic. He simply suggested Apex coordinate with the bank to get the ownership "updated". Notably, Hannig did not copy the actual account holder, Barnett, on any of this correspondence.

122. Hannig's cursory review had immediately identified fundamentally inconsistent information about the LLCs' ownership, the ownership of the bank accounts, and discrepancies between the websites and the products which Apex was hoping to sell on them. He had pointed out that the irregularities and discrepancies would cause the merchant applications he wanted to present on Apex's behalf to be rejected. As a merchant banker, Hannig knew that the discrepancies in the owners, coupled with the use of anonymous Wyoming LLCs and the pattern of burning through the LLCs' bank accounts, were indicative of fraud.

123. Instead of doing what he should have done under standard banking procedures – *e.g.*, refuse to submit the shell account's merchant processing applications; ask questions and demand answers about the troubling and inconsistent information being revealed; and communicate his concerns and report suspicious activity through Wells Fargo's established channels — Hannig simply directed Apex on how to change its paperwork, so the applications would not be flagged, allowing him to potentially pad his sales numbers and the bank itself to expand its banking relationship with the fraudulent Apex Enterprise.

124. During the years when the Apex fraud was in full bloom, on information and belief, such aggressive sales tactics were rewarded within Wells Fargo's misaligned compensation system. Hannig himself was recognized as a Wells Fargo "Sales Star" (winning that award in 2013, 2014, 2015, 2016, and

Case No. _____
RECEIVER'S COMPLAINT

2017), and he was also named the #1 Wells Fargo Sales Representative out of 500 employees in 2013 and 2016.

125. Hannig was not the only Wells Fargo banker to advance Apex's ongoing fraud, however. In light of Wells Fargo's pernicious sales culture and misaligned compensation system, this type of employee misconduct repeated itself again and again, across Wells Fargo bankers and branches. Indeed, as recently as January 23, 2020, the OCC recognized: "[t]he Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model, and declined to implement effective controls to catch systemic misconduct. Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper *conduct across the entire Community Bank*." (Emphasis added.)

126. Apex's last-minute pivot to the two new corporations they had "just set up" for merchant processing and which were now supposedly "owned" by Apex employee Camacho, necessitated getting new Wells Fargo bank accounts opened before the merchant account application could be completed. Testa was more than happy to oblige. When Camacho sent Testa documents for one of the new LLCs (with a Wyoming operating agreement signed that same day, April 21, 2015), Testa replied that the documents were "perfect" and the accounts were promptly opened.

127. Once the new bank accounts were opened, Apex submitted the merchant processing application to Hannig listing Camacho as the "owner" and listing the Wyoming mail drop as the address. But on April 30, 2015, Hannig informed Apex that higher-ups at Wells Fargo had rejected the application, as he had received a "decline email due to an unqualified business model for Wells Fargo. We tried, thank you for considering us."

128. In response to questions from Apex, Hannig said the application was rejected because the companies were selling supplements. In other words, despite

Case No. _____
RECEIVER'S COMPLAINT

Hannig's questionable efforts to obtain Wells Fargo's merchant processing services for Apex, Wells Fargo's merchant banking division had (correctly) categorized the shell companies as high-risk businesses with which they did not want a relationship. The Bank's merchant division was unwilling to take on the risk of processing for these companies, recognizing that they were in an industry rife with consumer deception, and there was the potential for high chargebacks and losses *for Wells Fargo* caused by fraudulent activity.

129. Of course, Wells Fargo was still perfectly willing to continue servicing the fraudulent LLCs at the branch level and opening bank accounts for additional shell companies, while letting *other* merchant processors (who had less insight into Apex's illegitimacy, and no insight into its obfuscated performance history and ownership legerdemain, and who would be reassured by the fact that Wells Fargo had approved them for bank accounts) take on that risk – and while allowing Apex to deceive more unsuspecting consumers (including even Wells Fargo's own credit card holders) with the lure of "free trial" products.

130. Knowing what it did, Wells Fargo was legally required to take a number of steps, including conducting a further investigation into the Apex Enterprise, evaluating patterns of misconduct and suspicious activity across the entire Apex relationship, terminating the Bank's relationship with Apex, its principals, and its associated shell companies, and/or following the Wells Fargo established procedures for reporting the suspicious activity both internally and externally.

131. Wells Fargo did none of these things. Instead, it kept doing business and looking for growth opportunities with Apex. Through Testa, Wells Fargo continued to open numerous shell company accounts for Apex. Similarly, Hannig periodically attempted to get merchant processing for Apex shell companies but was ultimately always unsuccessful.

132. In December of 2015, Camacho accidentally sent a spreadsheet of

Case No. _____
RECEIVER'S COMPLAINT

active and pending "MID's" (merchant processing accounts) to Hannig. The spreadsheet listed more than 25 LLCs with bank accounts at Wells Fargo, along with their corresponding accounts at various merchant processors. As was the case when Hannig had identified and flagged the central issue months earlier, *the purported owners of the LLCs were not the Wells Fargo account holders.* The spreadsheet made it absolutely clear that, at a minimum, Apex was engaged in large-scale credit card laundering and was using shell companies and straw owners to secure merchant processing services—something any banker in Hannig's position would have immediately recognized, particularly because of the incident some months earlier.

133. Within minutes, Camacho recognized that he did not want that spreadsheet in the Bank's files. He wrote to Hannig, asking him to "[p]lease delete ASAP" and adding that he "would greatly appreciate if you can keep the information confidential." Camacho concluded the email by asking Hannig to confirm with him once the email had been deleted.

134. Hannig promptly replied "Deleted." On information and belief, Hannig's prompt deletion of this e-mail and attachment from Wells Fargo records violated both Bank policy and the law. As an executive at Wells Fargo, Hannig had a duty under a number of federal laws to investigate and report Apex's suspicious activities. Those obligations did not disappear just because a customer asked that Hannig delete an email.

135. The spreadsheet was not sent to Hannig in a vacuum. Both he and Testa knew exactly who this very high-risk customer was. They were all too aware of Apex's history of hiding the true owners of the anonymous shell companies they created – and they had even helped Apex to mask these beneficial ownership issues and sanitize its merchant processing application at Wells Fargo. Hannig and Testa also knew that Wells Fargo had analyzed Apex's high-risk business earlier that year and had declined to provide merchant processing services to it. In light of the

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-61**

above, on information and belief, the deletion of Camacho's email and failure to take steps to report the suspicious actions were deliberate efforts to aid and abet Apex's fraud.

136.   Notwithstanding its knowledge of obvious fraud, Wells Fargo and the Westlake Village Branch continued to open bank accounts for Apex shell companies throughout 2015, 2016, 2017, and 2018; the new accounts only stopped when the FTC filed its lawsuit against Apex.  In 2015, Camacho opened 14 more Wells Fargo accounts for 13 anonymous shell companies.  In 2016, Camacho opened six accounts for six shell companies; in 2017, 19 accounts for 19 shell companies; and in 2018 12 accounts for 12 shell companies.  In total, Wells Fargo opened *at least* 92 bank accounts for more than 70 shell companies over the course of just four years.

137.   When opening and servicing the accounts, Wells Fargo bankers continued to provide atypical banking services, asking no questions and deliberately ignoring Apex's obvious efforts to launder money it obtained operating its high-risk, fraudulent business through anonymous shell companies fronted by straw owners.

138.   The pattern was clear – and only became clearer with time: Apex, primarily through Camacho, would periodically request that Wells Fargo close existing shell companies' bank accounts after those shell companies had been blacklisted and lost their merchant processing because of the massive levels of chargebacks.   At the same time, Camacho would request Wells Fargo open new shell company bank accounts—often six new bank accounts at a time—of which Camacho would be the "owner".  In this way, Wells Fargo's conduct enabled Apex to cycle through the burned shell companies and their associated bank accounts before creating new, "unrelated" and anonymous LLCs to use to defraud consumers.

139.   As was the case with the San Diego Branch, the Westlake Village

Case No. _____
RECEIVER'S COMPLAINT

Branch, via Testa, was more than willing to supply no-name reference letters for the shell companies. Testa provided large tranches of reference letters, routinely issuing 6 letters, and on one occasion 12 letters, at a time. He was also willing to vary the format and information contained in the reference letters based on requests made Camacho.

140. Across multiple branches and multiple bankers, between 2014 and 2018, Wells Fargo assisted the Apex Enterprise by opening account, after account, after account, for a host of shell companies. These shell companies were "anonymous" LLCs based out of Wyoming, though true their owners were not anonymous to Wells Fargo—Wells Fargo was well aware that all of these companies and accounts were part of the Apex Enterprise, owned and controlled by Barnett and Peikos. That clear not only based on the fact that core Apex personnel were always the ones opening the accounts, and also from the email that Camacho mistakenly sent to Hannig, which spelled out exactly what Apex was doing. Yet Wells Fargo was more than happy to keep, and even pursue, Apex's business by facilitating Apex's ongoing fraud.

### B. Wells Fargo's Support of the Triangle Enterprise

#### (i) Overview

141. At the same time that Wells Fargo was providing banking services to the Apex Enterprise, it was also providing those same services to the Triangle Enterprise, which was also running "free trial" scams out of Southern California and which was operating using a business model strikingly similar to Apex's.

142. In the case of Triangle, as with Apex, multiple Wells Fargo bankers across multiple branches developed long-term and ongoing business relationships with Triangle's owner and controller, Brian Phillips; as with Apex, these Wells Fargo bankers eagerly opened bank accounts for a host of companies that they knew were shells being used by Phillips. And as with Apex, Wells Fargo's clear-eyed support of the Triangle Enterprise resulted in millions of dollars in consumer

Case No. _____
RECEIVER'S COMPLAINT

harm—damages which spilled over to the Receivership Entities.

143. Wells Fargo began providing services to Phillips and Triangle in at least 2009. In addition to opening and closing accounts and executing reference letters for Phillips and his shell companies, Wells Fargo also provided a host of other services, including payroll services and tax return preparation. In each instance, Wells Fargo took instructions from Phillips and provided information directly to him, understanding that he was the owner and controller of all Triangle-related accounts even though numerous others were listed as the "owners" of the accounts. Wells Fargo provided these services to Phillips and Triangle even though it knew that those services were a prerequisite for money laundering and fraudulent business activity.

144. Like Apex, the Triangle fraud relied on the use of shell companies with straw owners, which Triangle generally referred to as "nominees", to keep their fraudulent businesses running. Phillips recruited nominees to be the "owners" of the shell companies by offering them a monthly fee, such as $500 per month, for allowing Phillips to use their names and identities to establish shell companies and accompanying bank accounts at Wells Fargo. Phillips' only requirement to qualify was that the nominees not be blacklisted on the MATCH list as a previously terminated merchant.

145. Phillips then served as the conduit between Wells Fargo and each nominee in order to secure the Wells Fargo bank accounts needed to carry out the Triangle fraud. Each time, Wells Fargo rubber-stamped the applications. From there, Phillips used the corporate documents and Wells Fargo account information (along with the essential Wells Fargo reference letters) to obtain merchant processing services in the nominee's name, which allowed the Triangle Enterprise to perpetrate its "free trial" scam at consumers' expense.

146. None of this would have been possible without Wells Fargo. Each time Phillips opened a new shell account, he instructed Wells Fargo that the

Case No. _____
RECEIVER'S COMPLAINT

nominee was the "100 % owner" on paper, but Phillips was always to be given immediate access and full control as a "co-signer" of the Wells Fargo bank account belonging to the supposed "100% owner." Each shell company's account opening paperwork falsely represented Phillips as a rank-and-file employee of the shell company—its supposed "Data Specialist" —a transparent effort understood by Wells Fargo to mask Phillips' true ownership of all of the shell companies. Wells Fargo always accommodated "employee" Phillips' requests, which was not in line with banking practices. As a result, Wells Fargo knew that Phillips retained the unfettered ability to transfer money from a nominee's shell account directly into the primary Triangle Enterprise account at Wells Fargo, which Wells Fargo knew was owned by Phillips.

147. The troubling pattern repeated itself, again and again, with Phillips driving all communications with Wells Fargo for the nominees. Notwithstanding known abuse of beneficial ownership for these types of high-risk businesses, and mounting evidence that Phillips was actively engaged in such abuse, Wells Fargo bankers happily opened this stream of new accounts in the names of nominees (in keeping with its sales culture prizing growth above all else). All the while Wells Fargo bankers conducted the most minimal level of due diligence, if any, on the nominee "owners", largely relying on Phillips' vouching for the new nominee "owner." Phillips himself routinely filled out the forms and gathered and submitted the signatures of the "owners" to Wells Fargo. If a Wells Fargo banker requested a cursory phone call with the "owner" before opening an account, Phillips arranged it. In the latter years of the fraud, Phillips even walked nominees into the local branches, and Wells Fargo promptly accepted the paperwork from the new "owners" before turning around to give "employee" Phillips full control as the co-signer. This arrangement benefitted Wells Fargo as well as Triangle and Phillips, because it gave Wells Fargo an easy way to open new accounts in perpetuity.

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-65**

148.   After dealing with the "owners" on only the most perfunctory level at account opening, if at all, Wells Fargo then dealt thereafter with Phillips, understanding him as their customer and the actual owner of all of the accounts. At Phillips' direction, Wells Fargo regularly swept funds in the shell company accounts into Triangle's primary bank account at Wells Fargo. Once transferred to Triangle's main account, the funds would almost immediately be sent to a Canadian company owned by Triangle, Global Northern, at a Canadian bank. In turn, Global Northern would forward the funds to Hardwire accounts in Hong Kong or Thailand. Hardwire would then wire money back to Triangle in the U.S. to cover expenses to complete the laundering of the funds.

149.   From the very start, Phillips and Triangle's offshore-based principal, Devin Keer relied upon Wells Fargo as the best (and perhaps only) banking option for opening scores of essential bank accounts for the shell companies. In 2009, near the start of Triangle's implementation of its "free trial" scam, Keer, then in Canada, emailed a merchant processor to ask:

> Do you guys work with/know any corp services type guys who incorporate US corps quickly? Brian [Phillips] has a corp in NV that he just set up but there's no bank accounts and stuff set up yet. Would like your advice on the whole US corp issue before we drive down to Seattle to open bank accounts - if we can set up another corp for the purpose of this…deal that might be a better play for us.

The processor promised to look into it, but before he could, Keer wrote back: "*I think we can get Wells to take care of it*." (Emphasis added.) As it turned out, Keer was right.

150.   Phillips, Keer, and Triangle relied on Wells Fargo to deliberately overlook obvious beneficial ownership issues, which Wells Fargo was happy to do. Phillips was so confident in Wells Fargo's pliancy that when one nominee raised a concern about what would happen if Wells Fargo contacted his mother (whom he had enlisted to serve as another nominee for Phillips in 2011), Phillips responded by dismissing his concerns wholesale, responding, "***Dude, you still don't***

Case No. _____
RECEIVER'S COMPLAINT

*understand how wells is totally different. The bank won't be calling her.*"
(Emphasis added). Wells didn't call.

151. Instead of conducting an investigation, increasing its monitoring of the Triangle accounts, reporting suspicious or unusual activity internally or externally, or simply refusing to provide banking services to the Triangle fraud, time and again Wells Fargo acceded to Phillips's requests for the Bank to open new shell company accounts with nominee owners, effectively legitimizing the shells in the eyes of the merchant processors.

### (ii) The Keller, Texas Branch

152. The relationship between Wells Fargo, Phillips, and Triangle began in Texas on September 2, 2009, when Wells Fargo's Keller, Texas branch, principally through banker Lea Walker ("Walker"), but with assistance of others in the branch, including the branch manager, began opening shell company accounts for Phillips and providing him with reference letters.

153. In roughly one year, Walker opened at least eight shell company accounts for Phillips and provided him with four reference letters for these accounts.

154. In 2011, Walker opened four more accounts for shell companies at Phillips' request, providing him with three reference letters. That year, another banker at the Keller, Texas branch, opened two more shell company accounts for Phillips and signed another reference letter. Walker continued to open additional shell accounts for Phillips into 2012. In total, this Wells Fargo branch opened more than 20 banks account at Phillips' request, with roughly half of those being for shell accounts nominally owned by others.

155. Wells Fargo's understanding of Phillips' ownership interest in the accounts is abundantly clear in May 2012 emails that Phillips and Walker exchanged, in which Phillips asked Walker to remove certain approval requirements so that he could generate and send wires for accounts that he did not

own on paper. Walker immediately fulfilled Phillips' request, which would have been unthinkable if she were not aware that he was the true owner of the accounts and that the purported "owner" was just a nominee.

### (iii) The Southern California Branches

156. In or about 2013, Phillips began moving his banking relationship with Wells Fargo to Southern California. Across multiple Wells Fargo Community Bank branches in Southern California (and in partnership with multiple Wells Fargo bankers), Phillips came to open dozens more Wells Fargo accounts as the Triangle scheme expanded. In total, over the course of the Triangle scheme, Wells Fargo opened more than 85 Triangle-related accounts in California and Texas at Phillips' request. While Wells Fargo knew that all of the accounts were under Phillips' exclusive control, over 60% (approximately 55) of those accounts were bank accounts for the shell companies that were "owned" in the names of the nominees. Wells Fargo also opened more than 30 corporate bank accounts that Phillips directly owned. These included, most notably, numerous Wells Fargo bank accounts for the Triangle Media Corporation, into which Phillips regularly requested that Wells Fargo transfer funds from the shell company accounts "owned" by others, which Wells Fargo always did.

157. Between 2013 and Triangle's demise in 2018, Phillips' business with Wells Fargo in California expanded rapidly. Over a nine-month period in 2015 alone, Wells Fargo opened a total of 12 shell company accounts "owned" by nominees for Phillips. Phillips established a close and continued relationship with Wells Fargo across multiple branches in Southern California. In total, over a dozen Wells Fargo Community Bank branches in Southern California provided an array of banking services for Phillips, Triangle, and his many related shell companies. Between fall 2013 and the end of Triangle in 2018, Wells Fargo opened more than 60 accounts at Phillips' request. More than 40 of those bank accounts, however, were for shell companies supposedly not "owned" by Phillips.

Case No. _____
RECEIVER'S COMPLAINT

Phillips was a repeat player at many branches, including San Diego (1st and Market – 5 accounts and 3 reference letters), El Cajon (6 shell accounts and 9 reference letter), Palomar Vista (8 accounts and 2 reference letters), and San Marcos (6 accounts and 1 reference letter). Additionally, Phillips often made requests to open accounts to his Relationship Managers (Albana and Cording) working out of the Escondido branch, who expedited that process. Albana and Cording played the essential role of providing Phillips with ready access to reference letters (they wrote more than 30 such letters between 2015 and 2018).

158. The scope of the branches involved emphasizes that this was not one bad banker or one bad branch—rather, the bad conduct was reliably endemic at Wells Fargo. While the Escondido Branch was probably the worst offender (as discussed below), the misconduct at issue occurred across the Southern California branches noted above, all of which were operating under Wells Fargo's toxic sales culture. For example, in 2015 a banker from the San Diego Branch came to Phillips's aid when he asked her to set up a bank account for a shell company "with me and another signer on it." The banker responded that she needed the nominee owner's information to open the account, but that she would "switch the relationship once I have it." Phillips sent the banker the information she requested (the nominee's driver license, phone number, and social security number, among other things), and the banker proceeded to open the account, apparently untroubled by the fact that Phillips—not the nominee—was the one providing the information to open an account for a company that purported to be owned by the nominee.

159. The Wells Fargo bankers knew that all of these accounts were related, but on information and belief, that relationship was never risk-rated, monitored, or otherwise managed as would be befitting a relationship encompassing the volumes, number of accounts and global scope of what was an enterprise—not a series of individually-owned accounts.

(iv) <u>The Escondido Branch</u>

160. Wells Fargo bankers at the Escondido Branch were especially accommodating to Phillips, particularly Haiman Albana ("Albana"), who was a Vice President and Business Relationship Manager at the branch, and Brian Cording ("Cording"), who was a Vice President and Senior Business Relationship Manager. Compliance "rules" were easily bent or discarded for Phillips, in line with the OCC's conclusion that "[t]o the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank." Albana, for example, initially told Phillips on October 30, 2013, that a shell company account (which Phillips had requested on October 24) hadn't yet been set up because Albana was "waiting to hear back from my compliance department" about it—but when Phillips complained that "when [he] was working with the branch on this stuff they could turn it around in 1 day" and asked whether he should "reach out to my branch contact," Albana sent him the forms for the next step *less than one hour later*.

161. On August 25, 2014, Phillips sent an email to Albana about one shell company's accounts, asking Albana "to make sure that my name is not showing up on the [Vital Global Marketing] account (7355) at all. These are [the nominee]'s accounts of which I have access too. ***Can you please work to have my name replaced with her name?*** Let me know how quickly we can get this taken care of?" (Emphasis added.) About a week later, Phillips forwarded forms purportedly completed by the nominee to add her and remove him from the shell account, at which point a Wells Fargo effected the change.

162. Cording was fully aware that Phillips was the one in control of the shell accounts that Triangle had at Wells Fargo. On August 19, 2015, for example, Phillips complained to Cording that he couldn't see accounts for shell companies H1 Marketing, Brand Junction, and Total Market Products "at the moment in a

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-70**

single portal view on my wells fargo login." Phillips explained that he "need[ed] to have key executive access" to the shell company accounts because "they need[ed] to have my status changed in the company." Cording immediately made changes to the profiles in Wells Fargo's system in order to allow Phillips "to see the accounts with the ability to transfer into the 3 of them."

163. Meanwhile, Phillips was making changes to the ownership of the Vital Global Marketing account—the account which, roughly a year earlier, he'd had Wells Fargo scrub his name from. Phillips sent over the paperwork to have the old nominee "owner" removed from the account on August 28, 2015. Less than a week later, he asked to have a different nominee added to another Vital Global Marketing account (x1053); a Wells Fargo banker business associate gave the new nominee control over the account, but when Phillips asked for documentation of a change in ownership, the Wells Fargo employee explained she would need an amended operating agreement. A few days after that, Cording chimed in to explain that the change in ownership would require a new account. The Wells Fargo employee sent over the required paperwork, explaining that Phillips "would want to list [the new nominee] as 100% owner to match your documents." Recognizing Phillips's true role in the operation, the banker added, "You will also need to list anyone (like yourself) who might have control of the company," and warned Phillips that as the technical owner of the shell company, the new nominee would have control over the other Vital Global Marketing account (x7355)—a warning she would not have needed to give if she'd believed the nominee was, in fact, the owner.

164. Cording also continued to accommodate Phillips' requests for visibility into accounts purportedly owned by others. On May 5, 2016, Phillips asked Cording to add another shell account, Sunset Order Marketing, to his "consolidated Business banking view in the portal." Cording asked another banker to make the change without hesitation. That banker, however, pointed out that the

Case No. _____
RECEIVER'S COMPLAINT

nominee for the account was the "100% owner, so in order to grant [Phillips] combine[d] view through online banking" she would need approval from the nominee. Phillips then asked, "why do these accounts keep getting setup this way where I have no right to visibility. Can we please get this and all accounts going forward switched to be in my consolidated view."

165. The Wells Fargo banker was quick to offer a couple work arounds:

If you aren't owner they can't automatically grant you combined view because you can transfer between other entities and personal accounts that way. **The work around is to have the owner grant you this authority but our online department requires it in writing incase there is some sort of internal fraud or something with the business, WF won't be liable**.

Unfortunately we cannot automatically do this every time. We have the work around but it requires an extra step. **In order to avoid this entirely we do offer the CEO portal for our large business clients**. (Emphasis added.)

166. Phillips made it absolutely clear that he wanted full access to multiple accounts for companies in which he had, on paper, no ownership interest. Though this is an obvious indication of potential fraud, no one at Wells Fargo appeared troubled by the request. In fact, when Phillips expressed exasperation with the process, one Wells Fargo banker even sympathized, apologizing for the Bank's (flimsy) procedural hurdle: "I'm sure somewhere along the lines an employee transferred out money from a business to his/her personal accounts and WF took a significant loss. So they now require an acknowledgement from the owner stating they are ok with the combine view."

167. Wells Fargo clearly understood that Phillips was in charge and that the nominee owner of the company was more or less irrelevant, but the Bank continued to do business with Phillips and Triangle. Wells Fargo did so in violation of KYC rules and regulations, which required the Bank to have a relationship with each of its customers. That posed a problem since Wells Fargo's only relationship with the shell companies was through Phillips.

Case No. _____
RECEIVER'S COMPLAINT

168.   The rules changed in May 2016, but by December 2017—nearly a year and a half later—Wells Fargo had not yet implemented them.  On information and belief, the new rule, in fact, simply reflected what had been accepted as standard practices at many other banks for a number of years (but of course not Wells Fargo), going back as far as the establishment of new rules after the September 11, 2001 terrorist attacks.  That month, Cording emailed Phillips to explain the Bank's obligations under the "new" rule:

> In May 2016, the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) issued a rule strengthening the due diligence that certain financial institutions must perform with respect to their customers.  The new rule requires that financial institutions thoroughly understand the nature of the business of each of their clients.Wells Fargo and other banks are required to comply with these new and existing regulations related to the prevention of financial crimes.  As a result, we are enhancing our internal compliance and risk related policies.  Because of the size and scope of our organization, we are starting to collect customer information now to ensure that we are able to comply with the federal deadline.

169.   Cording sent Phillips pre-filled paperwork for 10 companies, seven of which were shell companies *but all of which listed Phillips as the owner*.  This was inconsistent with the owners listed on the Wells Fargo bank records, but Cording clearly considered Phillips to be the actual owner of all 10 companies in spite of this.  Predictably, Phillips responded and asked to have the "docs changed around" so he could "coordinate for each of the people to sign."  Cording replied: "Happy to do it, *I think the challenge is we may not be sure of the owners of each entity*."  Not only did Wells Fargo have zero idea who its account owners were (showing how little the Bank was concerned about Triangle's proliferation of shell accounts), but Cording, apparently unperturbed, continued doing business with Phillips even after he was once more faced with proof that Phillips was the *de facto* owner for a host of shell companies.

(v)    Triangle's Attempts at Securing ACH Processing

170.   Phillips periodically looked into securing ACH processing services from Wells Fargo, which would give Triangle another avenue to accept customer

payments.. Wells Fargo's incentive was obvious: they would be able to collect processing fees for any transactions that Triangle ran.

171. As early as 2014, Albana was working with Phillips to try and secure web-based ACH processing for Triangle. Apologizing for the delay in getting approval for Phillips' application, Albana explained that "[a]s you know your industry is high risk and the bank is scrutinizing each detail prior to getting approval, I am working diligently with credit supervision to get the approval." In response to requests from Albana, Phillips provided him with a client list, sample agreement, key officer bios, and additional information.

172. The 2014 push to get ACH processing for Triangle through Wells Fargo was dead by August, however. As Keer wrote to another Triangle employee, "the entire ACH deal with Wells was scuttled because of some random text on [the Triangle website]."

173. Emails the following month between Triangle personnel make it clear exactly what, in one employee's words, "wells' compliance team saw" that caused the Bank to back off: an old website for Triangle Media Corporation, which touted the company's ability to "provide expertise for your high-risk business" because its "seamless solutions offer your business the ability to market concepts normally rejected by traditional processors and banks."

174. While Triangle had already removed the problematic language from its website, it was still popping up as the top google search for "Triangle Media," so Phillips and his employees made efforts to bury it by "get[ting] new content to pile over the [problematic language]."

175. Wells Fargo's compliance team's decision to reject Triangle's processing application demonstrates, as with the Bank's rejection of the Apex merchant processing applications, that Wells Fargo was unwilling to take on the risk of processing for these companies. The Bank was careful when its own potential exposure was on the line. Of course, the Bank remained perfectly willing

Case No. _____
RECEIVER'S COMPLAINT

to continue servicing the fraudulent shell companies at the branch level, open bank accounts for additional shell companies, and take other atypical steps to assist the schemes' success.

176. Despite the compliance team's decision to nix ACH processing, the sales imperative at the Bank was overwhelming. One year later in 2015, Cording, was doing his best to get ACH approval for Phillips and Triangle once again. Cording emailed Phillips that after "thinking through my strategy to get ACH approved on Triangle Media," he thought it would be useful to have some balance sheets and income statements, because they would allow him to "utilize the financial strength of the business [to] mitigate any risks."

177. Cording still had not managed to obtain approval for Triangle to use Wells Fargo's ACH processing in early 2017, but that didn't mean that he had stopped trying. On February 16, he wrote Phillips that "[w]e did do some further due diligence internally and there is potential for us to fulfill the ACH request as well as we may have a solution for the account needs." Although it does not appear that Cording was ultimately able to secure ACH processing for Triangle, the fact that he was still willing to try (and that Wells Fargo was still apparently considering it) in light of everything that Cording and Wells Fargo knew about Phillips and Triangle speaks for itself. The evidence firmly establishes that Wells Fargo knew exactly what Triangle was doing, and that by assisting Triangle, it was violating banking regulations and the Bank's own (on paper) policies and procedures.

(vi)   Wells Fargo Authorized Suspicious and Unusual
Transactions that Made No Economic Sense.

178. As all of the above examples indicate, Wells Fargo knew from very early on in its relationship with Triangle that Triangle was using nominees as fronts for shell companies, with Phillips regularly insisting that the nominees (as opposed to Phillips, who Wells Fargo knew was the true owner) be listed as the

"100% owners" of the accounts. Wells Fargo bankers had obligations under standard banking practices and banking laws and regulations to investigate and report Phillips' manipulation of the shell companies' beneficial ownership. Had Wells Fargo conducted a real investigation, its findings would have compelled it to refuse to do any more business with Phillips, shut down Phillips' accounts, and/or follow Wells Fargo's established processes regarding the making of internal and external reports of suspicious activity. In reality, of course, given all that it knew by this point, Wells Fargo already understood what the results of any such investigation would be.

179. Wells Fargo knew that Triangle's shell companies continually suffered massive chargebacks. Like with Apex, this was abundantly clear from the shell companies' monthly account statements.

180. Wells Fargo had an obligation under banking laws and regulations to look at the family of Triangle accounts as a whole, rather than looking at individual account activity in isolation. If one Triangle-related account needed to be closed, then all other Triangle accounts likely would have to be closed too. This obligation required the Bank to reassess its dealings with the Triangle Enterprise on a regular basis, including whenever it opened a new account at Phillips' request.

181. Wells Fargo was therefore obligated when conducting its account opening and at least annual diligence for Triangle-related entities under standard AML procedures to assess both new – and existing accounts in the context of the overall relationship with Triangle's beneficial owners and key parties, namely Phillips who had more than 30 personal and corporate accounts with Wells Fargo (in addition to the more than 50 shell accounts).

182. In particular, Wells Fargo should have conducted a critical examination of transfers between Phillips-owned and Phillips-associated companies, which there is no indication it did—even though there were multiple indicia of fraud present. Wells Fargo knew that Phillips was regularly requesting

Case No. _____
RECEIVER'S COMPLAINT

that the Bank move money into his main Wells Fargo Triangle account, which Phillips himself exclusively owned. At Phillips' direction, Wells Fargo regularly processed suspicious large-figure, round-number transfers out of shell accounts (which were nominally owned by others) and into his own Triangle account. Wells Fargo bankers should have pressed Phillips on why significant amounts of money were being sent from accounts owned by others to Phillips' Triangle account, all while the listed owners (nominees) were receiving only nominal payments from the accounts that they supposedly owned. Wells Fargo was also knew that funds which hit Wells Fargo's Triangle account were regularly being transferred overseas. If Wells Fargo had any concern for protecting the interests of these "owners," or complying with anti-fraud or AML regulations, it would not have permitted Phillips and Triangle to do what they were doing.

183. Wells Fargo had no such concerns. Instead, after Wells Fargo had enabled Phillips himself, and not the supposed "owners," to direct these transfers from the LLC accounts to his Triangle accounts, thereafter Wells Fargo even transferred the recently-deposited funds from the Triangle account entirely out of the United States.

184. While Wells Fargo was disregarding problematic and unusual account activity, Wells Fargo was not at all ignoring Phillips or Triangle's accounts. However, instead of vigilantly monitoring these accounts for suspicious behavior in the context of a high-risk customer in a high-risk industry, making all manner of suspicious transactions out of accounts he did not "own," Wells Fargo was nurturing its relationship with Phillips to try to grow Wells Fargo's business. In other words, Wells Fargo was doing what it did best: opening accounts wherever it could, whether by providing new banks accounts for the shell companies or trying to provide add-on banking services, such as ACH processing, merchant processing, or even access to foreign accounts. Cross-selling clients, not compliance or client oversight, was the priority for Wells Fargo. *See, e.g.,* American Banker, *Bankshot:*

Case No. _____
RECEIVER'S COMPLAINT

*Wells Fargo Should Have Seen Add-on-product Trouble Coming,* Kevin Wack, July 19, 2018.

185. It is particularly troubling that over many years, Wells Fargo used so-called "Relationship Managers" (in this case Albana and Cording operating out of the Escondido branch) to serve as lead salespersons seeking to grow the Triangle relationship as much as possible. Wells Fargo flouted the common industry role that positions such as Relationship Managers have as experienced bankers, providing an extra "first line of defense" layer of protection for a bank against fraud and money laundering.

186. Wells Fargo designed a corporate structure prioritizing sales that instead used its designated Relationship Managers in a way that perpetuated fraud and weakened risk compliance, unlike other banks of its size. Typically, a banker in such a position will conduct periodic due diligence reviews across families of accounts, especially for accounts like Triangle, operating in high-risk industries rife with fraud. At other institutions following standard banking practices, a designated account representative such as this would have adhered to procedures such as requiring visits to an owner's place of business. Such designated account representatives would also have been responsible for being familiar with the specific activity in the account and its purpose, and for providing updated predictions of expected activity in order to facilitate centrally managed, automated monitoring for potentially suspicious activity. But, as Brian Phillips had learned early on, Wells Fargo was "totally different."

## C. Wells Fargo Aided and Abetted Fraudulent Transfers

187. There is additional evidence of Wells Fargo's knowledge of the scammers' modus operandi. Millions of dollars consumers paid into the various shell company accounts were diverted to the individual fraudsters to maintain their lavish personal lifestyle, or to funnel monies out of the Enterprises into real estate and investments that they would purchase via trusts and corporations. For

Case No. _____
RECEIVER'S COMPLAINT

example, in July 2014 emails between Triangle's Phillips and Tim Morgan, a Wells Fargo Private Mortgage Banker, Phillips notified Morgan that Phillips would receive a $2 million wire from Hardwire (a defendant in the FTC case), and then asked, "will this money need to be 'seasoned' before being used for a house purchase?"

188.  As set forth herein, Peikos and/or Barnett, and Phillips controlled the Apex and Triangle Enterprises (which are now Receivership Entities), and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo).  At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

189.  Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

190.  The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

191.  Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud consumers;

192.  Phillips, Peikos and Barnett engaged in the free-trial schemes knowing that their assets and the assets of the Receivership Entities they controlled

Case No. _____
RECEIVER'S COMPLAINT

were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;They retained possession or control of the assets after the transfers.

193. The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

194. The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

195. The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

196. The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

197. When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

198. Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

199. The transfers were of substantially all the Receivership Entities' assets;

200. The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

201. The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

202. Despite knowing that Phillips, Peikos and Barnett had no lawful claim

Case No. _____
RECEIVER'S COMPLAINT

to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

203. Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

204. Wells Fargo knowingly aided and abetted the fraudulent transfers from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

205. In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

206. Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities and thus constitute fraudulent transfers which must be returned to the Receivership Entities.

## VIII.  KNOWING VIOLATIONS OF BANKING LAWS AND PROCEDURES

207.  Wells Fargo repeatedly and knowingly violated banking rules and regulations in its assistance and facilitation of the Apex and Triangle Enterprises, which is further evidence that Wells Fargo knew exactly what it was doing to assist a fraud.  The lengths to which Wells Fargo went to substantially aid and abet these fraudulent enterprises is evidenced by not only their willful disregard of standard banking procedures, but also Wells Fargo's continued violations of a dizzying array of banking laws designed to protect against fraud and money laundering.[14]

208.  The Bank Secrecy Act ("BSA") makes it a criminal act for banks and other financial institutions to aid and abet criminals in the laundering of money.  FinCEN is the federal regulatory agency responsible for issuing regulations to combat money laundering.  FinCEN defines money laundering as the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (*i.e.*, "clean").  Typically, it involves three steps: placement, layering, and integration.  First, the illegitimate funds are introduced into a legitimate financial system (placement).  Then, the money is moved around to create confusion, sometimes by wiring or transferring the funds through numerous accounts (layering).  Finally, it is integrated into the financial system through additional transactions until the "dirty money" appears "clean" (integration).[15]

209. Under the BSA, banks must comply with certain Customer Identification Program (CIP) requirements when opening new accounts, including

---

[14] Plaintiff is not bringing any claims for violating the Bank Secrecy Act or related regulations, nor is he alleging that an express or implied duty arose to Plaintiff based on Wells Fargo's BSA violations.  Wells Fargo's duties directly arose to the Receivership Entities as Wells Fargo's customers.

[15] *See* "History of Anti-Money Laundering Laws," FinCEN, *available at* https://www.fincen.gov/history-anti-money-laundering-laws.

---

Case No. _____
RECEIVER'S COMPLAINT

maintaining account-opening procedures detailing the identifying information that must be obtained from each customer. As an established nationwide banking system, Wells Fargo and its bankers knew what these requirements were.

210. Section 326 of the USA PATRIOT Act was enacted following the 9/11 terrorist attacks and jointly implemented by the federal banking regulators, requires that banks to meet minimum standards with regard to collection of the name, address, date of birth and tax identification number or other means of positive identification for all customers for which it opens an account.

211. A circular issued jointly by the then four federal bank regulatory agencies, joining with FinCEN and the Department of Treasury stated that:

> "a bank's CIP **must** include risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable. ***It is critical that each bank develop procedures to account for all relevant risks including those presented by the types of accounts maintained by the bank***, the various methods of opening accounts provided, the type of identifying information available, and the bank's size, location, and type of business or customer base. ***Thus, specific minimum requirements in the rule, such as the four basic types of information to be obtained from each customer, should be supplemented by risk-based verification procedures, where appropriate, to ensure that the bank has a reasonable belief that it knows each customer's identity.*** (Emphasis added.)

212. Additionally, Wells Fargo was required as a part of federally-mandated account opening process to understand the business/account use ("Know Your Customer"), and to add extra steps in due diligence, especially where, as was the case with both Triangle and Apex, high risk existed: Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD").

213. During the Relevant Period, it was standard industry practice (and expected by banks of Wells Fargo's size) to provide its branch employees with tailored training on how to comply with these laws and regulations, including how recognize and escalate suspicious activity in their roles.

---

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-83**

214.   Wells Fargo was required to train its employees on how to comply with the BSA and USA PATRIOT Act, including but not limited to:

- The importance of getting accurate identity information and beneficial owner identification;

- The ability to identify and act upon red flags for suspicious activity, including but not limited to

  o  Suspicious designation of beneficiaries, assignees or joint owners
  o  Suspicious use of multiple accounts
  o  Transactions out-of-pattern for the customer or business situation
  o  Transactions that don't make economic sense

- Understanding of various types of activity that require reporting in a number of categories including:

  o  31-Fraud, including
     ▪  e-credit/debit card
     ▪  h-mass marketing
     ▪  i-pyramid scheme

  o  33-Money Laundering
     ▪  d-suspicious designation of beneficiaries, assignees or joint owners
     ▪  h-suspicious use of multiple accounts
     ▪  l-transactions out-of-pattern for customers

  o  34-Identification/Documentation.

215.   The regulatory requirements under the BSA placed central importance on vigilantly monitoring to identify and verify customers and beneficial owners, to understand the nature and purpose of customer relationships to develop an accurate customer risk profile, and to undertake ongoing monitoring for reporting suspicious transactions and to maintain and update customer information.

216.   In a branch system, like Wells Fargo maintained, the branch employees were required to have a central role in complying with the law and related regulations.   Among other things, branch employees were typically the

primary source of reporting suspicious activity up the chain within Wells Fargo to enable the bank to determine whether it needed to take steps to fulfill its obligations to report such activity externally (to FinCEN). Wells Fargo routinely failed to follow the requirements of BSA/AML/CIP for Apex and Triangle. Wells Fargo's Community Bank gave its branches wide discretion and deficient oversight in performing these tasks, while at the same time incentivizing branch employees to open accounts and cross-sell under a high-pressure quota system.

217. As examples, Wells Fargo knowingly allowed accounts to have incorrect addresses and use identical Wyoming mail drops (in the case of Apex). Instead of identifying and verifying actual beneficial owners of the shell companies, Wells Fargo knew that actual owners were different from the listed owners, and undertook any number of steps to mask or paper over such inconsistencies.

218. Wells Fargo deliberately failed to compile an adequate customer risk profile for all of the shell companies. If the Bank had used commercially reasonable risk assessment techniques, it would never have opened these accounts or would have immediately closed the accounts after it processed transactions that were clearly suspicious.

219. Further, Wells Fargo knew that Apex and Triangle shell companies were routinely executing suspicious transactions using their Wells Fargo accounts, such as transferring funds between accounts and to external accounts in "round" dollar amounts—that is, round numbers with zeros on the end (*e.g.*, $100,000). An abundance of "round" dollar transactions (which the Apex and Triangle shell companies certainly had) is indicative of money laundering and has been referred to as "a fingerprint of fraud." *See* Nigrini, Mark J., "Round numbers: A fingerprint of fraud," Journal of Accountancy (May 1, 2018), *available at* https://www.journalofaccountancy.com/issues/2018/may/fraud-round-numbers.html.

---

65

Case No. _____
RECEIVER'S COMPLAINT

220. As even the most cursory reviews of monthly account statements made abundantly clear, Wells Fargo was well aware of the Apex and Triangle shell companies' high chargeback rates, which were well in excess of the permitted chargeback rates under Visa/Mastercard rules for high-risk merchants.

221. Regardless of the vantage point from which the Apex and Triangle Enterprises are viewed, Wells Fargo knew that they were high-risk relationships and accounts for multiple reasons. As such, Wells Fargo knew that they were required to classify the family of Apex and Triangle accounts as high risk for misuse and as such, subject them to heightened oversight and enhanced due diligence.

222. Further, Wells Fargo was well aware that Apex and Triangle were classified as high risk by merchant processors, including Wells Fargo's own merchant processing group. This provided yet another reason for active monitoring of these accounts by Community Bank employees and branches.

223. Indeed, the Bank's very own Merchant Processing Agreement and Credit Risk Guidelines confirm the many risks created by businesses like Apex and Triangle. The Processing Agreement specifically prohibits the solicitation of merchants engaged in certain unacceptable business practices, because they were presumptively illegal, violated card association rules, or created excessive risk exposure. The prohibited categories included, for example, debt consolidation services, Get Rich Quick Opportunities, and any merchant engaged in any form of deceptive marketing practices.

224. Wells Fargo also prohibited the solicitation of merchants selling nutraceuticals through free trial offers, unless specifically pre-approved by Wells Fargo. And when Wells Fargo periodically evaluated, and on several occasions reviewed, completed applications, for the Apex and Triangle Enterprises Wells Fargo declined to provide merchant processing. (The exception was the small amount Triangle legacy merchant processing through a third party, which

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-86**

apparently stayed below Wells Fargo's radar for years – either by mistake or policy design.)

225. Wells Fargo's Credit Risk Guidelines (the "Guidelines") require that merchants be scrutinized for evidence of deceptive marketing practices and, if found, immediately compel the merchant to eliminate these practices or terminate the merchant. The Guidelines provide numerous examples of common warning signs of potential deceptive marketing practices, almost all of which the Enterprises employed. These include negative options and industries where deceptive marketing practices were prevalent, such as nutraceuticals. Further, the Guidelines specifically warn about merchants opening multiple accounts, particularly via multiple shell companies with the same or similar principals (in some cases, hired "mules" with little or no business involvement which may be submitted to obscure the true ownership).

## IX. WELLS FARGO EXECUTIVES AUTHORIZED AND RATIFIED BANKER PARTICIPATION IN THE FRAUDS

226. Evidence of Wells Fargo's executives' pressure on managers and employees to participate in the fraudulent misconduct alleged herein also is set forth in numerous governmental and private lawsuits. In the SEC's complaint against Carrie L. Tolstedt, Senior Executive Vice President of Community Banking for Wells Fargo filed on November 13, 2020, the SEC alleged that for several years, until mid-2016, Wells Fargo opened millions of accounts or sold products that were unauthorized or fraudulent, and others that were unneeded and unwanted by retail banking customers.

227. The Community Bank, which Tolstedt led from 2007 through mid-2016, was responsible for managing the large network of bank branches, referred to within Wells Fargo as "stores," as well as other sales channels through which Wells Fargo offered its products. The branches employed, among others, bankers who were generally responsible for offering accounts and financial products or

Case No. _____
RECEIVER'S COMPLAINT

services to customers. The bankers reported up through managers of the branches to Regional Bank Executives, who reported to Tolstedt. In addition, the persons who managed the various groups organized around products that the Community Bank offered also reported up to Tolstedt.

228. The Community Bank also had financial and risk officers who reported to Tolstedt and assessed the Community Bank's business progress and its risks. Those persons provided information to the financial and risk officers for the Company overall, often after first discussing the information with Tolstedt. In addition, at least quarterly, Tolstedt met with the CEO (and frequently others) to discuss the business of the Community Bank and to make strategic plans.

229. During the Relevant Period, Wells Fargo's CEO and other high-level executives and directors of the Bank encouraged employees to deliberately ignore indicia of fraud if it helped the Bank's bottom line—instructions which led to Wells Fargo and its employees aiding and abetting the Enterprise schemes.

230. Other higher-level employees and agents of Wells Fargo in the Community Bank branches encouraged and instructed their bankers and employees to do the same. These higher-level employees and agents included:

- David Hannig, who was an Assistant Vice President and Business Sales Consultant for Wells Fargo Merchant Services, and who worked directly with Apex's Barnett, Peikos, Camacho, and Carr;

- Lea Walker, who was a Business Specialist and subsequently an Assistant Vice President at Wells Fargo in the Keller, TX branch (910 Keller Parkway, Keller, TX 76248), and who worked directly with Triangle's Phillips;

- Haiman Albana, who was a Business Relationship Manager at Wells Fargo associated in the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips; and

- Brian Cording, who was a Senior Business Relationship Manager at Wells Fargo associated with the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips.

231. These are just some of the Wells Fargo employees who knowingly

Case No. _____
RECEIVER'S COMPLAINT

acted in collaboration and collusion with Apex and Triangle in furtherance of the unlawful schemes. Wells Fargo authorized or ratified the acts of these employees as alleged herein.

## X.   INFORMATION ALLEGATIONS

232.   Allegations made in this Complaint are based on information and belief, except those allegations that pertain directly to the Receiver, which are based on his personal knowledge. The Receiver's information and belief is based on, *inter alia,* the investigation and review of publicly filed documents and from the Receiver appointed in the FTC actions described above and his attorneys. Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by the Receiver or his counsel.

## XI.   DELAYED DISCOVERY BY THE RECEIVER AND ESTOPPEL

233.   First and foremost, the Receiver's discovery of the Receivership Entities' claims against Wells Fargo was impossible until his appointment; prior to that, the Receivership Entities were controlled by Phillips, Barnett, and Peikos, which made discovery of their wrongdoing impossible. The statutes of limitations were tolled until the time of the Receiver's appointment.

234.   The statutes of limitations were tolled past that point, however, because the Receiver did not (and could not have) discovered the fraud immediately upon his appointment. The Receiver only discovered Wells Fargo's misconduct related to the Apex and Triangle Enterprises in 2019. There were two primary reasons for this: (1) Wells Fargo took steps to conceal its role in the Apex and Triangle frauds; and (2) the Receiver did not receive responses to subpoenas it issued to Wells Fargo until June and July of 2019, before which there was insufficient documentary evidence for the Receiver to discover the claims. Once the Receiver and his counsel had the documents in hand, they were finally able to

piece together Wells Fargo's role in facilitating the Apex and Triangle frauds, and to confirm that the Bank knew of the fraudulent nature of the Apex and Triangle Enterprises.[16]

235. Because of Phillips's, Peikos's and Barnett's efforts to conceal the Apex and Triangle frauds from consumers, along with the role Wells Fargo played in those frauds, Wells Fargo is estopped from contending that any of the Receiver's claims are barred by applicable statutes of limitations.

## XII. CAUSES OF ACTION

### First Cause of Action

### (Aiding and Abetting Fraud)

236. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

237. Phillips, Peikos, and Barnett, via the Apex and Triangle Enterprises, operated online "free trial" scams, which falsely advertised that consumers would only be charged the cost of shipping in exchange for a trial of a product. In reality, the consumers were being signed up for a subscription service and charged for the full price of the product on the next billing cycle unless they affirmatively canceled the subscription.

238. Wells Fargo knew that the Apex and Triangle Enterprises were engaged in a high-risk, fraudulent business, and Wells Fargo knew that they were required to terminate or further investigate that business pursuant to the BSA, FinCEN regulations, and their own internal policies. Multiple Wells Fargo employees across multiple branches deliberately turned a blind eye to the Apex and Triangle frauds, because the large number of accounts needed by the Apex and Triangle Enterprises helped them to meet otherwise-unattainable sales quotas set

---

[16] The Receiver did not file until now pursuant to a Tolling Agreement with Defendants.

by Wells Fargo's corporate headquarters. Wells Fargo's corporate policies encouraged sales misconduct by setting unrealistic sales goals and requiring bankers to open as many accounts, and to sell as many services and bank products, as possible.

239. Wells Fargo provided substantial assistance to the intentional torts committed by the primary wrongdoers by, among other things, creating accounts for shell companies used by the Apex and Triangle Enterprises to secure critical merchant processing services; assisting the Apex and Triangle principals in hiding their ownership of those accounts from the merchant processors, so that the principals could continue to secure merchant processing services for the underlying fraud; and allowing Apex and Triangle to launder money obtained from defrauded consumers through their Wells Fargo accounts.

240. The substantial assistance that Wells Fargo provided to the Apex and Triangle frauds proximately caused substantial damages to the Receivership Entities in an amount to be proven at trial. These damages include, but are not limited to: the fees charged by Wells Fargo for their banking services, which directly furthered the fraudulent schemes and depleted the funds of the Receivership Entities; the Receivership Entities' legal obligations to satisfy the FTC Judgments, which require the Receivership Entities to make whole the consumers who were defrauded as a result of the Apex and Triangle frauds that Wells Fargo facilitated; all fees and costs necessitated by the need to establish a Receivership; and the costs of defending the action by the FTC (including the resulting Receiverships).

241. Wells Fargo's conduct was intentional, fraudulent, willful, malicious, and intended to injure the Receivership Entities, by virtue of which the Receiver prays for an award of exemplary and punitive damages.

## **Second Cause of Action**

### **(Conspiracy to Commit Fraud)**

242.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

243.   Philips, Peikos, and Barnett engaged in the primary wrongs described herein.

244.   Wells Fargo entered into a conspiracy with Phillips, Barnett, and Peikos to perpetuate their frauds.  Wells Fargo agreed to assist the frauds by, among other things, and as described herein, (i) opening accounts for dozens of shell companies, which Wells Fargo knew were owned and controlled by Apex and Triangle's principals, (ii) executing reference letters that gave legitimacy to the shell companies and allowed them to secure merchant processing services, (iii) accepting as deposits funds which Wells Fargo knew were fraudulently obtained from consumers, (iv) transferring those funds to other accounts (including foreign accounts), which allowed the Apex and Triangle principals to launder the money they derived from the frauds, and (v) continually providing atypical banking services.

245.   The Receivership Entities suffered damages that were proximately caused by Wells Fargo's participation in the conspiracy (without which the Apex and Triangle Enterprises could not have functioned) and which are described herein.

### Third Cause of Action

### (Breach of Fiduciary Duty)

246.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

247.   Wells Fargo owed fiduciary duties to the Receivership Entities pursuant to their bank/client relationships.  Wells Fargo had a duty to their customers, the Receivership Entities, to discharge its duties in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-92**

248.   Wells Fargo knew that Phillips, Peikos, and Barnett were engaging in fraud as described herein.

249.   Wells Fargo breached the fiduciary duties it owed to the Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities. Specifically, Wells Fargo (i) diverted funds that belonged to the Receivership Entities into Phillips, Peikos, and Barnett's pockets, and (ii) failed to, or refused to, fulfill its "know your customer" obligations, conduct due diligence, and abide by other banking regulations and standard practices.

250.   Wells Fargo's breaches of the fiduciary duties it owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities as described herein.

### Fourth Cause of Action

### (Aiding and Abetting Breach of Fiduciary Duty)

251.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

252.   At all material times, Phillips, Peikos, and Barnett owned or controlled their respective Receivership Entities.  As the owners of the Triangle or Apex Enterprises, they had a fiduciary relationship with the Receivership Entities because the entities were under their complete control.  Phillips, Peikos, and Barnett owed the Receivership Entities a fiduciary duty to act in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

253.   Phillips, Peikos, and Barnett breached their fiduciary duties owed to their respective Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities by engaging in the primary wrongs described herein and by diverting the Receivership Entities' assets into their own pockets with no

Case No. _____
RECEIVER'S COMPLAINT

legitimate or justifiable business purpose.

254.   Phillips, Peikos, and Barnett's breaches of the fiduciary duties they owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities, as described herein, in an amount to be proven at trial.

255.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's breaches of their fiduciary duty and rendered substantial assistance in regard to such breaches by affording them or their agents special privileges, by enabling and allowing continuous, suspicious, and obviously fraudulent banking activity, and by failing to adhere to federal, local and internal regulatory banking procedures and policies.

256.   Wells Fargo is liable for all damages actually and proximately caused to the Receivership Entities through its acts and omissions, including those damages described above, in an amount to be proven at trial.

## Fifth Cause of Action

### (Aiding and Abetting Conversion)

257.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

258.   Phillips, Peikos, and Barnett wrongfully asserted dominion and control over the funds in the Apex and Triangle Enterprise accounts, which rightfully belonged to their respective Receivership Entities, by misappropriating consumer funds from those accounts and using the funds for their personal use and benefit.  Phillips, Peikos, and Barnett's actions resulted in the conversion of funds belonging to the Receivership Entities.

259.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's misappropriation of the Receivership Entities' funds, because those funds were wrongfully transferred into, between, and out of accounts held by Wells Fargo.

260.   Wells Fargo rendered substantial assistance to Phillips, Peikos, and Barnett in their conversion of the Receivership Entities' funds by executing their

---

74

Case No. _____
RECEIVER'S COMPLAINT

transactions, even though doing so violated banking regulations and other prudent and sound banking practices and procedures.

261. Wells Fargo is therefore liable for all damages actually and proximately caused to the Receivership Entities based on the conversion of funds undertaken by Phillips, Peikos, and Barnett, in an amount to be proven at trial.

## Sixth Cause of Action

### (Violation of California Penal Code § 496)

262. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

263. Penal Code § 496(c) permits "any" person who has been injured by a violation of § 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit. Penal Code § 496(a) creates an action against "any" person who (1) receives "any" property that has been obtained in any manner constituting theft, knowing the property to be so obtained, or (2) conceals, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so obtained.

264. Under Penal Code § 7, "person" includes a corporation as well as a natural person. Wells Fargo Bank, N.A., as a national banking association, and Wells Fargo & Co., as a corporation, are "persons" capable of violating § 496(a).

265. Phillips, Peikos, and Barnett obtained consumer funds by theft under Penal Code § 484, because those funds were obtained "knowingly and designedly, by any false or fraudulent representation or pretense," from consumers. These funds were so obtained because, among other things, consumers were falsely informed they were signing up for free trials but ended up paying for products or subscriptions without their consent.

266. Wells Fargo, knowing of their frauds, deliberately concealed and aided in concealing those frauds by, *inter alia*, hiding the identity of the individuals who were committing the fraud, and by setting up and maintaining the fraudulent

Case No. _____
RECEIVER'S COMPLAINT

accounts as described herein.

267. Additionally, Wells Fargo knowingly transferred property that was wrongfully obtained from consumers to Phillips, Peikos, Barnett, or third parties at their behest, as described herein.

268. As a direct and proximate result of Wells Fargo's violations of Penal Code § 496(a), the Receivership Entities were deprived of assets. Pursuant to Penal Code § 496(c), the Receiver seeks statutory treble damages, costs of suit, and reasonable attorney's fees.

**Seventh Cause of Action**

**(Violation of California Business and Professions Code § 17200)**

269. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

270. Business & Professions Code §§ 17200, et seq., prohibit acts of "unfair competition," a term which is defined by Business & Professions Code § 17200 as including "any unlawful, unfair or fraudulent business act or practice…."

271. Defendants have violated Business & Professions Code section 17200's prohibition against engaging in unlawful, unfair, and/or fraudulent business practices by, *inter alia*, aiding and abetting fraud, conspiring to commit fraud, and violating California Penal Code § 496.

272. The Receivership Entities suffered injury in fact and lost money as a result of Wells Fargo's substantial assistance in these unlawful business acts and practices.

273. As a result of Defendants' violations of Business & Professions Code § 17200, et seq., the Receiver is entitled to equitable relief in the form of full restitution of all monies wrongfully paid pursuant to the fraudulent schemes aided and abetted by Defendants.

Case No. _____
RECEIVER'S COMPLAINT

## **Eighth Cause of Action**

### **(Aiding and Abetting Fraudulent Transfer/Voidable Transaction)**

274.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

275.   Prior to the establishment of the Receiverships, the physical operations of the Receivership Entities with which Defendants did business were primarily in the State of California. The *FTC v. Triangle* and *FTC v. Apex* actions in which the Receiver was appointed were then filed in the United States District Court for the Southern and Central Districts of California, respectively.

276.   Effective January 1, 2016, California (similar to the majority of other States) adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at California Civil Code §§ 3439, et seq.  The UVTA defines a voidable transfer to include the following types of transfer or obligations incurred by a debtor:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1)  With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B)  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
>
> (b)  In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
>
> (1)  Whether the transfer or obligation was to an insider.
>
> (2)  Whether the debtor retained possession or control of the property transferred after the transfer.

---

77

Case No. _____
RECEIVER'S COMPLAINT

(3)  Whether the transfer or obligation was disclosed or concealed.

(4)  Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5)  Whether the transfer was of substantially all the debtor's assets.

(6)  Whether the debtor absconded.

(7)  Whether the debtor removed or concealed assets.

(8)  Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9)  Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11)  Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

277.  California Civil Code §3439.05(a) provides that transfers are voidable as to present creditors as follows:

A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

278.  The UVTA provides the following definitions, in relevant part:

(b) "Claim," except as used in "claim for relief," means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(c) "Creditor" means a person that has a claim, and includes an assignee of a general assignment for the benefit of creditors, as defined in Section 493.010 of the Code of Civil Procedure, of a debtor.

(d) "Debt" means liability on a claim.

(e) "Debtor" means a person that is liable on a claim.

---

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-98**

279. Phillips, Peikos and Barnett are "debtors" under the UVTA because they are liable to the Receivership Entities and consumers who have a right to reimbursement for their claims of consumer fraud under the FTC judgments. Said Receivership Entities and consumers are "creditors" with "claims" under the meaning of the UVTA.

280. Prior to enactment of the UVTA, and relevant to transfers by Defendants prior to 2016, the California Uniform Fraudulent Transfer Act ("UFTA"), formerly codified at California Civil Code §§ 3439, et seq. ("UFTA"), provided in §3439.04:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

281. A "transfer" was defined in the UFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Civ. Code, former § 3439.01, subd. (i)). A similar definition is found as subdivision (m) of the UVTA with one minor revision: "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license and creation of a lien or other encumbrance."

282. As set forth herein, Phillips, Peikos, and/or Barnett controlled the

Case No. _____
RECEIVER'S COMPLAINT

Receivership Entities and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo). At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

283. Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, and that they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

284. The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

(a) Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud creditors (including the Receivership Entities and consumers);

(b) Phillips, Peikos and Barnett engaged in free trial schemes knowing that their assets and the assets of the Receivership Entities they controlled were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

(c) Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;

(d) Phillips, Peikos and Barnett retained possession or control of the assets after the transfers;

(e) The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the

shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

(f) The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

(g) The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

(h) The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

(i) When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

(j) Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

(k) The transfers were of substantially all the Receivership Entities' assets;

(l) The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

(m) The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

285. Despite knowing that Phillips, Peikos and Barnett had no lawful claim to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

286. Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

287. Wells Fargo knowingly aided and abetted the fraudulent transfers

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-101

from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

288.   In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

289.   Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities, and thus these payments constitute fraudulent transfers which must be returned to the Receivership Entities.

290.   Accordingly, the Receiver seeks to recover as fraudulent transfers any (a) Receivership Entity funds taken from the Wells Fargo accounts and transferred to Phillips, Peikos, and Barnett as a result of the fraudulent schemes and b) payments to Wells Fargo from Receivership Entities in connection with setting up and maintaining the fraudulent accounts.

291.    The Receiver therefore asks that the Court order Wells Fargo to pay to the Receiver all fraudulent transfers they received or transferred, as alleged herein and as further shown by proof at trial. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

## **Ninth Cause of Action**

### **(Unjust Enrichment/ Constructive Trust)**

292.   The Receiver repeats and realleges the allegations of each and every

one of the prior paragraphs, inclusive, as if fully set forth herein.

293.   Wells Fargo received payments (whether denominated as "fees," "charges," "fines," "reserves," or otherwise) from the Receivership Entities' accounts used in connection with the processing and maintenance of accounts, and also transferred fraudulently-obtained funds to Peikos, Barnett, and Phillips.

294.   The payments received by Wells Fargo were made in furtherance of the fraudulent schemes and Wells Fargo has been unjustly enriched by the amount of these payments.

295.   In addition, through Wells Fargo's knowing and substantial assistance in the wrongful transfer of account funds from the Receivership Entities, entities and individuals who owned or controlled the Receivership Entities were unjustly enriched in the amount of these transfers.

296.   Because of Wells Fargo's own unjust enrichment and its knowing assistance in unjustly enriching the perpetrators of the frauds, the Receiver seeks an equitable remedy ordering that Wells Fargo is holding, and shall continue to hold, in constructive trust for the Receiver, the amount of the payments and transfers to itself, as well as funds in Wells Fargo accounts which were wrongfully transferred to third parties, including those who owned or controlled the Receivership Entities.

297.   The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

### Tenth Cause of Action (In the Alternative)

### (Negligent Supervision)

298.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

299.   In the alternative to Causes of Action One through Nine, Wells Fargo negligently supervised the Wells Fargo employees named and/or described herein.

300.   Wells Fargo knew or should have known that the policies and

Case No. _____
RECEIVER'S COMPLAINT

procedures permeating its Community Bank regarding sales incentives and quotas were deficient and created a sales culture pressuring its employees into opening accounts without concern for the repercussions, and which directly contributed to and incentivized branch-level employees under the fear of being terminated, aiding and abetting the Apex and Triangle frauds, cutting corners, and disregarding both applicable Bank procedures (on paper) and legal obligations when opening and monitoring accounts, and under the BSA and related rules. Wells Fargo's knowledge of its own toxic sales culture is described herein.

301. Wells Fargo also knew or should have known that a corporate policy pushing employees to open as many accounts as possible would facilitate money laundering activities, as it would make it substantially easier for the Bank's customers to open dozens of shell companies. The relevance of shell companies to money laundering and fraud is discussed herein.

302. Wells Fargo knew or should have known that its lax oversight and its implementation, design, and maintenance of proper controls to ensure branch-level compliance in the Community Bank with all legal obligations, including under the BSA, and to protect against fraudulent conduct, were deficient and would directly contribute to branch-level bankers' misconduct, by providing atypical services, assisting the frauds, and taking steps to conceal—rather than unmask or report— the Apex and Triangle Entities' fraud.

303. Wells Fargo knew or should have known that its deficient policies for the Community Bank, as detailed herein, leading to Wells Fargo's facilitation of the Apex and Triangle Enterprises' consumer fraud and money laundering activities would result in increased liabilities for, and substantial damage to, the Receivership Entities as described herein.

304. Had Wells Fargo properly supervised its employees, properly put in place appropriate policies and procedures in the Community Bank regarding sales practices and incentives, properly implemented, designed, and maintained proper

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-104**

controls to ensure branch-level compliance in the Community Bank with industry standards and norms, and/or monitored and terminated employees who engaged in misconduct (none of which occurred), the Receivership Entities would not have suffered the damages that they did.

## **Eleventh Cause of Action (In the Alternative)**

### **(Negligence)**

305.  The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

306.  In the alternative to Causes of Action One through Nine, the acts and omissions of Wells Fargo as described herein were negligent.

307.  Wells Fargo provided banking services to the Apex and Triangle Receivership Entities; as such, these entities were Wells Fargo's clients.

308.  Because the Receivership Entities were customers of Wells Fargo, the Bank owed them a duty to act with reasonable care in its dealings with, and in performing its services for, the Receivership Entities and their accounts.  That duty included, without limitation, the duty to use the requisite care, skill and diligence to detect, investigate and/or prevent the use of Wells Fargo accounts to perpetrate fraud.

309.  Wells Fargo breached this duty because, without limitation, it established corporate policies that prioritized the opening of accounts above anything else—a policy which uniquely incentivized its employees to facilitate the banking activities of shell companies, which any banker would know were key indicia of fraud and money laundering.  Despite fully understanding that the accounts opened by Apex and Triangle personnel were for shell companies used to hide the true ownership of the accounts, Wells Fargo failed to timely stop or take any action to prevent the fraud, including the transfer of Receivership Entities' assets to Phillips, Peikos, Barnett, and/or third parties.

310.  Wells Fargo's breaches of its duties proximately caused damages to

Case No. _____
RECEIVER'S COMPLAINT

the Receivership Entities in an amount to be determined at trial, because those breaches allowed Phillips, Peikos, Barnett, and/or third parties to commit massive fraud and to siphon off funds that rightfully belonged to the Receivership Entities for their own, personal use.

### Twelfth Cause of Action

### (Request for an Accounting)

311.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

312.   To ascertain the exact amounts received by Wells Fargo in connection with the Apex and Triangle Enterprises the Receiver seeks entry of an order compelling Wells Fargo to file with the Court and serve upon the Receiver an accounting, under oath, detailing: (i) the amounts received from all accounts owned or controlled by the Receivership Entities or related individuals and entities, including Peikos, Barnett, and Phillips; (ii) the current locations of the amounts, including the specific bank accounts to which any funds were transferred; and (iii) the fees which Wells Fargo obtained as a result of doing business with the Apex and Triangle Enterprises.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, the Receiver respectfully prays for judgment against Defendants as follows:

1.    For all applicable damages to the Receivership Entities proximately caused by Wells Fargo's tortious conduct, including punitive damages pursuant to California Civil Code § 3294, and treble damages pursuant to California Penal Code § 496(c); in an amount to be determined at trial;

2.    For the return of funds acquired by Wells Fargo through fraudulent transfers and/or unjust enrichment at the expense of the Receivership Entities, including, but not limited to, funds acquired as fraudulent

Case No. _____
RECEIVER'S COMPLAINT

obligations supposedly owed to the Wells Fargo by the Receivership Entities;

3.     For imposition of a constructive trust in favor of the Receiver as to all funds received by Wells Fargo from the Receivership Entities;

4.     For a judgment ordering Wells Fargo to file an accounting, under oath, as requested herein;

5.     For pre- and post- judgment interest;

6.     For attorneys' fees and costs: and

7.     For such other and further relief as the Court may deem proper.

## XIV. JURY DEMAND

The Receiver demands a jury trial.

Respectfully Submitted,

DATED: July 8, 2021        By:*/s/ Lionel Z. Glancy*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Jonathan M. Rotter
Garth A. Spencer
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com

**MCNAMARA SMITH LLP**

Logan D. Smith
Cornelia J.B. Gordon
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401
Email: lsmith@mcnamarallp.com

*Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

Case No. _____
RECEIVER'S COMPLAINT

1  **MCGUIREWOODS LLP**
   DAVID C. POWELL (SBN 129781)
2  dpowell@mcguirewoods.com
   ALICIA A. BAIARDO (SBN 254228)
3  abaiardo@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
4  San Francisco, CA 94111-3821
   Telephone: 415.844.9944
5  Facsimile: 415.844.9922

6  **MCGUIREWOODS LLP**
   KEVIN M. LALLY (SBN 226402)
7  klally@mcguirewoods.com
   355 S. Grand Avenue, Suite 4200
8  Los Angeles, CA 90071
   Telephone: 213.627.2268
9  Facsimile: 213.627.2579

10 Attorneys for Proposed Intervenor
   Wells Fargo & Company and Wells Fargo Bank N.A.
11

12                 **UNITED STATES DISTRICT COURT**

13                **CENTRAL DISTRICT OF CALIFORNIA**

14 FEDERAL TRADE                    | CASE NO. 18-cv-9573-JFW (JPRx)
15 COMMISSION,                      |
                                    | The Hon. John F. Walter
16          Plaintiff,              |
                                    |
17     vs.                          | **EXHIBIT 1 - WELLS FARGO'S**
                                    | **ANTICIPATED MOTION TO**
18 APEX CAPITAL GROUP, LLC,         | **MODIFY EXISTING ORDERS TO**
                                    | **ALIGN WITH CURRENT LAW**
19 et al.,                          |
                                    | Date:  TBA
20          Defendants.             | Time: TBA
21                                  | Div.:  TBA
22
23                                  | Complaint Filed: November 14, 2018
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Wells Fargo has been sued by the Court-appointed Receiver in this case, Thomas McNamara ("Receiver" or "McNamara") for tens of millions of dollars left unpaid by the actual Defendants to the above-captioned Federal Trade Commission ("FTC") enforcement action. Both the appointment of the Receiver and the underlying Stipulated Settlements that serve as the foundation of the Receiver's claims against Wells Fargo were founded primarily, if not entirely, upon long-prevailing, albeit erroneous, Circuit precedent that the equitable authority under Section 13(b) of the FTC Act permitted a district court to directly impose, and the FTC and court-appointed receivers to directly seek, monetary judgments for violations of the FTC Act. In *AMG Capital Mgmt., LLC,* 141 S. Ct. 1341, 1352 (2021), the Supreme Court unanimously held that Section 13(b)'s injunction provisions never empowered courts with equitable authority to award monetary relief. The Supreme Court further noted that the FTC could secure monetary recovery, in some instances, either by first proceeding administratively or under the more restrictive statutory requirements set forth in Section 19 of the FTC Act ("Section 19").

Following *AMG Capital*, Wells Fargo is in the perverse position where it is being pursued to backfill judgments that the FTC suspended against the actual wrongdoers, which were issued erroneously based on now-overturned precedent. The Receiver continues to pursue this relief in full against Wells Fargo based on authorization set forth in pre-*AMG Capital* orders that failed to tailor the scope of the receivership to align with the limitations that Section 13(b) and Section 19 impose on the Receiver's equitable authority. To rectify that error, this Court, which has kept jurisdiction over the Stipulated Settlements and has ongoing supervision responsibilities over the receivership, should make a finding that the

1

judgments were issued erroneously and should not be applied prospectively as to Wells Fargo and to modify the orders defining the terms of the receivership to bring its scope within the parameters established under current law.[1] Alternatively, if this Court concludes that the monetary judgments within the Stipulated Settlements are final orders, it first should vacate those orders as applied to Wells Fargo pursuant to Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6) and provide the remainder of the requested relief.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

#### (1) The FTC Enforcement Action and Appointment of McNamara as Receiver

On November 14, 2018, the FTC, without first proceeding administratively, filed an enforcement action against Apex Capital Group, LLC, eleven of its affiliated entities ("Corporate Defendants"), and owners Phillip Peikos ("Peikos") and David Barnett ("Barnett"; collectively "Apex"), for allegedly engaging in multiple types of fraudulent conduct in the online sale of approximately 50 products dating back to early 2014.[2] Dkt. 1. The Complaint alleged five violations of the FTC Act, 15 U.S.C. § 45(a), based on Apex's use of unfair and deceptive acts or practices, including: (1) misrepresentations of the price of trial offers; (2) misrepresentations as to whether the purchase was singular or recurring pursuant to a subscription plan; (3) the failure to include material terms of trial

_____

[1] The relief sought is narrow. Wells Fargo does not ask the Court to undo the stipulated judgments.
[2] Notably, the Complaint repeatedly references how a different major U.S. bank housed the "single, centralized account" to which all of the allegedly illicitly obtained funds were funneled. *Id*. at 12, 14, 28. It only referenced Wells Fargo when discussing how defendants on select occasions doctored Wells Fargo checks and importantly did not ascribe any wrongdoing to Wells Fargo. *Id*. at 27-28. In fact, Wells Fargo was one of dozens of banks and payment processors where the defendants had accounts that they purportedly used to advance their allegedly illicit schemes. Dkt. 31 (Preliminary Report of Receiver), pp. 15-17.

1  appointment," *citing Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th
2  Cir. 2006)); *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) (Court's authority
3  to supervise receiver is "extremely broad").

4  ### G. Rule 60(b)(5) Alternatively Requires the Orders Be Vacated as
5  ### Applied to Wells Fargo.

6  Should the Court conclude that the relevant orders are final, it should vacate
7  these orders pursuant to Rule 60(b)(5) to prevent inequitable enforcement and
8  impose the relief requested above.[15] Rule 60(b)(5) provides relief from a final
9  judgment, in situations where "applying [a judgment or order] prospectively is no
10 longer equitable." Fed. R. Civ. P. 60(b)(5). *Frew ex rel. Frew v. Hawkins*, 540
11 U.S. 431, 441 (2004);*California v. U.S. EPA*, 978 F.3d 708, 713 (9th Cir. 2020)
12 (Rule 60(b)(5) is a malleable standard; "this flexibility is a virtue"). Relief is
13 appropriate when a party seeking modification of an order establishes "that a
14 significant change in facts or law warrants revision of the decree and that the
15 proposed modification is suitably tailored to the change circumstance." *Rufo v.*
16 *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992); *Bellevue Manor Assocs. v.*
17 *U.S.*, 165 F.3d 1249, 1257 (9th Cir. 1999).

18 The *AMG Capital* decision unquestionably represents a significant change
19 in how the law relating to how the equitable scope of Section 13(b) is interpreted
20 and applied.[16] The Supreme Court detailed at length how the FTC has misapplied,

---

21

22 [15] This Court denied defendants Moskvins and SIA Transact Pro's *AMG Capital*-
23 based Section 60(b)(5) motion because the monetary judgment they previously
   stipulated to (and did not timely pay as required under the judgment) did not
   constitute a prospective judgment under Rule 60(b)(5). This is materially different
24 than the position of Wells Fargo, which is being pursued *prospectively* by a
   Receiver appointed in equity who is proceeding on an inaccurate, but correctable,
25 misapplication of the scope of its authority as set forth in this Court's prior
   injunctive relief orders. Dkt. 207, p. 4-5.
26 [16] The Supreme Court's interpretation does not constitute a change in the law, as it
27 interpreted the statute as it was always written. Instead, the change lies in
   discarding prior incorrect interpretations by lower courts, thereby replacing an
28 interpretation that was contrary to law with a correct interpretation of that law.

and the courts – including the Ninth Circuit—have misinterpreted, Section 13(b) for decades to allow monetary relief when, in fact, the plain language of the provision did not allow for such relief. *AMG Capital*, 141 S. Ct. at 1344. The Court further recognized that its holding would significantly impact pending and future FTC enforcement actions by removing what had been the FTC's principal enforcement tool and noted that if the FTC wished to seek monetary damages under Section 13(b), it needed to have Congress pass legislation that actually would allow for this. *Id*. at 1351-1352. The FTC, likewise, successfully has argued that the break with prior precedent "significantly changed the law in this Circuit," when seeking an amended Judgment pursuant to Federal Rule of Civil Procedure 59(e), after the Seventh Circuit issued its opinion. *FTC v. Credit Bureau Center, LLC*, Case No. 1:17-cv-00194, Dkt. 275 at 7 (N.D. Ill. May 6, 2021).

Simply stated, the *AMG Capital* decision has "removed the legal basis for the continuing application of the court's Order(s)" and therefore, relief should be granted under Rule 60(b)(5). *California Dept. of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1032 (9th Cir. 2008); *see also Agostini v. Felton,* 521 U.S. 203, 237 (1997) (reviewing denial of the modification of an injunction sought under Rule 60(b)(5) following a change in the Supreme Court's interpretation of the Establishment Clause, holding that trial court's exercise of "discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained.") Moreover, the requested modifications are directly tailored to the changed circumstance and are fully consistent with principles of equity. The Ninth Circuit has recognized "[an] unbroken line of Supreme Court cases makes clear that it is an abuse of discretion to deny a modification of an injunction after the law underlying the order changes to permit what was previously forbidden." *California*

---

*Rivers v. Roadway Express,* 511 U.S. 298, 312-13 (1994) ("judicial construction of a statute is an authoritative statement of what the statue meant before as well as after the decision of the case giving rise to construction").

*by & Through Becerra*, 978 F.3d 708, 713-14 (9th Cir. 2020). The need is even greater here, where the change in the law makes clear that the law always forbade what previously had been thought permissible. The failure to correctly interpret Section 13(b) resulted in an overextension of the equitable authority granted by its injunctive provisions allowing for the erroneous recovery of monetary judgments and an equally erroneous overextension of the grant of equitable powers to the receivership. *AMG Capital* makes clear that it is "no longer equitable" to continue with enforcement of these erroneous interpretations. This court, therefore, should exercise its authority under Section 60(b)(5) and modify its orders in the narrowly tailored manner requested herein to bring them in alignment with current law.

## H. This Court Should Exercise Discretion and Grant Relief Under Rule 60(b)(6) Due to the Extraordinary Circumstances Involved

Rule 60(b)(6) permits a court to vacate a judgment for "any other reason that justifies relief."[17] Fed. R. Civ. P. 60(b)(6). Relief under Rule 60(b)(6) requires that a motion "be filed within a reasonable time, and it must demonstrate 'extraordinary circumstances' justifying reopening the judgment. Extraordinary circumstances occur where there are 'other compelling reasons' for opening the judgment." *Bynoe v. Baca*, 966 F.3d 972, 979 (9th Cir. 2020). The Ninth Circuit has stated that Rule 60(b)(6)"should be liberally applied . . . so that, giving due regard to the sound interest underlying the finality of judgments, the district court, nevertheless, has power to grant relief from a judgment whenever, under all the surrounding circumstances, such action is appropriate in the furtherance of justice." *Henson v. Fid. Nat'l Fin. Servs.*, 943 F.3d 434, 443 (9th Cir. 2019).

"To assess a Rule 60(b)(6) motion 'predicated on an intervening change in

---

[17] This Court denied Moskvins/SIA Transact Pro's Rule 60(b)(6) motion primarily because these defendants were aware the law could change in their favor, used this possibility to secure a beneficial plea agreement, made a conscious and informed decision to freely enter the settlement, and could not now seek extraordinary relief because they would have been better off had they adopted a different strategy. Dkt. 207, p. 5-8. It is self-evident that none of these factors apply to Wells Fargo.

the law,' a district court must 'evaluate the circumstances surrounding the specific motion before the court." *Id*. (quoting *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009)). "A change in the controlling law can—but does not always—provide a sufficient basis for granting relief under Rule 60(b)(6)." *Henson*, 943 F.3d at 444. In what it identified as a non-exhaustive list, the Ninth Circuit set forth six factors to guide courts in their exercise of discretion under Rule 60(b)(6) when determining if a change in law equates to an extraordinary circumstance: (1) the nature of the intervening change in law, (2) the movant's interest in pursuing relief, (3) the parties' reliance on the finality of the case, (4) the delay between the judgment and the Rule 60(b)(6) motion, (5) the relationship between the original judgment and the change in law, and (6) concerns of comity. *Henson,* 943 F.3d at 445; *see also Phelps*, 569 F.3d at 444. Five of the factors favor Wells Fargo and one does not apply.[18] Additional compelling equities support the relief requested. Balancing these equities, this Court should correct the orders defining the Receiver's authority to bring them into compliance with the law because "such action is appropriate to accomplish justice." *Id*. at 445.

### (1) *AMG Capital's* Overturning of Decades of Controlling Precedent Favors Relief

The *AMG Capital* decision upended controlling precedent in the Ninth Circuit, and until 2018, every other circuit that had ruled on the issue for decades. *FTC v. Credit Bureau Center, LLC*, 937 F.3d at 776-786 (analyzing development of circuit precedents nationwide).[19] It represented a sea change in the interpretation of Section 13(b) that strongly favors relief.

---

[18] This Court previously found that comity is not an applicable concern to an *AMG Capital*-based claim. Dkt. 207, p. 8; *see also*, *Henson* 943 F.3d at 453 (comity need not be considered if inapplicable to issue under review).

[19] In fact, *AMG Capital* came from this Circuit. While it included a concurrence from Judge O'Scannlain calling for *en banc* review challenging the precedent, Judge O'Scannlain also wrote the 3-0 majority decision that quickly dismissed *AMG Capital's* claim that Section 13(b) did not allow for monetary relief by

## I. Wells Fargo Diligently Pursued Relief and Filed its Motion in an Acceptably Timely Manner

In assessing Rule 60(b)(6) factors, courts weigh the similar, but distinct, concepts of diligence and delay. Delay embodies the principle that "a change in the law should not indefinitely render preexisting judgments subject to potential challenge [but rather should be brought . . .] with a promptness that respects 'the strong public interest in timeliness and finality.'" *Id.*

As addressed more fully in its intervention motion, Wells Fargo has been both diligent and timely in pursuing relief and filing this motion. Wells Fargo was not a party to this action, and therefore lacked standing to challenge the FTC's legal authority until: (a) the *AMG Capital* decision reset the precedent as to the scope of equitable authority under Section 13(b), and (b) the Receiver filed its civil lawsuit against Wells Fargo on July 8, 2021. *See Latshaw v. Trainer Worhtam & Co.*, 452 F.3d 1097, 1103 (9th Cir. 2006) (a party who moves for relief under Rule 60(b)(6) "must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with the action in a proper fashion" (internal quotations omitted).). Additional necessary documents, including the TRO appointing the Receiver and several communications to the Court explaining the Receiver's intent to sue Wells Fargo, were only unsealed by this Court on December 10, 2021. Dkt. 213. Wells Fargo moved diligently to investigate and research the material issues, file its intervention motion, and then timely file this motion. *See, e.g., Jones*, 733 F.3d at 839 (17-month delay between intervening change in law and Rule 60(b)(6) motion had little weight in either direction); *see also Ritter,* 811 F.2d at 1402 (noting that motion filed 9 months after judgment

---

citing to almost 25 years of contrary precedent that "squarely forecloses [*AMG Capital's*] argument." *AMG Capital,* 910 F.3d 426; *see also, Federal Trade Commission v. Credit Bureau Center,* LLC, 2021 WL 4146884 *7, 10 (granting FTC's request to amend judgment under Section 54(e) following adverse Circuit ruling that that broke with precedent in finding monetary relief was not available under Section 13(b)).

EXHIBIT 1 - WELLS FARGO'S ANTICIPATED MOTION TO MODIFY EXISTING ORDERS TO ALIGN WITH CURRENT LAW

became final was "only a very brief delay"); *Bynoe v. Baca,* 966 F.3d 972, 981 (9th Cir. 2020) (7-month delay was timely).

### J.     An Order Granting Relief Would Not Upset the Parties' Interest in the Finality of the Case

This is not a motion that will "'undo the past executed effects of the judgment' thereby disturbing the parties' reliance interest in the finality of the case." *Phelps*, 569 F.3d at 1137 (quoting *Ritter v. Smith*, 811 F.2d 1398, 1402 (11th Cir. 1987)). Instead, the Court can provide the relief requested without undoing the settlements, leaving the FTC and the defendants in the same position that they would have been in had this motion not been filed. As to the Receiver, the orders relating to the scope of his authority are non-final and subject to this Court's supervision and modification. Moreover, the Receiver has no legitimate interest in proceeding prospectively based on monetary judgment orders that are known to have been erroneously issued. This factor favors Wells Fargo.

### K.     The Change in Law Due to the *AMG Capital* Decision is Directly Related to Wells Fargo's Claim for Relief

Closeness in the relationship between the initial decision and the subsequent holding that represents a change in the law makes it more likely that the change will be deemed sufficiently extraordinary to justify disturbing the finality of the original judgment." *Phelps,* 569 F.3d at 1139. As discussed at length above, the Supreme Court's *AMG Capital* decision relates directly to the scope of equitable authority under Section 13(b), to include the availability of monetary judgment – the exact issues here. The FTC conceded when addressing challenges to the monetary judgment imposed against Moskvins and SIA Transact Pro that, given *AMG Capital*, they would not have been able to obtain the same monetary judgment. Dkt. 197, p. 1. This Court, likewise, found its order imposing this judgment to be erroneous. Dkt. 207, p. 4. The same error exists with the Stipulated Settlements. Also, as discussed above, the *AMG Capital* decision profoundly impacts the scope

EXHIBIT 1 - WELLS FARGO'S ANTICIPATED MOTION TO MODIFY EXISTING ORDERS TO ALIGN WITH CURRENT LAW

of equitable authority available to the receivership now that recovery must be limited to Section 19. This factor weighs strongly in favor of relief.

### L.     Other Compelling Considerations Further Warrant Relief

In *Henson*, the court was clear that factors it enumerated "do not impose a rigid or exhaustive checklist… [and] a district court must evaluate the circumstances surrounding the specific motion before the court to ensure that justice [is] done in light of all the facts." *Id.* at 453 (internal quotations omitted). Compelling due process considerations also warrant relief. As addressed above, failure to act will mean that an agent of a United States District Court, erroneously empowered with an overbroad grant of equitable authority, will prospectively seek to recover monetary damages on behalf of the FTC, to backfill a judgment that was erroneously issued, for conduct that the FTC lacks lawful authority to secure monetary damages, while pursuing types damages expressly prohibited by the one provision within the FTC Act that potentially could allow for the recovery of monetary damages. A circumstance this unjust should never occur, but what makes the situation particularly egregious is that the party perpetuating the injustice was appointed by, is subject to the ongoing supervision of, and serves as an agent of this Court. Rule 60(b)(6) relief is warranted.

## IV.    CONCLUSION

For the reasons set forth herein, Wells Fargo requests this Court find that the monetary judgments cannot be applied prospectively to Wells Fargo and modify the orders settling forth the terms of the receivership so that they are alignment with current law.

DATED: January __, 2022              Respectfully submitted,

                                     MCGUIREWOODS LLP

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.    **CV 18-9573-JFW(JPRx)**                    Date: September 3, 2021

Title:        Federal Trade Commission -*v*- Apex Capital Group, et al.

**PRESENT:**
            **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

            **Shannon Reilly**                              **None Present**
            **Courtroom Deputy**                          **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**      **ATTORNEYS PRESENT FOR DEFENDANTS:**
                None                                              None

**PROCEEDINGS (IN CHAMBERS):**      **ORDER DENYING DEFENDANTS SIA TRANSACT**
                                    **PRO'S AND MARK MOSKVINS'S MOTION TO MODIFY,**
                                    **VACATE, OR SET ASIDE MONETARY PORTION OF**
                                    **STIPULATED PERMANENT INJUNCTION AND**
                                    **MONETARY JUDGMENT [filed 7/9/21; Docket No. 182]**

        On July 9, 2021, Defendants Sia Transact Pro ("Sia") and Mark Moskvins ("Moskvins")
(collectively, the "Transact Pro Defendants") filed a Motion to Modify, Vacate, or Set Aside
Monetary Portion of Stipulated Permanent Injunction and Monetary Judgment ("Motion").  On
August 9, 2021, Plaintiff the Federal Trade Commission (the "FTC") filed its Opposition.  On August
16, 2021, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure
and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without
oral argument.  The matter was, therefore, removed from the Court's August 30, 2021 hearing
calendar and the parties were given advance notice.  After considering the moving, opposing, and
reply papers, and the arguments therein, the Court rules as follows:

**I.      Factual and Procedural Background**

        On November 14, 2018, the FTC filed a Complaint against Apex Capital Group, LLC
("Apex"), together with its two United States based principals, Phillip Peikos ("Peikos") and David
Barnett ("Barnett"), Omni Group Ltd. ("Omni"), and ten United Kingdom registered shell
companies[1] (collectively, the "Apex Defendants").  Docket No. 1.  On May 30, 2019, the FTC filed a

_____

        [1]  The ten United Kingdom registered shell companies include Capstone Capital Solutions
Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited,
Mountain Venture Solutions Limited, Nutra Global Limited, Rendezvous It Limited, Sky Blue Media
Limited, and Tactic Solutions Limited.

FTCSER-118

First Amended Complaint, which added the Transact Pro Defendants. Docket No. 73. In the First Amended Complaint, the FTC alleged two claims against the Transact Pro Defendants: (1) credit card laundering in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") (Count VI); and (2) chargeback manipulation in violation of Section 5 of the FTC Act (Count VII).[2] The FTC alleged that the Apex Defendants engaged in a scheme to offer phony "free trials" of personal care products and dietary supplements in order to obtain consumers' credit and debit card information and then placed recurring charges on the cards without the consumers' authorization. The FTC also alleged that the Apex Defendants and Transact Pro Defendants worked together to perpetuate this scheme through credit card laundering and chargeback manipulation. The FTC sought, amongst other remedies, equitable monetary relief under Section 13(b) of the FTC Act.

On January 15, 2020, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment ("Stipulated Judgment") pursuant to a settlement between the FTC and the Transact Pro Defendants. *See* Docket Nos. 141 and 142. In the Stipulated Judgment, the FTC and the Transact Pro Defendants agreed that the Transact Pro Defendants would pay $3.5 million "within ten (10) days." Stipulated Judgment, 20:9-12. In addition, the Transact Pro Defendants "waive[d] all rights to appeal or otherwise challenge or contest the validity of this Order." *Id.*, at 2:17-18.

On April 22, 2021, in an unrelated action, the Supreme Court unanimously held that Section 13(b) of the FTC Act does not authorize the FTC to seek, or a court to award, equitable monetary relief. *AMG v. Capital Management, LLC v. Federal Trade Commission*, 141 S.Ct. 1341, 1344 (2021).

## II. Legal Standard

Federal Rule of Civil Procedure 60(b) provides for reconsideration of a final judgment or order where one or more of the following is shown: (1) "mistake, inadvertence, surprise or excusable neglect"; (2) "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; (3) "fraud . . . , misrepresentation, or misconduct by an opposing party"; (4) "the judgment is void"; (5) "the judgment has been satisfied, released, or discharged"; (6) "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

In exercising its discretion in determining whether Rule 60(b) applies, courts should be mindful that there is a compelling interest in finality of judgments and final judgments should not be disturbed lightly. *See Matton Steamboat Co. v. Murphy*, 319 U.S. 412, 415 (1943) ("The purpose of statutes limiting the period for appeal is to set a definite point of time when litigation shall be at an end, unless within that time the prescribed application has been made; and if it has not, to advise prospective appellees that they are freed of the appellant's demands"); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994) (Rule 60 "preserves a balance between serving

---

[2] On September 11, 2019, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment as to the Apex Defendants pursuant to a settlement between the FTC and the Apex Defendants. *See* Docket Nos. 120 and 121.

Initials of Deputy Clerk ___sr___

the ends of justice and ensuring that litigation reached an end within a finite period of time"). Thus, "[r]econsideration for any of the reasons set forth in Rule 60(b) is an 'extraordinary remedy that works against the interest of finality and should be applied only in exceptional circumstances.'" *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, 2015 WL 11201243, at *7 (C.D. Cal. Nov. 4, 2015) (citations omitted). "Motions for relief from judgment pursuant to Rule 60(b) are addressed to the sound discretion of the district court and will not be reversed absent an abuse of discretion." *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004).

## III. Discussion

In light of the Supreme Court's holding in *AMG*, the Transact Pro Defendants now seek to set aside that portion of the Stipulated Judgment requiring the Transact Pro Defendants to pay $3.5 million in equitable monetary relief on the grounds that: (1) it is void for lack of jurisdiction pursuant to Rule 60(b)(4); (2) prospective enforcement of the equitable monetary relief portion of the Stipulated Judgment would be inequitable pursuant to Rule 60(b)(5); and (3) the profound change in law announced by the Supreme Court in *AMG* creates "extraordinary circumstances" necessitating relief pursuant to Rule 60(b)(6). The FTC argues that the Transact Pro Defendants' Motion is meritless, and that the Transact Pro Defendants settled despite knowing that the Supreme Court was reviewing the issue of whether Section 13(b) of the FTC Act authorized the FTC to seek equitable monetary relief.

### A. Rule 60(b)(4)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment pursuant to Rule 60(b)(4). Specifically, the Transact Pro Defendants argue that because Section 13(b) never permitted the FTC to recover monetary relief, that portion of the Stipulated Judgment is invalid because the Court lacked jurisdiction to enter it. The FTC argues that the Transact Pro Defendants waived their right to challenge the validity of the Stipulated Judgment. In addition, the FTC argues that specific provisions of the FTC Act are not the only source of the Court's jurisdiction over this action, and, as a result, a misinterpretation of those provisions cannot render the Stipulated Judgment void.

As the Supreme Court held in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010), "[a] judgment is not void . . . simply because it is or may have been erroneous." "Instead, Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.* at 271 (citations omitted). "Total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction, and only rare instances of a clear usurpation of power will render a judgment void." *Id.* (*quoting United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990)) (internal alterations and quotation marks omitted). "[T]he scope of what constitutes a void judgment is narrowly circumscribed, and judgments are deemed void only where the assertion of jurisdiction is truly unsupported." *Hoffmann v. Pulido*, 928 F.3d 1147, 1151 (9th Cir. 2019). For example, in *Hoffmann*, the Ninth Circuit denied the plaintiff relief under Rule 60(b)(4), holding that although the magistrate judge lacked statutory authority to dismiss his complaint, the dismissal was "[a]t worst, . . . an error regarding the contours of a magistrate judge's authority pursuant to 28 U.S.C. § 636," which "is not equivalent to acting with total want of jurisdiction and does not render the judgment a complete nullity." *Hoffman*, 928 F.3d

Initials of Deputy Clerk __sr__

at 1151. The Ninth Circuit held that because there was "plainly an 'arguable basis'" for the magistrate judge's assertion of jurisdiction – namely, that magistrate judges had routinely dismissed actions in similar situations prior to a recent Ninth Circuit decision prohibiting the practice – the judgment did not "fall into the narrowly circumscribed set of void judgments" under Rule 60(b)(4). *Id.* Similarly, in *United States v. Philip Morris USA Inc.*, 840 F.3d 844, 850 (D.C. Cir. 2016), the D.C. Circuit held that a court's authority to fashion relief under a particular statute is "fundamentally different from a court's subject matter jurisdiction over a case and from its personal jurisdiction over the parties, both of which concern the power to proceed with a case at all." As a result, the D.C. Circuit concluded that "Rule 60(b)(4) does not permit relief where a court has exceeded its remedial authority" because "[s]uch errors are simply not the type of fundamental defects the [Supreme] Court had in mind in *Espinosa*." *Id.* at 276 (*citing Boch Oldsmobile, Inc.*, 909 F.2d at 662 ("Consent decrees that run afoul of the applicable statutes lead to an erroneous judgment, not to a void one")).

In this case, the Court concludes that the portion of the Stipulated Judgment granting the FTC equitable monetary relief was erroneous because it was not authorized by Section 13(b). However, the Court also concludes that portion of the Stipulated Judgment was not void within the meaning of Rule 60(b)(4) because, as in *Hoffman*, there was plainly an "arguable basis" for the Court's exercise of jurisdiction in issuing the Stipulated Judgment, namely that the Ninth Circuit at the time construed Section 13(b) as authorizing courts to fashion equitable monetary relief. *See, e.g., Federal Trade Commission v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). In addition, the Court agrees with the reasoning of the D.C. Circuit in *Philip Morris* that Rule 60(b)(4) does not permit relief where a court has merely exceeded its remedial authority. Otherwise, "[c]omplex remedial schemes in voting rights, securities fraud, affirmative action, prison conditions, and scores of other cases could all be challenged [under Rule 60(b)(4)] on the ground that the remedies imposed were, in one litigant's view, unauthorized by the statute at issue." *Philip Morris*, 840 F.3d at 851. Such a broad reading of Rule 60(b)(4) would contravene the Supreme Court's warning in *Espinosa* that the list of defects rendering a judgment void must be "'exceedingly short,' lest 'Rule 60(b)(4)'s exception to finality swallow the rule.'" *Id.* (*quoting Espinosa*, 559 U.S. at 270) (internal alterations omitted).

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(4).

### B.    Rule 60(b)(5)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment because Rule 60(b)(5) permits a court to vacate a judgment when "applying it prospectively is no longer equitable." Because the Transact Pro Defendants never paid the $3.5 million in equitable monetary relief, they argue that the equitable monetary relief portion of the Stipulated Judgment is prospective. The FTC argues that the overwhelming weight of authority establishes that monetary judgments are not "prospective" within the meaning of Rule 60(b)(5).

Rule 60(b)(5) provides that a court may relieve a party from a final judgment where "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." However, the portion of Rule 60(b)(5) that provides a court may relieve a party from final judgment where

"applying it prospectively is no longer equitable" only applies to prospective injunctive relief, and not the monetary judgment challenged by the Transact Pro Defendants. *See California by & though Becerra v. U.S. Environmental Protection Agency*, 978 F.3d 708, 713-17 (9th Cir. 2020) (discussing Rule 60(b)(5) as the standard for modifying an injunction "with prospective effect," in contrast to "judgments that offer a present remedy for a past wrong"). Indeed, a provision of an order only has "prospective application" under Rule 60(b)(5) if it is "executory" or involves "the supervision of changing conduct or conditions." *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138-39 (D.C. Cir. 1988) ("That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application'"). Monetary judgments are not executory and do not require the supervision of changing conduct. *See, e.g., Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980) (contrasting provisions "that have prospective effect . . . with those that offer a present remedy for a past wrong"); *United States v. Eyler*, 778 F. Supp. 1553, 1557 (M.D. Fla. 1991) (back pay award is "present" rather than "prospective" remedy). In addition, the fact that a monetary judgment has not yet been paid does not make it "prospective." *See, e.g., Stokors S.A. v. Morrison*, 147 F.3d 759, 762 (8th Cir. 1998) ("[W]hile the judgment against Morrison may be 'prospective' to the extent that he has failed to pay it in a timely manner, it is . . . not 'prospective' for purposes of Rule 60(b)(5)"); *see also* 12 *Federal Practice*, § 60.47[1][b] (2021) ("Even if the judgment debtor has not yet paid the judgment . . . it is not 'prospective,' since it is not executory and involves no judicial supervision of changing conduct or conditions"); *Flexiteek Americas, Inc. v. PlasTEAK, Inc.*, 2012 WL 5364263, *6 (S.D. Fla. Sept. 10, 2012) (concluding that judgment does not qualify as "prospective" under Rule 60(b)(5) even "where a money judgment is 'prospective' in the more general sense that it remains unpaid"), *modified on other grounds*, 2012 WL 5364247 (S.D. Fla. Oct. 31, 2012).

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(5).

**C.      Rule 60(b)(6)**

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment pursuant to Rule 60(b)(6) because there was a "profound" change in the law announced by the Supreme Court in *AMG* and this "extraordinary circumstance . . . overrides any otherwise usual consideration of finality of interest." Motion, 5: 11-16. The Transact Pro Defendants also argue that it would be a "manifest injustice" if the FTC attempts to enforce the equitable monetary relief portion of the Stipulated Judgment. The FTC argue that free, calculated, and deliberate choices, such as the one the Transact Pro Defendants made in deciding to settle this action, can never form the basis for Rule 60(b)(6) relief.

Rule 60(b)(6) is a "catch-all" provision allowing for relief from a judgment or order for "any other reason that justifies relief." *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1102 (9th Cir. 2006). This rule is used to prevent "manifest injustice" where "extraordinary circumstances" are present. *Id*. However, when "a party makes a conscious and informed choice of litigation strategy, [that party] cannot seek extraordinary relief [under Rule 60(b)(6)] merely because his assessment of the consequences was incorrect." *In re Master Key Antitrust Litig.*, 76 F.R.D. 460, 464 (D. Conn. 1977), *aff'd*, 580 F.2d 1045 (2d Cir. 1978). For example, in *Ackermann v. United States*, 340 U.S. 193 (1950), the Supreme Court reviewed a motion to vacate filed by a party who declined to appeal, only to have a similarly situated co-party successfully appeal. *Id*. at 194-95. The Supreme Court declined to give the petitioner the benefit of an appeal he chose not

to take:

> His choice was a risk, but calculated and deliberate and such as follows a free choice. Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong . . . There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

*Id.* at 198; *see also Schwartz v. United States*, 129 F.R.D. 117, 123 (D. Md. 1990) (refusing to vacate settlement under *Ackermann* where plaintiff chose "to forgo the risk of litigation and settle," reflecting an "exercise of free will"), *aff'd*, 976 F.2d 213 (4th Cir. 1992). In addition, in *Master Key*, 76 F.R.D. at 462, the remote purchaser plaintiffs sued the manufacturer defendants pursuant to Section 4 of the Clayton Act. After the parties settled, "the Supreme Court held [in an unrelated action] that remote purchasers have no cause of action against manufacturers pursuant to § 4 of the Clayton Act." *Id.* (*citing Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)). However, the court denied the defendants' subsequent Rule 60(b) motion to set aside the settlement, and concluded that "[t]he holding in *Ackermann* is controlling here." *Id.* at 464.

In this case, as in *Ackermann* and *Master Key*, the Transact Pro Defendants decided to settle this case and freely entered into the Stipulated Judgment, and, as a result, cannot be relieved of those decisions simply because those decisions now seem ill conceived. Indeed, before deciding to settle, the Transact Pro Defendants were fully aware of the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b). Specifically, on August 21, 2019, while the FTC pursued its Section 13(b) case against the Transact Pro Defendants, the Seventh Circuit held in *Federal Trade Commission v. Credit Bureau Center, LLC*, 937 F.3d 764, 767 (7th Cir. 2019), "that section 13(b) does not authorize restitutionary relief." The next day, Moskvins sent a copy of the *Credit Bureau* case to his attorneys, stating that "[a]ttached is [an] example of [a] recently won case that may be helpful in terms of [the] FTC['s] power to collect money." In addition, Moskvins subsequently forwarded his attorneys an email with the subject line: "**BREAKING: FTC Loses Authority to Collect Damages?**" Moskvins's email contained a link to a website that had posted an article entitled, "Seventh Circuit Drops Bomb on FTC," which stated "[m]ake no mistake. The FTC's remedial authority is now in doubt." The article also stated that "[t]he potential impact of this decision is significant and has potentially presented interesting opportunities for defendants facing FTC enforcement lawsuits." One of the Transact Pro Defendants' attorneys responded to Moskvins and stated: "[g]reat case, Mark. The Seventh Circuit's opinion creates a circuit split on monetary recovery, which will obviously be an important issue for us down the road." Moreover, the Transact Pro Defendants and their attorneys relied on the Seventh Circuit decision in *Credit Bureau* during the parties' mediation and subsequent settlement discussions to negotiate a favorable settlement because of the risk that the FTC might lose its authority to seek equitable monetary relief. Therefore, in light of the fact that the Transact Pro Defendants, and their attorneys, knew about the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b) and, indeed, used those challenges to negotiated a more favorable settlement, the Transact Pro Defendants are not entitled to relief

Initials of Deputy Clerk _sr_

under Rule 60(b)(6).[3]

In response, the Transact Pro Defendants argue that *Ackermann* and *Master Key* do not prevent this Court from applying the seven factor test set forth in *Phelps v. Alameida*, 569 F.3d 1120 (9th Cir. 2009), and applied in *Henson v. Fidelity National Financial, Inc.*, 943 F.3d 434 (9th Cir. 2019). Applying the *Phelps* factors, the Transact Pro Defendants argue that they are entitled to relief pursuant to Rule 60(b)(6). In *Phelps*, the Ninth Circuit considered six factors in determining whether relief under Rule 60(b)(6) was warranted: (1) "the nature of the intervening change in the law"; (2) the movant's "interest in pursuing relief"; (3) the parties' "reliance interest in the finality of the case"; (4) "the delay between the judgment and the Rule 60(b) motion"; (5) "the relationship between the original judgment and the change in the law"; and (6) "concerns of comity." *Phelps*, 569 F.3d at 1135-39. However, the Ninth Circuit cautioned that its discussion of the *Phelps* factors, which arose in the *habeas corpus* context, "was not meant to impose a rigid or exhaustive checklist, because Rule 60(b)(6) is a grand reservoir of equitable power, and it affords courts the discretion and power to vacate judgments whenever such action is appropriate to accomplish justice." *Id.* at 445 (*citing Phelps*, 569 F.3d at 1135) (internal quotation marks and alterations omitted). In addition, the Ninth Circuit held that, especially when "a district court is faced with applying [the *Phelps*] factors in an entirely new context, the court should assess how that different context might alter the calculus of the factors' application, and whether those factors adequately capture all of the relevant circumstances." *Id.* at 446. In other words, the Ninth Circuit requires courts to "consider all of the relevant circumstances surrounding the specific motion before the court in order to ensure that justice be done in light of all the facts." *Id.* at 440. Moreover, the Ninth Circuit cautioned that "a change in the controlling law can – but does not always – provide a sufficient basis for granting relief." *Id.* at 444 (holding that "[t]o assess a Rule 60(b)(6) motion predicated on an intervening change in the law, a district court must evaluate the circumstances surrounding the specific motion before the court" and that this "case-by-case inquiry requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts") (*citing Phelps*, 569 F.3d at 1132-33) (internal quotation marks and alterations omitted).

In this case, even assuming that the *Phelps* factors apply (and it is not clear that they do), those factors weigh heavily against finding that the Transact Pro Defendants have established "extraordinary circumstances" necessitating relief under Rule 60(b)(6). With respect to the first factor regarding nature of the intervening change in law, although the Transact Pro Defendants argue that the Supreme Court overturned "settled" precedent in *AMG*, it is not clear that the

---

[3] Although Moskvins submitted a declaration with his Motion stating that he "was unaware of any legal challenges to the FTC's monetary authority" when he chose to settle, Moskvins submitted a supplemental declaration with his Reply acknowledging his previous declaration was misleading and not accurate, claiming that, at the time he signed his previous declaration, he "did not have a ready recollection of legal aspects of events occurring in the case two years ago." According to Moskvins, his review of the FTC's Opposition and accompanying evidence had suddenly "refreshe[d] [his] recollection" that he had been aware of the Seventh Circuit's holding in *Credit Bureau* and that his attorneys had discussed that case in the Transact Pro Defendants' mediation brief and at the mediation.

Initials of Deputy Clerk __sr__

precedent was "settled" because a circuit split existed regarding the FTC's ability to seek equitable monetary relief pursuant to Section 13(b).  Indeed, Judge O'Scannlain stated in his concurrence in *FTC v. AMG Capital Management, LLC*, 910 F.3d 417. 429 (9th Cir. 2018), that the Ninth Circuit's decision to follow earlier precedent concluding that the FTC could recover equitable monetary relief pursuant to Section 13(b) was "unfortunate" and an "impermissible exercise of judicial creativity" that "contravenes the basic separation-of-powers principle that leaves to Congress the power to authorize (or to withhold) rights and remedies."  With respect to the second factor regarding pursuing relief and the third factor regarding the parties' reliance interest in the finality of the case, the Transact Pro Defendants were fully aware that a change in the law was possible, if not probable.  Despite this awareness, the Transact Pro Defendants made an informed decision to choose the certainty and finality of a comparatively favorable settlement, rather than to incur additional expenses and risk the possibility of a far greater monetary judgment if there was no change in the law.  The fourth factor regarding the delay between the judgment and the Rule 60(b) motion favors the Transact Pro Defendants because they filed their Rule 60(b) motion within a reasonable time after the Supreme Court's decision in *AMG*.  The fifth factor, which looks at the closeness of the relationship between the decision resulting in the original judgment and the subsequent decision that represents a change in the law, does not apply in this case because the original judgment was the result of a settlement.  Similarly, the sixth factor, the need for comity between the independently sovereign state and federal judiciaries, does not apply.

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(6).

## IV.    Conclusion

For all the foregoing reasons, Defendants' Motion is **DENIED**.

IT IS SO ORDERED.

Initials of Deputy Clerk   sr

Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:18-cv-09573-JFW (JPRx) |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RECEIVER'S MOTION FOR AUTHORIZATION TO ENGAGE CONTINGENT FEE COUNSEL** |
| v. | |
| APEX CAPITAL GROUP, LLC, et al., | |
| Defendants. | JUDGE: Hon. John F. Walter<br>CTRM: 7A<br>DATE: March 9, 2020<br>TIME: 1:30 p.m. |

Thomas W. McNamara, in his capacity as Court-appointed receiver
("Receiver"), respectfully requests for the reasons identified in this motion that the
Court authorize his retention of contingent-fee counsel to pursue a lawsuit against
Wells Fargo and Company ("Wells Fargo").

## I.   The Receiver Requests Authorization to Hire Contingent-fee Counsel

### A.   The Reasons for Hiring Contingent-fee Counsel

For some time, the Receiver and counsel have investigated potential
Receivership claims against Wells Fargo for its conduct in connection with the
"risk-free" trial scheme.  The investigation involved a review of documents in the
Receiver's possession, as well as documents subpoenaed from Wells Fargo.[1]  The
conduct that was discovered was troubling to say the least.  The Receiver believes
that the anticipated litigation against Wells Fargo is meritorious, and the potential
recovery for the Receivership Estate is significant.  But all litigation is uncertain.
It will be expensive, as the conduct occurred over several years and involved many
individuals and entities, and the case will likely be vigorously defended at all
stages.

The Receiver has made his assessment that viable claims exist which should
be vigorously pursued fully recognizing the potential costs to the Receivership
Estate that such litigation would require.  Because the litigation will likely be hard-
fought, expensive, and long, the Receiver has determined that the cost and risk of
pursuing litigation on an hourly fee basis would be prohibitive.  This caused the
Receiver to evaluate alternative fee arrangements, which would shift the risk away
from the Receivership Estate.  While a hybrid (reduced hourly rate and reduced
contingency rate) arrangement was considered, the Receiver ultimately concluded
that a pure contingency fee arrangement makes the most sense; a contingency fee
eliminates direct costs to the Receivership Estate because the significant

---

[1]  A declaration of receiver Thomas W. McNamara supporting this Motion is filed
under seal.

1  professional fees necessary to prosecute the cases would not be paid by the

2  Receivership Estate.  Attorney's fees would only be paid out of litigation

3  recoveries should the case be successfully settled or litigated.

4       The Receiver generally has the discretion to hire counsel as he deems

5  necessary.  *See* Preliminary Injunctions, XV. Duties and Authority of Receiver,

6  ECF No. 40 at 20; ECF No. 41 at 18 ("IT IS FURTHER ORDERED that the

7  Receiver is directed and authorized to accomplish the following: . . . F. "Choose,

8  engage, and employ attorneys, accountants, appraisers, and other independent

9  contractors and technical specialists, as the Receiver deems advisable or necessary

10  in the performance of duties and responsibilities under the authority granted by this

11  Order.").

12       However, it is common when a receiver intends to retain contingency

13  counsel to seek permission for the retention from the appointing court.  *See, e.g.*,

14  *FTC v. Triangle Media Corp., et al.*, Case No. 3:18-cv-01388-LAB, ECF No. 142

15  (S.D. Cal. Nov. 19, 2019); *SEC v. Capital Cove Bancorp, LLC, et al.*, Case No.

16  8:15-cv-00980-JLS, ECF No. 302 (C.D. Cal. Mar. 23, 2016); *SEC v. Diversified*

17  *Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R, ECF No. 264 (C.D. Cal.

18  Jan. 7, 2011); *SEC v. Ruderman, et al.*, Case No. 2:09-cv-02974-ODW, ECF No.

19  122 (C.D. Cal. Dec. 22, 2010).

20       Of particular relevance here, the Receiver notes that a few months before his

21  appointment in this case he was separately appointed as receiver in a case in the

22  Southern District of California which involved a "risk free" trial scheme very

23  similar to that used by the Apex Defendants.  *See FTC v. Triangle Media Corp., et*

24  *al.*, Case No. 3:18-cv-01388-LAB (S.D. Cal.) ("Triangle").  In both Apex and

25  Triangle, the defendants used Wells Fargo to open up dozens and dozens of

26  accounts through which consumer funds were passed.  In Triangle, the Receiver

27  recently sought and obtained the Court's permission to hire contingent-fee counsel

28  ///

---

to pursue a lawsuit against Wells Fargo.  *See* Triangle, ECF No. 142 (attached as Exhibit 1).

The Receiver and his counsel conducted parallel investigations of Wells Fargo's conduct in connection with the Apex and Triangle schemes.  After consulting with counsel, the Receiver believes that the claims against Wells Fargo in both the Apex and Triangle Receiverships should be pursued in the same litigation and brought by the same counsel, given the identity of interests and claims.

The Receiver has also concluded that the only way to pursue such litigation against Wells Fargo without harming the Receivership Estate would be on a contingent-fee basis.  The Receiver reached out to experienced contingency counsel to discuss possible claims that might be brought and the potential contours of litigation.  As a result of these discussions, the Receiver identified and has spoken on numerous occasions with partners at Glancy Prongay & Murray LLP, a national law firm based in Los Angeles with offices in New York and Berkeley that prosecutes class action cases and complex litigation in federal and state courts throughout the country.  As lead counsel or as a member of the Plaintiff's Counsel Executive Committees, the firm has recovered billions for its clients.

Glancy Prongay & Murray has spent months reviewing substantial materials regarding the potential case provided by the Receiver, and its lawyers have conducted their own independent investigation into the merits of a prospective litigation.  The firm has concluded that it is willing to pursue the litigation on behalf of the Receiver.  Given the firm's credentials (discussed above), the Receiver believes the firm is eminently qualified to represent the Receivership Estate's interest in the prospective litigation against Wells Fargo.

McNamara Smith professionals have dedicated substantial efforts over the last year working closely with the Receiver to understand the facts, identify various parties, and review voluminous transactions related to the potential litigation.

They are thus uniquely suited to assist in the prosecution of the litigation because of their in-depth understanding of the factual background and deep knowledge of the legal issues peculiar to receiverships.  McNamara Smith attorneys regularly represent fiduciaries, including receivers and monitors, in matters across the country, and they have worked with the Receiver here.  The firm is willing to continue on in collaboration with Glancy Prongay & Murray pursuant to a contingency fee arrangement.

**B.      The Proposed Terms of the Contingent Fee Agreement Are Reasonable**

The Receiver believes that the proposed arrangement is reasonable, especially in light of the agreement by counsel to advance litigation costs and thus remove any financial risk to the Receivership Estate.  The Receiver negotiated with Glancy Prongay & Murray for the costs of the litigation to be fronted by counsel, under the express condition that the Receivership Estate will only be responsible for the costs in the event that there is a recovery through settlement or judgment.  The Receiver believes that this is the most cost-effective approach and will also result in the greatest possible recovery for the Receivership Estate.

The Court's power to supervise an equity receivership and to determine the appropriate action to be taken in the receivership, including the retention and compensation of counsel, is extremely broad.  *See SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (district court has broad discretion to approve appropriate action to be taken in the administration of a receivership); *see also CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the [district] court's supervisory role and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership for the benefit of creditors.").

///

Courts in this Circuit have considered and approved contingent fee arrangements in order to compensate a receiver's counsel to recover assets for the receivership. There is no particular formula employed by the courts. *See e.g.*, *SEC v. Diversified Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R (C.D. Cal.) (district court approved contingent fee arrangement, including 25 percent of pre-suit recovery, 35 percent if settled up until 120 days before trial and 45 percent thereafter); *SEC v. Ruderman, et al.*, Case No. 2:09-cv-02974-ODW (C.D. Cal.) (approving contingency fee arrangement, 33 percent of recovery up to 60 days before trial, 40 percent after that date); *SEC v. Capital Cove Bancorp, LLC, et al.*, Case No. 8:15-cv-00980-JLS (C.D. Cal.) (approving contingency fee of between 25 and 40 percent, rate changing depending on timing and size of gross recoveries).

In *SEC v. JCS Enterprises, Inc., et al.*, Case No. 9:14-cv-80468-DMM, ECF Nos. 237 and 238 (S.D. Fla. Oct. 16, 2015), the district court approved a standard contingent fee arrangement for one counsel (25 percent of gross recoveries before summary judgment, and 30 percent after that date) and a hybrid contingent agreement for a second counsel ($200 per hour and 20 percent of gross recoveries). *See also SEC v. We the People, Inc. of the United States*, Case No. 2:13-cv-14050-JEM, ECF No. 100 (S.D. Fla. Mar. 14, 2014) (approving a 33.3 percent contingent fee).

Here, the proposed contingent fees fall well within the range of fees approved in other receivership cases. Notably, the proposed contingent fee arrangement is the same fee structure presented to Judge Burns when he recently authorized the engagement of contingent-fee counsel in the Triangle case in November of 2019. *See Triangle*, ECF No. 142 (authorizing receiver to engage contingency counsel on the terms proposed). The Glancy Prongay & Murray and McNamara Smith firms have agreed to act as counsel to the Receiver and to share a contingent fee equal to 28.5% of the gross recovery up until a ruling on summary

judgment, and 33.3% contingent fee on gross recovery received after a ruling on summary judgment.  Under this arrangement, the Receivership Estate will not be obligated to advance litigation costs, *e.g.*, court fees, discovery and expert costs.

The proposed contingent fees fall well within the range of fees approved in other receivership cases, and the Receiver believes that the proposed arrangement is reasonable, especially in light of the agreement by counsel to advance litigation costs and thus remove any financial risk to the Receivership Estate.

## II.   CONCLUSION

Based on the foregoing, I respectfully request that the Court grant the Receiver permission to engage contingency counsel to represent the Receiver, as identified above.

Dated:  February 4, 2020                   MCNAMARA SMITH LLP

By:    /s/ Edward Chang
Edward Chang
*Attorneys for Receiver,*
*Thomas W. McNamara*

## DECLARATION OF FLORENCE M. HOGAN
## PURSUANT TO 28 U.S.C. § 1746

I, Florence M. Hogan, hereby declare as follows:

1. I am a United States citizen over eighteen years of age. I am an investigator employed by the Federal Trade Commission ("FTC"). I have been employed by the FTC for over 18 years. My office address is One Bowling Green, Suite 318, New York, NY.

2. As an investigator, my duties include investigating individuals and companies that are suspected of engaging in unfair or deceptive acts or practices in violation of the FTC Act and any other laws or rules that the FTC enforces. I am also custodian of documents and records that the FTC obtains during the course of investigations to which I am assigned.

3. In the course of my employment, I participated in an investigation of Apex Capital Group, LLC ("Apex Capital Group"), Capstone Capital Solutions Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Omni Group Limited, Rendezvous IT Limited, Sky Blue Media Limited, and Tactic Solutions Limited (together, the "Corporate Defendants"), as well as David Barnett and Phillip Peikos (altogether, "Defendants"). In the course of this investigation, I have acquired personal knowledge and information about the facts stated herein, and, if called, I would testify to the same.

### CORPORATE RECORDS OF U.S. DEFENDANTS
### Apex Capital Group, LLC

4. Attached as **Hogan Exhibit A** are true and correct copies of select corporate filings (with certain identifying information redacted) of Apex Capital Group, including:

1

applications, signature card documents, monthly account statements, and check images.

28. According to the records Citibank produced to the FTC, Phillip Peikos and David Barnett are co-signatories on a bank account in the name of Apex Capital Group ending in x9275. A true and correct copy of excerpts from the account opening documents, with certain identifying information redacted, is attached as **Hogan Exhibit V**.

29. Citibank also produced to the FTC checks associated with the Apex Capital Group account ending in x9275. True and correct copies of some of these checks, with certain identifying information redacted, are attached as **Hogan Exhibit W**.

30. Citibank also produced to the FTC statements and wire transfer records associated with the Apex Capital Group account ending in x9275. True and correct copies of some of these statements and wire transfer records, with certain identifying information redacted, are attached as **Hogan Exhibit X**.

31. Citibank also produced to the FTC account opening documents for a bank account in the name of NextG Payments, LLC ("NextG Payments"), ending in x6446. A true and correct copy of excerpts from these account opening documents, with certain identifying information redacted, is attached as **Hogan Exhibit Y**. Phillip Peikos and Gina Marie Manfredi Peikos are co-signatories on this account. The Business Deposit Account Application describes NextG Payments' business as: "Company holds investments belonging to owner of business." The application later states that Phillip Peikos is the Managing Member and 100% owner of NextG Payments.

32. The FTC issued CIDs to Wells Fargo Bank, N.A. ("Wells Fargo") for company bank records related to the Defendants. Wells Fargo responded to the CIDs by producing records to the FTC, which were received on or about December 22, 2017, with supplemental productions thereafter. Wells Fargo

Ex. 18
FTC-000173

**FTCSER-134**

produced a business records declaration dated December 22, 2017 signed by a subpoena processing representative in Wells Fargo's Summons and Subpoena Department. Attached as **Hogan Exhibit Z** is a true and correct copy of this business records declaration, with certain identifying information redacted.

33. In response to a CID, on or about December 22, 2017, and supplemented on later dates, Wells Fargo produced to the FTC records for certain bank accounts identified in the CID by either the corporate account holder, account number, or signer on the account, including David Barnett, Phillip Peikos, and Raul Camacho. The records produced by Wells Fargo include account applications, signature card documents, monthly account statements, and check images.

34. According to the records produced by Wells Fargo to the FTC, Phillip Peikos, David Barnett, and Raul Camacho are the only authorized signers for the following bank accounts:[1]

| No. | Wells Fargo Acct. Name | Acct. Ending in | Phillip Peikos (Auth. Signer) | David Barnett (Auth. Signer) | Raul Camacho (Auth. Signer) |
|-----|------------------------|-----------------|-------------------------------|------------------------------|-----------------------------|
| 1.  | Alpha Group LLC        | x2069 | ✓ | ✓ | |
| 2.  | Based Capital LLC      | x2410 | ✓ | ✓ | |
| 3.  | Bold Media LLC         | x7537 |   | ✓ | |
| 4.  | Capstone Capital, LLC  | x2628 |   | ✓ | |
| 5.  | Cascade Canyon LLC     | x2944 | ✓ |   | ✓ |
| 6.  | Cornice Group, LLC     | x4982 |   |   | ✓ |
| 7.  | Crest Capital LLC      | x2636 |   | ✓ | |
| 8.  | Energy Tomorrow LLC    | x2644 |   | ✓ | |
| 9.  | Fortune Ventures LLC   | x2436 | ✓ | ✓ | |
| 10. | Future Holdings LLC    | x2444 | ✓ | ✓ | |
| 11. | Grand Assets LLC       | x7594 | ✓ | ✓ | |
| 12. | Horizon Media, LLC     | x8305 | ✓ |   | ✓ |
| 13. | Interzoom, LLC         | x3074 | ✓ |   | ✓ |
| 14. | Lead Blast LLC         | x3318 | ✓ | ✓ | |
| 15. | Lion Capital LLC       | x2051 |   | ✓ | |
| 16. | Macro Group LLC        | x2077 | ✓ | ✓ | |

[1] The chart included in this paragraph summarizes data contained in Wells Fargo's Business Account Applications and, where present, Addenda to Certificate of Authority, as data is too voluminous to be conveniently examined in court. Nevertheless, duplicates are available for review upon request.

16

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing supplemental excerpts of record using the appellate CM/ECF system on October 11, 2022. All participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ *Michael D. Bergman*
Michael D. Bergman
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580